JUDGE FORREST                    12 CIV 6792

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

RANDOM VENTURES, INC., KEVIN        : No.
BRITTINGHAM, and LYNSEY THOMPSON,
                                    : ECF Case
                 Plaintiffs,
                                    : **COMPLAINT**
        - against -                 :
                                    :
ADVANCED ARMAMENT CORP., LLC, and   :
REMINGTON ARMS COMPANY, LLC,        :
                                    :
                 Defendants.        :

------------------------------------ x

RECEIVED
SEP 07 2012
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs Random Ventures, Inc. (formerly known as Advanced Armament Corp.;
"Random-AAC"), Kevin Brittingham ("Brittingham"), and Lynsey Thompson ("Thompson";
and collectively, "Plaintiffs"), by their undersigned counsel, as and for their complaint against
Advanced Armament Corp., LLC (formerly known as AAC Acquisitions, LLC; "AAC") and
Remington Arms Company, LLC (formerly known as Remington Arms Company, Inc.;
"Remington"; and collectively with AAC, "Defendants"), allege upon knowledge as to their own
acts and status and upon information and belief as to all other matters as follows:

## NATURE OF CLAIMS

1.      This action arises out of the wrongful termination of Brittingham's and
Thompson's employment by AAC so as to avoid paying substantial compensation to which they
were entitled.

2.      On or about October 2, 2009, AAC purchased substantially all of the assets of
Brittingham's company, Random-AAC, for an agreed upon purchase price. AAC paid Random-
AAC a portion of the purchase price upon closing. The parties also agreed that AAC would pay
Random-AAC and Brittingham substantial deferred payments in connection with the acquisition.

3.     In addition, the parties agreed that AAC would continue to employ Brittingham and Thompson at least through March 31, 2015.  If AAC terminated Brittingham for cause, AAC was not obligated to pay either Random-AAC or Brittingham the substantial deferred payments to which they were entitled.  If AAC terminated Thompson for cause, AAC was not obligated to pay Thompson her salary for the remainder of the term or any other benefits or amounts to which she was otherwise entitled.

4.     AAC and the parent companies that control AAC – Remington, Freedom Group, Inc. ("Freedom Group"), and Cerberus Capital Management, L.P. ("Cerberus") (collectively, the "Parent Companies") – sought to avoid paying Random-AAC and Brittingham the substantial deferred payments owed to them in accordance with the parties' agreements, and to cheat Brittingham out of the benefit of his bargain when he sold the assets of Random-AAC.  AAC and its Parent Companies also sought to avoid paying substantial amounts owed to Thompson in connection with her employment.

5.     Upon information and belief, it is Cerberus' standard business practice to acquire a company and subsequently remove its founders and/or former executives in an attempt to avoid payment of millions owed under the acquisition, sale, and employment documents.  At least three other lawsuits were brought in this and other courts involving dramatically similar wrongful conduct by a Cerberus-owned company.  See, e.g., York v. Dyncorp Int'l, LLC and Steven F. Gaffney, Circuit Court of Fairfax County, VA; Nolan v. Dyncorp Int'l, LLC, (Sup. Ct. N.Y. County, Index No. 651250/2011); and Casals v. Dyncorp Int'l, LLC, (Sup. Ct. N.Y., Index No. 652684/2011).

6.     On December 21, 2011, in bad faith and in material breach of the parties' agreements, AAC purported to terminate Brittingham's employment for cause.  Similarly, on

January 24, 2012, AAC, in bad faith and in material breach of the parties' agreement, further sought to avoid its payment obligations by purporting to terminate Thompson's employment for cause.

7.      In this action, Plaintiffs assert claims for breach of contract, anticipatory repudiation, and breach of the implied covenant of good faith and fair dealing against AAC. Plaintiffs also assert claims against Remington as guarantor of AAC's duties and obligations.  In addition, Plaintiffs seek a declaratory judgment holding that the restrictive covenants to which Plaintiffs are subject are unenforceable as a matter of law, and injunctive relief to maintain the status quo and to prevent enforcement of those covenants.

## PARTIES

8.      Random-AAC is a corporation organized and existing under the laws of the State of Georgia, with its corporate headquarters located at 2168 Town Manor Court, Dacula, Georgia 30019.

9.      Brittingham is a natural person and citizen of Georgia, residing at 2168 Town Manor Court, Dacula, Georgia 30019.

10.      Thompson is a natural person and citizen of Georgia, residing at 2289 Alnwick Drive, Duluth, Georgia 30096.

11.      AAC is a Delaware limited liability company that is wholly-owned by Remington.

12.      Remington is a Delaware limited liability company that is wholly-owned by FGI Operating Company, LLC, which is wholly-owned by FGI Holding Company, LLC, which is wholly-owned by Freedom Group, Inc., a Delaware corporation with its principal place of

business in North Carolina. Remington was formerly known as Remington Arms Company, Inc. until it was converted to a limited liability company on or about July 1, 2011.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

14.     Venue is proper in this court in that the relevant agreements provide that this Court shall be the exclusive jurisdiction for suits arising out of or relating to the parties' agreements or any transactions contemplated thereby.

## STATEMENT OF FACTS

### Purchase Agreement and Goodwill Agreement

15.     In 1994, Brittingham founded Advanced Armament Corp. (referred to herein as "Random-AAC"). Brittingham was, at all times, the sole shareholder of Random-AAC.

16.     Through Brittingham's efforts and dedication, Random-AAC grew from a small one-man enterprise to a leader in the design, manufacture, and sale of suppressors, or "silencers," in the military market and U.S. commercial market. In and around 2009, Random-AAC experienced growth as a result of the U.S. military's interest in purchasing silencers, including those manufactured by Random-AAC. Consequently, Random-AAC became one of the largest silencer manufacturers in the United States.

17.     As founder and leader of Random-AAC, Brittingham added tremendous value to the company's business. During the first 15 years of the business, Brittingham was responsible for creating and developing personal goodwill and other intangibles that contributed to Random-AAC's success. For example, Brittingham developed key relationships with government officials

responsible for entering into military contracts, expertise in product concept and design, and advanced knowledge of military weapons requirements, including how to meet such requirements.

18.     In or around March 2009, Freedom Group and Cerberus executives approached Brittingham about their desire to purchase Random-AAC.  At that time, neither Remington nor Freedom Group manufactured silencers such as the kind Random-AAC sold to the military. Upon information and belief, the decision by Cerberus, Freedom Group, and Remington to purchase Random-AAC stemmed from the desire to better compete for contracts in the military market.

19.     Because Brittingham devoted 15 years of his life to Random-AAC's success, it was extremely important to him that the terms of the acquisition fairly reflected Random-AAC's value and compensated him for his ongoing services to the company.

20.     On or around September 9, 2009, the Parent Companies formed AAC as a subsidiary of Remington for the purpose of acquiring Random-AAC.

21.     On October 2, 2009, AAC purchased substantially all of the assets of Random-AAC (the "Purchase") pursuant to that certain Asset Purchase Agreement by and among AAC, Random-AAC, and Brittingham, dated October 2, 2009 (the "Purchase Agreement").

22.     The Purchase Agreement required AAC to pay Random-AAC Ten Million One Hundred Sixty Thousand Dollars ($10,160,000) (the "Purchase Price") upon the closing of the Purchase Agreement. Remington unconditionally and irrevocably guaranteed, as primary obligor, AAC's obligation to pay Random-AAC the Purchase Price and guaranteed each and every covenant, agreement, and obligation to be performed or observed by AAC.

23.     To further induce Brittingham to agree to the Purchase, the Purchase Agreement also provided that AAC would pay Random-AAC a deferred payment of Four Million Dollars ($4,000,000) on or before March 31, 2015 in accordance with the terms of the Purchase Agreement. Section 1.8 of the Purchase Agreement provides, in relevant part:

> On or prior to March 31, 2015, provided that (i) on that date Shareholder [Brittingham] (A) is an employee of Buyer or an Affiliate of Buyer, (B) is not an employee of Buyer or an Affiliate of Buyer by reason of death or permanent disability or (C) is not an employee of Buyer or an Affiliate of Buyer as a result of termination of employment by Buyer or an Affiliate of Buyer other than for "cause" or termination of employment by Shareholder for "good reason", in each case as defined in the employment agreement to be entered into by Buyer and Shareholder pursuant to Section 5.5(e) and (ii) the Business achieves a Cumulative Adjusted EBITDA of twenty million dollars ($20,000,000), Buyer shall pay to Seller, or its permitted successor and assigns, four million dollars ($4,000,000) (the "EBITDA Contingent Payment")
> . . . .

24.     Thus, AAC was obligated to pay Random-AAC the EBITDA Contingent Payment totaling Four Million Dollars ($4,000,000) as long as: (1) AAC did not terminate Brittingham's employment for "Cause" prior to March 31, 2015, and (2) AAC achieved a "Cumulative Adjusted EBITDA" of Twenty Million Dollars ($20,000,000) as calculated in accordance with the Purchase Agreement.   Remington unconditionally and irrevocably guaranteed, as primary obligor, payment of the EBITDA Contingent Payment to Random-AAC.

25.     The Purchase Agreement also stated that AAC agreed to indemnify Random-AAC from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Random-AAC in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the Purchase Agreement.

26.     The Purchase Agreement also contained restrictive covenants that prohibit Brittingham and Random-AAC from engaging in a wide range of activities for a period of five (5) years following the Purchase (collectively, the "APA Restrictive Covenants").   Such prohibited activities include, but are not limited to, engaging in the firearms business in any capacity; being employed by, advising, or owning any interest in any entity engaged in business activities similar to AAC or any of its affiliates (including Remington, Freedom Group, and Cerberus); soliciting any employees, customers, or suppliers of AAC or any of its affiliates (including Remington, Freedom Group, and Cerberus), and disclosing the confidential information of AAC or any of its affiliates (including Remington, Freedom Group, and Cerberus).  None of the APA Restrictive Covenants contain a geographical limitation.

27.     Stephen P. Jackson executed the Purchase Agreement as Chief Financial Officer of AAC and Chief Financial Officer of Remington as guarantor.  At the time of such execution, Mr. Jackson was also the Chief Financial Officer and Treasurer of Freedom Group.

28.     Pursuant to the Purchase Agreement, AAC and Brittingham also executed the Personal Goodwill Acquisition Agreement whereby AAC purchased from Brittingham the personal goodwill and other intangibles owned by Brittingham and used in connection with Random-AAC's business (the "Goodwill Agreement").

29.     To induce Brittingham to agree to the Purchase and to compensate Brittingham for the personal goodwill and other intangibles owned by Brittingham, the Goodwill Agreement provided that AAC would pay Brittingham a deferred payment of Four Million Dollars ($4,000,000) on or before January 2, 2015 in accordance with the terms of the Goodwill Agreement (the "Goodwill Payment").  Section 2 of the Goodwill Agreement provides, in relevant part:

Buyer agrees that, on or prior to January 2, 2015 (such date, the "***Payment Date***"), provided that on that date Seller [Brittingham] (i) is an employee of Buyer or an Affiliate of Buyer, (ii) is not an employee of Buyer or an Affiliate of Buyer by reason of death or permanent disability or (iii) is not an employee of Buyer or an Affiliate of Buyer as a result of termination of employment by Buyer or an Affiliate of Buyer other than for "cause" or termination of employment by Seller for "good reason", in each case as defined in the Employment Agreement to be entered into by Buyer and Seller pursuant to <u>Section 5.5(e)</u> of the Asset Purchase Agreement (each of the foregoing, an "***Employment Condition***"), Buyer shall pay to Seller four million dollars ($4,000,000) (the "***Purchase Price***") in cash by wire transfer ….

30.    Accordingly, AAC was obligated to pay Brittingham the Goodwill Payment totaling Four Million Dollars ($4,000,000) as long as AAC did not terminate Brittingham's employment for "Cause" prior to January 2, 2015.

31.    In addition, pursuant to the Goodwill Agreement, AAC agreed to indemnify Brittingham from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Brittingham in connection with or arising from any failure by AAC to perform any of its covenants or obligations contained in the Goodwill Agreement.

32.    To induce Random-AAC and Brittingham to agree to enter into the Goodwill Agreement, Remington also agreed, pursuant to the Purchase Agreement, to unconditionally and irrevocably guarantee, as primary obligor, all of AAC's duties, liabilities, and obligations arising under or pursuant to the Goodwill Agreement.

33.    Mr. Jackson executed the Goodwill Agreement as Chief Financial Officer of AAC.  At such time, Mr. Jackson was also the Chief Financial Officer of Remington and the Chief Financial Officer and Treasurer of Freedom Group.

34.     Thus, as a result of negotiations between Brittingham and Freedom Group and Cerberus, Brittingham expected to receive, as sole shareholder of Random-AAC, a total of Eighteen Million One Hundred Sixty Thousand Dollars ($18,160,000) in connection with the Purchase. Brittingham agreed to such amount because he believed it fairly reflected Random-AAC's value and his contributions to the company.

### Brittingham Employment Agreement

35.     The Parent Companies recognized that, as the leader of Random-AAC, Brittingham had developed valuable knowledge and personal relationships with key players in the firearms industry, including government officials responsible for entering into military contracts. Accordingly, the parties agreed that Brittingham would serve as President of AAC following the Purchase.

36.     Pursuant to the Purchase Agreement, Brittingham and AAC executed an Employment Agreement providing that Brittingham would serve as President of AAC through March 31, 2015 (the "Brittingham Employment Agreement").

37.     Pursuant to the Brittingham Employment Agreement, Brittingham reported to Freedom Group's Vice President, Global Military Products Division ("FGI VP-GMPD") or such other person designated by the FGI VP-GMPD. During his entire employment with AAC, Brittingham reported to the FGI VP-GMPD, Jason Schauble.

38.     The Brittingham Employment Agreement provided that Brittingham would receive a base salary of $250,000, an annual bonus, reimbursement of business expenses, and other benefits.

39.     The Brittingham Employment Agreement provided that AAC may terminate Brittingham's employment with or without "Cause," and defined "Cause" as:

(A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of, or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft; (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties; (C) actions by the Executive involving embezzlement, theft, sexual harassment, discrimination, fraud or other acts of a criminal nature by the Executive in his dealings with the Company or its employees or representative; (D) the Executive's continued failure to perform his substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period; or (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company.

40.     The Brittingham Employment Agreement also contained restrictive covenants prohibiting Brittingham from engaging in a wide range of activities for a period of two (2) years following the termination of his employment (collectively, the "Brittingham Restrictive Covenants"). Such prohibited activities included, but were not limited to, engaging in, or being involved in any capacity with, any business competitive with AAC throughout North America; soliciting or hiring any employees of AAC, its subsidiaries, or affiliates (including employees of Remington, Freedom Group, and Cerberus); interfering with prospective relationships between AAC, its subsidiaries, or affiliates (including Remington, Freedom Group, and Cerberus) and any of their current or prospective customers, suppliers, or employees, and disclosing confidential information of AAC, its subsidiaries, or affiliates (including Remington, Freedom Group, and Cerberus).

41.     The Brittingham Employment Agreement provided that it could only be amended or modified in writing signed by both parties.

42.     Mr. Jackson executed the Brittingham Employment Agreement as Chief Financial Officer of AAC.  At such time, Mr. Jackson was also the Chief Financial Officer of Remington and the Chief Financial Officer and Treasurer of Freedom Group.

### AAC's Business

43.     Following the Purchase, Brittingham continued to lead AAC in the design, manufacture, and sale of silencers in the U.S. commercial and military markets.   Similar to Random-AAC's business prior to the Purchase, AAC devoted a large part of its business to the research and development of new firearm components.  Accordingly, it was the nature of such business and usual and customary for AAC's facility to contain a very large number of silencers, firearms, and other firearm components on the premises.

44.     Upon information and belief, following the Purchase, Cerberus, Freedom Group, and Remington exercised complete domination over AAC's business decisions.  Executives from Cerberus and Freedom Group (including then chief executive of Cerberus Operation and Advisory Company, LLC and Freedom Group, Robert Nardelli) participated extensively in AAC's operations, including conducting regular meetings with AAC.  In addition, Brittingham – the President of ACC – reported directly to an executive of Freedom Group, Mr. Schauble.

45.     In or around October or November 2010, Brittingham had a disagreement with the then-General Counsel of Freedom Group concerning an antique silencer located on AAC's premises.  Subsequently, Mr. Nardelli and Freedom Group's General Counsel decided to suspend Brittingham for one month. During Brittingham's suspension, he had no access to AAC's business.

46.     Upon information and belief, during Brittingham's suspension, executives of the Parent Companies decided to continue Brittingham's employment with AAC because they recognized Brittingham's value to the business, his personal relationships in the industry, his expertise in product design, and his ability to procure military contracts on behalf of AAC, including a very large contract then under negotiation with the military.

47.     On or around January 9, 2011, Brittingham's suspension ended.   Upon Brittingham's return to work, Brittingham continued to be responsible for the development, sale, and marketing of AAC's products, as well as customer relations, under Mr. Schauble's supervision.  However, Brittingham was no longer responsible for managing AAC's compliance program.

48.     Upon Brittingham's return from suspension, AAC did not implement any new compliance policies or modify any compliance practices in effect prior to Brittingham's suspension.

### The Purported Amended Brittingham Agreement

49.     On or around January 9, 2011, AAC presented Brittingham with a proposed amendment to the Brittingham Employment Agreement (the "Proposed Amended Brittingham Agreement").

50.     Pursuant to the Proposed Amended Brittingham Agreement, Brittingham was to serve as Founder of AAC through March 31, 2015, and would continue to report to Freedom Group's Vice President of Global Military Products Division, Mr. Schauble, or such other person designated by Mr. Schauble.

51.    The Proposed Amended Brittingham Agreement would reduce Brittingham's

salary to $200,000 and provide for annual bonus, reimbursement of business expenses, and other

benefits.

52.    The Proposed Amended Brittingham Agreement also provided that AAC may

terminate Brittingham's employment with or without "Cause," and defined "Cause" as:

> (A) if the Executive is indicted (which indictment is not dismissed
> within sixty (60) days and in the reasonable good-faith
> determination of the Board of Directors of the Company Executive
> has committed the actions alleged in the indictment), convicted of,
> or pleads guilty or no contest to, a felony or any crime involving
> moral turpitude, dishonesty or theft; (B) material failure by the
> Executive to comply with applicable laws or governmental
> regulations with respect to the Company's operations or the
> performance of his duties; (C) actions by the Executive involving
> embezzlement, theft, sexual harassment, discrimination, fraud or
> other acts of a criminal nature by the Executive in his dealings with
> the Company or its employees or representative; (D) the
> Executive's continued failure to perform his substantial job
> functions within thirty (30) days following written notice from the
> Company of the occurrence of any such failure, if such failure is
> not cured within such thirty (30) day period; (E) the Executive's
> material violation of any written policy of the Company within
> thirty (30) days following written notice from the Company of the
> occurrence of such violation, if such violation is not cured within
> such thirty (30) day period; or (F) the Executive's failure to fully
> cooperate in any investigation or audit of the Company or its
> affiliates, in each case as reasonably determined by the Board of
> Directors of the Company.  Additionally, for the twelve (12) month
> period starting on the Effective Date and ending on January 9,
> 2012 (the "Probationary Period") Cause shall be further defined to
> include (X) ANY violation by the Executive of the Company's
> compliance policies and (Y) Executive's failure to attend and
> complete all Company required and mandated compliance and
> policy training during the Probationary Period.

53.    The Proposed Amended Brittingham Agreement also contained restrictive

covenants identical to the restrictive covenants in the Brittingham Employment Agreement (such

covenants also referred to as the "Brittingham Restrictive Covenants").

54.     Brittingham and AAC intended and understood that the Proposed Amended Brittingham Agreement needed to be formally executed by both parties to take effect.

55.     Brittingham rejected the Proposed Amended Brittingham Agreement and neither he nor AAC executed it.  Accordingly, the initial Brittingham Employment Agreement remained in full force and effect.

## Brittingham's Termination

56.     Between January 9, 2011 and December 21, 2011, Brittingham's employment with AAC continued without incident.  At no time during this time period did anyone, including Mr. Schauble, discipline or counsel Brittingham for, or speak with him about, willfully refusing to comply with the laws and regulations concerning AAC's operations; actively attempting to undermine AAC's compliance initiatives; or violating company policy, the terms of an alleged probationary period, or the terms of his employment documents.

57.     In September 2011, Freedom Group executives conducted a compliance audit of AAC's premises.  Brittingham was neither counseled nor disciplined following the audit.

58.     On September 29, 2011, AAC executed a contract with the federal government which would result in $14 million additional revenue to AAC.  Because of his personal relationships and substantial experience dealing with military contracts, Brittingham was the key person who negotiated and secured such contract on behalf of AAC.

59.     The revenue AAC received, or would receive, under the $14 million government contract that Brittingham secured for AAC would move AAC closer to the targeted $20 million "Cumulative Adjusted EBITDA" that AAC needed to achieve in order for Random-AAC to receive the EBITDA Contingent Payment of $4 million under the Purchase Agreement.  (See ¶ 23 above.)

60.     Upon information and belief, in October 2011, Freedom Group executives conducted another compliance audit of AAC's premises.   Again, Brittingham was neither counseled nor disciplined following the audit.

61.     On October 6, 2011, Remington issued a press release announcing AAC's procurement of the $14 million government contract.

62.     Upon information and belief, once Brittingham secured the $14 million government contract for AAC, executives of Cerberus, Freedom Group, and Remington decided to terminate Brittingham's employment purportedly for "Cause" so as to avoid paying Random-AAC and Brittingham the substantial deferred payments to which they were entitled – and for which Random-AAC and Brittingham had negotiated in good faith – under the parties' respective agreements. Upon information and belief, such practice was consistent with the business strategy of other Cerberus-owned companies following similar business acquisitions.

63.     Upon information and belief, Mr. Schauble recognized Defendants' dishonest and unfair treatment of Brittingham and, therefore, refused to terminate Brittingham's employment for Cause.   Upon information and belief, Mr. Schauble resigned from his employment with Freedom Group shortly thereafter.

64.     On or around December 21, 2011, less than two months after Brittingham secured AAC's $14 million government contract, Brittingham received a hand-delivered letter from Scott Blackwell, the Chief Sales and Marketing Officer of Freedom Group (not Mr. Schauble, who had been Brittingham's boss) terminating Brittingham's employment immediately (the "Brittingham Termination Letter").

65.     On the same day Brittingham received the Brittingham Termination Letter, Defendants sent five armed security guards to escort him off AAC premises.

66.   The Brittingham Termination Letter claimed that AAC was terminating Brittingham's employment for Cause.  The Brittingham Termination Letter claimed, for the first time, that Brittingham demonstrated "a pattern of willfully refusing to comply with the statutes which govern AAC's operations," "actively attempted to undermine the Company's compliance initiatives," and violated "Company policy, the terms of [his] probation, and the terms of [his] employment documents."   In addition, the Brittingham Termination Letter summarized Brittingham's post-termination obligations under the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

67.   The allegations in the Brittingham Termination Letter were patently false.

68.   AAC had no grounds to terminate Brittingham's employment for "Cause."

69.   AAC's purported notice of termination for Cause was a transparent attempt by Cerberus, Freedom Group, Remington, and AAC to cheat Brittingham out of the rights and benefits of the parties' respective agreements.

70.   Beginning in January 2012, Brittingham's counsel repeatedly requested that counsel for AAC and the Parent Companies specify the AAC policies and procedures Brittingham allegedly violated, the compliance initiatives Brittingham allegedly attempted to undermine, and the facts allegedly showing that Brittingham violated applicable law.  To date, neither AAC nor any of the Parent Companies have provided this information.

71.   Upon termination of Brittingham's employment, AAC also failed to pay him for accrued vacation that remained unused as of the date of his termination, as well as unreimbursed business expenses Brittingham incurred during his employment.

72.   As a result of the restrictive covenants contained in the parties' agreements, Brittingham is purportedly prohibited from being associated with the firearms industry, as well

as any industry in which AAC's affiliates (i.e., Remington, Freedom Group, and Cerberus) are engaged, anywhere in the world until October 2014. Yet Brittingham is not receiving any compensation during such time because AAC wrongfully purported to terminate his employment for Cause.

73.     From the date of the Purchase through Brittingham's termination, AAC remained a profitable enterprise whose earnings were fast approaching the targeted $20 million "Cumulative Adjusted EBITDA" that entitled Random-AAC to receive the EBITDA Contingent Payment of $4 million under the Purchase Agreement.

**Thompson Employment Agreement**

74.     Thompson began working for Random-AAC in 2004 and remained employed at the time of the Purchase.

75.     The Parent Companies recognized that Thompson was a key employee of Random-AAC. Therefore, it was agreed that AAC would continue to employ Thompson following the Purchase.

76.     Pursuant to the Purchase Agreement, Thompson and AAC executed an Employment Agreement providing that Thompson would serve as Business Manager of AAC through March 31, 2015 (the "Thompson Employment Agreement"). The Thompson Employment Agreement provided that Thompson would receive a base salary of $100,000, an annual bonus, reimbursement of business expenses, and other benefits.

77.     The Thompson Employment Agreement provided that AAC may terminate Thompson's employment with or without "Cause," and defined "Cause" as:

> (A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of,

or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft; (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of her duties; (C) actions by the Executive involving embezzlement, theft, sexual harassment, discrimination, fraud or other acts of a criminal nature by the Executive in her dealings with the Company or its employees or representative; (D) the Executive's continued failure to perform her substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period; or (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company.

78.     The Thompson Employment Agreement also contained restrictive covenants prohibiting Thompson from engaging in a wide range of activities for a period of two (2) years following the termination of her employment (collectively, the "Thompson Restrictive Covenants"). Such prohibited activities included, but were not limited to, engaging in, or being involved in any capacity with, any business competitive with AAC throughout North America; soliciting or hiring any employees of AAC, its subsidiaries, or affiliates (including employees of Remington, Freedom Group, and Cerberus); interfering with prospective relationships between AAC, its subsidiaries, or affiliates (including Remington, Freedom Group, and Cerberus) and any of their current or prospective customers, suppliers, or employees, and disclosing confidential information of AAC, its subsidiaries, or affiliates (including Remington, Freedom Group, and Cerberus).

79.     The Thompson Employment Agreement provided that it could only be amended or modified in writing signed by both parties.

80.    Mr. Jackson executed the Thompson Employment Agreement as Chief Financial Officer of AAC.  At such time, Mr. Jackson was also the Chief Financial Officer of Remington and the Chief Financial Officer and Treasurer of Freedom Group.

### The Purported Amended Thompson Agreement

81.    In or around December 2010, AAC suspended Thompson for approximately one month as a result of the disagreement between Brittingham and the then-General Counsel of Freedom Group.

82.    Upon information and belief, during Thompson's suspension, executives of the Parent Companies decided to continue Thompson's employment with AAC because they recognized Thompson's value to the business.

83.    On or around January 9, 2011, Thompson's suspension ended.  On or around the same date, AAC presented Thompson with the First Amended and Restated Employment Agreement (the "Proposed Amended Thompson Agreement").

84.    Pursuant to the Proposed Amended Thompson Agreement, Thompson was to serve as Plant Manager of AAC through March 31, 2015 and would report to Freedom Group's Vice President of Global Military Products Division, Mr. Schauble, or such other person designated by Mr. Schauble.

85.    The Proposed Amended Thompson Agreement would reduce Thompson's salary to $98,000 and provide for an annual bonus, reimbursement of business expenses, and other benefits.

86.    The Proposed Amended Thompson Agreement also provided that AAC may terminate Thompson's employment with or without "Cause," and defined "Cause" as:

> (A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith

determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of, or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft; (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of her duties; (C) actions by the Executive involving embezzlement, theft, sexual harassment, discrimination, fraud or other acts of a criminal nature by the Executive in her dealings with the Company or its employees or representative; (D) the Executive's continued failure to perform her substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period; or (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company. Additionally, for the twelve (12) month period starting on the Effective Date and ending on January 9, 2012 (the "Probationary Period") Cause shall be further defined to include) [sic] ANY violation by the Executive of the Company's compliance policies and (Y) Executive's failure to attend and complete all Company required and mandated compliance and policy training during the Probationary Period.

87.     The Proposed Amended Thompson Agreement also contained restrictive covenants identical to the restrictive covenants in the Thompson Employment Agreement (such covenants also referred to as the "Thompson Restrictive Covenants").

88.     Thompson and AAC intended and understood that the Proposed Amended Thompson Agreement needed to be formally executed by both parties to take effect.

89.     AAC never executed the Proposed Amended Thompson Agreement. Accordingly, the initial Thompson Employment Agreement remained in full force and effect.

**Thompson's Termination**

90.     Between January 9, 2011 and January 24, 2012, Thompson's employment with AAC continued without incident.  At no time during this time period did anyone, including Mr. Schauble, discipline or counsel Thompson for any reason, including, but not limited to, any failure to cooperate in company investigations or any violation of company policy and/or her employment documents.

91.     Approximately one week after AAC terminated Brittingham's employment, counsel for AAC and the Parent Companies purportedly conducted an investigation of Brittingham.  As part of this investigation, counsel for AAC and the Parent Companies, Dana Rust, interrogated Thompson.  In the beginning of such interrogation, Thompson notified Rust that she would be tape recording the interrogation.  Mr. Rust chose not to tape record the interrogation.

92.     During the interrogation, Thompson answered all of Mr. Rust's questions to the best of her ability.

93.     At the end of the interrogation, Mr. Rust asked that Thompson provide her with a copy of the tape recording.  Shortly afterwards, Thompson and Mr. Rust discussed Thompson's suggestion to send the recording to a third party.  Mr. Rust agreed to respond to Thompson's suggestion, but never did so.

94.     On or around January 24, 2012, Thompson received a letter from a Freedom Group employee, John Day, terminating Thompson's employment (the "Thompson Termination Letter").

95.     The Thompson Termination Letter claimed that AAC was terminating Thompson's employment for Cause.  The Thompson Termination Letter claimed, for the first

time, that Thompson "refused to cooperate in company investigations" and violated "Company policy and the terms of [her] employment documents." In addition, the Thompson Termination Letter summarized Thompson's post-termination obligations under the Thompson Restrictive Covenants.

96.     The allegations in the Thompson Termination Letter are patently false.

97.     AAC had no grounds to terminate Thompson's employment for "Cause."

98.     AAC's purported notice of termination for Cause was a transparent attempt by Cerberus, Freedom Group, Remington, and AAC to cheat Thompson out of the rights and benefits under the parties' agreement.

99.     Beginning in February 2012, Thompson's counsel requested that counsel for AAC and the Parent Companies specify the AAC policies Thompson allegedly violated. To date, neither AAC nor the Parent Companies have provided this information.

100.    Upon termination of Thompson's employment, AAC also failed to pay her for unreimbursed business expenses in excess of $5,000 and accrued vacation that remained unused as of the date of her termination.

101.    As a result of the restrictive covenants contained in the Thompson Employment Agreement, Thompson is purportedly prohibited from being associated with any business that is directly or indirectly competitive with AAC throughout North America until January 24, 2014. Yet Thompson is not receiving any compensation during such time because AAC wrongfully purported to terminate her employment for Cause.

## COUNT I
### (Breach of Brittingham Employment Agreement - against AAC)

102.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

103.     At all times relevant hereto, the Brittingham Employment Agreement was a valid and enforceable contract.

104.     Brittingham performed all of the duties and obligations required of him under the Brittingham Employment Agreement.

105.     AAC purported to terminate Brittingham's employment for Cause in order to avoid its obligations under the Brittingham Employment Agreement and its obligations to pay Brittingham substantial deferred payments under the Purchase Agreement and the Goodwill Agreement.

106.     Cause did not exist to terminate Brittingham's employment.

107.     AAC's actions were willful and malicious and a breach of its obligations under the Brittingham Employment Agreement in that AAC purported to terminate Brittingham for Cause when Cause did not exist, and failed to pay Brittingham the salary, bonus compensation, benefits, unpaid, unused, and accrued vacation, and other perquisites he would have received under the Brittingham Employment Agreement through the end of the term on March 31, 2015.

108.     To the extent a court determines that the Proposed Amended Brittingham Agreement was a valid and enforceable contract, AAC's actions were willful and malicious and a breach of its obligations under the Proposed Amended Brittingham Agreement in that AAC purported to terminate Brittingham for Cause when Cause did not exist, and failed to pay Brittingham the salary, bonus compensation, benefits, unpaid, unused, and accrued vacation, and other perquisites he would have received under the Proposed Amended Brittingham Agreement through the end of the term on March 31, 2015.

109.     As a direct and proximate result of the foregoing, Brittingham has suffered damages in an amount to be determined at trial.

110.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Brittingham's interests, Brittingham is also entitled to an award of punitive damages.

## COUNT II
**(Breach of Asset Purchase Agreement –Anticipatory Repudiation – against AAC)**

111.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

112.    At all times relevant hereto, the Purchase Agreement was a valid and enforceable contract.

113.    Brittingham and Random-AAC have performed, and continue to perform, all of the duties and obligations required of them under the Purchase Agreement up to and including the date hereof.

114.    By purporting to terminate Brittingham's employment for Cause under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement), AAC clearly and unequivocally communicated its intent not to perform its obligation to pay the EBITDA Contingent Payment of Four Million Dollars ($4,000,000) under Section 1.8 of the Purchase Agreement, thereby repudiating the Purchase Agreement.

115.    At the time of AAC's repudiation, there existed a dependency of obligation between the parties to the Purchase Agreement.

116.    As a direct and proximate result of AAC's anticipatory repudiation of the Purchase Agreement, Random-AAC and Brittingham have suffered damages (including attorneys' fees) in an amount to be determined at trial.

117.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Random-AAC's and Brittingham's interests, Random-AAC and Brittingham are also entitled to an award of punitive damages.

## COUNT III
### (Breach of Asset Purchase Agreement – against AAC)

118.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

119.    At all times relevant hereto, the Purchase Agreement was a valid and enforceable contract.

120.    Brittingham and Random-AAC have performed, and continue to perform, all of the duties and obligations required of them under the Purchase Agreement up to and including the date hereof.

121.    To the extent a court determines that the doctrine of anticipatory repudiation has no application to the Purchase Agreement, AAC maliciously and wrongfully prohibited and deprived Random-AAC of its right to receive the EBITDA Contingent Payment of Four Million Dollars ($4,000,000) in breach of the Purchase Agreement by purporting to terminate Brittingham's employment for Cause when Cause did not exist under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement).

122.    The Purchase Agreement obligates AAC to indemnify Random-AAC from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Random-AAC in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the Purchase Agreement.

123.     As a direct and proximate result of the foregoing, Random-AAC and Brittingham have suffered damages (including attorneys' fees) in an amount to be determined at trial.

124.     Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Random-AAC's and Brittingham's interests, Random-AAC and Brittingham are also entitled to an award of punitive damages.

## COUNT IV
### (Breach of Asset Purchase Agreement – Covenant of Good Faith and Fair Dealing -- against AAC)

125.     The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

126.     At all times relevant hereto, the Purchase Agreement was a valid and enforceable contract.

127.     Brittingham and Random-AAC have performed, and continue to perform, all of the duties and obligations required of them under the Purchase Agreement up to and including the date hereof.

128.     The Purchase Agreement contains an implied covenant of good faith and fair dealing, pursuant to which no party will engage in any conduct which has the effect of depriving another party of the right to receive the benefits under the agreement.

129.     By purporting to terminate Brittingham's employment for Cause when Cause did not exist under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement), and thereby depriving Random-AAC of its right to receive the EBITDA Contingent Payment of Four Million Dollars ($4,000,000) under the Purchase Agreement, AAC breached the implied covenant of good faith and fair dealing.

130.    The Purchase Agreement obligates AAC to indemnify Random-AAC from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Random-AAC in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the Purchase Agreement.

131.    As a direct and proximate result of the foregoing, Random-AAC and Brittingham have suffered damages (including attorneys' fees) in an amount to be determined at trial.

132.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Random-AAC's and Brittingham's interests, Random-AAC and Brittingham are also entitled to an award of punitive damages.

## COUNT V
**(Breach of Goodwill Agreement –Anticipatory Repudiation – against AAC)**

133.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

134.    At all times relevant hereto, the Goodwill Agreement was a valid and enforceable contract.

135.    Brittingham has performed, and continues to perform, all of the duties and obligations required of him under the Goodwill Agreement up to and including the date hereof.

136.    By purporting to terminate Brittingham's employment for Cause under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement), AAC clearly and unequivocally communicated its intent not to perform its obligation to pay the Goodwill Payment of Four Million Dollars ($4,000,000) under Section 2 of the Goodwill Agreement, thereby repudiating the Goodwill Agreement.

137.    At the time of AAC's repudiation, there existed a dependency of obligation between the parties to the Goodwill Agreement.

138.    As a direct and proximate result of AAC's anticipatory repudiation of the Goodwill Agreement, Brittingham has suffered damages (including attorneys' fees) in an amount to be determined at trial.

139.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Brittingham's interests, Brittingham is also entitled to an award of punitive damages.

**COUNT VI**
**(Breach of Goodwill Agreement –against AAC)**

140.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

141.    At all times relevant hereto, the Goodwill Agreement was a valid and enforceable contract.

142.    Brittingham has performed, and continues to perform, all of the duties and obligations required of him under the Goodwill Agreement up to and including the date hereof.

143.    To the extent a court determines that the doctrine of anticipatory repudiation has no application to the Goodwill Agreement, AAC maliciously and wrongfully prohibited and deprived Brittingham of his right to receive the Goodwill Payment of Four Million Dollars ($4,000,000) in breach of the Goodwill Agreement by purporting to terminate Brittingham's employment for Cause when Cause did not exist under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement).

144.    As a direct and proximate result of the foregoing, Brittingham has suffered damages (including attorneys' fees) in an amount to be determined at trial.

145.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Brittingham's interests, Brittingham is also entitled to an award of punitive damages.

## COUNT VII
### (Breach of Goodwill Agreement – Covenant of Good Faith and Fair Dealing -- against AAC)

146.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

147.    At all times relevant hereto, the Goodwill Agreement was a valid and enforceable contract.

148.    Brittingham has performed, and continues to perform, all of the duties and obligations required of him under the Goodwill Agreement up to and including the date hereof.

149.    The Goodwill Agreement contains an implied covenant of good faith and fair dealing, pursuant to which no party will engage in any conduct which has the effect of depriving another party of the right to receive the benefits under the agreement.

150.    By purporting to terminate Brittingham's employment for Cause when Cause did not exist under the Brittingham Employment Agreement (or, in the alternative, the Proposed Amended Brittingham Agreement), and thereby depriving Brittingham of his right to receive the Goodwill Payment of Four Million Dollars ($4,000,000) under the Goodwill Agreement, AAC breached the implied covenant of good faith and fair dealing.

151.    As a direct and proximate result of the foregoing, Brittingham has suffered damages (including attorneys' fees) in an amount to be determined at trial.

152.     Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Brittingham's interests, Brittingham is also entitled to an award of punitive damages.

## COUNT VIII
### (Suit on Guaranty – Obligations under Asset Purchase Agreement – against Remington)

153.     The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

154.     At all times relevant hereto, the Purchase Agreement was a valid and enforceable contract.

155.     Pursuant to the Purchase Agreement, Remington unconditionally and irrevocably guaranteed, as primary obligor, all of AAC's duties, liabilities, and obligations arising under or pursuant to the Purchase Agreement. Pursuant to the Purchase Agreement, such guaranty is not conditional or contingent upon the pursuit of any remedies against AAC or any other person.

156.     The Purchase Agreement obligates AAC to indemnify Random-AAC from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Random-AAC in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the Purchase Agreement.

157.     Brittingham and Random-AAC have performed, and continue to perform, all of the duties and obligations required of them under the Purchase Agreement up to and including the date hereof.

158.    As set forth above, AAC maliciously and wrongfully prohibited and deprived Random-AAC of its right to receive the EBITDA Contingent Payment of Four Million Dollars ($4,000,000) in breach of the Purchase Agreement.

159.    Accordingly, as guarantor, Remington is liable for payment of the EBITDA Contingent Payment to Random-AAC.

160.    In addition, Remington is liable for any and all other "Losses" (losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Random-AAC in connection with or arising from AAC's breach of the Purchase Agreement.

## COUNT IX
**(Suit on Guaranty – Obligations under Goodwill Agreement - against Remington)**

161.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

162.    At all times relevant hereto, the Goodwill Agreement was a valid and enforceable contract.

163.    Pursuant to the Purchase Agreement, Remington unconditionally and irrevocably guaranteed, as primary obligor, all of AAC's duties, liabilities, and obligations arising under or pursuant to the Goodwill Agreement.  Pursuant to the Purchase Agreement, such guaranty is not conditional or contingent upon the pursuit of any remedies against AAC or any other person.

164.    The Goodwill Agreement obligates AAC to indemnify Brittingham from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Brittingham in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the Goodwill Agreement.

165.     Brittingham has performed, and continues to perform, all of the duties and obligations required of him under the Goodwill Agreement up to and including the date hereof.

166.     As set forth above, AAC maliciously, and wrongfully prohibited and deprived Brittingham of his right to receive the Goodwill Payment of Four Million Dollars ($4,000,000) in breach of the Goodwill Agreement.

167.     Accordingly, as guarantor, Remington is liable for payment of the Goodwill Payment to Brittingham.

168.     In addition, Remington is liable for any and all other "Losses" (losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Brittingham in connection with or arising from AAC's breach of the Goodwill Agreement.

## COUNT X
### (Declaratory Judgment – Dissolution of Restrictive Covenants Burdening Brittingham – against AAC)

169.     The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

170.     Because AAC wrongfully and maliciously terminated Brittingham's employment and deprived Brittingham of substantial payments to which he was entitled, Brittingham wishes to seek and pursue potential opportunities to earn a living.

171.     Based on statements made in the Brittingham Termination Letter, Brittingham and Random-AAC believe Defendants intend to attempt to enforce the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

172.     In light of Defendants' conduct, among other things, Brittingham and Random-AAC desire an adjudication of their rights under the respective agreements.

173.     New York law controls the interpretation of the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

174.     Under New York law, the Brittingham Restrictive Covenants are unenforceable as a matter of law because, among other reasons, AAC maliciously and willfully breached its obligations under the Brittingham Employment Agreement.

175.     Under New York law, the APA Restrictive Covenants are unenforceable as a matter of law because, among other reasons, AAC maliciously and willfully breached its obligations under the Purchase Agreement and the Goodwill Agreement.

176.     Brittingham and Random-AAC seek a declaratory judgment from this Court holding that the Brittingham Restrictive Covenants and APA Restrictive Covenants are unenforceable as a matter of law.

177.     A substantial justiciable, and actual controversy exists between Brittingham/ Random-AAC and Defendants.

178.     Brittingham and Random-AAC have acted promptly to obtain relief from this Court.

### COUNT XI
**(Declaratory Judgment and Injunctive Relief – Dissolution of Restrictive Covenants Burdening Brittingham – against AAC)**

179.     The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

180.     Because AAC wrongfully and maliciously terminated Brittingham's employment and deprived Brittingham of substantial payments to which he was entitled, Brittingham wishes to seek and pursue potential opportunities to earn a living.

181.     Based on statements made in the Brittingham Termination Letter, Brittingham and Random-AAC believe Defendants intend to attempt to enforce the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

182.     In light of Defendants' conduct, among other things, Brittingham and Random-AAC desire an adjudication of their rights under the respective agreements.

183.     New York law controls the interpretation of the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

184.     Under New York law, the Brittingham Restrictive Covenants are overbroad and unenforceable as a matter of law.

185.     Under New York law, the APA Restrictive Covenants are overbroad and unenforceable as a matter of law.

186.     Upon information and belief, unless enjoined and restrained, Defendants will seek to enforce the Brittingham Restrictive Covenants and APA Restrictive Covenants.

187.     Brittingham and Random-AAC seek a declaratory judgment from this Court holding that the Brittingham Restrictive Covenants and APA Restrictive Covenants are overbroad and unenforceable as a matter of law.

188.     Enforcement of the Brittingham Restrictive Covenants and APA Restrictive Covenants will cause Brittingham and Random-AAC irreparable and immediate injury, loss, and damage for which they have no adequate remedy at law.

189.     Brittingham and Random-AAC request that the Court preserve the status quo by restraining and preliminarily enjoining Defendants during the pendency of this lawsuit from:

          A.     Seeking to enforce (whether through court action or otherwise) the Brittingham Restrictive Covenants and/or the APA Restrictive Covenants;

B.   Taking any action to preclude Brittingham or Random-AAC from engaging in the activities which the Brittingham Restrictive Covenants and/or the APA Restrictive Covenants purport to prohibit; and

C.   Benefiting in any other fashion from the enforcement of the Brittingham Restrictive Covenants and/or the APA Restrictive Covenants against Brittingham or Random-AAC.

190.   Brittingham further requests that the Court enter a permanent injunction to restrain and enjoin Defendants from seeking to enforce the Brittingham Restrictive Covenants and the APA Restrictive Covenants.

191.   A substantial justiciable, and actual controversy exists between Brittingham/Random-AAC and Defendants.

192.   Brittingham and Random-AAC have acted promptly to obtain relief from this Court.

## COUNT XII
### (Breach of Thompson Employment Agreement –against AAC)

193.   The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

194.   At all times relevant hereto, the Thompson Employment Agreement was a valid and enforceable contract.

195.   Thompson performed all of the duties and obligations required of her under the Thompson Employment Agreement.

196.   AAC purported to terminate Thompson's employment for Cause in order to avoid its obligations under the Thompson Employment Agreement.

197.   Cause did not exist to terminate Thompson's employment.

198.    AAC's actions were willful and malicious and a breach of its obligations under the Thompson Employment Agreement in that AAC purported to terminate Thompson for Cause when Cause did not exist, and failed to pay Thompson the salary, bonus compensation, benefits, unpaid, unused, and accrued vacation, and other perquisites she would have received under the Thompson Employment Agreement through the end of the term on March 31, 2015.

199.    To the extent a court determines that the Proposed Amended Thompson Agreement was a valid and enforceable contract, AAC's actions were willful and malicious and a breach of its obligations under the Proposed Amended Thompson Agreement in that AAC purported to terminate Thompson for Cause when Cause did not exist, and failed to pay Thompson the salary, bonus compensation, benefits, unpaid, unused, and accrued vacation, and other perquisites she would have received under the Proposed Amended Thompson Agreement through the end of the term on March 31, 2015.

200.    As a direct and proximate result of the foregoing, Thompson has suffered damages in an amount to be determined at trial.

201.    Because AAC's actions were malicious, willful and deliberate, and demonstrated a conscious disregard for Thompson's interests, Thompson is also entitled to an award of punitive damages.

## COUNT XIII
### (Declaratory Judgment – Dissolution of Restrictive Covenants Burdening Thompson – Against AAC)

202.    The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

203.    Because AAC wrongfully and maliciously terminated Thompson's employment, Thompson wishes to seek and pursue potential opportunities to earn a living.

204.     Based on statements made in the Thompson Termination Letter, Thompson believes AAC intends to attempt to enforce the Thompson Restrictive Covenants.

205.     In light of AAC's conduct, among other things, Thompson desires an adjudication of her rights under the Thompson Employment Agreement or, to the extent a court determines that the Proposed Amended Thompson Agreement was a valid and enforceable contract, the Proposed Amended Thompson Agreement.

206.     New York law controls the interpretation of the Thompson Restrictive Covenants.

207.     Under New York law, the Thompson Restrictive Covenants are unenforceable as a matter of law because, among other reasons, AAC maliciously and willfully breached its obligations under the Thompson Employment Agreement.

208.     Thompson seeks a declaratory judgment from this Court holding that the Thompson Restrictive Covenants are unenforceable as a matter of law.

209.     A substantial justiciable, and actual controversy exists between Thompson and AAC.

210.     Thompson has acted promptly to obtain relief from this Court.

## COUNT XIV
### (Declaratory Judgment and Injunctive Relief –Dissolution of Restrictive Covenants Burdening Thompson – Against AAC)

211.     The allegations set forth above are hereby incorporated by reference as though fully set forth herein.

212.     Because AAC wrongfully and maliciously terminated Thompson's employment, Thompson wishes to seek and pursue potential opportunities to earn a living.

213.     Based on statements made in the Thompson Termination Letter, Thompson believes AAC intends to attempt to enforce the Thompson Restrictive Covenants.

214.     In light of AAC's conduct, among other things, Thompson desires an adjudication of her rights under the Thompson Employment Agreement or, to the extent a court determines that the Proposed Amended Thompson Agreement was a valid and enforceable contract, the Proposed Amended Thompson Agreement.

215.     New York law controls the interpretation of the Thompson Restrictive Covenants.

216.     Under New York law, the Thompson Restrictive Covenants are overbroad and unenforceable as a matter of law.

217.     Upon information and belief, unless enjoined and restrained, AAC will seek to enforce the Thompson Restrictive Covenants.

218.     Thompson seeks a declaratory judgment from this Court holding that the Thompson Restrictive Covenants are overbroad and unenforceable as a matter of law.

219.     Enforcement of the Thompson Restrictive Covenants will cause Thompson irreparable and immediate injury, loss, and damage for which she has no adequate remedy at law.

220.     Thompson requests that the Court preserve the status quo by restraining and preliminarily enjoining AAC during the pendency of this lawsuit from:

     A.     Seeking to enforce (whether through court action or otherwise) the Thompson Restrictive Covenants;

     B.     Taking any action to preclude Thompson from engaging in the activities which the Thompson Restrictive Covenants purport to prohibit; and

     C.     Benefiting in any other fashion from the enforcement of the Thompson Restrictive Covenants against Thompson.

221.     Thompson further requests that the Court enter a permanent injunction to restrain and enjoin AAC from seeking to enforce the Thompson Restrictive Covenants.

222.     A substantial justiciable, and actual controversy exists between Thompson and Defendants.

223.     Thompson has acted promptly to obtain relief from this Court.

WHEREFORE, the Court is requested to enter judgment as follows:

(1)     On Count I, against ACC, awarding Brittingham damages in an amount to be determined at trial, together with interest, expenses, and punitive damages;

(2)     On Counts II, III, IV, or VIII, against Defendants, awarding Random-AAC damages in an amount to be determined at trial, together with interest, expenses, attorneys' fees, and punitive damages; and

(3)     On Counts V, VI, or VII, or IX, against Defendants, awarding Brittingham damages in an amount to be determined at trial together with interest, expenses, attorneys' fees, and punitive damages; and

(4)     On Count X, against AAC, declaring the Brittingham Restrictive Covenants and the APA Restrictive Covenants unenforceable as a matter of law; and

(5)     On Count XI, against AAC, declaring the Brittingham Restrictive Covenants and the APA Restrictive Covenants unenforceable as a matter of law and granting Random-AAC and Brittingham preliminary and permanent injunctive relief;

(6)     On Count XII, against AAC, awarding Thompson damages in an amount to be determined at trial, together with interest, and expenses, and punitive damages; and

(7)     On Count XIII, against AAC, declaring the Thompson Restrictive Covenants unenforceable as a matter of law; and

(8)     On Count XIV, against AAC declaring the Thompson Restrictive Covenants unenforceable as a matter of law and granting Thompson preliminary and permanent injunctive relief;

(9)     Granting Random-AAC, Brittingham, and Thompson attorneys' fees and costs of the action and such other and further relief as the Court shall deem equitable, just, and proper.

Dated: New York, New York
       September 7, 2012

                         O'HARE PARNAGIAN LLP

                         Robert A. O'Hare Jr.
                         Michael Zarocostas
                         Andrew C. Levitt
                         82 Wall Street, Suite 300
                         New York, NY 10005-3686
                         212-425-1401
                         212-425-1421 (f)
                         rohare@ohareparnagian.com
                         mzarocostas@ohareparnagian.com
                         alevitt@ohareparnagian.com

                         MORRIS, MANNING & MARTIN, LLP
                         R. Jason D'Cruz
                         Leslie J. Nordin
                         1600 Atlanta Financial Center
                         3343 Peachtree Road, N.E.
                         Atlanta, Georgia 30326
                         404-233-7000
                         404-365-9532 (f)

                         *Attorney for Plaintiffs*