

**MORRIS, MANNING & MARTIN, LLP**
ATTORNEYS AT LAW

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JAN 2 9 2013

January 28, 2013

R. Jason D'Cruz
404-504-7601
rjd@mmmlaw.com
www.mmmlaw.com

**VIA E-MAIL AND FEDERAL EXPRESS**

Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street, Room 730
New York, New York 10007

Re:   **Random Ventures, Inc., et al. v. Advanced Armament Corp., LLC, et al.**
      **Case No. 12-cv-6792 (KBF)(GWG)**

Dear Judge Forrest:

We write to respond to the letter sent to you on January 23, 2013 by counsel for Advanced Armament Corp., LLC ("AAC") and Remington Arms Company, LLC ("Remington")(collectively, "Defendants") in the above-referenced action ("Defendants Letter").

Defendants accuse Plaintiff Kevin Brittingham ("Brittingham") of one of the most serious violations of court rules, i.e., trying to pay off a witness for his testimony. Yet the only "evidence" Defendants have to support such a serious allegation is a statement that Jason Schauble ("Schauble") "thought" Brittingham offered to pay him money to influence his testimony, even though the person who relayed Brittingham's message to Schauble, Travis Getz, unequivocally told Defendants' counsel on several occasions that Brittingham did not offer to pay Schauble money for any reason. (Def. Letter, Ex. A, ¶ 10; Getz Declaration ("Getz Dec.") attached as Exhibit A, ¶¶ 7, 9-11).

Defendants' Letter contains untrue, inflammatory accusations in a continuing attempt to paint Brittingham in a negative light to the Court. Defendants attempt to mislead the Court by failing to provide a complete account of all pertinent facts. Accordingly, we ask the Court to consider the following:

- **December 27, 2011 Text Messages.** The circumstances surrounding Brittingham's termination explain the reasoning behind his text messages to Schauble on December 27, 2011. Schauble, Brittingham's boss, was scheduled to visit AAC's offices in or around the week of December 12, 2011, but canceled his visit without explanation. (Brittingham Declaration ("Brittingham Dec.") attached as Exhibit B, ¶ 3). Thereafter, Brittingham could not reach Schauble by phone or e-mail which was very unusual. (Id.). On December 21, 2011, Scott Blackwell (not Jason Schauble) terminated Brittingham. (Complaint, ¶ 64). Shortly after Brittingham's termination, he was told that Schauble had taken a "leave of

Atlanta
404.233.7000

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Fax: 404.365.9532

With offices in

Washington, D.C.
Raleigh-Durham, N.C.

MORRIS, MANNING & MARTIN, LLP

Honorable Katherine B. Forrest
Page 2

absence" from work. (Brittingham Dec., ¶ 4). Confused about Schauble's lack of communication with him, Brittingham attempted to contact Schauble in the days following his termination but to no avail. (Id.). During that time, Brittingham also received various accounts of Schauble's employment status, including that Schauble had "cut a deal" to save his job by agreeing to Brittingham's termination. (Id.). Thus, when Brittingham sent the two texts to Schauble on December 27, 2011 noted by Defendants, Brittingham was reacting to the information Brittingham received about Schauble's "deal" and his frustration over not being able to get in touch with Schauble. (Id.).

When Brittingham sent the two text messages to Schauble on December 27, 2011, there was no threatened or pending litigation between Brittingham and AAC or Remington. Thus, Defendants' claim that Brittingham attempted to contact Schauble on December 27, 2011 – just six days after his termination – "for the purpose of attempting to influence his testimony as a witness in this case" is misleading and unfounded. (See Def. Letter, p. 2).

- **May 2012 Conversation with Trey Knight**. On or around May 22, 2012, Reed (Trey) Knight, III ("Knight") ran into Schauble at a trade show. (Knight Declaration "(Knight Dec.") attached as Exhibit C, ¶ 4). During their casual conversation, Schauble spoke poorly about Brittingham for trying to recover money from AAC and Remington. (Id.). Schauble's comments surprised Knight because he knew Schauble and Brittingham to be friends. (Id.). That evening, Knight called Brittingham and told him about Schauble's comments, leading Brittingham to send Schauble a text message at 12:47 a.m. on May 23, 2012. (Id.; Def. Letter, Ex. A attachment; Brittingham Dec., ¶ 5). The same day, Brittingham apologized to Schauble for his earlier text. (Id.). Knight never told Schauble that Brittingham was trying to get in touch with him and/or that Schauble should take Brittingham's call and speak with him. (Knight Dec., ¶ 5).

Thus, contrary to Defendants' assertion, Brittingham did not enlist Knight to contact Schauble on Brittingham's behalf. Nor did Brittingham send a text to Schauble May 23, 2012 because his efforts to contact Schauble failed, but because he was upset to hear that Schauble was speaking poorly about him.

Further, when Brittingham sent the two text messages to Schauble on May 23, 2012, there was no threatened or pending litigation between Brittingham and AAC or Remington. Thus, Defendants' claim that Brittingham attempted to contact Schauble on May 23, 2012 "for the purpose of attempting to influence his testimony as a witness in this case" is misleading and unfounded. (See Def. Letter, p. 2).

- **December 2012 Message From Travis Getz**. On December 6, 2012, Brittingham asked a friend, Travis Getz ("Getz"), to relay a message to Schauble. (Getz Dec, ¶ 5; Brittingham Dec., ¶ 6). In his message to Schauble, Getz conveyed that Brittingham: (1) had heard Schauble was receiving severance payments from Remington, (2) believed Remington might

MORRIS, MANNING & MARTIN, LLP

Honorable Katherine B. Forrest
Page 3

stop severance payments to Schauble if he testified in a deposition in this action, and (3) did not want to put Schauble in a bad financial position and, therefore, would postpone any deposition of Schauble until after any severance payments from Remington ended. (Id.). For example, if Schauble's last severance payment from Remington was in January, then Brittingham would wait to depose him in February so that he would not be out any money. (Id.). Upon receiving Brittingham's message from Getz, Schauble replied, "Thank you for reaching out – not sure what I can say back due to legal stuff. I understand what you are saying and don't worry about the financial issues." (Getz Dec., ¶ 6). Brittingham never stated to Getz and Getz never passed along any message to Schauble that Brittingham would: (1) "make it right" if Schauble lost the money he was receiving from Remington so that Schauble would not have to "take the financial hit for telling the truth;" (2) pay Schauble any money to influence his testimony or for any other reason, (3) match any money Schauble received from AAC, Remington, Freedom Group, Inc., or Cerberus Capital Management, L.P., or (4) make up the difference to cover any money Schauble lost as a result of testifying at his deposition. (Getz Dec., ¶ 7; Brittingham Dec., ¶ 7).

Within days of relaying Brittingham's message to Schauble, Defendants' counsel, Jeb Eakin of McGuire Woods LLP, contacted Getz to take a statement regarding Getz's conversations with Schauble and Brittingham. (Id. at ¶ 8-9). During that call, and on at least two other separate occasions (including as recently as January 21, 2013), Getz unequivocally told Mr. Eakin that Brittingham made no mention to him about offering to pay any money to Schauble for any reason. (Id. at ¶ 9-11). Getz's statement is noticeably absent from Defendants' Letter. When Defendants' counsel realized Getz's version of events did not support their theory of witness tampering, they apparently decided not to give Getz the opportunity to confirm the contents of his statement, despite their assurances to Getz that he would have such opportunity and his repeated requests to see his statement. (Id. at ¶ 9, 10, 12).

Defendants attempt to characterize Brittingham's communications with Schauble on three separate occasions over a period of twelve months as an overall "ploy" to influence Schauble's testimony. To the contrary, the facts establish that in each case, Brittingham's communication with Schauble was an isolated occurrence motivated by different circumstances: (1) the first instance occurring just six days after Brittingham's termination at a time when Brittingham did not know why he could not find Schauble for an extended period of time, (2) the second instance occurring over five months later when a friend told Brittingham that Schauble had made upsetting statements about Brittingham, and (3) the third instance occurring over six months later when Brittingham offered to schedule Schauble's deposition after Schauble's severance payments ended.

There is nothing improper about a litigant talking to witnesses. In fact, this is a common topic explored in depositions. In this case, Brittingham did not even speak with Schauble. Most importantly, what Schauble "thought" or "believed" or "interpreted" about Brittingham's

MORRIS, MANNING & MARTIN, LLP

Honorable Katherine B. Forrest
Page 4

message on December 6, 2012 does not support an allegation as serious as witness tampering, especially in light of Getz's unequivocal testimony of which McGuire Woods was well aware. Getz – the person who heard the message directly from Brittingham and communicated it directly to Schauble – has unequivocally stated on numerous occasions that Brittingham never stated to Getz, and Getz never passed along any message to Schauble, that Brittingham would pay Schauble any money to influence his testimony or for any other reason, or any other statement to that effect. (Getz Dec. at ¶¶ 7, 9-11).

There is no improper ploy here, just a continuing attempt by Defendants to smear Brittingham's reputation before the Court.

For these reasons, Brittingham requests that the Court deny Defendants' request.

Sincerely,

R. Jason D'Cruz

___Ordered___

Counsel for Brittingham to inform the Court by C.O.B. 1/30/13 whether — in light of the back and forth and potential for confusion, will Brittingham voluntarily agree not to contact Schauble directly or indirectly as to any matter relating to this case, during the pendency of this case?

1/29/13                    ← B. For
                             USDJ

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RANDOM VENTURES, INC., KEVIN
BRITTINGHAM, and LYNSEY THOMPSON,

                             ECF Case

                  Plaintiffs,

                             No. 12-CV-6792 (KBF)

      - against -

                             **DECLARATION OF TRAVIS**
ADVANCED ARMAMENT CORP., LLC, and    **GETZ**
REMINGTON ARMS COMPANY, LLC,

                  Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1.

I hereby authorize Kevin Brittingham ("Brittingham") to submit this, my sworn Declaration, in connection with a cause of action that Brittingham, Random Ventures, Inc., and Lynsey Thompson (collectively, "Plaintiffs") filed against Advanced Armament Corp., LLC ("AAC") and Remington Arms Company, LLC ("Remington")(collectively, "Defendants") in the United States District Court for the Southern District of New York, Civil Action Number 12-CV-6792 (the "Civil Action")

2.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Declaration is based upon my personal knowledge

3.

I have no personal or professional interest in the outcome of the Civil Action. I have a personal friendship with Brittingham and Jason Schauble ("Schauble). I currently provide consulting services to Schauble's company, TrackingPoint. I have never been employed by Brittingham nor have there been any past or current plans for me to be employed by Brittingham

Brittingham has not offered me any money and/or favors in connection with the Civil Action.

4.

On two occasions between December 2011 and the present date, I acted as an intermediary to exchange messages between Schauble and Brittingham.

5

On December 6, 2012, Brititngham asked me to relay a message to Schauble. In his message to Schauble, Brittingham stated that (1) he had heard Schauble was receiving severance payments from Remington, (2) he believed Remington might stop severance payments to Schauble if he testified in a deposition in the Civil Action, and (3) he did not want to put Schauble in a bad financial position and, therefore, would postpone any deposition of Schauble until after any severance payments from Remington ended. For example, if Schauble's last severance payment from Remington was in January, then Brittingham would wait to depose him in February so that he would not be out any money. I took handwritten notes of my conversation with Brittingham during which he communicated this message, a copy of which is attached to this Declaration. These notes represent the major points of the message Brittingham asked me to convey to Schauble.

6.

Upon receiving Brittingham's message from me as set forth in Paragraph 5 above, Schauble spoke to me as he considered his response. As he spoke, I took handwritten notes on the same paper containing the notes of Brittingham's message. A copy of these notes are attached to this Declaration. I ultimately typed up Schauble's exact reply in an e-mail to myself to avoid confusion, a copy of which is also attached to this Declaration. The final, typed reply stated: "Thank you for reaching out – not sure what I can say back due to legal stuff. I

understand what you are saying and don't worry about the financial issues." I made several attempts to contact Brittingham to deliver the message, but was unsuccessful. At 9:01 p.m. on December 6, 2012, I read from the typed reply in a message that I left on Brittingham's phone voicemail, and considered the issue closed.

7.

Brittingham never stated to me and I never passed along any message to Schauble that Brittingham would (1) "make it right" if Schauble lost the money he was receiving from Remington so that Schauble would not have to "take the financial hit for telling the truth," (2) pay Schauble any money to influence his testimony or for any other reason, (3) match any money Schauble received from AAC, Remington, Freedom Group, Inc., or Cerberus Capital Management, L.P., or (4) make up the difference to cover any money Schauble lost as a result of testifying at his deposition.

8.

Within days of relaying Brittingham's message to Schauble, Schauble called me and told me that Defendants' counsel, Jeb Eakin of McGuire Woods LLP, wanted to get a statement from me regarding the conversations I had with Schauble and Brittingham. Schauble did not tell me what he had told Mr. Eakin. To prepare for my call with Mr. Eakin, I reviewed information on my cell phone, typed up notes of that information, and prepared a statement concerning my perception of Brittingham's intentions in contacting Schauble. A copy of these notes are attached to this Declaration.

9

When Mr. Eakin called, I relayed the contents of Brittingham's message to Schauble as set forth in Paragraph 5 above. After taking my statement, Mr. Eakin mentioned to me that

Schauble had told him that the message I relayed to him from Brittingham included information set forth in Paragraph 7 above. I immediately and clearly told Mr. Eakin that I did not hear or convey any such information to Schauble. Mr. Eakin asked several more questions to be sure he understood me correctly on this point. At the end of the call, Mr. Eakin told me he would e-mail the text of my statement so that I could confirm its contents.

10

Within a week following my call with Mr. Eakin, I discovered my handwritten notes from my call with Brittingham. I called Mr. Eakin to let him know I had my notes and suggested they were significant because they supported my memory of my conversation with Brittingham, particularly that Brittingham made no remarks like those set forth in Paragraph 7 above. Mr. Eakin indicated that my notes may indeed be significant and asked me to hold on to them if he needed them in the future; however, he never asked me to send the notes to him. During this call, Mr. Eakin assured me that he would be sending me my statement to confirm its contents "soon."

11.

On at least three separate occasions – including as recently as January 21, 2013 - I unequivocally told Mr. Eakin that Brittingham made no mention to me about offering to pay any money to Schauble for any reason. A copy of my communication to Mr. Eakin dated January 21, 2013 is attached to this Declaration.

12.

In addition to the two separate occasions when Mr. Eakin assured me he would send me the text of the statement I provided to him so that I could confirm its contents, I have repeatedly asked Mr. Eakin – by phone and e-mail - to send me my statement but he has not done so.

13

Because Mr  Eakin failed to send me my statement to confirm, I am providing my statement again via Brittingham's counsel so that my confirmed statement will be available to the parties and the Court

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of January, 2013.

_____

Travis Getz

From: **Getz Solutions (Travis Getz)** <getzsolutions@gmail.com>
Date: Mon, Dec 10, 2012 at 4:54 PM
Subject: Phone Notes - Kevin and Jason
To: travis getz <getzsolutions@gmail.com>

Could I ask that you please add a note in the official record about my testimony?  I just want to say up front –that I do not believe Kevin intended anything nefarious or manipulative by calling me.  I believe he was truly acting out of concern for Jason's financial well-being.  This is based on my knowing Kevin as a conscientious person who has spoken at length – even before the break with AAC/Remington, about his concern for Jason's family and respect for Jason as a person.  I think this was Kevin trying to do what he thought was right (for a friend).

Earlier history – passed some messages between Kevin and Jason – trying to smooth things over.

Kevin sent an e-mail Wed 6:29pm (Dec 5), asking me to give him a call.

Thursday 9am (Dec 6), called him.  He was visiting his sitter's hospital room (she'd been in a car accident) and said he'd call me back.

Thursday 9:15am he called back, we talked.  Asked Kevin if everything was legally OK with this, he said it was. Kevin was

9:31am, called Jason, asked him to call me back

9:43am Jason calls me, I pass on Kevin's message.  Type email to myself with his reply
"Thank you for reaching out – not sure what he can say back due to legal stuff.
He understands what you're saying and don't worry about the financial issues."
10am wrote Kevin a note asking him to call me.  Did not hear back from him.

5:47pm Called Kevin, Don't think I left any message at this time.

9:01pm, Called Kevin again, left VM asking him to call me to pass on the message.

Friday Dec 7th 4:30pm, Called again and just left Jason's message on Kevin's VM, figuring that maybe he was dealing with an emergency with his sitter, who was in the hospital after a car accident.

--
*Travis Getz*
Getz Solutions - High-End Design and Consulting
Squadron Store - Military Graphic Design Services

From: **Getz Solutions (Travis Getz)** <getzsolutions@gmail.com>
Date: Wed, Jan 23, 2013 at 12:40 AM
Subject: Re: Brittingham/Remington - Scan of handwritten note and statement call notes
To: jeakin@mcguirewoods.com, rjd@mmmlaw.com, jnordin@mmmlaw.com

Hello everyone,

Jeb, I still have not heard back regarding you sending my statement so I can confirm the contents. If I
don't hear back from you by tomorrow evening, I'll assume the statement is not coming and have to re-do
it.

Regarding the scan I sent yesterday - When I pulled the folded piece of paper off the scanner, and
opened it up, I realized there were more notes on it that may be of interest for some or all of you.

My notes from my conversation with Kevin are in the upper left and have already been
described for you.

On the upper right, in blue ink, are my notes from the call with Jason.  I took these notes
to know what he wanted me to say back to Kevin.  They are not his final message, just
sort of me taking notes as he was thinking what to say.  I switched from using the pen to
the computer to type it out so I could get his exact quote to relay.

Similar to what I did with the notes from Kevin, here is a 'translation' of the notes from
my talk with Jason (stuff in parenthesis is to give you more info/context).

Been deposed by Remington - Info available to Kevin's Legal (Jason said that he'd
already given his deposition and that Kevin would probably see it eventually)

- Will tell truth regardless

- Appreciates him reaching out

- Can't say more (Jason wasn't sure what he could/could not say due to legal stuff)

(an arrow points up to 'Will tell truth regardless' - this was to make sure I referenced it
when reply to Kevin)

- Depose any time

As I mentioned, these notes aren't the final message, but they may shed some light on
the thought process.  Sorry I did not remember them earlier; the piece of paper has
been sitting folded on my scanner since I mentioned it to Jeb in December and he
asked me to hang onto it.

Contents of the lower section of the paper may not really be significant, but I am
including them anyway, in the interests of full disclosure:

- The drawing on the left is an embarrassingly bad sketch for a shirt design I was thinking of for the 'Kong Killers' of the US Navy Fighter Squadron 14.
- The 90/80 is probably blood pressure for a family member.
- The 'Pocket Mentor' note is me trying to remember to look up that book after seeing it on a friend's shelf.
- The crossed out month abbreviation letters on the left and list of gift ideas/months on the right were my wife and kids and I planning out ideas for a series of 'monthly gifts' to give as a Christmas gift for an elderly friend.

The back of the paper is just some Google directions.  I suppose its only significance may be in the date shown in the corner - December 5th - the date of my calls with Kevin/Jason S.

Hope it is useful,

--Travis Getz

On Mon, Jan 21, 2013 at 4:07 PM, Getz Solutions (Travis Getz) <getzsolutions@gmail.com> wrote:
Hello Jeb,

I had a call this afternoon from Jason D'Cruz and Leslie Nordin (in copy) with Kevin Brittingham's legal team regarding the discussions I had with Kevin, Jason and you in December.

They asked to receive a scan of the handwritten notes I took during my call with Kevin.  These are the notes I worked from when relaying the message to Jason.  And that I called you back about after our initial phone call.  In the interests of keeping everyone fully informed, I thought you would like to receive them too.

My handwriting is terrible, sorry about that.  Here is a translation (info in parenthesis is explanatory notes from me):

J (Jason S) will get deposed to testify

(Kevin) believes J (Jason S) won't be dishonest (Kevin believed that when Jason gave his deposition, it would upset Remington and that Remington would stop any severance payments to Jason S)

Does not want to put J (Jason S) in a position when it (Kevin did not want to put Jason S in a bad spot.  He did not want his legal team to depose Jason S before any severance payments from Remington had ended)

(Kevin has) Heard from Cerberus people (that Jason S was getting severance payments)

Bob Nardelli will be deposed too

$25,000 for severance (I don't remember if Kevin mentioned severance payments of $25k per month or per year. As I mentioned to Jeb on the phone, when I spoke to Jason S, I mentioned $25k per month, which may have been incorrect)

Those are the complete notes from my call with Kevin, they cover all the major points of his message.

Just to reiterate: I discovered these notes after you took my statement in December and called you back to tell you about them because they back up my strong recollection that Kevin made no mention about offering to pay any money to Jason S for any reason.

Regarding our call and my statement, I thought it might be helpful for everyone to have the notes I worked from as we spoke - I e-mailed these to myself in preparation for our call, which I anticipated after Jason S said you might be calling.

You may have already received my voice mails requesting you send the text of my statement that you promised in December so I can confirm the contents. Please send it to me at this e-mail address (please do not copy anyone) and I will reply to both legal teams with the confirmed or corrected statement signed and attached so there is no mystery as to what info I shared in my statement.

Looking forward to getting everyone on the same page.

Thank you,

--Travis Getz


—
*Travis Getz*
 <u>Getz Solutions</u> - High-End Design and Consulting
   <u>Squadron Store</u> - Military Support Artwork

--------- Forwarded message ---------
From: **Getz Solutions (Travis Getz)** <<u>getzsolutions@gmail.com</u>>
Date: Mon, Dec 10, 2012 at 4:54 PM
Subject: Phone Notes - Kevin and Jason
To: travis getz <<u>getzsolutions@gmail.com</u>>


Could I ask that you please add a note in the official record about my testimony? I just want to say up front –that I do not believe Kevin intended anything nefarious or manipulative by calling me. I believe he was truly acting out of concern for Jason's financial well-being. This is based on my knowing Kevin as a conscientious person who has spoken at length – even before the break with AAC/Remington, about his concern for Jason's family and respect for Jason as a person. I think this was Kevin trying to do what he thought was right (for a friend).

Earlier history – passed some messages between Kevin and Jason – trying to smooth things over.

Kevin sent an e-mail Wed 6:29pm (Dec 5), asking me to give him a call.

Thursday 9am (Dec 6), called him.  He was visiting his sitter's hospital room (she'd been in a car accident) and said he'd call me back.

Thursday 9:15am he called back, we talked.  Asked Kevin if everything was legally OK with this, he said it was.  Kevin was

9:31am, called Jason, asked him to call me back

9:43am Jason calls me, I pass on Kevin's message.  Type email to myself with his reply
"Thank you for reaching out -- not sure what he can say back due to legal stuff.
He understands what you're saying and don't worry about the financial issues."
10am wrote Kevin a note asking him to call me.  Did not hear back from him.

5:47pm Called Kevin, Don't think I left any message at this time.

9:01pm, Called Kevin again, left VM asking him to call me to pass on the message.

Friday Dec 7th 4:30pm, Called again and just left Jason's message on Kevin's VM, figuring that maybe he was dealing with an emergency with his sitter, who was in the hospital after a car accident.

--

*Travis Getz*
  Getz Solutions - High-End Design and Consulting
    Squadron Store - Military Graphic Design Services

WILL GET                          JOHN DEPOSED BY
DEPOSED TO                        REMINGTON -
TESTIFY RE. WANT                  INFO AVAILABLE TO
BE DEPOST                         LEWIS LEGAL
DOES NOT WANT TO                  WILL TELL TRUTH
PUT J IN A                        REGARDLESS
POSITION WHEN IT                  - APPRECIATES HIM
HEARD FROM OTHERS                 REACHING OUT
PEOPLE.                           - CANT SAY MORE
BOB HARDZUL WILL
DE DEPOSED TO
$25,000 FOR SEVERANCE             - DISCUSS ANY TIME



90
50

POCKET
MENTOR:
GIVING FEEDBACK

https://maps.google.com/maps?f=d&source=s_d&saddr=2000+Centre+Green+Way,+Cary,+...



GET BACK TO
HIM ABOUT IT
LATER. BEST
WEEKEND B-4

©2012 Google

12/5/2012 1:55 PM

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RANDOM VENTURES, INC., KEVIN                :
BRITTINGHAM, and LYNSEY THOMPSON,           :
                                            :   ECF Case
                              Plaintiffs,   :
                                            :   No. 12-CV-6792 (KBF)
              - against -                   :
                                            :   **DECLARATION OF KEVIN**
ADVANCED ARMAMENT CORP., LLC, and           :   **BRITTINGHAM**
REMINGTON ARMS COMPANY, LLC,                :
                                            :
                              Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                            x

1.

I submit this, my sworn Declaration, in connection with the cause of action that Random Ventures, Inc., Lynsey Thompson, and I (collectively, "Plaintiffs") filed against Advanced Armament Corp., LLC ("AAC") and Remington Arms Company, LLC ("Remington")(collectively, "Defendants") in the United States District Court for the Southern District of New York, Civil Action Number 12-CV-6792 (the "Civil Action").

2.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Declaration is based upon my personal knowledge.

3.

My boss, Jason Schauble ("Schauble"), was scheduled to visit AAC's offices in or around the week of December 12, 2011, but he canceled his visit without explanation. Thereafter, I could not reach Schauble by phone or e-mail which was very unusual.

4.

Shortly after my termination, I was told that Schauble had taken a "leave of absence"

from work. Confused about Schauble's lack of communication with me, I attempted to contact Schauble in the days following my termination but to no avail. During that time, I also received various accounts of Schauble's employment status, including that Schauble had "cut a deal" to save his job by agreeing to my termination. Thus, when I sent the two texts to Schauble on December 27, 2011 noted by Defendants, I was reacting to the information I received about Schauble's "deal" and my frustration over not being able to get in touch with him.

5.

On or around May 22, 2012, Reed (Trey) Knight, III ("Knight") called me and told me that he had run into Schauble at a trade show.  Knight also told me that Schauble was talking poorly about me for trying to recover money from AAC and Remington.  Consequently, I sent the text to Schauble at 12:47 on May 23, 2012 (noted by Defendants) because I was upset to hear that Schauble was speaking poorly about me.  The same day, I apologized to Schauble for my earlier text.

6.

On December 6, 2012, I asked Travis Getz to relay a message to Schauble.  In my message to Schauble, I stated that: (1) I had heard Schauble was receiving severance payments from Remington, (2) I believed Remington might stop severance payments to Schauble if he testified in a deposition in the Civil Action, and (3) I did not want to put Schauble in a bad financial position and, therefore, would postpone any deposition of Schauble until after any severance payments from Remington ended.  For example, if Schauble's last severance payment from Remington was in January, then I would wait to have him deposed in February so that he would not be out any money.

7.

I never told Getz to tell Schauble that I would: (1) "make it right" if Schauble lost the money he was receiving from Remington so that Schauble would not have to "take the financial hit for telling the truth;" (2) pay Schauble any money to influence his testimony or for any other reason, (3) match any money Schauble received from AAC, Remington, Freedom Group, Inc., or Cerberus Capital Management, L.P., or (4) make up the difference to cover any money Schauble lost as a result of testifying at his deposition.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of January, 2013.

_____
Kevin Brittingham

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RANDOM VENTURES, INC., KEVIN
BRITTINGHAM, and LYNSEY THOMPSON,

                                        Plaintiffs,

                 - against -

ADVANCED ARMAMENT CORP., LLC, and
REMINGTON ARMS COMPANY, LLC,

                                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ECF Case

No. 12-CV-6792 (KBF)

**DECLARATION OF REED
KNIGHT, III**

1.

I hereby authorize Kevin Brittingham ("Brittingham") to submit this, my sworn Declaration, in connection with a cause of action that Brittingham, Random Ventures, Inc., and Lynsey Thompson filed against Advanced Armament Corp., LLC ("AAC") and Remington Arms Company, LLC in the United States District Court for the Southern District of New York, Civil Action Number 12-CV-6792 (the "Civil Action").

2.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Declaration is based upon my personal knowledge.

3.

I am employed by Knight's Armament Company which is a competitor of AAC.

4.

On or around May 22, 2012, I ran in to Jason Schauble ("Schauble") at a trade show. During a casual conversation with Schauble, he was talking poorly about Brittingham for trying

to recover money from AAC and Remington.  I do not remember exactly what Schauble said, but Schauble's comments surprised me because I knew Schauble and Brittingham to be friends.  That evening, I called Brittingham and told him about Schauble's comments, and I remarked to Brittingham that Schauble's comments were not as positive as I expected in light of Brittingham and Schauble's friendship.

5.

I never told Schauble that Brittingham was trying to get in touch with him and that Schauble should take Brittingham's call and speak with him.


**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

**Executed this 24th day of January, 2013.**


_____
Reed Knight, III