UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| RANDOM VENTURES, INC. (f/k/a, ADVANCED ARMAMENT CORP.), KEVIN BRITTINGHAM, and LYNSEY THOMPSON, | : : : |
| | : ECF Case |
| Plaintiffs, | : No. 12-CV-6792 (KBF) |
| | : |
| - against - | : |
| | : |
| ADVANCED ARMAMENT CORP., LLC, and REMINGTON ARMS COMPANY, LLC, | : : |
| | : |
| Defendants. | : |
| | x |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000

O'HARE PARNAGIAN LLP
82 Wall Street, Suite 300
New York, New York 10005-3686
(212) 425-1401

*Attorney for Plaintiffs Random Ventures, Inc.,*
*Kevin Brittingham, and Lynsey Thompson*

# TABLE OF CONTENTS

## TABLE OF AUTHORITIES

## I.   <u>INTRODUCTION</u>

Notwithstanding the past and anticipated mudslinging against Kevin Brittingham ("Brittingham") and Lynsey Thompson ("Thompson"), the central issue in this case is whether Advanced Armament Corp., LLC ("AAC") had "Cause" to fire Brittingham and Thompson under their employment agreements. It did not.

Brittingham founded Random Ventures, Inc. ("Random-AAC") in 1994 and grew it to a leader in the design, manufacture, and sale of silencers. After Brittingham sold his company to AAC (which is owned and controlled by Freedom Group International ("FGI") and, in turn, the private equity fund Cerberus Capital Management ("Cerberus")), he worked tirelessly for AAC's success and advocated for the best interests of AAC employees.

On December 21, 2011, AAC purported to terminate Brittingham's employment for Cause when Cause did not exist. In doing so, FGI thought it could avoid paying millions of dollars owed to him and Random-AAC under the acquisition documents. Though AAC contends Cause existed because Brittingham brought personal firearms on AAC's premises, AAC has no evidence he did so. Rather, AAC's evidence shows that AAC and FGI repeatedly failed to fulfill their obligations to put a compliance program in place, which was one of the reasons Brittingham sold his company in the first place.

AAC also did not have "Cause" to terminate Thompson's employment on January 24, 2012. Though AAC contends Thompson was terminated for Cause for failing to follow AAC policy and failing to cooperate in an investigation, Cause did not exist because, among other reasons, AAC terminated her without the required 30-day written notice, and AAC's Board of Directors did not "reasonably determine" that she failed to cooperate in any investigation

On January 28, 2012, FGI's now-ousted CEO Robert Nardelli wrote: "Now that we have <u>cleared the decks</u> we have a hug[e] responsibility to defend and GROW AAC . . . . This has to be bigger and better than the founder had in mind." (REM020000001-02,   ) (emphasis added). Nardelli admits he was referring to Brittingham and Thompson when he wrote "clear the decks." (Nardelli, 257-260). Nardelli insists that he did not terminate Brittingham (he alleges the FGI Compliance Committee did). But on December 23, 2011, Nardelli wrote to the full FGI Board that (1) FGI would not make its 2011 Revenue/EBITDA numbers, the revised numbers, or the revised-revised numbers, and (2) the decision to terminate Brittingham's employment for "Cause" was "<u>reviewed</u> by the Compliance Committee." (REM30018386-90,   ) (emphasis added). By purporting to terminate Brittingham for Cause, FGI avoided the obligation to pay him millions of dollars.

Though the evidence fails to show that Cause existed to terminate Brittingham or Thompson, Defendants have effectively concealed the truth surrounding their terminations. AAC has asserted that key events related to this case—a 2010 investigation of Brittingham and Thompson, a so-called "routine" audit of AAC by Mark Barnes in August 2011, a follow-up audit of AAC by Barnes, an investigation of Brittingham in December 2011 by Interim General Counsel Jim Phillips, and a December 2011 "prep conversation" between Dana Rust and Thompson on December 28, 2011—are attorney-client privileged. Neither Brittingham, Thompson, nor the Court will ever know what was investigated, how it was investigated, the problems with the investigation, the deficiencies of the investigation, the alleged findings of the investigation, or the deficiencies of the findings, because they are all purportedly cloaked by the attorney-client privilege. In other words, AAC has elected to use the attorney-client privilege as a

"shield" to hide the alleged findings. As a result, and as this Court has ordered, AAC may not use this information as a "sword" against Brittingham or Thompson.

Finally, the counterclaims AAC asserted in response to Plaintiff's claims for millions of dollars owed lack merit. AAC's only evidence of conversion is that AAC cannot find certain items at its facility, which is not surprising and insufficient to demonstrate conversion. Regarding AAC's breach of contract counterclaim regarding 526 silencers, the APA only describes the parties' obligations with respect to ATF paperwork transfers of Purchased Firearms and the 526 silencers are not Purchased Firearms, so AAC cannot demonstrate any breach.

## II.    STATEMENT OF FACTS

### The Acquisition

In 1994, Brittingham founded Random-AAC and grew it from a small one-man enterprise to a leader in the design, manufacture, and sale of suppressors, or "silencers," in the U.S. military and commercial markets. (Brittingham, 58-59). On October 2, 2009, AAC[1] purchased substantially all of the assets of Random-AAC (the "Acquisition") pursuant to the Asset Purchase Agreement (the "APA"). (APA). The APA provided that AAC would pay Random-AAC a deferred payment of Four Million Dollars ($4,000,000) (the "EBITDA Payment") on or before March 31, 2015 as long as: (1) AAC did not terminate Brittingham's employment for "Cause" prior to March 31, 2015, and (2) AAC achieved a "Cumulative Adjusted EBITDA" of Twenty Million Dollars ($20,000,000). (APA, 6). AAC and Brittingham also executed a Personal Goodwill Acquisition Agreement (the "Goodwill Agreement") which provided that AAC would pay Brittingham a deferred payment of Four Million Dollars ($4,000,000) (the "Goodwill Payment") on or before January 2, 2015 as long as AAC did not

---

[1] AAC is wholly-owned by Remington Arms Company, LLC ("Remington"). Remington is wholly-owned (through operating and/or holding companies) by Freedom Group, Inc. ("Freedom Group"). Cerberus Capital Management, L.P. ("Cerberus") owns a controlling interest in Freedom Group. (Jackson 30(b)(6), 47-48, 52).

terminate Brittingham's employment for "Cause" prior to that date. (Goodwill Agreement). In addition, Brittingham and AAC executed an Employment Agreement providing that Brittingham would be employed through March 31, 2015 (the "Brittingham EA"). (Brittingham EA, 1). The Brittingham EA provided that AAC could terminate Brittingham's employment with "Cause," and defined "Cause," in relevant part, as … (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties …." (Brittingham EA, 2).

Brittingham's entitlement to receive the EBITDA Payment—which constituted over twenty percent (20%) of the Acquisition's purchase price—was dependent upon the financial performance of AAC. Thus, FGI motivated Brittingham to grow <u>AAC</u>. (Jackson 30(b)(6), _, 74-75). At the time of the Acquisition, FGI sold that vision to Brittingham: it promised to provide AAC with the resources and autonomy needed to scale AAC's business to expand into emerging markets so AAC could compete for major contracts and "make the commercial silencer world larger." (Schauble, 41-42; Brittingham, 86-87). FGI also sold the vision that it would help AAC to get into the emerging military market, initially in special operations and eventually the larger military. (Schauble, 20, 32-34, 41-42). Specifically, winning military contracts with special operations would position AAC to "win even larger contracts with conventional force." (Schauble, 34).

<u>**Conflict From the Start**</u>

Discord arose between Brittingham and FGI immediately after the Acquisition. The day after closing, FGI's General Counsel, Fred Roth, shut down AAC's facilities for approximately one month "out of the gate" because all of AAC's parts suppliers did not have federal firearms licenses ("FFL's"). (Schauble, 200; Brittingham, 152-157). Though an attorney specializing in

ATF regulations conducted six months of due diligence of Random-AAC's compliance, the issue was "not caught during the due diligence" because there was "nothing in the due diligence that said we needed to do this." (Schauble, 200; Mustian, 67-68, REM030000814-817). The shutdown ultimately resulted from Roth's "disagreement in interpretation of law." (Schauble, , 200-201). Conflict also arose over Brittingham's entitlement to approximately $1.2 million owed to him for inventory, how FGI was charging AAC expenses against its EBITDA calculation, equipment expenditures, and a bonus program for inside salespeople. (Schauble, _, 187-188, 192). Further, in November 2009 FGI wanted to move AAC's facility but could not because of the "good reason" clause in Brittingham's employment agreement (REM170007296).

Conflict between FGI and Brittingham escalated when Cerberus brought in new management in September 2010, including interim CEO Robert Nardelli and Chief Human Resources Officer Donald Ronchi. (Nardelli, 34-35; Schauble, 21-22; Ronchi, _, 43-44). Nardelli was brought in because FGI was "spiraling downward." (Nardelli, 40; Ronchi, 44). "Sales were being missed, EBITDA was turning down from previous years, the overall performance was not where it needed to be." (Nardelli, 40). As a result of missing financial projections in 2010 ($100 million in revenue and $30 million in EBITDA), FGI breached debt covenants with its lender resulting in higher interest rates. (Ronchi, 50). Consequently, there was tremendous financial pressure on Nardelli to control FGI's costs and cut operating expenses. (Ronchi, 95-101; Nardelli, 43-44, 75-78; Schauble, 44-47). To achieve this goal, Nardelli instituted a number of measures beneficial to FGI, but in direct contrast to Brittingham's interests of growing AAC, earning the EBITDA Payment, and earning the bonus to which he was entitled under the Brittingham EA. For example, Nardelli mandated that Brittingham's bonus structure be based on FGI's, not AAC's financial performance, contrary to the terms of

Brittingham EA. (Nardelli, 128-131; Schauble, 193-194; REM070003769). In addition, Nardelli mandated that he approve (1) all new hires, and (2) any expenditure above $2500. (Schauble, 44-45; Ronchi, 99).

Messrs. Nardelli and Ronchi did not believe that Britttingham was a "company man;" they thought he only cared about himself and that his interests were not aligned with FGI. (Ronchi, 298-299, 301-303; Schauble, 229, 236; Nardelli, 267-269; Brittingham, 138-146). Both referred to him as a "founder" who had difficulty adjusting to "a bigger organization that has increasing oversight, more compliance, more accounting procedures, more hiring procedures, etc." (Nardelli, 268, Ronchi, 306-307). Nardelli and Ronchi (who came out of Cerberus' "private equity model") thought that the executives' interests should be aligned with the investors' interests (Cerberus) with the goal to grow FGI. (Nardelli, 59-60; Ronchi , 302, 304). The FGI executives owned interests in FGI, but Brittingham did not. (Ronchi, 304-305). Brittingham had no reason to align his interests with FGI. (Brittingham, 138; Schauble, 193). Rather, the terms of the APA provided that Brittingham's success depended on the growth and success of <u>AAC</u>. In the fall of 2011, Brittingham helped AAC win a $14 million military contract. (Schauble, 32-34). Nardelli, however, did not view the military market as a priority. (Schauble, 31).

Shortly after "clearing the decks," FGI lost significant amounts of money again in 2011 under Nardelli and Ronchi's watch, and Cerberus replaced them in March of 2012. (Nardelli, 17-18; Ronchi, 50-52).

## AAC's Compliance Plan: What Was Supposed to Happen

Prior to the Acquisition, Random-AAC maintained its operations in Norcross, Georgia. Random-AAC held an FFL for the Norcross facility (the "Random-AAC FFL"), and maintained an electronic Bound Book for this FFL. (Brittingham, 11-12, 31-33). Brittingham also held a sole

proprietorship FFL for other firearms located at the Norcross facility (the "KB FFL") and maintained a separate electronic Bound Book for this FFL. (Brittingham, 11-12, 31-33).

As part of the Acquisition, AAC purchased Random-AAC's inventory of firearms and firearm components (the "Inventory"). (APA, Section 1.1(a)). In addition, AAC purchased certain identified firearms, firearm components, and equipment that Random-ACC or Brittingham owned but did not manufacture for sale[2] listed in a schedule to the APA (the "Purchased Firearms"). (APA, Section 1.1(l); APA, Schedule 1.1(l),  ). Some of the Purchased Firearms were registered under the Random-AAC FFL, and others were registered under the KB FFL. (Schauble, 112; Brittingham, 203). On October 2, 2009, legal ownership to all of the Purchased Assets, including, but not limited to, the Inventory and Purchased Firearms, transferred to AAC. (APA; Bill of Sale, REM140005307). Neither Random-AAC nor Brittingham retained any ownership interest in such items, or held any ownership interest in AAC, Remington, or FGI. (APA; Bill of Sale, REM140005307).

Following the Acquisition, AAC needed to obtain an FFL to operate in Norcross (the "Norcross FFL"), and then all Inventory and Purchased Firearms were to be transferred from the Random-AAC FFL or KB FFL to the Norcross FFL. (APA, Schauble, 137; Mustian, 74). Once all Purchased Firearms were transferred to AAC, the parties intended that Random-AAC would terminate its FFL and Random-AAC would "remove any remaining property not subject to the Agreement to ensure that there is no commingling of current and former FFL operations." (APA, Section 6.9(g)).

FGI's Director of Corporate Compliance, Roger Mustian, was to work with AAC employees Kathy Love (née Wagoner) and Allison Wolfe to effectuate the transfers of the Inventory and Purchased Firearms, including, but not limited to: (1) identifying firearms that

---

[2] AAC purchased most of the Purchased Firearms for research and development purposes. (Schauble, 53).

needed to be transferred off the Random-AAC FFL and KB FFL; (2) preparing and submitting forms to obtain ATF approval for transfers of NFA Inventory and Purchased Firearms, and (3) recording the transfers in the applicable Bound Books. (Schauble, 59-60; Love, 32-33; Wolfe, 73-74; REM030000430; REM14001507; REM030000005-06). Brittingham did not prepare or manage the flow of ATF transfer paperwork. (Schauble, 59-60). Brittingham's only involvement was to sign the ATF transfer forms, and, in many cases, Ms. Love used a stamp of his signature instead. (Love, 32; Schauble, 113). Remington planned to complete the firearm transfer process by October 31, 2009. (REM030001198).

In addition to transferring the firearms, Remington executives planned to address "serious compliance issues" they identified at AAC. (REM170000069; REM030000814). Specifically, Remington's transition plan identified the need to establish "appropriate control structures" at AAC to address the lack of formal written compliance policies. (REM30000014; REM170000069). One month after the Acquisition, Remington indicated that it planned to hire a full-time AAC employee dedicated to compliance. (REM030001192, REM030000718-719, REM030000707-708).

### AAC's Transfers: What Didn't Happen

AAC did not obtain the Norcross FFL until March 2010, and did not begin using the Norcross FFL until May 1, 2010, when it implemented its new computer system, "DBA." (Norcross FFL, REM030000032; REM050000026; Love, 40). For seven months, Brittingham allowed AAC to continue to operate its business under the Random-AAC FFL, which meant that AAC registered all firearms that it manufactured, purchased, or otherwise acquired during that time under the Random-AAC FFL, and sold firearms off of that FFL as well. (Jackson 30(b)(6), 67; Mustian, 73-74). At all relevant times, AAC had full access to the Random-AAC FFL and the KB FFL, and the Bound Books for each. (Brittingham, 25, 31-33; see generally Love;

Wolfe).

In or around July 2010, AAC moved its operations to a facility in Lawrenceville, Georgia (the "Move") and obtained a new FFL for that facility (the "LV FFL"). (LV FFL, REM03000002, REM030000892, Mustian, 130, 197-198). During the Move, some firearms were physically moved to the vault at AAC's Lawrenceville facility, and others remained in the vault at the Norcross facility. (Lesard Decl.). All the inventory, including Inventory from the Acquisition, was moved to Lawrenceville. (Thompson,93). At the time of the Move, AAC had not yet transferred all of the Inventory and Purchased Firearms to the Norcross FFL. (Schauble, , 115; REM030001130). Now, the transfers "to-do list" had multipled. Whatever was on the Norcross FFL needed to be transferred to the LV FFL; Inventory and Purchased Firearms still on the Random-AAC FFL and KB FFL needed to be transferred to the LV FFL; and all firearms registered on the Random-AAC FFL after the Acquisition (and not transferred to the Norcross FFL) needed to be transferred to the LV FFL. (Mustian,206). All of these transfers were not completed. As late as December 2011, AAC was still completing paperwork to transfer firearms to the LV FFL, even though those firearms had been _moved_ to Lawrenceville a year and a half earlier. (Schauble,115; REM130012328; Love, 67). In or around January 2012, AAC "discovered" an additional 514 silencers (subsequently increased to 526) at their Lawrenceville facility that were not transferred to the LV FFL. (2/3/12 letter from Rust to D'Cruz, ). And to this day, AAC has not obtained the requisite Law Enforcement Letters to transfer the machineguns included as Purchased Firearms. (APA, Schedule 1.1(l); Brittingham,127-128; Schauble,116-117). In addition, other Purchased Firearms still have not been transferred. (Schauble, 137).

Throughout 2011, AAC also experienced significant problems with DBA, which it used

to maintain the Bound Books for the Norcross FFL and LV FFL. (Mustian, 92, 181-182). Data entered into DBA did not always appear in the Bound Book or appeared incorrectly, and the system did not allow operators to manually correct the entries. (Love, 42-44; Wolfe, 82-84; REM130012159). For example, serial numbers entered into DBA appeared incorrectly in the Bound Book, or did not show up at all. (Love, 74-75). As a result, the Bound Books for the Norcross FFL and LV FFL were inaccurate. (Love, 94-95). These repeated inaccuracies prevented AAC employees from performing reliable inventories and audits of firearms at the Lawrenceville facility. (Williams, 96-97). Despite numerous attempts by Ms. Wolfe, Ms. Love, and Ms. Thompson to resolve these issues, the DBA Bound Books for the Norcross FFL and LV FFL remained inaccurate and unreliable as late as December 19, 2011, just two days before Brittingham's termination. (Schauble, 115; Love, 114; REM130011918).

In 2011, AAC continued to conduct business, however. Form 3s filled out by AAC employees using a stamp of Brittingham's signature show that AAC sold silencers located in Lawrenceville to dealers directly off the RV FFL for the Norcross facility. (Form 3s dated 8/5/10, 8/10/10, 8/19/10; Love, 144-145; Lesard Decl., Burt Decl.). In addition, employees in AAC's research and development ("R&D") Department frequently brought firearms registered under the Random-AAC FFL and KB FFL from Norcross to Lawrenceville. They used these firearms on a daily basis to design, test, and develop new products; conduct demonstrations; attend industry events; and complete drawings and models. (Lesard Decl.). In most cases, R&D employees did not enter these firearms in to AAC's Lawrenceville Bound Book, complete any ATF transfer paperwork, or log them in or out of the Lawrenceville vault. (Lesard Decl; Burt Decl.). On many occasions, they did not even return the firearms to Norcross. No one informed these employees which firearms were owned by AAC, Random-AAC, or Brittingham, or which

firearms had been transferred to the LV FFL, nor did anyone assist or guide them with respect to the movement of firearms from Norcross. (Lesard Decl; Burt Decl.). Thus, they "continued to do what [they] needed to do to get [their] job done and no one gave [them] any problems about it." (Lesard Decl; Burt Decl.).

### 2010 Suspensions

Toward the end of 2010, Roger Watson sent an antique silencer to AAC's facility, even though Brittingham previously told Watson that he did not want the silencer. (Thompson, 129; Brittingham, 174-178). AAC's receiving department did not enter the silencer into DBA before delivering it to Brittingham's office as it should have, or it entered the silencer but because of problems with DBA it did not show up on the Bound Book. (Cofield, 218-219).

Because it was an antique, the silencer did not have a legible serial number and was not registered with the ATF (hence, the reason why Brittingham did not want it). (Thompson, 130; Disclosure email). A few weeks later, Brittingham received a call from Mustian at FGI ordering Brittingham to send him the silencer.[3] To avoid transferring an unregistered NFA firearm in violation of federal law, Brittingham cut the silencer in half and sent one half to Mustian. (Thompson, 135; Disclosure email). After receiving half of the silencer, Mustian requested that Brittingham send him the rest of it. (Thompson, 137-138). Brittingham sent him the remaining half cut into numerous pieces. (Thompson, 138).  Shortly thereafter Fred Roth, FGI's General Counsel, traveled to AAC's facility, immediately suspended Brittingham and Thompson, and launched an "investigation." (Ronchi, 60-61)

After one month of suspension, AAC reinstated Brittingham and Thompson, even though Nardelli did not want to bring them back. (REM170008424; Nardelli, 96). Upon their return to

---

[3] Apparently, Watson had contacted FGI's counsel, Mark Barnes, to ask for guidance concerning the silencer, and Barnes informed Roth that Brittingham was in possession of the silencer.

work, AAC reduced their salaries, changed their titles, required them to attend compliance training, placed them on probation, and took away <u>all</u> compliance responsibilities from Brittingham and Thompson, including removing Brittingham as a "Responsible Person" from AAC's FFLs. (Brittingham term sheet; Thompson term sheet). Brittingham was directed not to bring "personal" firearms onto AAC premises without permission of Melissa Cofield, FGI's Chief Human Resources Officer. "Personal firearms" was not defined. Though AAC presented Brittingham and Thompson with amended employment agreements, neither agreement took effect; AAC did not execute either amended agreement, and Brittingham did not execute his amended agreement. (Amended Brittingham EA;  ; Amended Thompson EA).

## Who's In Charge?

FGI was supposed to address "serious compliance issues" they identified at AAC, establish "appropriate control structures," and hire a full-time AAC employee dedicated to compliance. (REM170000069, REM030000814, REM30000014, REM170000069; REM030001192, REM030000718-719, REM030000707-708). Brittingham's supervisor, Jason Schauble, promised Nardelli that he would make AAC a "model of compliance." (Nardelli,, 178-179; Schauble, 177; Ronchi, 183; REM170001347). This never occurred.

Prior to Brittingham's termination on December 21, 2011, no compliance policies or procedures were implemented by Schauble, Mustian, or Stevens, including any procedures for logging firearms in and out of the Lawrenceville vault. (Lesard Decl.; Burt Decl.; Stevens, 105-107; Smith, 50-51, 58-60). AAC also failed to hire a full-time employee dedicated to compliance, despite repeated requests from Brittingham and Thompson for compliance assistance over a two-year period, and repeated assurances that they would receive it. (REM030001192, REM030000383; REM170000324).

While denying personal responsibility, AAC's representatives have conveniently professed "belief" that Brittingham or Thompson was responsible for compliance. (Weisnicht, 27; Smith, 15-16, 58-59). But Brittingham <u>did not</u> have this responsibility. (Cofield, 199). In fact, between January 2011 and December 21, 2011, no one was implementing or overseeing compliance at AAC. (Nardelli, 178-179; Schauble, 177; Ronchi, 183; REM170001347). Mustian and Roth were the Responsible Persons for the Norcross and LV FFLs starting in January 2011, but were rarely there. (Schauble, 59; Smith, 53-54; Mustian, 78). Mustian signed the FFLs as the RP when they were obtained in March and July 2011. (REM030000002-3; REM010000032-33, ). Incredibly, Mustian vehemently denies having <u>any</u> responsibility for compliance at AAC. (Mustian, 78). (Schauble, 137-139).

### Nardelli's "Out of the Blue" Compliance Hire

Following the suspensions for alleged "serious compliance violations," the FGI Compliance Committee recommended hiring a full-time employee to handle compliance at AAC. (Nardelli, 195). Yet four days after Brittingham and Thompson's reinstatement, Nardelli rejected a request to hire a full-time compliance specialist at an annual salary of $60,000. (Nardelli, 189-190; REM060002732; REM180006092). Instead, the Office of the CEO subsequently approved the hiring of a joint HR/Compliance position at the same salary. (REM180007581). The salary for this position was paid for by the reductions in Brittingham and Thompson's compensation. (REM080000840). The person hired for this position in March 2011, Jerri Jackson, had no compliance experience and left abruptly after just 40 days.  (Mustian, 144).

In late May/early June, in an unprecedented move for an FGI CEO, Nardelli himself recruited a "compliance person" for AAC. (Mustian, 150, 157, 167). He called his friend John Stevens about the position, and arranged to have him meet FGI and Remington executives on

June 15, 2011. (Stevens, 62). Stevens had <u>absolutely no federal firearms compliance experience</u> and Blackwell and Jackson questioned whether he was the right person for the job. (Schauble, 101, 141; Stevens, 83; Nardelli,  202-203). Yet they believed Nardelli had already decided to move forward with his hiring. (Schauble, 141-142; Jackson 30(b)(6),  , 53; Blackwell,  , 96-97). Indeed, in August 2011, AAC hired Stevens as a consultant to provide monitoring and administrative compliance services. (REM104444561). Despite alleged "serious compliance violations" at AAC months earlier, AAC only expected Stevens to work on a part-time, "mutually agreeable" schedule. (REM104444561). And despite FGI's serious cost-cutting efforts, FGI agreed to pay Stevens $2,000 per week ($104,000 per year) for his part-time work.[4] (REM104444561). At no time did Nardelli notify the Compliance Committee of the hire nor even ask the Committee to talk to Stevens. (Nardelli, 206).

Nardelli seemingly hired Stevens "out of the blue." (Nardelli, 199). His actions, however, were not quite "out of the blue." On May 26, 2011, Brittingham angered Nardelli by advocating for his, Thompson's, and Silvers' 2010 annual bonuses in accordance with their employment agreements when no one else at FGI received a bonus.[5] (REM070003769; Nardelli, 108-109). Though Nardelli agreed to pay the bonus, Nardelli thought that Brittingham was only out for himself, and even lectured Blackwell about "deliver[ing] the message about integrity" to Brittingham. (Blackwell, 198; Schauble, 193-194; REM70003769). <u>One day later</u>, on May 27, 2011, Cofield notified Schauble that Nardelli had "requested to look for someone with stronger compliance background" at AAC instead of replacing Ms. Jackson. (REM170002889). And while Stevens was negotiating his consulting deal at the end of June 2011, Nardelli knew of significant shortfalls in FGI's year-to-date revenue and EBITDA. (REM070003749).

---

[4] Stevens' inflated compensation was charged against AAC's EBITDA.
[5] Pursuant to the Brittingham EA, Brittingham was entitled to a large bonus based on AAC's strong performance in 2010. FGI, however, lost lots of money in 2010.

Continuing the "who's in charge?" circus described above, even Stevens denies responsibility for compliance at AAC and claims not to know who was ultimately responsible. (Stevens, 21-22).

### Shoot First, Ask Questions Later

In late August/early September 2011, Stevens and AAC's outside counsel, Mark Barnes, conducted a firearms audit of AAC's Lawrenceville facility (the "First Audit").[6] (Stevens I, 103-104). Cofield indicated this was a routine audit. (Cofield, 29-30). But according to Mustian, FGI only brought in outside counsel when a "serious issue" arose. (Mustian, 244-245). And though Nardelli had never been to AAC or even met or spoken to Brittingham, he touched based with Stevens after the audit so that Nardelli could figure out "how things were going." (Nardelli, 239-240). He learned there were compliance issues involving Brittingham but did not inform the Compliance Committee. There is considerable confusion among Defendants' current and former employees as to what happened next. Eight different witnesses provided eight different stories as to what occurred between the First Audit and Brittingham's termination on December 21, 2011. (cite page ranges from depo t/ipts of 8 witnesses). However, the following facts are undisputed:

(1)     AAC did not terminate Brittingham based on any firearms found on AAC's premises during the First Audit. (Cofield, 157; Schauble, 71).

(2)     In September or October 2011, Stevens and Barnes conducted a follow-up audit of the Lawrenceville facility (the "Second Audit"). (Cofield, 18, 101).

(3)     In September or October 2011, Stevens instructed Brittingham to remove a truckload of firearms from AAC's premises.  (Cofield, 156). Brittingham did so.  AAC later

---

[6] Mustian testified that they customarily invited the ATF to attend routine audits.  There is no evidence that AAC invited the ATF to the First Audit.

determined that many of these firearms actually belonged not to Brittingham, but to AAC or Remington, and asked Brittingham to bring them back. (Stevens, 181-183). AAC did not terminate Britingham for taking the truckload of guns away. (Cofield, 156-157).

(4)     At some point before or after the Second Audit, an AAC employee, Knox Williams, prepared a list of firearms allegedly found on AAC's premises that did not belong to AAC (the "Handwritten List"). (Schauble, 80-85; Williams, 76-77, 81-82). The Handwritten List contained 68 firearms.  There is conflicting testimony concerning the details of the firearms set forth in the Handwritten List, including where they were found, when they were found, and the circumstances leading Williams to prepare the list. (Williams, 21, 80; Stevens 224-225, Love 136-137).

(5)     At some point during or after the Second Audit, Williams prepared several versions of another, color-coded spreadsheet listing 61 firearms allegedly found on AAC's premises that did not belong to AAC (the "Firearm Spreadsheet"). Williams provided different versions of the Firearm Spreadsheet to Stevens on November 3 and 4, 2011. (Williams, 133-134, 152-154).

(6)     Williams based the Firearm Spreadsheet on information contained in AAC's Bound Book on the DBA system and hard copies of ATF manufacturing paperwork. (Williams, 89). AAC's Bound Book, however, was inaccurate.  (Williams, 63-64; Wolfe, 82-84; Love, 42-44).

(7)     The Firearm Spreadsheet confused Williams, even though he made it.  (Williams, _, 157-160, 162; REM140000479).

(8)     Williams never completed the Firearm Spreadsheet. When Williams resigned from AAC on November 11, 2011, the spreadsheet was still a "work in progress."  (Williams,

34-35).

(9)     No one – including Williams, Schauble, Stevens, or Love – could verify the accuracy of the Firearm Spreadsheet.  (Williams, 96-97; Schauble, 272; Stevens, 200; Love, 136-138).

(10)     At some point during or after the Second Audit, Stevens notified Cofield and Schauble that Brittingham allegedly brought "personal" firearms to AAC's Lawrenceville facility between the First Audit and Second Audit (Cofield, 18, 29, 31, 34-35, 158-60; Schauble 72-73). Stevens does not know which version of the Firearm Spreadsheet he relied on in reaching that conclusion. (Stevens, 272-273, 279-80).

(11)     At no time before or after Brittingham's termination did Stevens, Barnes, or Williams ask Brittingham, R&D Manager Ethan Lessard, or R&D Research Engineer Eric Burt why any of the firearms listed on the Handwritten List or the Firearm Spreadsheet were at the Lawrenceville facility, how they got there, or how long they had been there.  (Cofield, 47-48).

(12)     At no time before Brittingham's termination did Stevens, Barnes, or Williams ask Brittingham or Wolfe – who maintained the Bound Book for the KB FFL for Brittingham – to review such Bound Book to compare it against the Handwritten List or any version of the Firearms Spreadsheet.  (Brittingham Dec., ¶__; Wolfe Dec., ¶ 5).

(13)     After the Second Audit, AAC conducted an "investigation," but all information concerning the investigation (including what was investigated, the findings, and the conclusions) is protected by the attorney-client privilege. (Cofield, 44-47). At no time during this "investigation" did anyone interview or otherwise speak to Brittingham. Based on this undisclosed investigation, AAC terminated Brittingham's employment on December 21, 2011. (Cofield, 47-48).

(14)   AAC claims that it terminated Brittingham for "Cause" under the Brittingham EA because Brittingham brought "personal" firearms to AAC's Lawrenceville facility which purportedly constituted a "material failure .... to comply with applicable laws or governmental regulations with respect to [AAC's] operations or the performance of his duties." (Cofield, 178-179).   There is conflicting testimony as to whether AAC relied on the Handwritten List, the Firearms Spreadsheet, or a different list altogether in making this determination.

(15)   Hours after firing Brittingham, AAC promoted employee Cory Weisnicht to head compliance at AAC. (Smith, 59).   Immediately <u>after</u> Brittingham's termination, AAC implemented numerous compliance policies and procedures. (Smith, 60-61).   Although AAC had purchased Random-AAC over two years earlier, as demonstrated above no one had taken any steps to implement these or other compliance policies or procedures <u>before</u> Brittingham's termination.

### <u>What An "Investigation" Would Have Revealed</u>

There is no evidence that AAC has, even to this day, resolved the inaccuracies in its Bound Book.   Had Stevens or anyone else conducted a thorough investigation before terminating Brittingham, they would have discovered these undisputed facts.   Of the 68 firearms collectively listed on the Handwritten List and the Firearms Spreadsheet (the "68 Listed Firearms"):

- **<u>18 firearms are listed in Bound Books as belonging to AAC</u>**

  - 5 firearms are listed in AAC's Bound Book as being acquired under the LV FFL in 2010 or 2011 (Nordin Dec., Ex. A);

  - 8 firearms (6 on the RV FFL and 2 on the KB FFL) were purchased in the Acquisition as a Purchased Firearm or Inventory, but were not transferred to AAC's Norcross FFL or LV FFL in a timely manner (Nordin Dec., Ex. A; Brittingham Dec., ¶ 5); and

  - 5 firearms are listed in the Bound Book for the RV FFL as being acquired by AAC <u>after</u> the Acquisition before AAC obtained the Norcross FFL to operate its

business. (Nordin Dec., Ex. A).

- **27 firearms are not listed in the Bound Books for the RV FFL or KB FFL; they do not belong to Brittingham or Random-AAC.**

  - AAC admits that 1 firearm belongs to AAC, as set forth in AAC's conversion counterclaim against Brittingham (Def. Counterclaim, ¶¶1, 12-17; Nordin Dec., Ex. A);

  - Many of the remaining 26 firearms were sent to AAC <u>after</u> the Acquisition but do not appear on the Norcross FFL or LV FFL, including, but not limited to: (i) firearms the R&D Department ordered from manufacturers for use in the performance of their duties, and (ii) a large number of firearms Remington sent to AAC for a demonstration conducted for FGI executives (Lesard Dec., ¶ 27); and

  - Any of these 27 firearms could have belonged to AAC, but the accuracy problems with DBA could have prevented the entries from showing up in the Bound Book. (<u>see</u> p. 10 <u>supra</u>).

  - There is no evidence that any of these firearms belong to Brittingham or Random-AAC, or that they were registered under the KB FFL or RV FFL. (Nordin Dec., Ex. A).

- **1 firearm listed on the RV FFL does not belong to Random-AAC or Brittingham**

  - This firearm belongs to the cousin of an AAC Machinist (Wade Knowlton), and was brought to the Lawrenceville facility for a modification (Nordin Dec., Ex. A; Knowlton Dec., ¶ 7);

- **9 firearms are listed on the RV FFL** that were not Purchased Firearms belonging to AAC.

  - 7 of these firearms were brought to Lawrenceville by AAC's R&D employees Lessard and Burt in the performance of their duties (Nordin Dec., Ex. A; Lessard Dec., Burt Dec.); and

  - 2 of these firearms were brought to Lawrenceville by AAC employees, other than Brittingham, as part of the Move (Nordin Dec., Ex. A; Lessard Dec.).

- **13 firearms are listed on the KB FFL** that were not Purchased Firearms belonging to AAC.

  - 8 of these firearms were brought to Lawrenceville by R&D employees Lessard or Burt in the performance of their duties (Nordin Dec., Ex. A; Lessard Dec., Burt Dec.);

- 2 of these firearms were kept in Lawrenceville because Lessard, Burt, and other R&D employees frequently used the firearms for testing for almost all of the contracts and projects the R&D Department worked on in the summer and fall of 2011 (Id.);

- 1 of these firearms was mistakenly brought back to the Lawrenceville facility by the R&D Department, instead of Norcross, after the Silencer Shoot event in the summer of 2011 (Nordin Dec., Ex. A; Lessard Dec., Ex. A);

- 1 of these firearms was brought to Lawrenceville by AAC employees, other than Brittingham, as part of the Move (Nordin Dec., Ex. A; Lessard Dec., Ex. A); and

- 1 of these firearms, used by Burt for a particular project, was brought to the Lawrenceville facility prior to October 2010. (Burt Dec., Ex. A).

Thus, out of the thousands of firearms at the Lawrenceville facility, 22 were found on the premises that: (1) appeared on the KB FFL or RV FFL, and (2) did not belong to AAC.  AAC used all of these firearms in the operation of its business.  **For 20 of the 22 firearms, it is undisputed that either someone other than Brittingham brought the firearm to Lawrenceville and/or that the firearm arrived in Lawrenceville prior to 2011.  Thus, a question only remains with respect to 2 of the 22 firearms**.  Brittingham is adamant that he did not bring any of the 22 firearms into the Lawrenceville facility in 2011, nor can any witness testified that s/he saw Brittingham do so.

**Thompson's Termination**

On October 2, 2009, Thompson and AAC executed an Employment Agreement ("Thompson EA"). (Thompson EA). In 2011, AAC attempted to modify the Thompson EA through the First Amended and Restated Employment Agreement ("Amended Thompson EA"), but AAC never signed the Amended Thompson EA. (Amended Thompson EA, 7; Cofield, 200, 234, 236; Thompson EA, Section 9).

On December 28, 2011, FGI's outside counsel, Dana Rust, met with Thompson to have a "prep conversation," not an investigation, related to Brittingham's prior termination. (Cofield,

115-116, 120-121, 128, 147, 191). Thompson asked Rust if she could record the conversation. (Cofield, 133). Rust agreed and requested that Thompson provide him with a <u>copy</u> of the recording. (Cofield, 133).

At some point between January 1 and January 10, 2012, Cofield and John Day (Thompson's supervisor) each called Thompson and requested the recording. (Cofield, 129; Day, , 75). After those conversations, Cofield spoke with FGI's inside counsel Jim Phillips and decided that if Thompson would not turn over "the tape," they would terminate her employment. (Cofield, 147-148).

On January 10, 2012, FGI's Legal Department received an anonymous "Hotline" call. (Cofield, 113, 138). The caller alleged that Brittingham and Thompson were conspiring to start a competing company. (Cofield, 108-109). The Legal Department determined that HR should investigate and that Day and Oralia Johnson (FGI's Human Resources Manager) should meet with Thompson. (Cofield, 136-140). It was pre-arranged that if Thompson refused to turn over "the tape" at that meeting, Day and Johnson were to terminate her employment. (Cofield, 109; Day, 72-73, 81-82). Thompson's termination letter, dated January 24, 2012, was prepared in advance of that meeting. (Day, 81-82; Thompson termination letter).

On January 24, 2012, Day and Johnson met with Thompson. (Cofield, 140-141). Johnson asked Thompson a prepared a list of questions and wrote down Thompson's answers. (Cofield, , 141; Day, 85; 1/24/12 notes from Johnson). Johnson asked Thompson: "Will you let us examine your cell phone to review text messages between you and Kevin?" (1/24/12 notes from Johnson, 3). Thompson said no, and Johnson asked why not. (1/24/12 notes from Johnson, 3; Cofield, 110). Thompson explained, "this is my personal phone." (1/24/12 notes from Johnson, 3;

Cofield, 110). Johnson neither asked any follow-up questions nor demanded that Thompson show the text messages. (1/24/12 notes from Johnson, 3).

At the end of the conversation, Johnson asked Thompson to turn over "the tape" of her conversation with Rust. (1/24/12 notes from Johnson, 4). Day told Thompson that since she would not turn over "the tape," AAC was terminating her employment and Johnson gave her the already prepared termination letter. (1/24/12 notes from Johnson, 4; Day, 87-88). The termination letter stated that Thompson "refused to cooperate in company investigations" and had "chosen not to provide the recording." (Thompson termination letter).

At the time of Thompson's termination, Steve Jackson was the only member of AAC's Board. (Jackson 30(b)(6) depo., 40-44). When asked how he found out about Thompson's purported failure to cooperate with an investigation, Jackson stated that "[a]round the time that [Thompson] departed" he "was informed that she was—she had been separated from the company" (Jackson,  , 89). As this shows, Jackson did not find out about any failure to cooperate until he learned that Thompson "had been" terminated. Jackson "didn't have any direct responsibilities" related to Thompson's termination. (Jackson, 89-90).

## No Conversion

On February 15, 2012, AAC instructed Brittingham to return items AAC claimed he had "removed from AAC premises." (2/15/12 letter from Rust to D'Cruz). Brittingham informed AAC that since it had delivered some of the items to his property for AAC's use, AAC could pick those items up. (2/17/12 letter from D'Cruz to Rust). Brittingham also stated, and reiterated on multiple occasions, that he did not have any of the other items. (2/17/12, 2/24/12, 4/24/12 letters from D'Cruz to Rust; Brittingham's Response to AAC's Second Request for Production of Documents ("Brittingham's Response") 5-6). AAC never picked up the items so Brittingham ultimately brought them to AAC. (Brittingham's Response, 5-6).   On  March  22,  2012,  AAC

informed Brittingham that one of the guns it had accused Brittingham of stealing (Remington 51 .380 SN PA24524) was "correctly logged into the AAC bound book and is located in our vault." (3/22/12 letter from Rust to D'Cruz, 4).

October 3, 2012, AAC filed a counterclaim alleging that Brittingham unlawfully converted AAC's property, <u>including</u> items Brittingham returned and the gun AAC "misplaced." (Answer & Counterclaim, ECF No. 13, ¶¶1, 12-17; Stafford, 17-18, 21-22, 24, 34-36). Though AAC has repeatedly failed to provide specific information about the items it alleges Brittingham converted, the attached Exhibit lists the items AAC has represented are the subject of the conversion claim (the "Items"). (Answer & Counterclaim, 38-43, ¶ 1; Stafford, 15, 17-27; Stafford exhibits 8-12). Even after the opportunity to inspect Brittingham's personal property, including all of his firearms, AAC has <u>no</u> evidence that Brittingham possesses the Items. (Stafford, 45). The only evidence AAC has to support its conversion claim is that AAC determined the Items are not at AAC's facility. (Stafford, 37-39).

### 514 (526?) Found Silencers

The 526 silencers that are the subject of AAC's counterclaim for breach of contract are not Purchased Firearms. (APA, Section 1.1(a), 1.1(l), __, 1-2; Schedule 1.1(l), __; Weisnicht 30(b)(6) depo., 49). AAC contends they are Inventory. (2/3/12 letter from Rust to D'Cruz, __, 1-2; Weisnicht 30(b)(6) depo., 50, 70). The APA only describes the parties' obligations with respect to ATF paperwork transfers of Purchased Firearms, not Inventory. (APA, Section 6.9(f)).

AAC "discovered" these silencers in February 2012 and never discussed them with Brittingham during his employment. (Weisnicht 30(b)(6) depo., 68, 78, 83-84). Brittingham first learned of them on February 3, 2012, when AAC informed him that it had recently found 514 silencers at its facility. (2/3/12 letter from Rust to D'Cruz, 1-2). AAC has never explained why that number changed to 526. When AAC requested Brittingham's assistance with paperwork

regarding these silencers, Brittingham signed the Form 3s that AAC asked him to sign on August 14, 2012. (Weisnicht 30(b)(6) depo., 62). Later that day, AAC determined that Brittingham's SOT stamp had expired but AAC has no evidence that Brittingham knew that on August 14, 2012. (Weisnicht depo., 58-59, 62). After subsequently learning that his SOT stamp had expired, Brittingham renewed it so that his SOT stamp became current for the July 1, 2012-July 1, 2013 tax year. (Special Tax Registration Form and Federal Firearms License). AAC possesses the completed paperwork necessary to transfer the silencers to its FFL, but has not submitted it.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has made an initial showing that no genuine issue of material fact exists, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation . . . ." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003). Rather, parties opposing summary judgment must "cit[e] to particular parts of materials in the record" to establish a genuine issue of fact. Fed. R. Civ. P. 56(c)(1); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, (1986).

### B.   AAC Breached the Brittingham EA Because AAC Did Not Have Cause to Terminate Brittingham's Employment.

The elements of breach of contract are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4)

damages." <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 348 (2d Cir.1996) (applying New York law). In order to determine whether a breach has occurred, the court must look to the contract itself to determine the intent of the parties. <u>See</u> <u>Rothenberg v. Lincoln Farm Camp, Inc.</u>, 755 F.2d 1017, 1019 (2d Cir. 1985) (applying New York law); <u>Slatt v. Slatt</u>, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (N.Y. 1985). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." <u>Rothenberg</u>, 755 F.2d at 1019. Where a contract is unambiguously worded and has only one reasonable interpretation, the court "may not make or vary the contract . . . to accomplish its notions of abstract justice or moral obligation." <u>Breed v. Insurance Co. of N. Am.</u>, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (N.Y. 1978).

No genuine issue of material fact exists that the Brittingham EA is a valid and enforceable contract, Brittingham adequately performed under the Brittingham EA, and Brittingham suffered damages. (Answer & Counterclaim, ECF No. 13, ¶¶ 176, 186-187; Cofield, 178-179). Therefore, the only element of breach of contract at issue is AAC's breach. <u>See</u> <u>Harsco</u>, 91 F.3d at 348.

After January 9, 2011, Brittingham did not bring "personal" guns onto the AAC premises AAC cannot demonstrate anything to the contrary. In addition, the inaccurate Gun lists do nothing to prove that Brittingham brought "personal" guns onto the premises.  If Williams is to be believed, the Gun list was created after an October photo shoot and the guns were loaded in Brittingham's truck, and he was told to take off the premises.  Cofield, the 30(b)(6) designee, testified that Brittingham was not fired for taking those guns off the premises (Cofield depo). Therefore, AAC must demonstrate that Brittingham brought guns onto the premises after the truckload was removed.  This, AAC cannot do.  In addition, the Gun list demonstrates that AAC

had no idea who owned these guns. Many belonged to AAC and were on its Bound Books. Many belonged to AAC but were on Random Venture's FFLs Bound Book and may or may not have been Form 3'd. Many were brought onto the Lawrenceville premises by R&D employees for business purposes and with full knowledge of the RPs for AAC's FFLs. Many belonged to Remington but were not entered into the Bound Book. AAC had no idea who owned many of them. All of this occurred when Brittingham was not an RP for any AAC FFL, all compliance duties had been stripped from him, and Schauble (who promised to make AAC a "model of compliance") was in charge of AAC's operations. From this evidence, AAC cannot demonstrate that Brittingham "materially failed" to comply with applicable laws or governmental regulation with respect to the Company's operations or the performance of his duties. To the contrary, AAC, Schauble, Mustian, Roth, and Stevens, by abdicating their RP responsibilities, were guilty of "material failure."

1. **AAC's Breach of the Brittingham EA Constitutes an Anticipatory Repudiation of the APA and Goodwill Agreement.**

To establish anticipatory repudiation under New York law, Brittingham must identify an "overt communication of intention not to perform." See O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp., 915 F. Supp. 560, 567 (W.D.N.Y. 1996).

No genuine issue of material fact exists that the APA and the Goodwill Agreement are valid and enforceable contracts and that Brittingham has performed, and continues to perform, all duties and obligations required of him under those Agreements.

By purporting to terminate Brittingham's employment for Cause under the Brittingham EA, AAC clearly and unequivocally communicated: 1) its intent not to perform its obligation to pay the EBITDA Payment of Four Million Dollars ($4,000,000) under Section 1.8 of the APA, thereby repudiating the APA; and 2) its intent not to perform its obligation to pay the Goodwill

Payment of Four Million Dollars ($4,000,000) under Section 2 of the Goodwill Agreement, thereby repudiating the Goodwill Agreement. At the time of AAC's repudiation, there was a dependency of obligation between the parties to the APA and the Goodwill Agreement.

###### 2. If Anticipatory Repudiation Does Not Apply, AAC's Breach of the Brittingham EA Constitutes a Breach of the APA and Goodwill Agreement.

To the extent a court determines that the doctrine of anticipatory repudiation has no application to the APA and/or the Goodwill Agreement, AAC deprived Random-AAC of its right to receive the EBITDA Payment of Four Million Dollars ($4,000,000) in breach of the APA, and deprived Brittingham of his right to receive the Goodwill Payment of Four Million Dollars ($4,000,000) in breach of the Goodwill Agreement, by purporting to terminate Brittingham's employment for Cause when Cause did not exist under the Brittingham EA.

###### 3. AAC Breached the Implied Covenant of Good Faith and Fair Dealing in the APA and Goodwill Agreement.

The implied covenant of good faith and fair dealing "encompasses any promises which a reasonable person in [plaintiffs' position] would be justified in understanding was included" in the parties' agreement. Just–Irv Sales v. Air–Tite Bus. Ctr., 237 A.D.2d 793, 794, 655 N.Y.S.2d 131 (1997). Here, the APA and Goodwill Agreements contained implied covenants of good faith and fair dealing that obligated AAC not to terminate Brittingham for Cause when Cause did not exist under the Brittingham EA. A reasonable person in Brittingham's position would be justified in understanding that those covenants were included, because Random-AAC's and Brittingham's rights to receive the EBITDA Payment and Goodwill Payment were contingent on AAC's fulfillment of those covenants. AAC's termination of Brittingham for Cause when Cause did not exist deprived him of the right to receive the EBITDA Payment and Goodwill Payment, and AAC therefore breached the covenants of good faith and fair dealing.

More specifically, AAC's actions towards Brittingham evidence the opposite of good faith and fair dealing. Brittingham reasonably expected that AAC/Remington would implement compliance policies and procedures on October 3, 2009, after the APA was executed, and on January 10, 2011, after Brittingham returned from suspension, and Schauble vowed to make AAC a "model of compliance." (Nardelli,  , 178-179; Schauble,  , 177; Ronchi,  , 183; REM170001347). AAC did not. Brittingham also reasonably expected that AAC would <u>not</u> bring in Nardelli's "friend" in lieu of a qualified compliance supervisor, work up a compliance plan without him, terminate him for non-compliance, and then immediately implement the compliance plan.

**4.      As a Guarantor, Remington is Liable for All Losses Resulting From AAC's Breach of the APA and Goodwill Agreement.**

Pursuant to the APA, Remington unconditionally and irrevocably guaranteed, as primary obligor, all of AAC's duties, liabilities, and obligations arising under the APA and the Goodwill Agreement. (APA, Section 6.7). Therefore, Remington is liable for all losses incurred by Random-AAC arising from AAC's breach of the APA, and all losses incurred by Brittingham arising from AAC's breach of the Goodwill Agreement.

**5.      The Restrictive Covenants in the Brittingham EA and APA are Unenforceable.**

Since AAC breached the Brittingham EA and APA, as demonstrated above, the restrictive covenants in the APA and Brittingham EA are unenforceable as a matter of law. <u>Cornell v. T.V. Dev. Corp.</u>, 17 N.Y. 2d 69, 75 (N.Y. 1966).

**C.      No Cause Existed to Terminate Thompson.**

No genuine issue of material fact exists that the Thompson EA is a valid and enforceable contract, Thompson adequately performed under the Agreement, and Thompson suffered

damages. (Thompson EA, _; Answer & Counterclaim, ECF No. 13, ¶¶ 74-80; Jackson 30(b)(6) depo., __, 67; Cofield, _, 23, 106, 149-151). Therefore, the only element of breach of contract at issue is AAC's breach. See Harsco, 91 F.3d at 348.

The undisputed evidence demonstrates that AAC breached the Thompson EA by purporting to terminate her for Cause when Cause did not exist. AAC contends it terminated Thompson based on the following provisions of the Cause definition:

3.2(a)(v)(E)     the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; or

3.2(a)(v)(F)     the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company.

(Thompson EA, Section 3.2(a)(v), _, 2-3; Thompson termination letter, __, 1; Cofield, __, 149-150, 195).

The only factual bases AAC offered to purportedly show Cause are: 1) Thompson did not provide AAC with "the tape" she made of her December 28, 2011 conversation with Rust (Thompson termination letter, __, 1) (the "Tape Issue"); and 2) on the date of her termination, Thompson did not show AAC personal text messages between her and Brittingham (Cofield, __, 23-24) (the "Text Issue"). As demonstrated below, neither constitutes Cause under the Thompson EA.

### 1.   Thompson did not violate subsection 3.2(a)(v)(E).

AAC could not have terminated Thompson for Cause under subsection 3.2(a)(v)(E) of the Thompson EA because: 1) there was no "material violation of any written policy of the Company," 2) AAC did not provide Thompson with "written notice" of any violation; and 3) AAC did not provide Thompson with a 30-day cure period for any such violation.

First, neither the Tape Issue nor the Text Issue was a material violation of any written policy. The only written Company policy AAC cited as a basis for Thompson's termination is the last sentence of the FGI Code of Business Conduct, which states:

> All Employees are required, as a condition of employment and/or continued employment, to cooperate with the Chief Compliance Officer and those appointed by the Chief Compliance Officer to assist the Chief Compliance Officer in an investigation or review of a situation whether or not the Employee is implicated or may become implicated in the investigation or review of a situation.

(Cofield, __, 149-150; FGI Code of Business Conduct, Cofield depo. exhibit 1, __, 17). Neither the Tape Issue nor the Text Issue was a material violation of this provision. Thompson was "fully cooperative" in the December 28 "prep conversation" with Rust (Cofield, __, 121, 144). Thompson agreed in that conversation to provide a <u>copy</u> of the tape. (Cofield, __, 133). What Day and Cofield requested, and what purportedly resulted in her termination, was that Thompson failed to turn over the <u>original</u> recording. (Cofield, __, 109; Day, __, 72-73, 81-82). Regarding the Text Issue, there was no written policy requiring Thompson to show Johnson and Day the text messages. (Cofield, __, 145, 149-151). Further, Thompson "fully cooperated" in the January 24 conversation with Johnson and Day. (Day, __, 85). Johnson asked Thompson: "Will you let us examine your cell phone to review text messages between you and Kevin?" (1/24/12 notes from Johnson, __, 3). Thompson said no, and Johnson asked why not. (1/24/12 notes from Johnson, __, 3; Cofield, __, 110). Thompson explained, "this is my personal phone." (1/24/12 notes from Johnson, __, 3; Cofield, __, 110). Johnson neither asked any follow-up questions nor demanded that Thompson show the text messages. (1/24/12 notes from Johnson, __, 3).

Second, AAC <u>never</u> provided Thompson with written notice about the Tape or Text Issue. (Thompson decl., _).

Third, AAC did not provide Thompson with a 30-day opportunity to cure for either the Tape Issue or Text Issue. The 30-day opportunity to cure is an express condition precedent that must have been literally performed in order for AAC to terminate Thompson for Cause under subsection 3.2(a)(v)(E). See, e.g., Israel v. Chabra, 537 F.3d 86, 92 (2d Cir. 2008). As to the Tape Issue, AAC terminated Thompson less than thirty days after the conversation with Rust occurred. As to the Text Issue, Thompson was terminated during the conversation in which the Text Issue first arose. AAC's failure to comply with this condition precedent means AAC did not have Cause under subsection 3.2(a)(v)(E).

### 2. **Thompson did not violate subsection 3.2(a)(v)(F).**

AAC could not have terminated Thompson for Cause under subsection 3.2(a)(v)(F) of the Thompson EA because: 1) Thompson fully cooperated, 2) there was no "investigation or audit of the Company or its affiliates," and 3) the Board of Directors of the Company (AAC Acquisitions, LLC) did not "reasonably determine" anything related to Thompson's termination.

First, as demonstrated above, Thompson was "fully cooperative" in the December 28 conversation with Rust and the January 24 conversation with Johnson and Day. (Cofield, 121, 144; Day, 85).

Second, Defendants' corporate representative testified repeatedly and emphatically that the conversation with Rust was not an investigation. (Cofield, 115-116, 120-121, 147). She stated: "I wouldn't use the word 'investigation.' It was a prep conversation." (Cofield, 191) (emphasis added).

Third, there was no reasonable determination by the Board of Directors. Reasonable determination by the Board of Thompson's failure to cooperate with an investigation or audit is an express condition precedent that must have been literally performed in order for AAC to

terminate Thompson for Cause under subsection 3.2(a)(v)(F). <u>See, e.g.</u>, <u>Israel</u>, 537 F.3d at 92. At the time of Thompson's termination, Steve Jackson was the only member of AAC's Board. (Jackson 30(b)(6) depo., 40-44). When asked how he found out about Thompson's purported failure to cooperate with an investigation, Jackson stated that "[a]round the time that [Thompson] departed" he "was informed that she was—she had been separated from the company" (Jackson, , 89). As this shows, Jackson did not find out about any failure to cooperate until he learned that Thompson "had been" terminated. Jackson "didn't have any direct responsibilities" related to Thompson's termination. (Jackson, 89-90). Jackson therefore did not "reasonably determine" that Thompson violated subsection 3.2(a)(v)(F).

### 3. <u>The Restrictive Covenants in the Thompson EA are Unenforceable Due To AAC's Breach.</u>

Since AAC breached the Thompson EA by purporting to terminate Thompson for Cause when Cause did not exist, as shown above, the restrictive covenants in the Thompson EA are unenforceable as a matter of law. <u>Cornell</u>, 17 N.Y. 2d at 75.

### D. <u>Summary Judgment is Warranted on AAC's Counterclaims.</u>
### 1. <u>No evidence shows Brittingham possesses the Items.</u>

Georgia law applies to Defendants' counterclaim for conversion. <u>See</u> <u>Grund v. Delaware Charter Guarantee & Trust Co.</u>, 788 F. Supp. 2d 226, 243-44 (S.D.N.Y. 2011); <u>Keehfus Ltd. P'ship v. Fromkin Energy, LLC</u>, No. 1:06CV987, 2007 WL 2454217 (N.D.N.Y. Aug. 23, 2007). Where initial possession of the property was lawful, "the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." <u>Washington v. Harrison</u>, 299 Ga. App. 335, 338, 682 S.E.2d 679, 682 (2009); <u>Johnson v. First Union Nat'l Bank</u>, 255 Ga. App. 819, 823, 567 S.E.2d 44, 48 (2002); <u>see also</u> <u>Williams</u>, 287 Ga. App. at 285.

AAC cannot provide evidence showing that Brittingham has actual possession of the Items. See Johnson, 255 Ga. App. at 823 (granting summary judgment on conversion claim because the plaintiffs "failed to provide any evidence showing that [the defendant] possesses any of the Johnson's personal items.").

Here, AAC admits it has no evidence demonstrating that Brittingham has actual possession of any of the Items. (Stafford, _, 33, 39, 45). The only evidence AAC has in support of its conversion claim are receipts and invoices, some over three years old, which do not show that Brittingham ever possessed, let alone currently possesses, the Items. Brittingham does not, in fact, possess any of the Items.. Further, on March 22, 2013, AAC had the opportunity to inspect all of Brittingham's personal property related to the Items and learned firsthand that he does not possess them. For these reasons, the Court should grant summary judgment and dismiss the counterclaim for conversion.

**2.** **AAC cannot demonstrate that Brittingham or Random-AAC breached the APA.**

**a. There was no breach of the APA.**

AAC alleges that Brittingham's SOT stamp was not current on August 14, 2012, when AAC asked him to sign ATF paperwork to transfer 526 silencers it found after his termination. (Counterclaim, ECF No. 13, ¶ 20). This alleged breach occurred approximately eight months after AAC terminated Brittingham's employment and nearly three years after Brittingham transferred legal ownership of the silencers to AAC.

The provisions AAC relies upon are Sections 1.1, 2.1, 3.1, 3.2, 3.9, and 6.9. (Counterclaim, ¶¶ 3-6). None contain any obligation that Brittingham or Random-AAC failed to perform. Section 1.1 states that Brittingham and Random-AAC sold all Purchased Assets to AAC on October 2, 2009. They did. The representations and warranties in Sections 2.1, 3.1, 3.2,

and 3.9 of the APA only relate to Brittingham and Random-AAC's status on that day. (APA, 9-10, 15-16). AAC has not alleged that, on October 2, 2009, Brittingham or Random-AAC did not have authority to enter into the APA or did not have the necessary permits and licenses to transfer the Purchased Assets to AAC.

AAC also cannot demonstrate that Brittingham or Random-AAC failed to perform any obligation under Section 6.9 of the APA. Section 6.9 only sets forth procedures for completing the paperwork required to transfer Purchased Firearms. (APA, Section 6.9(f)). The 526 silencers are not Purchased Firearms and therefore are <u>not</u> covered by Section 6.9. (Weisnicht 30(b)(6) depo., 49). To the extent paperwork is needed to transfer other Purchased Assets to AAC's FFL, Section 6.9 contains no specific obligations for either party. (APA, Section 6.9(f)).

Moreover, Brittingham has an SOT stamp that is valid for the July 1, 2012 to July 1, 2013 tax year. (Special Tax Registration Form and Federal Firearms License, Brittingham000411 ). Despite AAC's contention that Brittingham somehow breached the APA, Brittingham has attempted to cooperate with AAC and remains willing to assist with the transfer of these silencers. (Brittingham, 51-52, 55). Since Brittingham has signed the necessary paperwork and has a current SOT stamp, AAC needs to submit the paperwork.

### b. AAC suffered no damages.

"Where no breach has occurred, there can be no damages." <u>Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc.</u>, No. CV 11-4825, 2012 WL 5289606, at *5 (E.D.N.Y. Sept. 13, 2012). Here, since neither Brittingham nor Random-AAC breached the APA, AAC necessarily suffered no damages.

### IV.   CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court grant this summary

judgment motion. In addition, Plaintiffs respectfully request that the Court dismiss Defendants'

counterclaims.

Respectfully submitted this 30th day of April, 2013.

MORRIS, MANNING & MARTIN, LLP


_*/s/ R. Jason D'Cruz*_
R. Jason D'Cruz (GA Bar No. 004740)
(Admitted pro hac vice September 14, 2012)
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000
(404) 365-9532 (f)
rjd@mmmlaw.com

O'HARE PARNAGIAN LLP
Robert A. O'Hare Jr.
Michael Zarocostas
Andrew C. Levitt
82 Wall Street, Suite 300
New York, NY 10005-3686
(212) 425-1401
(212) 425-1421 (f)
rohare@ohareparnagian.com
mzarocostas@ohareparnagian.com
alevitt@ohareparnagian.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RANDOM VENTURES, INC. (f/k/a, ADVANCED    :
ARMAMENT CORP.), KEVIN BRITTINGHAM,    :
and LYNSEY THOMPSON,    :   ECF Case
   :
           Plaintiffs,    :   No. 12-CV-6792 (KBF)
   :
      - against -    :   **CERTIFICATE OF SERVICE**
   :
ADVANCED ARMAMENT CORP., LLC, and    :
REMINGTON ARMS COMPANY, LLC,    :
   :
           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I hereby certify that I have served a copy of the foregoing "Memorandum of Law in

Support of Plaintiffs' Motion for Summary Judgment" upon Defendants Advanced Armament

Corp., LLC and Remington Arms Company, LLC via electronic filing through the CM-ECF

system to the following:

Michael J. DiMattia                                Dana L. Rust
Philip A. Goldstein                                 Edward M. Eakin, III
McGuire Woods LLP                          McGuire Woods LLP
1345 Avenue of the Americas, 7th Floor      901 East Cary Street
New York, NY 10105                            Richmond, Virginia 23219

This 30th day of April, 2013

                             By:    * /s/ R. Jason D'Cruz*
                                  R. Jason D'Cruz (GA Bar No. 004740)
                                  Admitted pro hac vice September 14, 2012
                                  rjd@mmmlaw.com
                                  Morris, Manning & Martin, LLP
                                  1600 Atlanta Financial Center
                                  3343 Peachtree Road, N.E.
                                  Atlanta, GA 30226
                                  Telephone: (404) 233-7000
                                  Facsimile: (404) 365-9532

*Attorney for Plaintiffs*