# Exhibit 21

*Execution Version*

---

ASSET PURCHASE AGREEMENT


by and among

AAC ACQUISITIONS, LLC, as Buyer


ADVANCED ARMAMENT CORP., as Seller

KEVIN BRITTINGHAM, as Shareholder

and

REMINGTON ARMS COMPANY, INC., as Guarantor

---


October 2, 2009

Brittingham - 000001

TABLE OF CONTENTS

Page

Article 1 PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES; CLOSING .............1

1.1 Purchased Assets .................................................................................................1

1.2 Excluded Assets....................................................................................................3

1.3 Limited Assumption of Liabilities .......................................................................3

1.4 Excluded Liabilities .............................................................................................4

1.5 Insurance Proceeds................................................................................................5

1.6 Purchase Price; Tax Allocation ............................................................................5

1.7 Closing...................................................................................................................5

1.8 Additional Contingent Consideration ..................................................................6

1.9 Reserved ................................................................................................................8

1.10 Post-Closing Purchase Price Adjustment.............................................................8

1.11 Subsequent Actions...............................................................................................9

Article 2 REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER......................9

2.1 Authority and Enforceability.................................................................................9

2.2 Conflicts.................................................................................................................9

2.3 Litigation..............................................................................................................10

2.4 Brokers and Finders ............................................................................................10

Article 3 REPRESENTATIONS AND WARRANTIES AS TO SELLER ...........................10

3.1 Organization and Power ......................................................................................10

3.2 Authority and Enforceability...............................................................................10

3.3 Conflicts...............................................................................................................11

3.4 Investments; Subsidiaries ...................................................................................11

3.5 Financial Statements ...........................................................................................11

3.6 No Undisclosed Liabilities..................................................................................12

3.7     Operations Since June 30, 2009 ............................................................12

3.8     Taxes ..........................................................................................13

3.9     Permits ........................................................................................15

3.10    Real Property ................................................................................16

3.11    Intellectual Property ......................................................................16

3.12    Compliance with Laws ...................................................................17

3.13    Contracts. ....................................................................................17

3.14    Government Contracts ....................................................................19

3.15    No Debarment or Suspension - Export ...............................................20

3.16    Export/Foreign Corrupt Practices Act ................................................20

3.17    Foreign Assets Control; Anti-Money Laundering ..................................21

3.18    Foreign Assets; Revenues ................................................................21

3.19    Employee Benefits .........................................................................21

3.20    Environmental Matters ....................................................................23

3.21    Employee Relations and Agreements ..................................................24

3.22    Litigation .....................................................................................25

3.23    Insurance .....................................................................................25

3.24    Suppliers and Customers .................................................................25

3.25    Accounts Receivable .......................................................................26

3.26    Purchased Assets ...........................................................................26

3.27    Transactions with Affiliates .............................................................26

3.28    Inventory .....................................................................................26

3.29    Product Liabilities and Product Warranties ..........................................27

3.30    Ownership of Equity .......................................................................27

3.31    No Brokers ...................................................................................27

Brittingham - 000003

Article 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 27

4.1    Organization of Buyer ........................................................... 27

4.2    Authority of Buyer .............................................................. 27

4.3    No Violation of Law and Agreements ............................................ 27

4.4    No Litigation or Regulatory Action ............................................ 28

4.5    Financial Ability .............................................................. 28

4.6    No Brokers ..................................................................... 28

Article 5 ACTIONS PRIOR TO THE CLOSING DATE ........................................ 28

5.1    Consents of Third Parties; Governmental Approvals ............................. 28

5.2    Operations Prior to the Closing Date .......................................... 29

5.3    Commercially Reasonable Efforts ............................................... 30

5.4    Access to Information ......................................................... 31

5.5    Employees ...................................................................... 31

5.6    Royalty Agreement ............................................................. 32

5.7    Notification of Certain Matters ............................................... 32

5.8    No Solicitations .............................................................. 32

5.9    Personal Goodwill Acquisition Agreement ....................................... 32

Article 6 POST-CLOSING AGREEMENTS .................................................. 32

6.1    Equity Commitment ............................................................. 32

6.2    Transfer and Other Tax Matters ................................................ 33

6.3    Confidentiality ............................................................... 33

6.4    Non-Compete ................................................................... 33

6.5    Non-Disparagement ............................................................. 35

6.6    Novation of Government Contracts .............................................. 35

6.7    Guaranty ...................................................................... 35

Brittingham - 000004

6.8        Litigation Costs ............................................................................... 35

6.9        Firearms Operations ....................................................................... 36

6.10       Use of Name .................................................................................... 37

Article 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ......................... 37

7.1        No Misrepresentation or Breach of Covenants and Warranties ................. 37

7.2        No Injunction ................................................................................... 37

7.3        Required Consents ........................................................................... 37

7.4        Reserved .......................................................................................... 37

7.5        Key Employment Agreements; Silvers Royalty Agreement ..................... 37

7.6        Lease ................................................................................................ 37

7.7        Absence of Impairment .................................................................... 38

7.8        FN Consent ...................................................................................... 38

7.9        Assignment Instruments .................................................................. 38

7.10       Laws ................................................................................................ 38

7.11       Goodwill Acquisition Agreement ................................................... 38

Article 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ......................... 38

8.1        No Misrepresentation or Breach of Covenants and Warranties ................. 38

8.2        Required Consents ........................................................................... 38

8.3        No Injunction ................................................................................... 38

8.4        Assumption Instruments .................................................................. 38

8.5        Laws ................................................................................................ 38

8.6        Goodwill Acquisition Agreement ................................................... 38

Article 9 INDEMNIFICATION ................................................................................. 39

9.1        Indemnification by Seller and Shareholder .................................... 39

9.2        Indemnification by Buyer ............................................................... 39

#4842-1748-2244

Brittingham - 000005

9.3     Tax Indemnification ..................................................................................39

9.4     Notice of Claims ......................................................................................40

9.5     Third Person Claims..................................................................................40

9.6     Limitations ..............................................................................................41

9.7     Mitigation................................................................................................41

9.8     Right of Setoff .........................................................................................41

Article 10 TERMINATION .........................................................................................41

10.1    Termination .............................................................................................41

Article 11 GENERAL PROVISIONS............................................................................42

11.1    Survival of Covenants, Representations and Warranties ...........................42

11.2    No Public Announcement ..........................................................................43

11.3    Notices ....................................................................................................43

11.4    Successors and Assigns .............................................................................44

11.5    Access to Records and Employees after Closing ........................................44

11.6    Entire Agreement......................................................................................45

11.7    Interpretation ..........................................................................................45

11.8    Amendments and Waivers..........................................................................46

11.9    Expenses .................................................................................................46

11.10       Partial Invalidity...............................................................................46

11.11       Execution in Counterparts; Facsimile ................................................46

11.12       Governing Law..................................................................................46

11.13       Consent to Jurisdiction; Waiver of Jury Trial ....................................47

11.14       No Third Party Beneficiaries.............................................................47

Article 12 DEFINITIONS ............................................................................................47

12.1    Definitions................................................................................................47

Brittingham - 000006

12.2     Index of Defined Terms.........................................................................................51

Exhibit A          June 30 Financial Statements

Exhibit B          Kevin Brittingham Employment Agreement

Exhibit C          Lynsey Thompson Employment Agreement

Exhibit D          Robert Silvers Employment Agreement

Exhibit E          Silvers Royalty Agreement

Exhibit F          Goodwill Acquisition Agreement

Brittingham - 000007

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of October 2, 2009, by and among AAC ACQUISITIONS, LLC, a Delaware limited liability company ("*Buyer*"), ADVANCED ARMAMENT CORP., a Georgia corporation ("*Seller*"), KEVIN BRITTINGHAM ("*Shareholder*") and REMINGTON ARMS COMPANY, INC., a Delaware corporation ("*Guarantor*").

## RECITALS

WHEREAS, Seller is engaged in the business of designing, manufacturing, marketing and selling silencers and other component parts of Firearms for government and consumer markets (the "*Business*");

WHEREAS, Seller desires to sell, and Buyer desires to buy, substantially all of Seller's assets on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, to induce Seller and Shareholder to enter into this Agreement, Guarantor, who controls and is the direct parent of Buyer, is willing to guaranty to Seller and Shareholder all of the duties, liabilities and obligations of Buyer arising under or pursuant to this Agreement as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, the parties hereto agree as follows (Section 12.1 contains definitions of certain terms used in this Agreement, and Section 12.2 contains an index of other terms defined elsewhere in this Agreement):

## ARTICLE 1
## PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES; CLOSING

1.1 <u>Purchased Assets</u>. Except for the Excluded Assets, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in and to Seller's assets used or useful in connection with the Business (collectively, the "*Purchased Assets*"), including, but not limited to, the following, free and clear of all Encumbrances except Permitted Encumbrances:

(a) all inventories of raw materials, work-in-process, finished goods, products under research and development, demonstration equipment, office and other supplies, parts, packaging materials and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' premises on consignment, in each case, which are used or held for use by Seller in the conduct of the Business, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, together with all rights of Seller against suppliers of such inventories (the "*Inventory*");

(b) except for the Shareholder Accounts Receivable described in Section 1.2(g), all trade accounts receivable and all notes, bonds and other evidences of indebtedness of and rights to receive payments arising out of sales occurring in the conduct of the Business and any security agreements related thereto, including any rights of Seller with respect to any third party

#4842-1748-2244

1

Brittingham - 000008

collection procedures or any other Actions which have been commenced in connection therewith (the "***Accounts Receivable***");

(c)     to the extent assignable to Buyer, any and all Permits, consents and licenses held by Seller and used or useful in the Business, including without limitation as described on Schedule 1.1(c);

(d)     all furniture, fixtures, machinery, equipment, vehicles, tools and implements of any kind, character or nature used or useful in the Business, including without limitation as described on Schedule 1.1(d);

(e)     all Contracts to which Seller is a party and which are utilized in the conduct of the Business, including without limitation Contracts relating to suppliers, sales representatives, distributors, purchase orders, marketing arrangements and manufacturing arrangements (the "***Business Contracts***") other than the Excluded Business Contracts; *provided*, *however*, that any Business Contracts that are Government Contracts shall be subject to novation pursuant to Section 6.6;

(f)     all Intellectual Property used or useful in the Business, including without limitation those copyrights, patents, trademarks, trade names and pending applications, described on Schedule 1.1(f) (the "***Business Intellectual Property***");

(g)     except as set forth in Section 1.2(c), all prepaid expenses of Seller relating to the Business, including amounts paid in advance on account of rent, property taxes, utility charges, fuel, fees and deposits;

(h)     originals or copies (at the option of Buyer) of all books, records, manuals, files, customer and supplier lists and records, accounts and billing records, plans, blueprints, specifications, drawings, surveys, personnel records (to the extent they may lawfully be provided to Buyer) and operating data of Seller used or useful in the Business, whether in electronic format or otherwise;

(i)     all rights of Seller in and to all databases, software, software programs, object codes, source codes, systems documentation and user manuals used or useful in the Business, including without limitation as described on Schedule 1.1(i);

(j)     the right to bill and receive payments for products shipped or delivered by Seller related to the Purchased Assets or the Business, but unbilled or unpaid as of the Closing;

(k)     all telephone numbers (e.g., toll free numbers), facsimile numbers, internet addresses, websites and similar numbers or addresses assigned to or used by Seller in the Business;

(l)     each of the Firearms, Firearm components and other equipment set forth on Schedule 1.1(l) (the "***Purchased Firearms***");

(m)     all of Seller's catalogs, samples, marketing and promotional materials used or useful in the Business; and

(n)     all Cash held by the Company.

1.2     Excluded Assets.  Notwithstanding anything to the contrary contained herein, the Purchased Assets do not include the following assets of Seller (collectively, the "*Excluded Assets*"):

(a)     all federal, state and local income tax, property tax and other tax credits and tax refund claims arising out of Seller's operations prior to Closing;

(b)     the minute books, equity record books and tax returns of Seller;

(c)     any insurance policies, insurance proceeds, insurance refunds and prepaid expenses relating to the period prior to the Closing;

(d)     all Contracts other than the Business Contracts and any claims related to Excluded Assets or Excluded Liabilities, and any counterclaims that Seller may have in respect of claims, causes of action or litigation brought against it prior to the Closing Date and related to Excluded Assets or Excluded Liabilities;

(e)     the Business Contracts set forth on Schedule 1.2(e) (the "*Excluded Business Contracts*");

(f)     any personnel records required by Law to be retained by Seller;

(g)     any accounts receivable of the Seller owed by Shareholder and set forth on Schedule 1.2(g) (the "*Shareholder Accounts Receivable*");

(h)     all rights of Seller under this Agreement; and

(i)     those assets described on Schedule 1.2(i).

1.3     Limited Assumption of Liabilities.  Subject to the terms and conditions of this Agreement, Buyer hereby agrees to assume, as of the Closing Date, and agrees to pay, perform and discharge when due, only the following liabilities, responsibilities and obligations of Seller (collectively, the "*Assumed Liabilities*"):

(a)     Business Contracts.  All liabilities, responsibilities and obligations of Seller arising out of or relating to the Business Contracts listed on Schedule 1.3(a), but only to the extent they arise, accrue or become performable after the Closing Date, except as may be required by a Federal Government Agency in connection with a novation agreement;

(b)     Customer Deposits.  To the extent included in the Purchased Assets, all liabilities, responsibilities and obligations relating to each of the security or other deposits made by customers of Seller set forth on Schedule 1.3(b) (the "*Customer Deposits*");

(c)     Regulatory Obligations.  All liabilities, responsibilities and obligations relating to any rule, regulation, law, mandate, decision or order of any Governmental Entity, whether enacted or promulgated before, on or after the Closing Date or any Permit, consent or license included in the Purchased Assets, in each case relating to periods on or after the Closing Date;

(d)     Accounts Payable.  The accounts payable set forth on Schedule 1.3(d), excluding all Transaction Expenses and the Litigation Costs provided for in Section 6.8 (the "*Accounts Payable*");

(e)       <u>Warranty Claims</u>.  All liabilities, responsibilities and obligations arising out of any warranty obligations to customers of the Business, but only to the extent such obligations arise from warranty claims made in respect of merchandise sold on or after the Closing Date; and

(f)       <u>Other Liabilities and Obligations</u>.  Except as set forth in <u>Section 1.4</u> hereof, all other liabilities and obligations to the extent such liabilities and obligations arise from the ownership, use and operation of the Purchased Assets by Buyer following the Closing Date.

Notwithstanding anything in this <u>Section 1.3</u> to the contrary, "Assumed Liabilities" shall not include any liabilities, responsibilities or obligations expressly identified as Excluded Liabilities pursuant to <u>Section 1.4</u>.

1.4       <u>Excluded Liabilities</u>.  Except as set forth in <u>Section 1.3</u>, Buyer shall not assume or be responsible for any of the liabilities or obligations of the Shareholder or Seller (collectively, the "***Excluded Liabilities***") including without limitation, the following:

(a)       any and all liabilities or obligations associated with or relating to any Excluded Assets and any debt of Seller for borrowed money (including any intercompany debt of Seller owed to any one or more of its Affiliates) and any outstanding obligations of Seller under any capital leases or Business Contracts as of the Closing Date, other than as set forth on <u>Schedule 1.3(a)</u>;

(b)       any liability or obligation of any kind, character or nature (whether the related claim is made before or after the Closing) arising out of the conduct of Seller in connection with the ownership or operation of the Purchased Assets or the Business prior to the Closing Date, including without limitation all liabilities, responsibilities and obligations arising out of any warranty obligations to customers of the Business to the extent such obligations arise from warranty claims made in respect of merchandise sold prior to the Closing Date;

(c)       any liability or obligation of any kind, character or nature (whether the related claim is made before or after the Closing) with respect to any Contract to which Seller is a party that is not a Business Contract;

(d)       any liability or obligation of any kind, character or nature (whether the related claim is made before or after the Closing) with respect to (i) any current or former employees, directors, consultants or agents of Seller, including without limitation the Transferred Employees, whether or not such employees, directors consultants or agents become Buyer's employees, directors, consultants or agents, including without limitation any liability under the Worker Adjustment and Retraining Notification Act, or (ii) any employment contract, retention, incentive, inducement or other similar benefit or arrangement, severance or separation plan or arrangement, employee benefit plan or arrangement with respect to which Seller is a party, Seller sponsors, or Seller has any liability, including without limitation, any Benefit Plan;

(e)       Benefit Plans, and any liability or obligation of any kind, character or nature relating to any current or former Benefit Plan;

(f)       any liability or obligation of any kind, character or nature with respect to any Affiliate of Seller;

(g)       any liabilities related to (i) income taxes (including interest or penalties) of Seller or Shareholder and (ii) all other taxes (including interest or penalties) attributable to Seller or

Shareholder for the tax periods or portions of tax periods ending on or prior to the Closing Date, including, but not limited to, sales, use and excise taxes;

      (h)    any liabilities or obligations, whenever arising or occurring, relating to the ownership or operation of the Purchased Assets arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, events or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, liabilities or obligations for the on-site or off-site release, handling, discharge, treatment, storage, disposal, arrangement for disposal or presence of Hazardous Substances; and

      (i)    any liabilities, responsibilities and obligations relating to any rule, regulation, law, mandate, decision or order of any Governmental Entity other than those described in Section 1.3(c).

      The Excluded Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller.

      1.5    <u>Insurance Proceeds</u>.  If prior to the Closing, any Purchased Assets shall have suffered, sustained or incurred any material loss, damage or destruction and Seller shall not have completed the repair or replacement of such Purchased Asset as of the Closing Date to the reasonable satisfaction of Buyer, then at Buyer's option upon two (2) days written notice to Seller, Seller shall, at the Closing, assign and transfer to Buyer, and Buyer shall be entitled to receive from Seller, all insurance proceeds collected by reason of such loss, damage or destruction which have not been expended on such repair or replacement, together with any rights to receive any uncollected insurance proceeds relating to such loss, damage or destruction which are payable to Seller.  This <u>Section 1.5</u> shall not limit Buyer's other rights hereunder.

      1.6    <u>Purchase Price; Tax Allocation</u>.  The purchase price for the Purchased Assets shall be ten million one hundred sixty thousand dollars ($10,160,000) (the "***Purchase Price***") *plus* the additional contingent consideration set forth in <u>Section 1.8</u>.  The Purchase Price, as adjusted in accordance with this <u>Section 1.6</u>, *plus* the amount of the Assumed Liabilities, shall be allocated for tax purposes among the Purchased Assets and the non-compete covenant in <u>Section 6.4</u> consistent with the general principles provided in the Code, Section 1060 and the regulations promulgated thereunder and in accordance with <u>Schedule 1.6</u> attached hereto.  Buyer, Seller and Shareholder shall each file all respective income and other tax returns consistent with such allocation for the tax year in which this Agreement is executed and Buyer, Seller and Shareholder shall report all tax consequences of the transactions contemplated by this Agreement in a manner consistent with such allocation, and not take any position inconsistent therewith upon examination of any tax return, in any refund claim, in any litigation or investigation or otherwise.

      1.7    <u>Closing</u>.

      (a)    Upon the terms set forth in this Agreement and subject to the fulfillment (or waiver by the party whose obligations are so conditioned) of the conditions set forth in <u>Articles 7</u> and <u>8</u> hereof, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall be on the Closing Date at the offices of Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, New York, or at such other place and time as shall be agreed upon by Buyer and Seller.

      (b)    At the Closing, (i) Seller will assign and transfer to Buyer all of its right, title and interest in and to the Purchased Assets (free and clear of all Encumbrances, other than Permitted Encumbrances) by delivery of such instruments of conveyance, assignment and transfer, in form and

substance reasonably acceptable to Buyer's counsel, as shall be effective to vest in Buyer good title to the Purchased Assets (the "***Assignment Instruments***"), and (ii) Buyer will assume from Seller the due payment, performance and discharge of the Assumed Liabilities by delivery of such instruments of assumption, in form and substance reasonably acceptable to Seller's counsel, as shall be effective to cause Buyer to assume the Assumed Liabilities as and to the extent provided in Section 1.3 (the "***Assumption Instruments***").   At the Closing, there shall also be delivered to Seller and Buyer the certificates and other Contracts, documents and instruments required to be delivered under Articles 7 and 8.

(c)      At the Closing, Buyer shall make the following payments:

(i)      Debt Holders.  Buyer shall pay on behalf of Seller to each holder of debt of Seller and lessors under capital leases set forth on Schedule 1.7(c)(i) hereto (each a "***Debt Holder***") the amount specified for each such Debt Holder on Schedule 1.7(c)(i).   Such payment shall be made by wire transfer of immediately available funds on the Closing Date to the accounts specified by each Debt Holder at lease two (2) Business Days prior to the Closing Date.   Simultaneously upon payment, Buyer shall receive a certificate of accord and satisfaction in a form satisfactory to Buyer executed by each such Debt Holder.

(ii)      Transaction Expenses.  Buyer shall pay on behalf of Seller the Transaction Expenses to each person set forth on Schedule 1.7(c)(ii) hereto the amount specified for each such person on Schedule 1.7(c)(ii).   Such payment shall be made by wire transfer of immediately available funds on the Closing Date to the accounts specified by each recipient set forth on Schedule 1.7(c)(ii) at lease two (2) Business Days prior to the Closing Date.

(iii)      Immediate Payment to Seller.  Buyer shall pay to Seller the amount equal to ten million one hundred sixty thousand dollars ($10,160,000) *minus* the aggregate amount of payments made to Debt Holders pursuant to Section 1.7(c)(i) hereof and the Transaction Expenses provided in Section 1.7(c)(ii).   Such payment shall be made by wire transfer of immediately available funds on the Closing Date to the account specified by Seller at least two (2) Business Days prior to the Closing Date.

1.8      Additional Contingent Consideration.

(a)      On or prior to March 31, 2015, provided that (i) on that date Shareholder (A) is an employee of Buyer or an Affiliate of Buyer, (B) is not an employee of Buyer or an Affiliate of Buyer by reason of death or permanent disability or (C) is not an employee of Buyer or an Affiliate of Buyer as a result of termination of employment by Buyer or an Affiliate of Buyer other than for "cause" or termination of employment by Shareholder for "good reason", in each case as defined in the employment agreement to be entered into by Buyer and Shareholder pursuant to Section 5.5(e) and (ii) the Business achieves a Cumulative Adjusted EBITDA of twenty million dollars ($20,000,000), Buyer shall pay to Seller, or its permitted successor and assigns, four million dollars ($4,000,000) (the "***EBITDA Contingent Payment***"), subject to Buyer's right of setoff set forth in Section 9.8.

For purposes of this Section 1.8:

(i)      "***Adjusted EBITDA***" means the earnings of the Business before interest, federal and state income Taxes, depreciation and amortization, all as determined in accordance with GAAP consistent with Buyer's accounting practices and procedures, which practices and procedures insofar as they apply to the definition of Adjusted EBITDA for purposes of this Agreement shall be applied in a consistent manner throughout the period

covered thereby, except for changes in practices and procedures required by GAAP on the advice of Buyer's independent public accountant, *adjusted* to reflect all (A) compensation expense (excluding expenses recognized in connection with payments made pursuant to this Section 1.8), other than with respect to non-cash equity compensation, related to the Business, (B) capital expenditures by Buyer or its Affiliates made in connection with the Business and (C) extraordinary and non-recurring expenses up to five hundred thousand dollars ($500,000) in the aggregate;

(ii)    "*Cumulative Adjusted EBITDA*" means the sum of the Adjusted EBITDA calculations for each of Partial Fiscal Year 2009 and fiscal years 2010, 2011, 2012, 2013 and 2014; and

(iii)    "*Partial Fiscal Year 2009*" means the portion of fiscal year 2009 beginning on the Closing Date and ending on the last day of such fiscal year.

(b)    Determination of Cumulative Adjusted EBITDA.

(i)    Within sixty (60) days following December 31, 2014, Buyer shall deliver to Seller a schedule prepared by Buyer setting forth Buyer's calculation of Cumulative Adjusted EBITDA (the "*Payment Schedule*").  If the Cumulative Adjusted EBITDA calculation set forth in such Payment Schedule is greater than or equal to twenty million dollars ($20,000,000), Buyer shall pay to Seller the EBITDA Contingent Payment pursuant to the terms of Section 1.8(a).

(ii)    Seller shall notify Buyer in writing within thirty (30) days following receipt of the Payment Schedule if Seller disagrees with some or all of the calculations set forth therein, identifying with specificity the calculations with which Seller disagrees (a "*Seller's Contingent Payment Dispute Notice*").    Upon receipt by Buyer of a Seller's Contingent Payment Dispute Notice, Buyer and Buyer's accountants, on the one hand, and Seller and Seller's accountants, on the other hand, will use good faith efforts during the ten (10) day period following the date of receipt of a Seller's Contingent Payment Dispute Notice (the "*Resolution Period*") to resolve any differences they may have as to the calculations of Cumulative Adjusted EBITDA.  Seller may request, and Buyer shall provide, reasonable access during normal business hours to the information and data used to calculate Cumulative Adjusted EBITDA.  If Buyer and Seller cannot reach agreement during the Resolution Period, within five (5) Business Days thereafter, their disagreements shall be submitted to an independent, nationally-recognized public accounting firm jointly selected by Seller and Buyer (the "*Independent Accountant*") which shall conduct such additional review as is necessary to resolve the specific disagreements referred to it.    Based upon such review, the Independent Accountant shall determine Cumulative Adjusted EBITDA (the "*Independent Accountant Determination*").  Such determination shall be completed as promptly as practicable but in no event later than forty-five (45) days following the selection of the Independent Accountant and shall be confirmed by the Independent Accountant in writing to, and shall be final and binding on, Buyer and Seller for purposes of this Section 1.8.

(iii)    In connection with any such dispute, Seller and Buyer shall each bear one-half of the costs and expenses of the Independent Accountant.

(iv)    On the fifth Business Day after the earlier of (A) the expiration of the Resolution Period, if Buyer and Seller have resolved any differences regarding the

Brittingham - 000014

calculations of Cumulative Adjusted EBITDA, and (B) the receipt of the Independent Accountant Determination, Buyer shall pay to Seller any unpaid EBITDA Contingent Payment or Seller shall repay to Buyer any EBITDA Contingent Payment that was erroneously paid to Seller, in each case as determined pursuant to Section 1.8(b)(ii).

       (c)     At all times until December 31, 2014:

       (i)     for internal financial reporting purposes, Buyer shall maintain the Business as a separate accounting entity;

       (ii)     Buyer shall operate the Business in a commercially reasonable manner and shall not take any action solely intended to avoid paying the EBITDA Contingent Payment;

       (iii)     Buyer shall not sell or dispose of the Business or all or substantially all of the assets of the Business existing as of the Closing Date unless the buyer thereof agrees to assume the obligations of Buyer with respect to the EBITDA Contingent Payments; and

       (d)     Buyer shall provide Shareholder an annual statement (the "***Annual Statement***") within 90 days following the end of each annual fiscal period following the Closing Date of the then current calculation of the Adjusted EBITDA of the Business for such fiscal period. Shareholder may request, and Buyer shall provide, reasonable access during normal business hours to the information and data used to calculate the amounts set forth in the Annual Statement and the Payment Schedule.

       1.9     ReservedPost-Closing Purchase Price Adjustment.

       (a)     On or prior to the date seventy-five (75) days after the Closing Date, Buyer shall deliver to Seller a balance sheet of the Business as of the Closing Date prepared in accordance with GAAP by a nationally recognized valuation firm (the "***True Up Closing Balance Sheet***") which shall include a calculation of the sum of (i) Cash, Inventory and Accounts Receivable (other than those Accounts Receivable set forth on Schedule 3.25) and (ii) Customer Deposits and Accounts Payable. On the earlier of thirty (30) days after receipt of the True Up Closing Balance Sheet or ten (10) Business Days following resolution of any disagreements with respect to the True Up Closing Balance Sheet pursuant to Section 1.10(b), (A) Seller shall pay to Buyer the amount, if any, by which (1) the sum of Customer Deposits and Accounts Payable exceeds (2) the sum of Cash, Inventory and Accounts Receivable (other than those Accounts Receivable set forth on Schedule 3.25) or (B) Buyer shall pay to Seller the amount, if any, by which (1) the sum of Cash, Inventory and Accounts Receivable (other than those Accounts Receivable set forth on Schedule 3.25) exceeds (2) the sum of Customer Deposits and Accounts Payable; *provided* that to the extent any payment is required to be made by Seller or Shareholder pursuant to this Section 1.10, Buyer shall deduct from such amount the first $250,000 due under this Section 1.10 pursuant to its right of setoff forth in Section 9.8 prior to seeking any repayment directly from Seller or Shareholder.

       (b)     Seller shall notify Buyer in writing within thirty (30) days following receipt of the True Up Closing Balance Sheet if Seller disagrees with some or all of the calculations set forth therein, identifying with specificity the calculations with which Seller disagrees (a "***Seller's True Up Closing Balance Sheet Dispute Notice***"). Upon receipt by Buyer of a Seller's True Up Closing Balance Sheet Dispute Notice, Buyer and Buyer's accountants, on the one hand, and Seller and Seller's accountants, on the other hand, will use good faith efforts during the ten (10) day period following the

date of receipt of a Seller's True Up Closing Balance Sheet Dispute Notice (the "***True Up Closing Balance Sheet Resolution Period***") to resolve any differences they may have as to the calculations set forth on the True Up Closing Balance Sheet. Seller may request, and Buyer shall provide, reasonable access during normal business hours to the information and data used to calculate the amounts set forth in the True Up Closing Balance Sheet. If Buyer and Seller cannot reach agreement during the True Up Closing Balance Sheet Resolution Period, within five (5) Business Days thereafter, their disagreements shall be submitted to an independent, nationally-recognized public accounting firm jointly selected by Seller and Buyer (the "***True Up Closing Balance Sheet Independent Accountant***") which shall conduct such additional review as is necessary to resolve the specific disagreements referred to it. Based upon such review, the True Up Closing Balance Sheet Independent Accountant shall prepare a revised True Up Closing Balance Sheet. Such revised True Up Closing Balance Sheet shall be completed as promptly as practicable but in no event later than forty-five (45) days following the selection of the True Up Balance Sheet Independent Accountant and shall be confirmed by the True Up Closing Balance Sheet Independent Accountant in writing to, and shall be final and binding on, Buyer and Seller for purposes of this Section 1.10. In connection with such dispute, Seller and Buyer shall each bear one-half of the costs and expenses of the True Up Closing Balance Sheet Independent Accountant.

       1.11    Subsequent Actions. At any time or from time to time after the Closing, Seller shall execute and deliver to Buyer such other documents and instruments, provide such materials and information and take such other actions as Buyer may reasonably request to more effectively vest title to the Purchased Assets in Buyer and, to the fullest extent permitted by Law, to put Buyer in actual possession and operating control of the Business, and otherwise to cause Seller to fulfill its obligations under this Agreement.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER

       As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Shareholder represents and warrants to Buyer as set forth below.

       2.1    Authority and Enforceability. Shareholder is an individual and has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement and to perform Shareholder's obligations hereunder. This Agreement has been duly authorized, executed and delivered by Shareholder and constitutes the legal, valid and binding obligations of Shareholder, enforceable against Seller in accordance with its terms subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general equity principles.

       2.2    Conflicts. The execution and delivery of this Agreement and the performance of Shareholder's obligations hereunder and the consummation of the transactions contemplated hereby, do not and will not:

       (a)    conflict with or result in a violation or breach of any term or provision of applicable Law; or

       (i)    require Shareholder to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of;

       (ii)    conflict with or result in a violation or breach of;

(iii)    constitute (with or without notice or lapse of time or both) a default under;

(iv)    result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to;

(v)    result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under; or

(vi)    result in the creation or imposition of any Encumbrance upon Shareholder or any of his respective assets or properties under,

any Contract or Permit to which Shareholder is a party or by which any of his assets or properties is bound.

2.3    Litigation.    There is no action, claim, suit or proceeding pending or, to Shareholder's knowledge, threatened against Shareholder before any Governmental Entity, that, individually or in the aggregate, would reasonably be expected to have an adverse effect on Shareholder's ability to consummate the transactions contemplated by this Agreement.

2.4    Brokers and Finders.    Shareholder has not employed any broker or finder in connection with the transactions contemplated herein so as to give rise to any claim against Seller, Buyer or any of its Affiliates for any brokerage or finder's commission, fee or similar compensation.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES AS TO SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller and Shareholder jointly and severally represent and warrant to Buyer as set forth below.

3.1    Organization and Power.    Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Georgia. Seller is licensed or qualified to conduct its business and is in good standing in those jurisdictions specified on Schedule 3.1, which jurisdictions are the only jurisdictions in which the nature of its business or the properties owned, leased or operated by it make such license or qualification necessary, except where the failure to be so qualified would not have a Material Adverse Effect. Seller has the power and authority to own, lease and operate the assets it purports to own, lease and operate and to carry on its business in the manner and to the extent currently conducted.

3.2    Authority and Enforceability.    Seller has all requisite corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized by the board of directors of Seller and no other corporate action on the part of Seller is necessary. This Agreement has been duly authorized, executed and delivered by Seller and (assuming the due authorization, execution and delivery by Buyer) constitutes the legal, valid and binding obligations of Seller, enforceable against it in accordance with its terms subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general equity principles.

3.3     Conflicts.  The execution and delivery by Seller of this Agreement and the performance by it of its obligations hereunder and the consummation of the transactions contemplated hereby, do not and will not:

(a)     conflict with or result in a violation or breach of any of the terms, conditions or provisions of the certificate of incorporation or by-laws of Seller;

(b)     (i) conflict with or result in a violation or breach of any term or provision of applicable Law (other than as would result from the identity or legal or regulatory status of Buyer), or (ii) except for notice to be provided to the Bureau of Alcohol, Tobacco, Firearms and Explosives, require a registration, filing, application, notice, consent, approval, order, qualification, or waiver with, to or from any Governmental Entity; or

(c)     except as set forth in Schedule 3.3(c) or as contemplated by Sections 6.6 or 6.9, (i) require Seller to obtain any consent or approval of, or take any action as to, or make any filing with or give any notice to, any Person or Governmental Entity as a result or under the terms of, (ii) conflict with or result in a violation or breach of, (iii) constitute (with or without notice or lapse of time or both) a default under, (iv) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under or (vi) result in the creation or imposition of any Encumbrance upon the Business or any of its assets or properties under any material Contract or Permit to which Seller is a party or by which any assets or properties of the Business are bound.

3.4     Investments; Subsidiaries.  Seller does not own, directly or indirectly, any capital stock, membership interest, partnership interest or other equity or ownership or proprietary interest in any corporation, limited liability company, partnership, association, trust, joint venture or other entity.

3.5     Financial Statements.

(a)     Attached hereto as Exhibit A are true and complete copies of the unaudited balance sheet of Seller as of June 30, 2009 and the related unaudited consolidated statements of income and comprehensive income and cash flows (the "*June 30 Financial Statements*");

(b)     Prior to the execution of this Agreement, Seller has made available to Buyer true and complete copies of the unaudited consolidated balance sheet of Seller as of December 31, 2008 and December 31, 2007, including the notes thereto, and the related unaudited statements of income and comprehensive income, cash flows and shareholders' equity for each of the fiscal years then ended (together, the "*Year End Financial Statements*", and together with the June 30 Financial Statements, the "*Financial Statements*").

(c)     All revenue as reflected in the Financial Statements is derived from the Business carried out in the ordinary course.  Except as set forth on Schedule 3.5(c), no other Person has any right or claim to or interest in such revenue.

(d)     All reserves reflected in the Financial Statements were determined in accordance with past business practices, consistently applied throughout the periods indicated, and were adequate in all material respects as of the respective dates of such Financial Statements to cover the total amount of liabilities resulting from the items to which such reserves relate.

Brittingham - 000018

3.6     <u>No Undisclosed Liabilities</u>.  To the Knowledge of Seller, there are no liabilities against, relating to or affecting the Business except for (i) liabilities disclosed, recorded in or reserved against on the June 30 Financial Statements, each of which such liability was incurred in the ordinary course of business consistent with past practice, and (ii) current liabilities of the type set forth on the June 30, 2009 Financial Statements arising after June 30, 2009 in the ordinary course of business consistent with past practice, each of which is set forth on <u>Schedule 3.6</u>.

3.7     <u>Operations Since June 30, 2009</u>.

(a)     Except as set forth in <u>Schedule 3.7(a)</u>, since June 30, 2009, there has been no damage, destruction or loss, whether or not covered by insurance, or condemnation or other taking adversely affecting, individually or together with other such events, in any material respect any of the Purchased Assets.

(b)     Except as set forth in <u>Schedule 3.7(b)</u> and except with respect to the actions of Seller resulting in this Agreement, since June 30, 2009, Seller has conducted the Business only in the ordinary course and in conformity with past practice.  Without limiting the generality of the foregoing, since June 30, 2009, except as set forth in <u>Schedule 3.7(b)</u>, Seller has not in connection with the Business:

(i)     made or permitted any amendment, cancellation or termination of any of the Business Contracts or created or suffered to exist any Encumbrance on any of the Purchased Assets, except for Permitted Encumbrances and Encumbrances to be discharged at or prior to Closing;

(ii)     (A) cancelled or waived any debts owed to or claims held by Seller (including the settlement of any claims or litigation) or (B) incurred any indebtedness;

(iii)     entered into, as lessee, any capitalized lease obligations (as defined in Statement of Financial Accounting Standards No. 13);

(iv)     revalued any assets or properties, or accelerated or delayed collection of or (except as contemplated by subparagraph (ii) above) written off notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of its business consistent with past practice, or increased or changed any assumptions underlying bad debt calculations or contingency or other reserves;

(v)     except for sales or dispositions of inventory or obsolete or worn out tangible assets in the ordinary course of business, suffered or made (or committed to make) any, sale, transfer, lease, license, encumbrance, loss, disposition, destruction or damage of any Purchased Asset;

(vi)     made any change in the accounting methods, principles and practices used by Seller from those applied in the preparation of the Year End Financial Statements;

(vii)   made or contractually committed to make any capital expenditures or commitments for additions to property, plant or equipment used or held for use in the conduct of the Business;

(viii)   made any declaration, setting aside or payment of any dividend or other distribution in respect of the capital stock of Seller (other than Tax payments), or any direct or indirect redemption, purchase or other acquisition by Seller of any such capital stock of or any other security of Seller;

(ix)   other than in the ordinary course of business (A) made any payment to Shareholder, any Affiliate or any family member thereof for products or services sold or rendered or to be sold or rendered, made any other payment in respect of any liability, obligation or commitment to Shareholder, any Affiliate or any family member thereof or assumed, guaranteed, or otherwise became liable (directly or contingently) for any liability or obligation of Shareholder, any Affiliate or any family member thereof, or (B) entered into any other transaction, commitment or understanding with Shareholder, any Affiliate or any family member thereof or for the benefit of any of them;

(x)   (A) increased the salary, wages, compensation, bonus or other remuneration or discretionary profit sharing contribution, severance, pension or other benefits payable to any employee, contractor, consultant or director of Seller; (B) established or modified (1) targets, goals, pools or similar provisions in respect of any fiscal year under any Benefit Plan, employment-related contract or other employee compensation arrangement or (2) salary ranges, increase guidelines or similar provisions in respect of any Benefit Plan, employment-related contract or other employee compensation arrangement; (C) adopted, entered into or became bound by any Benefit Plan, employment-related contract or collective bargaining agreement, or amended, modified or terminated (partially or completely) any Benefit Plan or employment-related contract, except to the extent required by applicable Law; or (D) made any representation or promise, oral or written, to any employee, contractor, consultant or director of Seller concerning any Benefit Plan, except for statements as to the rights or accrued benefits of any employee or consultant under the terms of the Benefit Plan, except as required by applicable Law;

(xi)   other than in the ordinary course of business, granted any discounts, rebates or similar incentives, either on a one-time or contingent basis or sold or delivered any product having payment terms of thirty (30) days or more; or made any material change in (i) any pricing, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Seller or (ii) any method of calculating any bad debt, contingency or other reserve of Seller for accounting, financial reporting or Tax purposes, or made any change in the fiscal year of Seller;

(xii)   entered into a contract to do or engage in any of the foregoing after the date hereof; or

(xiii)   entered into any other transaction involving the Business or the Purchased Assets outside the ordinary course of business consistent with past practice.

3.8   Taxes.

(a)    <u>Filing of Returns and Payment of Taxes</u>.  Seller has timely filed all required Tax Returns including, with respect to the Business and Purchased Assets.  Seller (i) has paid all Taxes that are due, claimed or asserted by any taxing authority to be due from Seller for periods covered by such Tax Returns except those being contested in good faith and (ii) has duly and fully provided reserves adequate to pay all such contested Taxes in accordance with GAAP.  Except as set forth on <u>Schedule 3.8(a)</u>, all such Tax Returns were (and, as to Tax Returns not filed as of the date hereof, will be) true, complete and correct in all material respects and filed on a timely basis.  To the Knowledge of Seller, no unresolved issue has been raised in writing by any Governmental Entity in the course of any audit with respect to Taxes for which Seller could be held liable.

(b)    Seller elected in respect of its January 1, 2004 tax year under Section 1362(a) of the Code to be treated as an "S corporation" within the meaning of Section 1361 of the Code, and since that date Seller has continuously qualified as an S corporation up to and including the Closing Date.  Each state in which Seller is required to file tax returns respects Seller's status as an S corporation and conforms to the federal income tax treatment of S corporations.  Except as set forth on <u>Schedule 3.8(b)</u>, Seller has no potential liability for tax under Code Section 1374.

(c)    <u>Tax Liens</u>.  None of the assets of Seller are subject to any lien in favor of the United States pursuant to Section 6321 of the Code for nonpayment of federal Taxes, or any lien in favor of any country, state or locality pursuant to any comparable provision of state or local Law, other than Taxes not yet due and payable.

(d)    <u>Audits and Extensions, etc</u>.  Except as set forth in <u>Schedule 3.8(d)</u>, no Tax Return of Seller relating to property Taxes, transfer Taxes, sales or use Taxes or any Tax is currently under audit or examination by any Governmental Entity of which Seller has notice, and no written notice of such an audit or examination has been received by Seller.  Each deficiency resulting from any audit or examination relating to any such Taxes by any Governmental Entity has been paid, except for deficiencies being contested in good faith by appropriate proceedings.  Except as set forth in <u>Schedule 3.8(d)</u>, Seller has not given nor is there a pending request to give waivers or extensions (and Seller is not and would not be subject to a waiver or extension given by any other Person) of any statute of limitations relating to any such Taxes.

(e)    <u>Tax Sharing Agreements</u>.    No agreement as to indemnification for, contribution to, or payment of Taxes exists between Seller and any other Person, including pursuant to any Tax sharing agreement, lease agreement, purchase or sale agreement, partnership agreement or any other agreement.

(f)    <u>Other Jurisdictions</u>.  Except as set forth in <u>Schedule 3.8(f)(i)</u>, no jurisdiction (whether within or without the United States) in which Seller has not filed a specific Tax Return has asserted that Seller is required to file such Tax Return in such jurisdiction.  <u>Schedule 3.8(f)(ii)</u> lists all states and all non-U.S. taxing jurisdictions in which Seller files any Tax Returns and indicates in the case of income or franchise Tax filings whether such filings are made on a consolidated, combined or unitary basis and the state allocation factors for the most recent taxable year for which filings have been made.

(g)    <u>Withholding</u>.  Seller has complied (and until the Closing Date will comply) with all applicable Laws relating to the payment and withholding of Taxes (including withholding and reporting requirements under Code §§1441 through 1464, 3401 through 3406, 6041 and 6049 and similar provisions under any other Laws) and has, within the time and in the manner prescribed by Law, withheld from employee wages and paid over to the proper Governmental Entities all required amounts.

(h)     <u>Tax Rulings, etc</u>.   Seller has not received any written ruling of a taxing authority relating to Taxes, or any other written and legally binding agreement with a taxing authority relating to Taxes.

(i)     <u>Copies of Tax Returns</u>.   Seller has made available (or, in the case of Tax Returns to be filed on or before the Closing Date, will make available) to Buyer complete and accurate copies of Tax Returns and associated work papers filed by or on behalf of Seller for the taxable years ending December 31, 2003 through December 31, 2008.

(j)     <u>Excess Parachute Payments</u>.   Neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement, either alone or in conjunction with or together with all other payments under any Contract or arrangement or otherwise, could constitute a "parachute payment" to any "disqualified individual" as those terms are defined in Code §280G (whether or not such payment is considered to be reasonable compensation for services rendered).

(k)     <u>Tax-Exempt Use Property</u>.   No property of Seller is property that Seller or any party to this transaction is or will be required to treat as being owned by another Person pursuant to the provisions of Code §168(f)(8) (as in effect prior to its amendment by the Tax Reform Act of 1986) or is "tax-exempt use property" or "tax-exempt bond financed property" within the meaning of Code §168.

(l)     <u>Reportable Transactions</u>.   Seller has disclosed on its federal income Tax Return all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662.   Seller has not engaged in any reportable transactions that were required to be disclosed pursuant to Treasury Regulation §1.6011-4.

(m)     <u>Tax Returns</u>.   For all applicable Tax Returns of Seller through December 31, 2008 (taking into account extensions to file that have been properly obtained), to the Knowledge of Seller either (i) the statute of limitations for the assessment of all Taxes has expired or (ii) all applicable Tax Returns have been examined by the appropriate taxing authorities and no deficiency for any Taxes has been suggested, proposed, asserted or assessed against Seller that has not been resolved and paid in full.

3.9     <u>Permits</u>.

(a)     Seller owns, holds or possesses all licenses, registrations, franchises, permits, privileges, immunities, approvals and other authorizations from Governmental Entities which are necessary, individually or in the aggregate, to entitle it to own or lease, operate and use its assets and to carry on and conduct its business as currently conducted in connection with the Business, including without limitation all licenses, permits, approvals or other authorizations required under any Environmental Laws (collectively, the "***Governmental Permits***").   Complete and correct copies of all of the Governmental Permits have heretofore been delivered or made available to Buyer and are listed on <u>Schedule 3.9(a)</u>.

(b)     Except as set forth in <u>Schedule 3.9(b)</u>, each Governmental Permit is in full force and effect, and Seller has fulfilled and performed its obligations under each Governmental Permit.   No proceedings or other actions to revoke, suspend, refuse, renew, modify or restrict the Governmental Permits are pending or threatened, and no event has occurred or condition or state of facts exists which constitutes or, after notice or lapse of time or both, would constitute a breach, violation or default under any such Governmental Permit or which permits or, after notice or lapse of time or both, would permit restriction, suspension, modification, revocation or termination of any such Governmental Permit, or which might adversely affect in any material respect the rights of Seller under any such

Governmental Permit.  No notice of cancellation, suspension, revocation, or default or of any dispute concerning any Governmental Permit, or of any event, condition or state of facts described in the preceding clause, has been received by, or is known to, Seller.  All filings and reports required by Governmental Entities to be made by Seller have been timely and properly made.

          3.10    <u>Real Property</u>.

          (a)    Seller does not own any real property.

          (b)    <u>Schedule 3.10(b)</u> contains a list of all leases and subleases, if any, (the "*Leases*") of real property used in connection with the Business pursuant to which Seller is the lessee (the "*Leased Real Property*").  Seller has a valid and subsisting leasehold estate in and the right to quiet enjoyment of the real properties leased by it for the full term of the lease thereof.  Each Lease is a legal, valid and binding agreement, enforceable in accordance with its terms, of Seller and, to the Knowledge of Seller, of each other Person that is a party thereto and there is no, and neither Seller nor Shareholder has received notice of any, material default by Seller (or any condition or event which, after notice or lapse of time or both, would constitute a default) thereunder.  Seller has no reason to believe that any lessor under any Lease will not consent (where such consent is necessary) to the consummation of the transactions contemplated by this Agreement without requiring any modification of the rights or obligations of the lessee thereunder.  Seller does not owe any brokerage commissions with respect to any such leased space.

          (c)    Prior to the execution of this Agreement, Seller has delivered to Buyer true and complete copies of all leases, licenses, tenancies, subleases and other material occupancy agreements (including any amendments and renewal letters) and all mortgages, deeds of trust, certificates of occupancy, title insurance policies, title reports, surveys and similar documents, and all amendments thereof, with respect to the Leased Real Property.

          (d)    Except as set forth on <u>Schedule 3.10(d)</u>, the improvements on the Leased Real Property are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, and, to the Knowledge of Seller, there are no condemnation or appropriation proceedings pending or threatened against any of such Leased Real Property.

          3.11    <u>Intellectual Property</u>.

          (a)    The Business Intellectual Property set forth on <u>Schedule 1.1(f)</u> constitutes all of the Intellectual Property that is used or usable in connection with the Business.  Seller owns the entire right, title, and interest in and to the Business Intellectual Property, free and clear of Encumbrances.  All of the Business Intellectual Property is valid and in full force and effect.  Except as set forth on <u>Schedule 3.11(a)</u>, none of the Business Intellectual Property has lapsed, expired, or been abandoned since December 31, 2006.

          (b)    Seller has not received any notice that there is any material violation by any other Person of any right of Seller with respect to any or all Business Intellectual Property.  Seller has not entered into or consummated any material license or user agreement with another Person in respect to any or all Business Intellectual Property.

          (c)    To the Knowledge of Seller, the Business Intellectual Property, for which the value is dependent upon its confidentiality, has not been misappropriated nor has it been the subject of an unauthorized disclosure.

(d)    To the Knowledge of Seller, during the previous three (3) years, no material Action has been taken or threatened, (i) alleging that the conduct of Seller or any Business Intellectual Property infringes on or misappropriates the Intellectual Property of another Person or (ii) challenging the ownership, right to use, or validity of the Business Intellectual Property.  To the Knowledge of Seller, there is no valid basis for any Action described in this <u>Section 3.11(d)</u>.

(e)    The consummation of this Agreement will not result in the loss or impairment of any rights to own, use or sell any or all Business Intellectual Property.

3.12    <u>Compliance with Laws</u>.  Except as set forth in <u>Schedule 3.12</u>, Seller is in material compliance with all applicable Laws and related Governmental Permits and has complied in a timely manner with all Laws and Permits that materially affect the business or condition of the Business, including without limitation, all Laws applicable to the import, export, manufacture, use, transportation, possession, and transfer of Firearms and other defense articles, including without limitation, the Gun Control Act of 1968 (chapter 44 of title 18, United States Code) ("*GCA*"), the National Firearms Act of 1934 (chapter 53 of title 26, United States Code) ("*NFA*"), and the Arms Export Control Act (22 U.S.C. § 2778) ("*AECA*"), as well as all implementing regulations thereto (collectively, "*Firearms Regulations*").  Except as set forth in <u>Schedule 3.12</u>, no notice, charge, claim or assertion to the effect that Seller is not in material compliance with any Law or related Permit has been received by Seller nor has any been filed, commenced or, to the Knowledge of Seller, threatened against Seller.  Except as set forth in <u>Schedule 3.12</u>, there are no contemplated or pending enforcement or regulatory actions by any Governmental Entity directed at Seller (as opposed to the Firearms industry as a whole) which could be reasonably expected to adversely affect or impede Seller's or Buyer's ability to operate the Business in accord with Firearms Regulations.

3.13    <u>Contracts</u>.

(a)    <u>Schedule 3.13(a)</u> (with paragraph references corresponding to those set forth below) contains a true and complete list of each of the following Contracts or other arrangements (true and complete copies or, if none, reasonably complete and accurate written descriptions of which, together with all amendments and supplements thereto and all waivers of any terms thereof, have been delivered to Buyer prior to the execution of this Agreement) to which Seller is a party or by which any of the Purchased Assets is bound:

(i)    (A) all Contracts (excluding Benefit Plans) providing for a commitment of employment or consultation services for a specified or unspecified term to, or otherwise relating to employment or the termination of employment of, any Employee, the name, position and rate of compensation of each Employee party to such a Contract and the expiration date of each such Contract; and (B) any written or unwritten representations, commitments, promises, communications or courses of conduct (excluding Benefit Plans and any such Contracts referred to in clause (A)) involving an obligation of Seller to make payments in any year, other than with respect to salary or incentive compensation payments in the ordinary course of business, to any Employee exceeding twenty-five thousand dollars ($25,000) or any group of Employees exceeding twenty-five thousand dollars ($25,000) in the aggregate;

(ii)    all Contracts with any Person containing any provision or covenant prohibiting or limiting the ability of Seller to engage in any business activity or compete with any Person in connection with the Business or prohibiting or limiting the ability of any Person to compete with Seller in connection with the Business;

(iii)     all partnership, joint venture, shareholders' or other similar Contracts with any Person in connection with the Business;

(iv)     all Contracts with distributors, dealers, manufacturer's representatives, sales agencies or franchises with whom Seller deals in connection with the Business;

(v)     all Contracts relating to the future disposition or acquisition of any assets, other than dispositions or acquisitions of Inventory in the ordinary course of business consistent with past practice;

(vi)     all Contracts between or among Seller, on the one hand, and any of Seller's Affiliates, officers, directors, or shareholders or any of such officer's, director's, or shareholder's Affiliates or family members, on the other hand;

(vii)     all Contracts, including licenses, sublicenses, agreements and permissions, by which Seller uses Intellectual Property owned by a third party (other than ordinary course off-the-shelf software licenses) or a third party uses the Business Intellectual Property;

(viii)     all collective bargaining or similar labor Contracts covering any Employee; and

(ix)     all other Contracts (other than Benefit Plans, the Leases and insurance policies listed in Schedule 3.23) with respect to the Business that (A) involve the payment or potential payment, pursuant to the terms of any such Contract, by or to Seller of more than twenty-five thousand dollars ($25,000) annually and (B) cannot be terminated within 30 days after giving notice of termination without resulting in any material cost or penalty to Seller.

(b)     Each Contract required to be disclosed in Schedule 3.13(a) is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms, of each party thereto; and except as disclosed in Schedule 3.13(b) neither Seller nor, to the Knowledge of Seller, any other party to such Contract is, or has received notice that it is, in violation or breach of or default under any such Contract (or with notice or lapse of time or both, would be in violation or breach of or default under any such Contract) in any material respect.

(c)     There are no Business Contracts other than those Contracts set forth in Schedule 1.3(a) and the Excluded Business Contracts; each of the Business Contracts is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms, of each party thereto.

(d)     Except as disclosed in Schedule 3.13(d), the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, will not (A) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (B) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under, or (C) result in the creation or imposition of any Encumbrance upon Seller or any of its assets and properties under, any Business Contract.

3.14    Government Contracts.  Schedule 3.14 sets forth a true, complete and correct list of the Government Contracts awarded to Seller that are currently in effect or for which final payment has been made within five (5) years prior to the date hereof.  Except as expressly set forth on Schedule 3.14, and with respect to the Government Contracts identified therein:

(a)    Seller complies in all material respects with all U.S. Government laws and regulations, certifications, representations, warranties, covenants, clauses, provisions and requirements applicable to its Government Contracts.

(b)    Seller has not been awarded any Government Contracts currently in effect and under which services remain to be performed in any awarded contract period or option period under small business programs as defined in Part 19 of the Federal Acquisition Regulation ("*FAR*") or involving any preference for minority or women-owned businesses.

(c)    Other than matters that have not yet been disclosed to Seller or otherwise made a matter of public record, there are no pending administrative, civil or criminal investigations, audits, subpoenas, or indictments by the U.S. Department of Justice, Government Accountability Office, Agency Inspector General, Defense Criminal Investigative Service or other Agency Investigative Service, any federal grand jury or any other U.S. Governmental Entity concerning the Business's Government Contracts or any individual Employee involved with performing such contracts within the past three (3) years, and the Seller has not made a voluntary disclosure of fraud or price mischarging or other violation of Laws and regulations in connection with its Government Contracts to any Governmental Entity within the past three (3) years.

(d)    Neither Seller nor, to Seller's Knowledge, any employee, contractor, consultant, vendor or supplier of Seller, is (or has been at any time since inception of Seller) suspended or debarred or has been proposed for suspension or debarment from doing business with the U.S. Government or has been declared non-responsible or ineligible for U.S. Government contracting, and there are no pending or threatened debarment or suspension proceedings or nonresponsibility determinations.

(e)    Seller is not in material default in the performance of any of the Government Contracts, and no termination for convenience, termination for default, cure notice or show cause notice has been issued to Seller with respect to any Government Contract within the past two (2) years and there are no pending or, to Seller's Knowledge, threatened terminations for convenience, terminations for default, cure notices or show cause notices.

(f)    All certifications and representations made by Seller in connection with any proposal, bid or award process for Government Contracts were true, correct and complete in all material respects when made, and to the extent required, Seller has notified the appropriate Governmental Entity of any material changes to such representations, certifications and warranties.

(g)    There are no "Organizational Conflicts of Interest" within the meaning of FAR Subpart 9.5 or agency procurement regulations on any Government Contract to which Seller, or its directors, managers, officers, employees, agents or consultants are a party.

(h)    To the extent required, Seller maintains and possesses facility clearances granted pursuant to the National Industrial Security Operating Manual ("*NISPOM*") by either the Department of Defense or such other Federal Government Agencies to perform the classified Federal Government Agency Contracts and as otherwise reasonably necessary for the continued conduct of Seller

Brittingham - 000026

with respect to a Contract with a Federal Government Agency.  Seller is in material compliance with the requirements of the NISPOM and its facility clearances.

(i)      Except as set forth on Schedule 3.14(i), in connection with each Government Contract, no material cost incurred by Seller has been formally questioned, challenged, or disallowed, nor, is any such cost the subject of any investigation, other than routine audit, by a Governmental Entity; no money due to Seller pertaining to such Contract has been withheld or offset nor has any claim been made to withhold or offset money, and, subject to applicable rate approvals, Seller is entitled to all progress payments received with respect thereto; and no price reductions for defective cost or pricing have been issued.

(j)      Except as set forth on Schedule 3.14(j), neither any Governmental Entity nor any prime contractor, subcontractor or other Person has asserted any material claim or initiated any material dispute proceeding against Seller's contracts or bids with Governmental Entities that has not been satisfactorily resolved; and Seller has not asserted any claim or initiated any dispute proceeding, directly or indirectly, against any such other party concerning any such Contract or bid with a Governmental Entity that has not been satisfactorily resolved.

3.15    No Debarment or Suspension - Export.  Seller is not currently nor has it at any time in the past been named in any temporary denial order or export denial order, or debarred or suspended from participating directly or indirectly in the export of articles subject to the Export Administration Regulations (15 C.F.R. § 730 et seq.) ("*EAR*")[1] or the International Traffic in Arms Regulations (22 C.F.R. § 120 et seq.) ("*ITAR*"), including technical data, or in the furnishing of defense services for which a license or approval is required under the ITAR, and Seller has no Knowledge of circumstances with respect to the Business that could result in the denial of export privileges or the imposition of suspension or debarment or the imposition of a monetary penalty for export violations.

3.16    Export/Foreign Corrupt Practices Act.

(a)      Seller is in compliance in all material respects with all United States export control laws, including the AECA, the ITAR, the EAR and associated executive orders, the Trading with the Enemy Act (50 U.S.C. Appendix), and the laws and regulations implemented by the Office of Foreign Assets Controls, United States Department of the Treasury and any other trade sanctions and embargoes to which the United States is a party (the "*Export Control Laws*").

(b)      Seller has all necessary authority under the United States Export Control Laws (including United States EAR and the ITAR) to conduct the Business as currently conducted in all material respects, including (i) necessary Permits for any export transactions or timely filed license applications for pending export transactions, (ii) necessary Permits and clearances for the disclosure of information to foreign Persons, including foreign Persons (other than permanent resident aliens) located in the United States, and (iii) necessary registrations with any U.S. Governmental Entity with authority to implement applicable Law;

---

[1] To include the statutory authority for the Export Administration Regulations, the Export Administration Act, which lapsed on August 20, 2001. Since the lapse, the President has continued the EAR in effect under the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1707) through Executive Order 13222 dated Aug. 17, 2001 (66 Fed. Reg. 44025 (Aug. 22, 2001)), and extended under subsequent Presidential Notices, the most recent dated Aug. 13, 2009 (74 Fed. Reg. 41325, (Aug. 14, 2009)).

(c)     Seller has not participated or cooperated in any unsanctioned boycott as defined in Section 999 of the Code and applicable Treasury Guidelines, nor has Seller violated the antiboycott provisions of the EAR (15 C.F.R. Part 760).  Seller has filed any required returns or reports concerning operations in boycotting countries, including receipt of boycott requests, as such returns or reports are required by Section 999 of the Code and 15 C.F.R. Part 760;

(d)     Seller is in compliance in all material respects with the U.S. Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1, et seq.) and all other anti-corruption and bribery laws and conventions to which Seller is subject;

(e)     None of Seller, Shareholder or any Person acting for or on behalf of Seller or Shareholder has directly or indirectly (i) made any contribution, gift, bribe, payoff, influence payment, kickback or other similar payment to any Person, private or public, regardless of form, whether in money, property or services that is a violation of a Law and that was made (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured or (C) to obtain special concessions or for special concessions already obtained, for or in respect of Seller or Shareholder or (ii) established or maintained any fund or asset that has not been recorded in the books and records of Seller; and

(f)     Neither Seller nor any director, officer, agent, employee (whether full time or contract) nor any other Person acting on behalf of Seller, in the course of its actions for, or on behalf of, Seller (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee (whether full time, part time or contract) from corporate funds; or (iii) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee (whether full time, part time or contract).

3.17     <u>Foreign Assets Control; Anti-Money Laundering</u>.  None of Seller, Shareholder or any other Person having a direct or indirect beneficial interest in Seller appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury or in Annex I to the United States Executive Order 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism (each a "*Government List*").  Seller has instituted, maintains and has at all times complied with internal control procedures designed to reduce the likelihood of, and help prevent Seller from being involved, in any money laundering scheme, fraud or other corrupt activity (including, without limitation, any activity in contravention of the U.S. Foreign Corrupt Practices Act or the rules and regulations administered by the U.S. Treasury Department's Office of Foreign Assets Control that prohibit, among other things, the engagement in transactions with, and the provision of services to, those countries, territories, entities and individuals listed from time to time on a Government List).

3.18     <u>Foreign Assets; Revenues</u>.  Seller has heretofore delivered to Buyer true, correct and complete information with respect to (i) any assets of Seller or any subsidiary of Seller located outside of the United States and (ii) any revenues in the most recent fiscal year from customers located outside of the United States.  Neither Seller nor Shareholder holds ten percent (10%) or more equity interest in any foreign Person.

3.19     <u>Employee Benefits</u>.

(a)      Schedule 3.19(a) contains a true and complete list of each Benefit Plan. No Benefit Plan is, and neither Seller nor any ERISA Affiliate has maintained or contributed to an employee benefit plan that was, intended to be a "qualified plan" within the meaning of Section 401(a) of the Code. No Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code, and neither Seller nor any ERISA Affiliate has ever maintained, contributed to, or had any liability with respect to, an employee benefit plan that was subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code.

(b)      Seller has not scheduled or agreed (i) to establish any plan, program, policy or arrangement that would be considered to be a Benefit Plan or (ii) to increase benefit levels (or to create new benefits) with respect to any Benefit Plan.

(c)      Complete and correct copies of the following documents have been provided to Buyer prior to the execution of this Agreement:  (i) the Benefit Plans, any related trust agreements, and service provider agreements, insurance contracts or agreements with investment managers, including without limitation, all amendments thereto, (ii) current summary plan descriptions of each Benefit Plan subject to ERISA, and any similar descriptions of all other Benefit Plans, (iii) the two (2) most recent Form 5500's and schedules thereto for each Benefit Plan subject to ERISA reporting requirements, (iv) the most recent financial statements prepared with respect to any Benefit Plan and (v) the most recent actuarial report of the qualified actuary of any Benefit Plan with respect to which actuarial valuations are, or are required to be, conducted.

(d)      Each of the Benefit Plans is, and its administration is and has been since inception, in all material respects in compliance with, and Seller has not received any written claim or notice that any such Benefit Plan is not in compliance with, all applicable Laws, including reporting obligations to the Department of Labor.  Each Benefit Plan intended to provide for the deferral of income, the reduction of salary or other compensation or to afford other Tax benefits complies, in form and operation, with the requirements of the applicable provisions of the Code or other Laws required in order to provide for such deferral of income, reduction of salary or other compensation or other Tax benefits (including, without limitation, Section 409A of the Code).

(e)      Neither Seller, nor any other Person, including any fiduciary, has engaged in any "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA), which could subject any of the Benefit Plans or their related trusts, Seller, or any other Person that Seller has an obligation to indemnify, to any material tax or penalty imposed under Section 4975 of the Code or Section 502 of ERISA.

(f)      Seller is not in default in performing any of its contractual obligations under any of the Benefit Plans or any related trust agreement or insurance contract.  All contributions and other payments required to be made by Seller to any Benefit Plan with respect to any period ending before or at or including the Closing Date have been made or reserves adequate for such contributions or other payments have been or will be set aside therefore and have been or will be reflected in the Financial Statements in accordance with GAAP. There are no material outstanding liabilities of, or related to, any Benefit Plan, other than liabilities for benefits to be paid in the ordinary course to participants in such Benefit Plan and their beneficiaries in accordance with the terms of such Benefit Plan.

(g)      No event has occurred, and there exists no condition or set of circumstances in connection with any Benefit Plan, under which Seller, directly or indirectly (through any indemnification agreement or otherwise), could reasonably be expected to be subject to any risk of material liability under ERISA,

the Code, or any other applicable Law other than liabilities for benefits or ancillary administrative services incurred in the ordinary course.

(h)     There are no pending or, to the Knowledge of Seller, threatened claims, investigations, or lawsuits related to any Benefit Plan, nor is there any basis for such a claim, investigation or lawsuit.

(i)     No benefit or payment under any Benefit Plan, including, without limitation, any severance or parachute payment plan or agreement, will be established or become accelerated, vested, funded or payable by reason of the execution of, or any transaction contemplated under, this Agreement.  No Benefit Plan provides for any additional amounts to be paid with respect to any Tax imposed under Section 4999 of the Code.

(j)     No Benefit Plan provides, and Seller does not have any liability with respect to, welfare coverage that extends after the termination of employment other than for continued coverage provided pursuant to the requirements of Section 4980B of the Code or other similar provision of state law.

(k)     Buyer will have no liability under any Benefit Plan (including without limitation, severance policy, practice, agreement, plan, worker's compensation or program) of Seller as a result of or in connection with the transactions contemplated by this Agreement or as a result of the termination by Seller of any persons employed by Seller on or prior to the Closing Date.

3.20     Environmental Matters.

(a)     Seller is in compliance with all Environmental Laws and (except as noted in Schedule 3.20(a)) has at all times complied with all Environmental Laws.

(b)     (i) Seller possesses all Permits required under Environmental Laws for its operations as currently conducted, (ii) all such Permits are in full force and effect, and (iii) no actions are pending, or to the Knowledge of Seller, threatened, to amend, challenge, terminate, cancel, limit, restrict or appeal any such Permits.

(c)     Except as noted in Schedule 3.20(c), there has been no release of any Hazardous Substance by Seller or any other party at any of the Leased Real Property that is in material violation of or could lead to any material liability or material investigative, corrective or remedial obligation arising under any Environmental Law.

(d)     Except as noted in Schedule 3.20(d) none of Seller or any of its predecessors or Affiliates has (i) treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released or exposed any Person to any Hazardous Substance so as to give rise to any material liability or any material investigative, corrective or remedial obligation under any Environmental Law, or (ii) either expressly or by operation of law, assumed or undertaken any material liability or any material obligation for corrective or remedial action of any other Person under any Environmental Law.

(e)     Except as in the ordinary course of business pursuant to Permits issued by the Georgia Department of Natural Resources and/or the U.S. Environmental Protection Agency for the facilities and operations of the Business, Seller has not transported or arranged for the treatment, storage, handling, disposal or transportation of any Hazardous Substance to any off-site location.

(f)     All material environmental studies and audits conducted in relation to the Leased Real Property by or on behalf of Seller in the last five (5) years are listed on <u>Schedule 3.20(f)</u>, copies of which have been provided to Buyer.

(g)     Neither this Agreement nor the consummation of the transaction that is the subject of this Agreement will result in any obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties, pursuant to any "transaction triggered" or "responsible property transfer" Environmental Laws.

3.21     <u>Employee Relations and Agreements</u>.

(a)     <u>Schedule 3.21(a)</u> contains a complete and accurate list of the following information for each employee and director of Seller, including each employee on a legally job-protected leave of absence: name; job title; date of hire; base compensation, any change in compensation since December 31, 2008 and status as exempt or non-exempt; current and latest earned bonus arrangement; and accrued vacation and leave status, if any.

(b)     <u>Schedule 3.21(b)</u> contains a list of (i) all employment, severance, consulting or similar agreements to which Seller is a party as of the date of this Agreement, (ii) all severance programs or policies of Seller with or relating to its employees and (iii) all other agreements that entitle any employee to compensation or other consideration as a result of the acquisition by any Person of control of Seller.

(c)     Seller is not, and has never been, a party to any collective bargaining agreement or other labor contract. Seller is not, and has never been, subject to any (i) unfair labor practice complaint before the National Labor Relations Board or any other federal, state, local or foreign agency, (ii) labor strike, slowdown, work stoppage, lockout, or other organized labor disturbance nor, to the Knowledge of Seller, have any of the foregoing been threatened, (iii) formal grievance proceeding, (iv) representation question, or (v) to the Knowledge of Seller, attempt by any union to represent employees as a collective bargaining agent.

(d)     Seller is not, and has never been, subject to any claim by or on behalf of any of its employees or former employees alleging (i) discrimination under any federal, state or local or foreign Law, including claims of discrimination, harassment or retaliation based on race, color, creed, age, sex, sexual orientation, national origin, ethnicity, religion, disability or other physical or mental impairment, or any other personal characteristic protected by Law, or (ii) any other claims relating to employment, including those based on statute, contract or tort; nor, to the Knowledge of Seller, has Seller been the subject of any investigation or threat of investigation by any Governmental Entity with regard to any of the foregoing.

(e)     Seller is, and in the last three (3) years has been, in compliance with all applicable Laws relating to the employment of individuals, including without limitation Laws related to fair employment practices and other Laws prohibiting harassment and discrimination, terms and conditions of employment, workers' compensation, occupational safety and health, plant closings and mass layoffs, immigration, family and medical leave, wages and hours, the payment and withholding of Taxes and other sums as required by appropriate Governmental Entities, and there has been withheld and paid to the appropriate Governmental Entities all amounts required to be withheld from the employees of Seller, and Seller is not liable for any arrears of wages, Taxes, penalties or other sums for failure to comply with any of the foregoing. Without limiting the generality of the foregoing, (i) each Person employed by Seller was or is properly classified as exempt or non-exempt in accordance with applicable overtime Laws, and (ii) no Persons treated as an independent contractor or consultant by Seller should have been properly classified as an employee under applicable Law.

(f)      To the Knowledge of Seller, none of the employees of Seller is in violation of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation to a former employer relating to the right of such employee to be employed by Seller or the employee's knowledge or use of trade secrets or proprietary information.

3.22    Litigation.    Except as disclosed on Schedule 3.22 (with paragraph references corresponding to those set forth below):

(a)      there are no outstanding injunctions, judgments, orders, decrees, rulings, or charges against Seller;

(b)      there are no Actions, hearings, or investigations of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction pending or, to the Knowledge of Seller threatened against, relating to or affecting Seller; and

(c)      there are no facts or circumstances Known to Seller that could reasonably be expected to give rise to any Action which, if determined adversely to Seller, could reasonably be expected to result in (A) any injunction or other equitable relief against Seller that would interfere in any material respect with the Business or (B) Losses by Seller, individually or in the aggregate with Losses in respect of other such Actions, that would be reasonably expected to exceed ten thousand dollars ($10,000.00).

3.23    Insurance.    All policies or binders of fire, liability, product liability, worker's compensation, vehicular and other insurance held by or on behalf of Seller are listed and described on Schedule 3.23.  The insurance coverage provided by any of the policies described on Schedule 3.23 will not terminate or lapse by reason of the transactions contemplated by this Agreement.  Each policy listed on Schedule 3.23 is valid and binding and in full force and effect, all premiums on all such policies have been paid to date and Seller has complied with all terms and conditions of such policies and neither Seller nor the Person to whom such policy has been issued has received any notice of cancellation or termination in respect of any such policy or is in default thereunder.  The insurance limits of such policies listed on Schedule 3.23 have not been exhausted or materially diminished.  The insurance policies listed on Schedule 3.23, in light of the respective business, operations and assets and properties of Seller, are in amounts and have coverages that are reasonable and customary for Persons engaged in such businesses and operations and having such assets and properties and are placed with insurers that are reputable and, to the Knowledge of Seller, financially sound.  Neither Seller nor the Person to whom such policy has been issued has received notice that any insurer under any policy referred to in this Section 3.23 is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.

3.24    Suppliers and Customers.

(a)      Schedule 3.24(a) lists the ten (10) largest customers of the Business, on the basis of revenues for goods sold or services provided for each of the three (3) most recently-completed fiscal years. No such material customer of the Business has canceled or reduced any contract or order for provisions of and, to the Knowledge of Seller, there has been no threat by any material customer to cancel or reduce any order for products, supplies or services from the Business at any time in the last two (2) years, other than order cancellations made in the ordinary course of business consistent with Seller's past experience.

(b)      Schedule 3.24(b) lists the ten (10) largest suppliers of the Business, on the basis of cost of goods or services purchased for the most recently-completed fiscal year.  No such material supplier of

the Business has canceled or reduced any contract or order for provisions of, and, to the Knowledge of Seller, there has been no threat by any material supplier not to provide products, supplies, or services to the Business at any time in the last two (2) years.

(c)    Set forth on Schedule 3.24(c) is a list, together with a brief description, of all complaints and disputes with any of the Business's customers or distributors since December 31, 2006.

3.25    Accounts Receivable.  Except as set forth on Schedule 3.25, all of the Accounts Receivable, net of applicable reserves, (i) constitute legal, valid and binding obligations of the respective debtors enforceable in accordance with their terms, (ii) arose from bona fide transactions for goods sold or services performed in the ordinary course of business and are payable on ordinary trade terms, (iii) are not subject to any valid set-off or counterclaim, (iv) do not represent obligations for goods sold on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return arrangement, (v) are genuine, in the ordinary course of business consistent with past practice, in the aggregate recorded amounts thereof net of any applicable reserves and (vi) are not the subject of any Actions brought by or on behalf of Seller.  To the Knowledge of Seller and except as set forth on Schedule 3.25, no account debtor has refused or threatened to refuse to pay its obligations for any reason and no account debtor is insolvent or bankrupt.  There are no security arrangements and collateral securing the repayment or other satisfaction of Accounts Receivable.

3.26    Purchased Assets.

(a)    The Purchased Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by Seller, including all tangible personal property reflected on the balance sheet included in the June 30 Financial Statements and tangible personal property acquired since June 30, 2009 other than property disposed of since such date in the ordinary course of business consistent with past practice.

(b)    Seller is in possession of and has good and marketable title to the Purchased Assets free and clear of all Encumbrances.

(c)    All material items of machinery, equipment, and other tangible assets of the Business are in operational condition, normal wear and tear excepted, have been regularly and properly serviced and maintained in a manner that would not void or limit the coverage of any warranty thereon, other than items currently under, or scheduled for, repair or construction, in the ordinary course of business consistent with past practice, and are adequate and fit to be used for the purposes for which they are currently used in the manner they are currently used.

(d)    Title to all of the Purchased Firearms have been transferred to Seller prior to the date hereof.

3.27    Transactions with Affiliates.  Except as set forth in Schedule 3.27(a), no officer, director or shareholder of Seller, or any Affiliate or family member of any of them, provides or causes to be provided any assets, services or facilities used or held for use in connection with the Business, and no such officer, director, shareholder or Affiliate or family member is provided any assets, services or facilities by the Business.  Except as disclosed in Schedule 3.27(b), each of the transactions listed in Schedule 3.27(a) is engaged in on an arm's length basis and will be terminated as of the Closing.

3.28    Inventory.  All of the Inventory consists of a quality and quantity usable and, with respect to finished goods, salable in the ordinary course of business consistent with past practice, subject

to normal and customary allowances in the industry for spoilage, damage and outdated items. All items included in the Inventory are the property of Seller, free and clear of any Encumbrance other than Permitted Encumbrances, have not been pledged as collateral, are not held by Seller on consignment from others and conform in all material respects to all standards applicable to such inventory or its use or sale imposed by any Governmental Entity.

3.29    Product Liabilities and Product Warranties. Except as disclosed on Schedule 3.29, there are no pending or, to the Knowledge of Seller, threatened product liability claims against Seller in connection with the Business. Schedule 3.29 sets forth a summary of each product liability claim in excess of five thousand dollars ($5,000) paid by Seller in the past five (5) years. Standard form product warranties issued by Seller are listed and described on Schedule 3.29. The reserves set forth on the June 30 Financial Statements are adequate for all pending, threatened and reasonably anticipated product warranty claims. There are no uninsured product liability claims that are pending or, to the Knowledge of Seller, threatened.

3.30    Ownership of Equity. Shareholder owns beneficially and of record, free of any Encumbrances, all of the equity of Seller, and no other Person has any other rights with respect to the equity of Seller.

3.31    No Brokers. Neither Shareholder nor Seller has become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller as follows:

4.1    Organization of Buyer. Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. Buyer has the limited liability company power and authority to own or lease its assets and to carry on its businesses as currently conducted.

4.2    Authority of Buyer. Buyer has the limited liability company power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by Buyer has been duly authorized and approved by its board of directors and does not require any further authorization or consent of its members. This Agreement has been duly authorized, executed and delivered by Buyer and (assuming the valid authorization, execution and delivery of this Agreement by Shareholder and Seller) is the legal, valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general equity principles.

4.3    No Violation of Law and Agreements. The execution and delivery by Buyer of this Agreement, and the performance by Buyer of each of its obligations hereunder, does not and will not:

(a)    Violate any provision of the certificate of incorporation or by-laws of Buyer;

(b)    To the knowledge of Buyer, violate any provision of applicable Law relating to Buyer;

(c)      Require a registration, filing, application, notice, consent, approval, order, qualification, authorization, designation, declaration or waiver with, to or from any Governmental Entity; or

(d)      To the knowledge of Buyer, (i) require a consent, approval or waiver from, or notice to, any party to any material contract to which Buyer is a party, or (ii) result in a breach of, constitute a default under, or result in the acceleration of material obligations, loss of material benefit or increase in any material liabilities or fees under, or create in any party the right to terminate, cancel or modify, any agreement to which Buyer is a party.

4.4      No Litigation or Regulatory Action.  There is no Action pending or, to the knowledge of Buyer, threatened, against Buyer or its Affiliates which would reasonably be expected to prevent, hinder or delay the consummation of any of the transactions contemplated hereby.  There is no Action pending or, to the knowledge of Buyer, threatened, that questions the legality or propriety of the transactions contemplated by this Agreement.

4.5      Financial Ability.  Buyer has, and will have on the Closing Date, and thereafter as needed, sufficient cash on hand from Buyer's immediately available internal organization funds or available under a currently established committed credit facility or unutilized lines of credit with financial institutions, to consummate the transactions contemplated by this Agreement and perform its obligations hereunder.

4.6      No Brokers.  Neither Buyer nor any Person acting on Buyer's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement that is payable by Seller.

## ARTICLE 5
## ACTIONS PRIOR TO THE CLOSING DATE

5.1      Consents of Third Parties; Governmental Approvals.

(a)      Buyer and Seller shall take, or cause to be taken by others, all commercially reasonable steps to obtain and satisfy, at the earliest practicable date, all Required Consents and to effect all required notices; *provided*, *however*, that neither Seller nor Buyer shall be required to incur any financial or other obligation in connection therewith, other than normal and customary transaction costs and filing fees.

(b)      Except as otherwise provided herein, the obligations of the parties under this Section 5.1 shall not include any requirement of any Affiliate of either party to expend money (other than normal legal and professional fees or filing fees), commence or participate in any litigation or offer or grant any accommodation (financial or otherwise) to any third Person.

5.2     Operations Prior to the Closing Date.  Seller agrees that during the period from the date of this Agreement to the Closing Date (unless Buyer shall otherwise consent in writing), Seller will exercise commercially reasonable efforts to:  (i) conduct its operations according to its ordinary and usual course of business consistent with past practice and, to the extent consistent therewith, with no less diligence and effort than would be applied in the absence of this Agreement, (ii) seek to preserve intact its current business organization, (iii) maintain the Purchased Assets in good working order and condition, ordinary wear and tear excepted, (iv) keep available the services of its current officers and employees, (v) continue all current sales, marketing and promotional activities relating to the Business, and (vi) preserve its relationships with customers, suppliers and others having business dealings with it to the end that goodwill and ongoing businesses shall not be impaired in any material respect on the Closing Date.

(b)     Without limiting the generality of the foregoing, and except as otherwise permitted in this Agreement or as set forth in Schedule 5.2, prior to the Closing Date, Seller will not, without the prior written consent of Buyer:

(i)     make or permit any amendment, cancellation or termination of any of the Business Contracts or create or suffer to exist any Encumbrance on any of the Purchased Assets, except for Permitted Encumbrances and Encumbrances to be discharged at or prior to Closing;

(ii)     (A) cancel or waive any debts owed to or claims held by Seller (including the settlement of any claims or litigation) or (B) incur any indebtedness;

(iii)     enter into, as lessee, any capitalized lease obligations (as defined in Statement of Financial Accounting Standards No. 13);

(iv)     revalue any assets or properties, or accelerate or delay collection of or (except as contemplated by subparagraph (ii) above) write off notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of business consistent with past practice, or increase or change any assumptions underlying bad debt calculations or contingency or other reserves;

(v)     except for sales or dispositions of inventory or obsolete or worn out tangible assets in the ordinary course of business, suffer or make (or commit to make) any, sale, transfer, lease, license, encumbrance, loss, disposition, destruction or damage of any Purchased Asset;

(vi)     make any change in the accounting methods, principles and practices used by Seller from those applied in the preparation of the Year End Financial Statements;

(vii)     make or contractually commit to make any capital expenditures or commitments for additions to property, plant or equipment used or held for use in the conduct of the Business;

(viii)     make any declaration, setting aside or payment of any dividend or other distribution in respect of the capital stock of Seller, or any direct or indirect

redemption, purchase or other acquisition by Seller of any such capital stock of or any other security of Seller;

(ix)   (A) make any payment to Shareholder, any Affiliate or any family member thereof for products or services sold or rendered or to be sold or rendered, make any other payment in respect of any liability, obligation or commitment to Shareholder, any Affiliate or any family member thereof or assume, guarantee, or otherwise become liable (directly or contingently) for any liability or obligation of Shareholder, any Affiliate or any family member thereof, or (B) enter into any other transaction, commitment or understanding with Shareholder, any Affiliate or any family member thereof or for the benefit of any of them;

(x)   (A) increase the salary, wages, compensation, bonus or other remuneration or discretionary profit sharing contribution, severance, pension or other benefits payable to any employee, contractor, consultant or director of Seller; (B) establish or modify (1) targets, goals, pools or similar provisions in respect of any fiscal year under any Benefit Plan, employment-related contract or other employee compensation arrangement or (2) salary ranges, increase guidelines or similar provisions in respect of any Benefit Plan, employment-related contract or other employee compensation arrangement; (C) adopt, enter into or become bound by any Benefit Plan, employment-related contract or collective bargaining agreement, or amend, modify or terminate (partially or completely) any Benefit Plan or employment-related contract, except to the extent required by applicable Law; or (D) make any representation or promise, oral or written, to any employee or consultant of Seller concerning any Benefit Plan, except for statements as to the rights or accrued benefits of any employee or consultant under the terms of the Benefit Plan, except as required by applicable Law;

(xi)   other than in the ordinary course of business, grant any discounts, rebates or similar incentives, either on a one-time or contingent basis or sell or deliver any product having payment terms of thirty (30) days or more; or make any material change in (i) any pricing, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Seller or (ii) any method of calculating any bad debt, contingency or other reserve of Seller for accounting, financial reporting or Tax purposes, or make any change in the fiscal year of Seller;

(xii)   enter into a contract to do or engage in any of the foregoing after the date hereof; or

(xiii)   enter into any other transaction involving the Business or the Purchased Assets outside the ordinary course of business consistent with past practice.

5.3   <u>Commercially Reasonable Efforts</u>.   Subject to the terms and conditions herein provided, each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including using its reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, to effect all necessary registrations, filings and submissions, and to lift any injunction or other legal bar to the consummation of the transactions contemplated by this Agreement (and, in such case, to proceed with such transactions as expeditiously as possible). These efforts shall include, but not be limited to, notice to the U.S. Government of any necessary novation requests, response to any requests

for information from the U.S. Government regarding such novation requests, and preparation of the documents required by FAR Part 42.12 to the extent such documents can reasonably be prepared prior to Closing.

        5.4    <u>Access to Information</u>. Following execution of this Agreement, Seller shall afford to Buyer and its officers, employees, counsel, accountants, prospective financing sources, and other authorized representatives ("***Representatives***"), full, open, continuing and reasonable access, upon reasonable notice throughout the period prior to the Closing Date, to its (i) equipment, personal and intangible properties, facilities and real properties, (ii) accounting files, financial and operating data, budgets, projections and plans, (iii) regulatory and other government filings, (iv) employment records, policies and files (to the extent permitted by applicable Law), (v) material Contracts, agreements and undertakings, (vi) environmental filings and tax returns, (vii) reports, schedules, books and records, and (viii) other information relevant to Seller's business, including without limitation any proceedings against Seller, (collectively, the "***Information***"); and, during such period, Seller shall furnish or make available reasonably promptly to such Representatives copies of all such Information (in addition to the information and materials which Buyer has previously received) as may reasonably be requested, including but not limited to a copy of each report, schedule, notice or other document submitted to, filed with or received by Seller from any Governmental Entity at any time prior to the Closing. Seller shall make reasonably available all of its officers, employees, agents or advisors to Buyer's Representatives for purposes of reviewing, providing, discussing, or describing any of the Information or otherwise keeping Buyer and its Representatives apprised with respect to, and responding to Buyer's inquiries regarding, the Business. Buyer agrees that it will not, and will cause its Representatives not to, use any Information obtained pursuant to this <u>Section 5.4</u> for any purpose unrelated to the consummation of the transactions contemplated by this Agreement. No Information or knowledge obtained in any investigation pursuant to this <u>Section 5.4</u> shall affect or be deemed to modify any representation or warranty contained in this Agreement or the conditions to the obligations of the parties to consummate the transactions contemplated thereby.

        5.5    <u>Employees</u>.

        (a)    Prior to Closing, Buyer shall offer employment to each employee set forth on <u>Schedule 3.21(a)</u>; *provided*, that Buyer may offer employment to any employee of Seller on such terms and conditions as Buyer deems appropriate in its sole discretion. Seller's employees who accept Buyer's offer of employment with Buyer shall be referred to, collectively, as "***Transferred Employees***."

        (b)    Any and all liabilities relating to or arising out of the employment, or cessation of employment, of any employee of Seller (whether or not a Transferred Employee) on or prior to the close of business on the Closing Date shall be the sole responsibility of Seller, including, without limitation, wages and other remuneration accrued or due on or prior to the close of business on the Closing Date.

        (c)    From and after the Closing Date, Buyer may offer to Transferred Employees any employee benefit plans that it deems appropriate in its sole discretion. Buyer shall not assume any liability under any Benefit Plans.

        (d)    Seller and its ERISA Affiliates shall retain and perform any and all obligations under Section 4980B of the Code and any similar state law, with respect to all current and former employees of Seller and their covered dependents on the Closing.

(e)     Effective as of the Closing Date, Buyer shall enter into employment agreements with each of Kevin Brittingham, Lynsey Thompson and Robert Silvers, substantially in the forms attached hereto as <u>Exhibits B</u>, <u>C</u>, and <u>D</u> respectively (the "***Key Employment Agreements***").

(f)     Except with respect to the Key Employment Agreements, Buyer shall have no obligation with respect to any employee, consultant, contractor or director of Seller.

5.6     <u>Royalty Agreement</u>.  Effective as of the Closing Date, Buyer shall enter into a royalty agreement with Robert Silvers substantially in the form attached hereto as <u>Exhibit E</u> (the "***Silvers Royalty Agreement***").

5.7     <u>Notification of Certain Matters</u>.  In the event that Buyer becomes aware on or prior to the Closing Date (whether by notification by Seller, updating of Schedules or otherwise) of any inaccuracy in any representation or breach of any warranty, covenant or agreement of Seller, Buyer shall promptly notify Seller in writing, and, to the extent such inaccuracy or breach is not cured in accordance with <u>Section 10.1</u>, Buyer may terminate this Agreement to the extent Buyer is entitled to do so pursuant to <u>Section 10.1</u>.  No notice given pursuant to this <u>Section 5.7</u> shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit Buyer's right to seek indemnity under this Agreement, including, without limitation, under <u>Article 9</u>.

5.8     <u>No Solicitations</u>.  Shareholder will not take, nor will Shareholder permit Seller or any Affiliate of Seller (or authorize or permit any investment banker, financial advisor, attorney, accountant or other Person retained by or acting for or on behalf of Shareholder, Seller or any such Affiliate) to take, directly or indirectly, any action to solicit, encourage, receive, negotiate, assist or otherwise facilitate (including by furnishing confidential information with respect to Seller or permitting access to the assets and properties and books and records of Seller) any offer or inquiry from any Person concerning an Acquisition Proposal.  If, after the date hereof, Shareholder, Seller or any such Affiliate (or any such Person acting for or on their behalf) receives from any Person any offer, inquiry or informational request referred to above, Shareholder or Seller will promptly advise such Person, by written notice, of the terms of this <u>Section 5.8</u> and will promptly, orally and in writing, advise Buyer of such offer, inquiry or request and deliver a copy of such notice to Buyer.

5.9     <u>Personal Goodwill Acquisition Agreement</u>.  Concurrently with the Closing, Buyer and Shareholder shall enter into that certain Personal Goodwill Acquisition Agreement substantially in the form attached hereto as <u>Exhibit F</u> (the "***Goodwill Acquisition Agreement***"), providing for the payment of four million dollars ($4,000,000) to Shareholder for Goodwill and Intangibles (as defined in the Goodwill Acquisition Agreement).

## ARTICLE 6
## POST-CLOSING AGREEMENTS

6.1     <u>Equity Commitment</u>.  Buyer agrees that from time to time after the Closing it will invest up to two million dollars ($2,000,000) in the Business to fund the following:

(a)     the purchase of capital equipment to enable maximum production potential within the Business's current facility, including, but not limited to, robot welders, a lathe and mill to modify stamped components, bead blast or acid etching capability, a paint machine and a laser engraving machine;

(b)     research and development of prototype machines for metal and plastic and a tool room lathe and mill; and

(c)      increasing the headcount of the Business, including additional engineers and product development personnel and shipping personnel.

All matters relating to such investment, including, without limitation, timing, terms and relative priority among the foregoing, shall each be determined in the reasonable business judgment of Buyer; *provided, however,* that Buyer shall provide prior notice to Shareholder of any related expenditure exceeding fifty thousand dollars ($50,000) and will provide Shareholder with a reasonable opportunity to consult with respect to such expenditure.

6.2      Transfer and Other Tax Matters.

(a)      Transfer Taxes.  As required by state law, Seller shall be liable for all transfer Taxes (including, without limitation, any transfer gains Taxes) arising from the transactions contemplated by this Agreement.  Seller shall file all Tax Returns relating to such transfer Taxes and shall provide evidence of payment thereof at Closing.

(b)      Tax Treatment of Indemnity Payments.  It is the intention of the parties hereto to treat any indemnity payment made under this Agreement, including, without limitation, Section 9.8, as an adjustment to the Purchase Price for Tax purposes, and the parties hereto agree to file their Tax Returns accordingly.

(c)      Tax Cooperation.  After the Closing Date, Seller will cooperate with Buyer in the preparation of all Tax Returns and will provide (or cause to be provided) any records and other information Buyer requests, and will provide access to, and the cooperation of its auditors.  Seller will cooperate with Buyer in connection with any Tax investigation, audit or other proceeding.

6.3      Confidentiality.

Each of Buyer, Seller and Shareholder will hold, and will use their best efforts to cause their Affiliates, and their respective Representatives to hold, in strict confidence from any Person (other than any such Affiliate or Representative), all documents and information concerning the other party or any of its Affiliates furnished to it by the other party or such other party's Affiliates or Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent that such documents or information can be shown to have been (a) previously known by the party receiving such documents or information, (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving party or (c) later acquired by the receiving party from another source if the source is not under an obligation to another party hereto to keep such documents and information confidential; and unless (i) compelled to disclose by judicial or administrative process (including without limitation in connection with obtaining the necessary approvals of this Agreement and the transactions contemplated hereby of any Governmental Entity) or by other requirements of Law or (ii) disclosed in an Action brought by a party hereto in pursuit of its rights or in the exercise of its remedies hereunder, *provided* that following the Closing the foregoing restrictions will not apply to Buyer's use of documents and information concerning the Business.

6.4      Non-Compete.

(a)      For a period of five (5) years commencing on the Closing Date, Shareholder and Seller shall not, directly or indirectly:

(i)      except as an employee of, or otherwise acting on behalf of, Buyer or any Affiliate thereof, engage in any commercial activity materially similar to that carried out by the Business;

(ii)     own any interest in, control, function in an executive or managerial capacity for or be employed by, act as a consultant to or advise in any capacity, any entity engaged in any commercial activity materially similar to that carried out by the Business, Buyer or any Affiliate thereof;

(iii)    solicit, hire or engage as an employee, independent contractor or agent any Person who is then or who was in the twelve (12) month period preceding such solicitation, hiring or engagement, employed by, providing services to or associated with the Business, Buyer or any Affiliates; or cause or attempt to cause any officer, employee or consultant of the Business or Buyer or any Affiliate thereof to resign, sever or materially reduce a relationship with the Business or Buyer or any Affiliate thereof;

(iv)    cause or attempt to cause any client, customer or supplier of the Business or Buyer or any Affiliate thereof to terminate or materially reduce its business with the Business or Buyer or any Affiliate thereof;

(v)     make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Person in any way that will or may injure an interest of the Business, Buyer or any of its Affiliates in its relationship and dealings with existing or potential customers; or

(vi)    disclose (unless compelled by judicial or administrative process) or use any Confidential Information relating to the Business, Buyer or any Affiliate thereof, or any of their respective clients, customers or suppliers (except, prior to the Closing Date, in the operation of the Business in the ordinary course).

(b)     For the purpose of this Section 6.4, "*Confidential Information*" shall mean all nonpublic and/or proprietary information respecting the Business, Buyer or any Affiliate, including, without limitation, their products, programs, projects, promotions, marketing plans and strategies, business plans or practices, business operations, employees, research and development, intellectual property, software, databases, trademarks, pricing information and accounting and financing data, and methods of design, distribution, marketing, service or procurement, regardless of whether such information has been reduced to documentary form. Confidential Information also includes information concerning the Business's, Buyer's or any Affiliate's clients, customers and suppliers, such as their identity, address and other information kept by the Business, Buyer or any Affiliate. Confidential Information does not include information that is, or becomes, available to the public unless such availability occurs through an unauthorized act on the part of Seller.

(c)     The parties hereto agree and acknowledge that any actual or threatened violation of the terms of this Section 6.4 by Seller or Shareholder would result in irreparable harm to the Business and/or Buyer and/or any Affiliate thereof, the consequences of which would not be wholly compensable by monetary damages. Accordingly, Buyer shall be entitled to injunctive or similar relief, without the necessity of actual monetary loss being proved, in the event of such a threatened or actual breach of a provision of this Section 6.4 by Seller or Shareholder, which remedies shall be cumulative with and not exclusive of any monetary or other relief that may be available to Buyer.

(d)     The parties hereto recognize that Laws and public policies of various jurisdictions may differ as to the validity and enforceability of covenants similar to those set forth in this Section 6.4.  It is the intention of the parties hereto that the provisions of this Section 6.4 be enforced to the fullest extent permissible under the Laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such Laws or policies) of any provisions of this Section 6.4 shall not render unenforceable, or impair, the remainder of the provisions of this Section 6.4.  Accordingly, if any provision of this Section 6.4 shall be determined to be invalid or unenforceable, such invalidity or unenforceability shall be deemed to apply only with respect to the operation of such provision in the particular jurisdiction in which such determination is made and not with respect to any other provision or jurisdiction.

6.5     Non-Disparagement.  For a period of five (5) years commencing with the date hereof, neither Shareholder nor Seller shall, directly or indirectly, engage in any activities detrimental to the reputation of the Business, Buyer or any Affiliate thereof.  Included in the foregoing, neither Shareholder nor Seller shall, directly or indirectly, individually or in concert with others, engage in any conduct or make any statement that has, or is likely to have, the effect of undermining or disparaging the reputation of the Business, Buyer or any Affiliate, or their goodwill, products or business opportunities, or that has, or is likely to have, the effect of undermining or disparaging the reputation of any officer, director, agent, representative or employee, past or present, of the Business, Buyer or any Affiliate.

6.6     Novation of Government Contracts.  As soon as practicable after the Closing Date, but in no event later than seven (7) Business Days after the Closing Date, the parties agree to submit to the U.S. Government a request for novation of any Government Contracts in accordance with FAR Part 42.12, to the extent applicable.  Seller agrees to provide all information requested by the U.S. Government in connection with the novation process and to provide to Buyer all reasonable cooperation and information necessary to obtain U.S. Government approval of the novation request.

6.7     Guaranty.  To induce Seller and Shareholder to enter into this Agreement and to consummate the transactions contemplated hereby, Guarantor hereby irrevocably and unconditionally guarantees to Seller and Shareholder, as primary obligor and not as surety, the payment and performance, when and if due, of each and every covenant, agreement and obligation to be performed or observed by the Buyer under this Agreement and the Goodwill Acquisition Agreement (individually, an "*Obligation*" and collectively, the "*Obligations*").  Guarantor hereby agrees that, in the event Buyer fails or refuses to pay any Obligation on the date on which such Obligation is required to be paid pursuant to the terms of this Agreement or the Goodwill Acquisition Agreement, Guarantor will pay or cause to be paid such Obligation pursuant to the terms of this Agreement or the Goodwill Acquisition Agreement, and that in the case of any extension of time of payment of any of the Obligations, the same will be promptly paid in full when due in accordance with the terms of such extension or renewal.  Guarantor agrees further that, in the event Buyer fails to perform any other Obligation on the date on which such Obligation is required to be performed pursuant to the terms of this Agreement, Guarantor will cause such Obligation to be performed when due to be performed by Buyer pursuant to the terms of this Agreement or the Goodwill Acquisition Agreement, and that in the case of any extension of time of performance of any of the Obligations, the same will be promptly performed on the date performance is due in accordance with the terms of such extension or renewal.

6.8     Litigation Costs.  Buyer shall pay to or on behalf of Seller one-half of the litigation costs (including attorney's fees) not covered by Seller's insurance (the "*Litigation Costs*") related to the litigation set forth on Schedule 3.22 within 30 days upon receipt of an invoice from the Seller or direct third-party invoice related to such matter; provided, however, that Buyer will not be obligated to pay more than seventy-five thousand dollars ($75,000).

6.9     Firearms Operations.

(a)     Each of Seller and Shareholder agree to use their best efforts to adhere to, assist with, and follow to the extent consistent with the GCA, the NFA, the AECA, and all Firearms Regulations, all instructions, restrictions, and recommendations (with respect to firearms and ammunition operations) provided by Buyer during the period beginning on the Closing Date and ending on such date as Buyer lawfully commences firearms and ammunition operations in Norcross, Georgia (the "*Transition Period*").

(b)     Shareholder, in dual capacities as Responsible Person ("*RP*") with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "*ATF*") for Seller's federal firearms license ("*FFL*") and as employee of the Buyer, shall remain responsible for firearm and ammunition inventory, maintain strict dominion and control over firearm and ammunition inventory, and direct firearms operations in conjunction with an officer of the Buyer at the licensed premises for the duration of the Transition Period, and until Buyer notifies Seller that Buyer has commenced firearms and ammunition operations in Norcross, Georgia under Buyer's newly obtained FFL, which shall be commenced by Buyer as soon as reasonably practicable.  During the Transition Period, Shareholder shall retain the existing RP status with the ATF for Seller's FFL.  Neither Buyer nor any agent, employee (other than Shareholder), subcontractor, independent contractor, designee, or other representative of Buyer shall be liable for, or responsible with respect to, Seller's firearms and ammunition operations prior to the Transition Period as regulated under the GCA, the NFA, the AECA, and state and local law.  Buyer shall not be liable for any action, inaction, act or undertaking of Seller with regard to such firearms and ammunition operations prior to the Transition Period.

(c)     During the Transition Period, Seller, as directed by the Shareholder, may only manufacture, acquire, dispose of, remove, or otherwise distribute, any firearm and ammunition inventory from Seller's licensed premises under the terms of, and in accordance with, Shareholder's responsibilities as employee of the Buyer and in conjunction with an officer of the Buyer while directing operations.

(d)     Shareholder shall report any firearm loss and/or theft to ATF as required under the GCA during the Transition Period.

(e)     Seller and Shareholder each acknowledge that immediately following the Closing, Buyer will have full access to Seller's former facility, equipment, and employees.

(f)     Upon Buyer's receipt of an FFL and Special (Occupational) Tax Stamp ("*SOT*"), Buyer shall present to Seller a certified copy of such FFL and SOT.  Certification shall be achieved when an RP of the Buyer signs a copy of the Buyer's FFL.  At such time, Seller will immediately transfer all non-NFA Purchased Firearms in Seller's acquisition and disposition records to Buyer, and apply to ATF for transfer and registration of all NFA Purchased Firearms in Seller's acquisition and disposition records to Buyer.  Such transfer shall take effect immediately upon ATF approval.  Immediately following transfer of all Purchased Firearms to Buyer, Seller shall commence the process of terminating its FFL.  The termination process shall comply with the GCA and ATF regulations set forth at 27 C.F.R. §§ 478.57 and 478.127, including surrender of Seller's FFL to the ATF, and submission of Seller's records to the ATF's Federal Firearms Licensing Center ("*FFLC*").  Records required to be submitted to the FFLC shall include any records required to be maintained by Parts 447, 478, and 479 of Title 27, Code of Federal Regulations.

(g)     Upon commencement by Buyer of firearms and ammunition operations under the Buyer's newly acquired FFL, and after Seller has transferred all Purchased Firearms to Buyer and has performed all necessary actions to terminate Seller's FFLs (including the submission of all records to the FFLC), Seller will immediately remove any remaining property not subject to the Agreement to ensure that there is no commingling of current and former FFL operations.

6.10     Use of Name.  From and after the Closing, Seller and Shareholder shall not, and shall cause their Affiliates to not, use or license or grant any third party the right to use any name, slogan, logo, trademark, service mark, trade name or Internet domain name that is similar or reasonably likely to cause confusion with any trademark or tradename, whether or not registered, used or usable in connection with the Business, or any derivation thereof, or any word deceptively similar to such word (collectively, the "*Seller Marks*").  At the Closing, Seller shall file a name change certificate with the state of its jurisdiction and each state in which it is qualified to do business, changing its name to a name that is not confusingly similar to and not including the Seller Marks.  Initially that name shall be Random Ventures, Inc.

## ARTICLE 7
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer under this Agreement shall, at the option of Buyer, be subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

7.1     No Misrepresentation or Breach of Covenants and Warranties.  The representations and warranties of Shareholder and Seller made in this Agreement (reading each such representation and warranty without regard to any Material Adverse Effect or materiality qualification) shall be true and correct in all respects: (a) as of the date hereof and (b) on and as of the Closing Date, as though made on such date, except (in the case of both clauses (a) and (b) above) (i) for those representations and warranties that are made as of a specific date (which shall be true and correct as of such respective date) and (ii) to the extent any breaches of such representations and warranties would not individually or in the aggregate be reasonably likely to have a Material Adverse Effect.  Shareholder and Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller and/or Shareholder on or before the Closing Date, and Seller shall have delivered to Buyer a certificate dated the Closing Date and signed by an authorized officer of Seller confirming the foregoing.

7.2     No Injunction.  There shall not be in effect on the Closing Date any Court Order restraining or enjoining the carrying out of this Agreement or the consummation of the transactions contemplated by this Agreement.

7.3     Required Consents.  The consents, approvals, waivers and notices set forth on Schedule 7.3 shall have been obtained (the "*Required Consents*").

7.4     ReservedKey Employment Agreements; Silvers Royalty Agreement.  Each of the Key Employment Agreements and the Silvers Royalty Agreement shall have been executed and delivered by Buyer and the counterparties thereto.

7.6     Lease.  Buyer shall have entered into a real property lease with respect to the Leased Real Property in form and substance acceptable to Buyer.

7.7     Absence of Impairment.  The Purchased Assets shall be free and clear of all Encumbrances, other than Permitted Encumbrances.  Buyer shall have received, in form satisfactory to Buyer, (i) each of the instruments of accord and satisfaction to be delivered by each Debt Holder pursuant to Section 1.7(c)(i) and (ii) releases of all security interests in the Purchased Assets, including but not limited to those set forth on Schedule 7.7.

7.8     FN Consent.  Seller shall have obtained the written consent required by Paragraph 9 of the FN Manufacturing, LLC Fixed Price Terms for Government Contracting (March 2009), P-200, REV 12-3/09.

7.9     Assignment Instruments.  Seller shall have executed and delivered to Buyer the Assignment Instruments.

7.10    Laws.  There shall not be in effect on the Closing Date any Law that became effective after the date of this Agreement prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

7.11    Goodwill Acquisition Agreement.  Shareholder shall have executed and delivered the Goodwill Acquisition Agreement to Buyer.

**ARTICLE 8**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**

The obligations of Seller under this Agreement shall, at the option of Seller, be subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

8.1     No Misrepresentation or Breach of Covenants and Warranties.  The representations and warranties of Buyer made in this Agreement shall be true and correct in all material respects:  (a) as of the date hereof and (b) on and as of the Closing Date, as though made on such date, except to the extent any breaches of such representations and warranties would not individually or in the aggregate be reasonably likely to have a Material Adverse Effect.  Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or before the Closing Date, and Buyer shall have delivered to Seller a certificate dated the Closing Date and signed by an authorized officer of Buyer confirming the foregoing.

8.2     Required Consents.  The Required Consents shall have been obtained.

8.3     No Injunction.  There shall not be in effect on the Closing Date any Court Order restraining or enjoining the carrying out of this Agreement or the consummation of the transactions contemplated by this Agreement.

8.4     Assumption Instruments.  Buyer shall have executed and delivered to Seller the Assumption Instruments.

8.5     Laws.  There shall not be in effect on the Closing Date any Law that became effective after the date of this Agreement prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

8.6     Goodwill Acquisition Agreement.  Buyer shall have executed and delivered the Goodwill Acquisition Agreement to Shareholder.

## ARTICLE 9
## INDEMNIFICATION

9.1    <u>Indemnification by Seller and Shareholder</u>.  After the Closing Date and subject to the limitations set forth herein (including, but not limited to <u>Section 11.1</u>), Seller and Shareholder shall, jointly and severally, indemnify and hold harmless Buyer from and against any and all Losses arising out of, relating to or resulting from:  (x) any breach of any warranty or the inaccuracy of any representation of Seller or Shareholder contained in this Agreement, (y) any breach by Shareholder or Seller of, or failure by Shareholder or Seller to perform, any of their respective covenants or obligations contained in this Agreement (determined in all cases under clauses (x) and (y) as if the limitations by the terms "material" or "materially", or any derivation thereof, were not included therein or in the Schedules related thereto), and (z) any liabilities or obligations of Seller arising out of, relating to or resulting from Excluded Assets, Excluded Liabilities or any facts or circumstances existing or occurring on or prior to the Closing Date other than any Assumed Liabilities; *provided, however*, that:

(i)    Seller and Shareholder shall be required to indemnify and hold harmless Buyer under clause (x) of this <u>Section 9.1</u> with respect to Losses only to the extent that the aggregate amount of such Losses exceed two hundred fifty thousand dollars ($250,000), in which event Buyer shall be entitled to claim indemnity for the full extent of all Losses; and

(ii)    the aggregate amount required to be paid by Seller and Shareholder collectively under clause (x) of this <u>Section 9.1</u> shall not exceed four million dollars ($4,000,000);

*provided, however*, that the limitations set forth in these clauses (i) and (ii) shall not apply to a claim pursuant to this <u>Section 9.1</u> relating to (A) any breach of any warranty or the inaccuracy of any representation set forth in <u>Article 2</u> (Representations and Warranties of Shareholder), <u>Section 3.1</u> (Organization and Power), <u>Section 3.2</u> (Authority and Enforceability), <u>Section 3.7</u> (Operations Since June 30, 2009), <u>Section 3.8</u> (Taxes), <u>Section 3.11</u> (Intellectual Property), <u>Section 3.19</u> (Employee Benefits), <u>Section 3.20</u> (Environmental Matters), <u>Section 3.27</u> (Transactions with Affiliates) and <u>Section 3.30</u> (Ownership of Equity) or (B) any breach of any warranty or the inaccuracy of any representation that constitutes fraud; and

(iii)    the aggregate liability of the Shareholder and the Seller for indemnification under this Agreement shall for all purposes other than fraud not exceed the Purchase Price *plus* any amount actually paid to Shareholder or Seller pursuant to <u>Section 1.8</u> and/or the Goodwill Acquisition Agreement.

9.2    <u>Indemnification by Buyer</u>. After the Closing Date and subject to the limitations set forth herein, Buyer agrees to indemnify and hold harmless Seller from and against any and all Losses incurred by Seller in connection with or arising from:  (a) any breach of any warranty or the inaccuracy of any representation of Buyer contained in this Agreement, (b) any breach by Buyer of, or failure by Buyer to perform, any of its covenants or obligations contained in this Agreement and (c) any Assumed Liability; *provided, however*, that the aggregate amount of any indemnification by Buyer pursuant to this <u>Section 9.2</u> (other than payment of the Purchase Price or payments due pursuant to <u>Section 1.8</u>) shall not exceed, in the aggregate, four million dollars ($4,000,000).

9.3    <u>Tax Indemnification</u>.  After the Closing Date, Seller shall indemnify and hold harmless Buyer, from and against any and all Losses and reasonable out-of-pocket expenses and costs resulting from, arising out of or relating to (a) any Taxes of Seller and (b) without duplication of amounts

Brittingham - 000046

included in clause (a) any Taxes resulting from a breach of the representations in Section 3.8.  The indemnity provided in the foregoing sentence shall include, without limitation, any Tax liability arising (A) by reason of Seller being severally liable for any Taxes of another Person pursuant to Treasury Regulation §1.1502-6 or any analogous state, local or foreign Tax provision, (B) by Contract as a transferee or otherwise and (C) in connection with the transactions contemplated by this Agreement.

        9.4     Notice of Claims.    Any party seeking indemnification hereunder (the "*Indemnified Party*") shall promptly give to the party obligated to provide indemnification to such Indemnified Party (the "*Indemnitor*") a written notice (a "*Claim Notice*") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based; *provided*, *however*, that the failure of any Indemnified Party to give the Claim Notice promptly as required by this Section 9.4 shall not affect such Indemnified Party's rights under this Article 9 except if, and only to the extent that, the Indemnitor's ability to defend has been materially prejudiced by such failure of the Indemnified Party.

        9.5     Third Person Claims.

        (a)     In the event of the initiation of any legal proceeding against the Indemnified Party by a third Person for which an Indemnified Party is seeking indemnity hereunder, such Indemnified Party shall notify the Indemnitor in writing, and in reasonable detail, of the third Person claim with reasonable promptness after receipt by such Indemnified Party of written notice of the third Person claim.  Thereafter, the Indemnified Party shall deliver to the Indemnitor, with reasonable promptness after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third Person claim (or in the case of court papers, within such time as may be necessary to enable the Indemnitor to respond to court proceedings on a timely basis); *provided*, *however*, that the failure of any Indemnified Party to give prompt notice of a claim or to promptly deliver copies of all notices and documents as required by this Section 9.5 shall not affect such Indemnified Party's rights under this Article 9 except if, and only to the extent that, the Indemnitor's ability to defend has been materially prejudiced by such failure of the Indemnified Party.

        (b)     In the event of the initiation of any legal proceeding against the Indemnified Party by a third Person, the Indemnitor shall have the sole and absolute right after the receipt of notice, at its option and at its own expense, to be represented by counsel of its choice (which shall be a firm experienced in the type of matter giving rise to the legal proceeding and which counsel shall be reasonably satisfactory to the Indemnified Party) and to control, defend against, negotiate and otherwise deal with any proceeding, claim, or demand which relates to any loss, liability or damage indemnified against hereunder; *provided*, *however*, (i) the Indemnitor will be deemed to have waived its right to dispute its liability to the Indemnified Party with respect to any third Person claim as to which it elects to control the defense, (ii) that all such proceedings, claims or demands to which the Indemnitor elects to control the defense of shall be vigorously and diligently prosecuted by the Indemnitor and (iii) that the Indemnified Party may participate in any such proceeding with counsel of its choice and at its expense.  If the Indemnitor does not assume control of the defense of a third Person claim, or abandons or fails to diligently pursue the defense of a third Person claim, the Indemnified Party shall have the right to control such defense.  The party controlling the defense of such third Person claim (the "*Controlling Party*") shall keep the non-Controlling Party advised of the status of such third Person claim and the defense thereof and shall consider in good faith the recommendations made by the non-Controlling Party with respect thereto.  To the extent the Indemnitor elects not to defend such proceeding, claim or demand, and the Indemnified Party defends against or otherwise deals with any such proceeding, claim or demand, the Indemnified Party may retain counsel, at the expense of the Indemnitor, and control the defense of such proceeding.  If the Indemnitor elects to assume control

of the defense of a third Person claim, any fees and expenses of legal counsel employed by the Indemnified Party with respect to such third Person claim shall be considered Losses for which the Indemnified Party may be entitled to indemnification under this Article 9 only if the named parties in such third Person claim include both the Indemnitor and the Indemnified Party and the Indemnified Party has been advised by legal counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnitor or the Indemnified Party has been advised in writing by legal counsel that it should be represented by separate counsel because a conflict exists between the Indemnitor and the Indemnified Party.   Neither the Indemnitor nor the Indemnified Party may settle or compromise any such proceeding, which settlement or compromise obligates the other party to pay money, to perform obligations or to admit liability without the written consent of the other party, such consent not to be unreasonably withheld or delayed.

        9.6     Limitations.

        (a)     For purposes of determining the amount of any Losses, such amount shall be reduced by the amount of any insurance benefits and proceeds actually paid to Buyer or Seller in respect of the Losses (net of any deductible amounts).

        (b)     In calculating any Losses there shall be deducted any indemnification, contribution or other similar payment actually received (less costs incurred in obtaining such payment) by the Indemnified Party or any Affiliate thereof from any third Person with respect thereto.  Any such amounts received by an Indemnified Party or any Affiliate thereof with respect to any indemnity claim after it has received an indemnity payment hereunder shall be promptly paid over to the Indemnitor; *provided* that the Indemnified Party shall not be obligated to pay over any such amount or benefit in excess of the amount paid by the Indemnitor to the Indemnified Party with respect to such claim.

        (c)     Except for remedies that cannot be waived as a matter of Law and injunctive and provisional relief, if the Closing occurs, this Article 9 shall be the sole and exclusive remedy for breach of, or inaccuracy in, any representation, warranty, covenant or agreement contained herein, or otherwise in respect of the transactions contemplated hereby.

        (d)     No party shall have any liability for any special, exemplary, punitive or consequential damages (including loss of profit or revenue) suffered or incurred by any other party.

        9.7     Mitigation.  Each of the parties hereto agrees to take all reasonable steps to mitigate their respective Losses upon and after becoming aware of any event or condition which could reasonably be expected to give rise to any Losses that are indemnifiable hereunder.

        9.8     Right of Setoff.  Without limiting the rights of Buyer as set forth herein, any amounts that may be due from Seller or Shareholder to Buyer for any indemnification or other liability pursuant to this Article 9 or Section 1.10 may, at the sole option of Buyer, be satisfied by an equivalent reduction in the amount of any payment payable to Seller pursuant to Section 1.8 and/or Shareholder pursuant to the Goodwill Acquisition Agreement.

**ARTICLE 10**
**TERMINATION**

        10.1     Termination.

        (a)     Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date:

(i)      by Seller by giving written notice to Buyer on or after sixty (60) days after the date of this Agreement, if any of the conditions set forth in Article 8 is not satisfied or waived by such date or has become incapable of fulfillment, unless such satisfaction has been frustrated or made impossible by any act or failure to act by Seller or Shareholder;

(ii)     by Buyer, by giving written notice to Seller and Shareholder on or after sixty (60) days after the date of this Agreement, if any of the conditions set forth in Article 7 is not satisfied or waived by such date or has become incapable of fulfillment, unless such satisfaction has been frustrated or made impossible by any act or failure to act by Buyer;

(iii)    by Seller, by giving written notice to Buyer at any time, if Buyer has materially breached any representation, warranty, covenant or agreement contained in this Agreement and such breach has not been cured within thirty (30) days after Seller's notice to Buyer of such breach or, if cure is not possible within thirty (30) days, if cure has not been commenced and is not being diligently pursued within thirty (30) days after such notice;

(iv)    by Buyer, by giving notice to Seller and Shareholder at any time, if Shareholder or Seller has breached any representation, warranty, covenant or agreement contained in this Agreement that results in a Material Adverse Effect and such breach has not been cured within thirty (30) calendar days after Buyer's notice to Seller of such breach ("**Buyer's Breach Notice**") or, if cure is not possible within thirty (30) calendar days, if cure has not been commenced and is not being diligently pursued within thirty (30) calendar days after Buyer's Breach Notice; or

(v)     by mutual written agreement of Buyer and Seller.

(b)      In the event of termination of this Agreement pursuant to Section 10.1(a), no party shall have any liability or further obligation to any other party, and no party shall be entitled to any monetary damages or injunctive relief (including specific performance) as a result of such termination, or any indemnification under Article 9; *provided, however*, that in no event shall any termination of this Agreement limit or restrict the rights and remedies of any party against any other party which has breached any of the agreements or other provisions of this Agreement prior to the termination hereof; and *provided further*, that the provisions of Section 6.3 (Confidentiality) and Article 11 (General Provisions) shall remain in full force and effect.

## ARTICLE 11
## GENERAL PROVISIONS

11.1    Survival of Covenants, Representations and Warranties.  Notwithstanding any right of Buyer (whether or not exercised) to investigate the affairs of Seller or any right of any party (whether or not exercised) to investigate the accuracy of the representations and warranties of the other party contained in this Agreement, Seller, Shareholder and Buyer have the right to rely fully upon the representations, warranties, covenants and agreements of the other contained in this Agreement. The representations, warranties, covenants and agreements of Seller and Shareholder contained in this Agreement will survive the Closing (a) indefinitely with respect to (i) the representations and warranties contained in Sections 2.1 (Authority and Enforceability), 2.4 (Brokers and Finders), 3.1 (Organization and Power), 3.2 (Authority and Enforceability), 3.4 (Investments; Subsidiaries), 3.26 (Purchased Assets), 3.30 (Ownership of Equity) and 3.31 (No Brokers) and (ii) the covenants and agreements contained in Sections 1.11 (Subsequent Actions), 6.3 (Confidentiality), and 11.9 (Expenses); (b) until sixty (60) days after the expiration of all applicable statutes of limitation (including all periods of extension, whether automatic or permissive) with respect to matters covered by Section 3.8 (Taxes), Section 3.19 (Employee

Benefits (insofar as it relates to ERISA or the Code)) and Section 3.20 (Environmental Matters); (c) until that date that is 24 months after the Closing Date in the case of the covenants to be performed prior to Closing and all other representations and warranties and (d) with respect to each other covenant or agreement contained in this Agreement, until sixty (60) days following the last date on which such covenant or agreement is to be performed or, if no such date is specified, indefinitely; *provided* that any representation, warranty, covenant or agreement that would otherwise terminate in accordance with clause (b), (c) or (d) above will continue to survive if a Claim Notice shall have been timely given under Article 9 on or prior to such termination date, until the related claim for indemnification has been satisfied or otherwise resolved as provided in Article 9.

      11.2   No Public Announcement. From the date of this Agreement, neither Buyer, on the one hand, nor Seller and/or Shareholder, on the other hand, shall, without the written approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by applicable Law, in which case such party shall allow the other party reasonable time to comment on such release or announcement and the parties hereto shall use their reasonable efforts to cause a mutually agreeable release or announcement to be issued; *provided*, *however*, that the foregoing shall not preclude communications or disclosures necessary to implement the provisions of this Agreement or to comply with any Law, accounting or Securities and Exchange Commission disclosure obligations or the rules of any stock exchange or national market system.

      11.3   Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (a) when delivered personally, against written receipt, (b) if sent by registered or certified mail, return receipt requested, postage prepaid, when received, (c) when received by facsimile transmission, if confirmed by the other means described in clause (a) or (b), and (d) when delivered by a nationally recognized overnight courier service, prepaid, and shall be addressed as follows:

      If to Seller, to:

            Advanced Armament Corp.
            1434 Hillcrest Road
            Norcross, Georgia 30093
            Attention:  Kevin Brittingham
            Facsimile:  (770) 925-9989

            with a copy to:

            Morris, Manning & Martin, LLP
            1600 Atlanta Financial Center
            3343 Peachtree Road N.E.
            Atlanta, Georgia 30326
            Attention:  Scott L. Allen, Esq.
            Facsimile: (404) 365-9532

      If to Shareholder, to:

            Kevin Brittingham
            1434 Hillcrest Road
            Norcross, Georgia 30093

with a copy to:

        Morris, Manning & Martin, LLP
        1600 Atlanta Financial Center
        3343 Peachtree Road N.E.
        Atlanta, Georgia 30326
        Attention:  Scott L. Allen, Esq.
        Facsimile: (404) 365-9532

If to Buyer, to:

        AAC Acquisitions, LLC
        870 Remington Drive
        Post Office Box 700
        Madison, North Carolina 27025
        Attention:  P. Jesse Walcott
        Facsimile:  (336) 548-7716

        and

        Remington Arms Company, Inc.
        870 Remington Drive
        Post Office Box 700
        Madison, North Carolina 27025
        Attention:  Frederic E. Roth, Jr.
        Facsimile:  (336) 548-8810

with a copy to:

        Milbank, Tweed, Hadley & McCloy LLP
        1 Chase Manhattan Plaza
        New York, New York 10005
        Attention:  Roland Hlawaty, Esq.
        Facsimile: (212) 822-5735

or to such other address as such party may indicate by a written notice delivered to the other parties hereto.

        11.4    <u>Successors and Assigns</u>.  The rights of a party under this Agreement shall not be assignable by such party without the written consent of the other parties hereto; *provided*, *however*, that (a) Buyer may assign this Agreement and its rights and obligations hereunder to an Affiliate of Buyer and (b) Seller may assign its rights to any payment under <u>Section 1.8</u> to Shareholder or to any Immediate Family Member of Shareholder or trust established for benefit of Shareholder or any Immediate Family Member of Shareholder.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

        11.5    <u>Access to Records and Employees after Closing</u>.

        (a)    For a period of five (5) years after the Closing Date, Seller shall have reasonable access to all of the books and records of the Business (including any books and records relating to Taxes and Tax Returns of the Business), to the extent that such access may reasonably be required by Seller in

connection with matters relating to or affected by the operations of the Business prior to the Closing Date, including the preparation of Seller's financial reports or Tax Returns, any Tax audits, the defense or prosecution of litigation (including arbitration or mediation), and any other reasonable need of Seller to consult such books and records. Such access shall be afforded by Buyer upon receipt of reasonable advance notice and during normal business hours. Seller shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 11.5(a). If any such books or records, or any other documents which Seller has the right to have access to pursuant to this Section 11.5(a) are produced by Buyer to an actual or potentially adverse party (*e.g.*, in litigation or in connection with a government investigation), Buyer shall endeavor to immediately make all such books, records and/or documents produced available for inspection and copying by Seller concurrently with the production of such books, records and/or documents. In addition, if Buyer shall desire to dispose of any of such books or records prior to the expiration of such five (5) year period, Buyer shall, prior to such disposition, give Seller a reasonable opportunity, at Seller's expense, to segregate and remove such books and records as Seller may select.

(b)     Buyer shall provide to Seller reasonable assistance, at Seller's actual expense, by providing employees of the Business to act as witnesses and preparing documents, reports and other information requested by Seller in support of the activities described in Section 11.5(a).

(c)     Seller may retain copies of any Contracts, documents or records: (i) which relate to properties or activities of Seller other than the Business or (ii) which are required to be retained pursuant to any legal requirement or are subject to the attorney-client privilege, or for financial reporting purposes, for Tax purposes or for legal defense or prosecution purposes.

11.6    Entire Agreement. This Agreement, the Schedules and the exhibits referred to herein, and the documents and certificates delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all other prior agreements, understandings, term sheets, or letters of intent between or among any of the parties hereto.

11.7    Interpretation.

(a)     Titles and headings to articles, sections and subsections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(b)     The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Disclosure of any fact or item in any particular Section in this Agreement or in any Schedule hereto referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement to which such matter is reasonably apparent on its face. Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item in any Schedule hereto is intended to vary the definition of "Material Adverse Effect" or to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not material for purposes of this Agreement. Unless this Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in this Agreement nor the inclusion of any specific item in any Schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not in the ordinary course of business for purposes of this Agreement.

(c)     Seller shall, from time to time prior to or at the Closing, by notice to Buyer, supplement, amend or create any Schedule in order to add information or correct previously supplied information. No such supplement, amendment or addition shall be evidence, in and of itself, that the representations and warranties in the corresponding Section are no longer true and correct in all material respects.  It is specifically agreed that such Schedules may be supplemented, amended and/or added to, to add immaterial, as well as material, items thereto.  No such supplemental, amended or additional Schedule shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit Buyer's right to seek indemnity under Article 9.

(d)     Whenever the context requires in this Agreement, the masculine pronoun shall include the feminine and the neutral, and the singular shall include the plural, and vice versa.

(e)     Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)     This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

11.8    Amendments and Waivers.  Any term or provision of this Agreement may be amended or waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof.  Any such amendment or waiver, including any such amendment to or waiver of this Section 11.8, shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party.  The failure of any party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

11.9    Expenses.  Except as otherwise provided herein, each party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel, accountants, advisors and consultants.

11.10   Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such a manner as to be effective and valid under applicable Law.  In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision or provisions shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability, without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

11.11   Execution in Counterparts; Facsimile.  This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile transmission, and any such counterpart executed and delivered via facsimile transmission will be deemed an original for all intents and purposes.

11.12   Governing Law.  This Agreement and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of New York.

11.13   Consent to Jurisdiction; Waiver of Jury Trial.

(a)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in the Borough of Manhattan in the City of New York in any such action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court; *provided*, *however*, that such consent to jurisdiction is solely for the purpose referred to in this Section 11.13 and shall not be deemed to be a general submission to the jurisdiction of said courts or in the State of New York other than for such purpose. Each party hereto hereby irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

(b)      Each party hereto acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore it hereby irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby.

11.14   No Third Party Beneficiaries.   Nothing herein is intended to, and shall not be construed to, create any third party beneficiary rights of any kind or nature, including, without limitation, the right of any employee or other individual to seek to enforce any right to compensation, benefits, or any other right or privilege of employment with Buyer.

## ARTICLE 12
## DEFINITIONS

12.1   Definitions.   In this Agreement, the following terms have the meanings specified in this Section 12.1.

"*Acquisition Proposal*" means any proposal for a merger or other business combination to which Seller or Shareholder is a party or the direct or indirect acquisition of any equity interest in, or a substantial portion of the assets of, the Business, other than the transactions contemplated by this Agreement.

"*Action*" means any lawsuit, legal proceeding, litigation, arbitration or Governmental Entity investigation or audit.

"*Affiliate*" means, with respect to any Person, any other Person, which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by Contract or otherwise and, in any event and without limitation of the previous sentence, any Person owning ten percent (10%) or more of the voting securities of another Person shall be deemed to control that Person.

"*Benefit Plan*" means each written compensation or benefits plan, program or arrangement (including, without limitation, plans within the meaning of Section 3(3) of ERISA (regardless of whether such plan is subject to ERISA), employment agreements, profit-sharing, defined contribution, deferred compensation, insurance, pension, retirement, medical, hospital, disability, change of control, termination, welfare or fringe benefit plans, programs, agreements or arrangements, cash or equity-based bonus or incentive arrangements, severance arrangements and vacation policies) contributed

to or sponsored or maintained by Seller or any ERISA Affiliate, or with respect to which either Seller or any ERISA Affiliate has any liability, for the benefit of any current or former employees, directors, consultants and contractors.

"*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"*Cash*" means cash, commercial paper, certificates of deposit and other bank deposits, treasury bills, and all other cash equivalents in all accounts of Seller, and third Person checks deposited or held in any Seller accounts that have not yet cleared.

"*Closing Date*" means the date hereof.

"*Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"*Contract*" means any contract, agreement, license, lease, guaranty, indenture, sales or purchase order or other legally binding commitment in the nature of a contract (whether written or oral).

"*Copyrights*" means all registered U.S. and foreign works of authorship and all applications to register and renewals of any of the foregoing.

"*Court Order*" means any judgment, order, writ, decision, injunction, award or decree of any foreign, federal, state, local or other court or tribunal, or of any Governmental Entity and any ruling or award in any binding arbitration proceeding in each case, whether preliminary or final.

"*Employee*" means any current employee of Seller.

"*Encumbrance*" means any lien, encumbrance, claim, charge, security interest, mortgage, deed of trust, pledge, easement, defect in title or other restriction of a similar kind, conditional sale contract or other title retention Contract or other Contract to give any of the foregoing.

"*Environmental Laws*" means all federal, state, local or foreign laws, statutes, ordinances, regulations, rules, judgments, orders, notice requirements, court decisions, agency guidelines or principles of common law, restrictions and licenses, which (a) regulate or relate to pollution; the protection of health, safety or the environment; the clean-up of the environment; the use, treatment, storage, transportation, handling, disposal or release of Hazardous Substances; or the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources; or (b) impose liability with respect to any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" means any Person who, together with Seller, is treated as a single employer under Section 414 of the Code.

"*Federal Government Agency*" means an executive department, a military department, or any independent establishment within the meaning of 5 USC 101, 102, and 104(1) respectively, and any wholly owned U.S. Government corporation within the meaning of 31 USC 9101;

"*Federal Government Agency Contract*" means a Government Contract with any Federal Government Agency.

"*Firearm*" means (A) any weapon (including starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or Firearm Silencer; or (D) any destructive device. Such term shall not include an antique firearm.

"*Firearm Silencer*" means any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time, consistently applied throughout the specific period and in the immediately prior comparable period.

"*Government Contract*" means any Contract, basic ordering agreement, letter contract, purchase order, bid, proposal, arrangement or other commitment of any kind, between (a) Seller and a Governmental Entity (a "*Prime Government Contract*"), (b) Seller and any prime contractor to a Governmental Entity (a "*Prime Government Contractor*") with respect to a Prime Government Contract of such Prime Government Contractor, or (c) Seller or any subsidiary of Seller and any direct subcontractor to a Prime Government Contractor with respect to a Prime Government Contract. "Government Contract" shall also include any "Contractor team arrangement" as defined in FAR § 9.601.

"*Governmental Entity*" means, with respect to the U.S., any foreign country or any domestic or foreign jurisdiction, any national, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"*Hazardous Substances*" shall mean any quantity of asbestos in any form, urea formaldehyde, PCBs, radon gas, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products, any radioactive substance, any toxic, infectious, reactive, corrosive, ignitable or flammable chemical or chemical compound and any other hazardous substance, material or waste (as defined in, or for purposes of, any Environmental Law), whether solid, liquid or gas.

"*Immediate Family Member*" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, of a natural person referred to herein.

"*Intellectual Property*" means all intellectual property rights of any nature or form of protection or similar nature or having equivalent or similar effect to any of the foregoing, including, without limitation, Patents, Marks and Copyrights.

"*Knowledge of Seller*," or any variant thereof, means as to a particular matter, the actual knowledge of the following persons:  Kevin Brittingham or Lynsey Thompson, including, without limitation, any knowledge obtained in connection with the preparation and negotiation of this Agreement.

"*Law*" means any law, statute, rule, regulation, ordinance, order, decree, consent decree or similar instrument or determination or award of a court or any other Governmental Entity.

"*Losses*" means any and all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and Taxes.

"*Marks*" means all registered and unregistered U.S. and foreign trade names, trademarks, trade dress and service marks, together with any applications related thereto.

"*Material Adverse Effect*" means any change, circumstance or effect that has a material adverse effect on the assets, properties, liabilities, business, prospects or financial condition or results of operations of the Business as a whole; *provided, however,* that Material Adverse Effect shall exclude any adverse changes or conditions as and to the extent such changes or conditions relate to or result from (i) general business, economic, political, regulatory conditions, including such conditions generally affecting the industry in which the Business competes, (ii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) changes in Law or GAAP, (iv) the taking of any action required by this Agreement, or (v) the taking of any action by Seller with the prior consent of Buyer; *provided, further,* that in the case of clauses (i)-(iii), only to the extent such changes and conditions have had a disproportionate effect on the Business, as compared to other participants in the industry in which the Business operates.

"*Patents*" means all issued U.S. and foreign patents and pending patent applications.

"*Permits*" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, any Governmental Entity or any other Person.

"*Permitted Encumbrances*" means (a) liens for Taxes and other governmental charges and assessments which are not yet due and payable or which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (b) any statutory liens arising in the ordinary course of business by operation of Law and (c) other minor imperfections of title, or similar Encumbrances, which individually or in the aggregate with other such Encumbrances do not materially impair the value of the property subject to such Encumbrance or the use of such property in the conduct of the Business.

"*Person*" means an individual, partnership, corporation, limited liability company, joint stock company, trust, association, joint venture, Governmental Entity or other entity of whatever nature.

"*Schedules*" means the record delivered to Buyer by Shareholder and Seller or to Seller by Buyer, as applicable, herewith and dated as of the date hereof, containing all lists, descriptions, exceptions and other information and materials as are required to be included therein by Shareholder and Seller or Buyer, as applicable, pursuant to this Agreement.

"*Tax*" (and, with correlative meaning, "*Taxes*") means any federal, state, local or foreign income, gross receipts, property, sales, use, license, franchise, employment, payroll, withholding, alternative or add-on minimum, ad valorem, transfer or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, or addition thereto imposed by any Governmental Entity, whether disputed or not, and any expenses incurred in connection with the determination, settlement or litigation of any Tax liability.

"***Tax Return***" means any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax and any affiliated, consolidated, combined, unitary or similar return.

"***Transaction Expenses***" means all fees and costs relating to this Agreement and the transactions contemplated hereby that are payable by the Seller as of the Closing to any financial advisor, attorney, accountant, consultant, or other professional.

12.2    Index of Defined Terms.  Solely for convenience purposes, the following is a list of terms that are defined in this Agreement and the Section number where such definition is contained:

| TERM: | SECTION: |
|---|---|
| Accounts Payable | Section 1.3(d) |
| Accounts Receivable | Section 1.1(b) |
| Adjusted EBITDA | Section 1.8(a)(i) |
| AECA | Section 3.12 |
| Agreement | Preface |
| Annual Statement | Section 1.8(d) |
| Assignment Instruments | Section 1.7(b) |
| Assumed Liabilities | Section 1.3 |
| Assumption Instruments | Section 1.7(b) |
| ATF | Section 6.9(b) |
| Business | Recitals |
| Business Contracts | Section 1.1(e) |
| Business Intellectual Property | Section 1.1(f) |
| Buyer | Preface |
| Buyer's Breach Notice | Section 10.1(a)(iv) |
| Claim Notice | Section 9.4 |
| Closing | Section 1.7(a) |
| Confidential Information | Section 6.4(b) |
| Controlling Party | Section 9.5(b) |
| Cumulative Adjusted EBITDA | Section 1.8(a)(ii) |
| Customer Deposits | Section 1.3(b) |
| Debt Holder | Section 1.7(c)(i) |
| EAR | Section 3.16 |
| EBITDA Contingent Payment | Section 1.8(a) |
| Excluded Assets | Section 1.2 |
| Excluded Business Contracts | Section 1.2(e) |
| Excluded Liabilities | Section 1.4 |
| Export Control Laws | Section 3.16(a) |
| FAR | Section 3.14(b) |
| FFL | Section 6.9(b) |
| FFLC | Section 6.9(f) |
| Financial Statements | Section 3.5(b) |
| Firearms Regulations | Section 3.12 |
| GCA | Section 3.12 |
| Goodwill Acquisition Agreement | Section 5.9 |
| Government List | Section 3.17 |

| TERM: | SECTION: |
|-------|----------|
| Governmental Permits | Section 3.9(a) |
| Guarantor | Preface |
| Indemnified Party | Section 9.4 |
| Indemnitor | Section 9.4 |
| Independent Accountant | Section 1.8(b)(ii) |
| Independent Accountant Determination | Section 1.8(b)(ii) |
| Information | Section 5.4 |
| Inventory | Section 1.1(a) |
| ITAR | Section 3.15 |
| June 30 Financial Statements | Section 3.5(a) |
| Key Employment Agreements | Section 5.5(e) |
| Leased Real Property | Section 3.10(b) |
| Leases | Section 3.10(b) |
| Litigation Costs | Section 6.8 |
| NFA | Section 3.12 |
| NISPOM | Section 3.14(h) |
| Obligation | Section 6.7 |
| Partial Fiscal Year 2009 | Section 1.8(a)(iii) |
| Payment Schedule | Section 1.08(c)(i) |
| Purchase Price | Section 1.6 |
| Purchased Assets | Section 1.1 |
| Purchased Firearms | Section 1.1(l) |
| Representatives | Section 5.4 |
| Required Consents | Section 7.3 |
| Resolution Period | Section 1.8(b)(ii) |
| RP | Section 6.9(b) |
| Seller | Preface |
| Seller Marks | Section 6.10 |
| Seller's Contingent Payment Dispute Notice | Section 1.8(b)(ii) |
| Seller's True Up Closing Balance Sheet Dispute Notice | Section 1.10(b) |
| Shareholder | Preface |
| Shareholder Accounts Receivable | Section 1.2(g) |
| Silvers Royalty Agreement | Section 5.6 |
| SOT | Section 6.9(f) |
| Transferred Employees | Section 5.5(a) |
| Transition Period | Section 6.9(a) |
| True Up Closing Balance Sheet | Section 1.10(a) |
| True Up Closing Balance Sheet Independent Accountant | Section 1.10(b) |
| True Up Closing Balance Sheet Resolution Period | Section 1.10(b) |
| Year End Financial Statements | Section 3.5(b) |

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed and delivered as of the day and year first above written.

**"Seller"**

ADVANCED ARMAMENT CORP.

By: _____
Name: Kevin Brittingham
Title: Chief Executive Officer


**"Buyer"**

AAC ACQUISITIONS, LLC

By:_____
Name:_____
Title:_____


**"Shareholder"**

_____
Kevin Brittingham


**"Guarantor"**

REMINGTON ARMS COMPANY, INC.

By:_____
Name:_____
Title:_____


*[Signature Page to the Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed and delivered as of the day and year first above written.

**"Seller"**

ADVANCED ARMAMENT CORP.

By: _____
Name:
Title:

**"Buyer"**

AAC ACQUISITIONS, LLC

By: _____
Name: Stephen P. Jackson Jr.
Title: CFO

**"Shareholder"**

_____

Kevin Brittingham

**"Guarantor"**

REMINGTON ARMS COMPANY, INC.

By: _____
Name: Stephen P. Jackson, Jr.
Title: CFO

Brittingham - 000061

## Schedule 1.1(l)

### Firearms and Firearm Components

See a list of the Firearms and Firearm Components attached to this Schedule 1.1(l).

Brittingham - 000107

| Serial Number | Model | Type | Caliber | Manufacturer |
|---|---|---|---|---|
| S90-00417 | SR-556 | RIFLE | 5.56MM | Ruger |
| 98B00255 | 98B | RIFLE | .338LM | Barrett |
| 386100106 | FIVESEVEN | SEMI AUTO PISTOL | 5.7 | FN Mfg. |
| 164-002718 | MP7 | MACHINEGUN | 4.6MM | HK |
| 88-002207 | HK416 | MACHINEGUN | 5.56X45 | HK |
| MFP888G | M&P | PISTOL | 9MM | SMITH AND WESSON |
| U668043 | P226 | PISTOL | 9MM | SIG ARMS |
| L224824 | P22 | PISTOL | 0.22 | WALTHER |
| A038172 | MOSQUITO | PISTOL | 0.22 | SIGARMS |
| 427571 | P1 | PISTOL | 9MM | WALTHER |
| 216-000101 | HK45C | PISTOL | 0.45 | HK |
| 01-033364 | MP7 | SILENCER | 4.6 | B&T |
| 223-01543 | MKII | SEMI AUTO PISTOL | 0.22 | RUGER |
| S221-01543 | MK512 | SILENCER | 0.22 | JANATHON ARTHUR CEINER |
| S07-23518 | OASIS | silencer | 0.22 | GEMTECH |
| 189516424 | NAGANT | REVOLVER | 7.62X38R | CAI |
| 146132 | H-D MILITARY | PISTOL | 0.22 | HI STANDARD |
| AT1109 | AT 22 HS | SILENCER | SILENCER | AURORA TACTICAL |
| L235547 | P22 | PISTOL | 0.22 | WALTHER |
| 515MP04466 | BUCKMARK | PISTOL | 0.22 | BROWNING |
| 225-36679 | 22/45 | SEMI AUTO PISTOL | 0.22 | RUGER |
| ST02945 | PM-63 | PISTOL | 9X18MM | PLISH GOVERNMENT FACTORY |
| TDIXS00017 | KRISS XSMG | SMG 9MM | | TRANSFORMATIONAL DEFENSE INDUSTRIES, INC. |
| FN93932 | M240 (Mag 58) | | | FN Mfg. |
| BMG-X2241 | TAC-50 | | | McMillan |
| 163-001526 | UMP .45 | | | HK |
| 162-001525 | UMP .40 | | | HK |
| 13872 | FAL | | | DSA(AAC) |
| US06-1507 | MP9 | SILENCER | | B&T |
| 075M11539 (U4393) | 0.338 | | | AI |
| FN10954 | SPR | | | FN Mfg. |
| SAW-003 | 249 (DSA) MOD. 249 | | | FN Mfg. |
| 64-21082 | MP5K | | | HK |
| 62-357280 | MP5 A2 | MACHINEGUN | 9MM | HK |
| 72561 | M92 | | | (AAC) (KRINK/YUGO) |
| 278784 | SSG 69 | RIFLE | 0.308 | STEYR |
| 318399 | HK99 | | | AK-47 |
| 22-100264 | USP TACTICAL | PISTOL .40 | | HK |
| 25-025046 | USP45 | PISTOL | 45ACP | HK |
| GEF590 | GLOCK 22 | PISTOL .40 | | GLOCK |
| G359276 | P220 | PISTOL .45 | | SIG SAUER |
| 25-060733 | USP TACTICAL | PISTOL .45 | | HK |
| 25-040609 | USP TACTICAL | PISTOL .45 | | HK |
| 24-087443 | USP | PISTOL 9MM | | HK |
| 24-112393 | USP | PISTOL | 9MM | HK |
| 23-6863 | MK23 | PISTOL .45 | | HK |
| MHB470 | 19 | PISTOL | 9MM | GLOCK |
| 212-85071 | MK11 | PISTOL .22 | | RUGER |
| 22-079 | 56 | SILENCER .22 | | HARD TIMES ARMORY |
| 220-10929 | 22/45 | PISTOL | 0.22 | RUGER |
| 1019 | OPERATOR | SILENCER | 0.22 | JR CUSTOMS |
| S170617 | P230 | PISTOL 380 | | SIG |
| 221-71466 | MK11 | PISTOL .22 | | RUGER |
| S97-3530 | QUANTUM | SILENCER | 0.22 | GEMTECH |
| TSS-23518 | | PISTOL .22 | | TACTICAL SOLUTIONS OR GEMTECH |
| 223-97007 | MK11 | PISTOL .22 | | RUGER |
| S-223-97007 | FALCON | SILENCER .22 | | SPEC OPS SHOP |
| 2059448 | M-101 | PISTOL S/AUTO | 0.22 | HI STANDARD |
| 79057 | RUP | SILENCER | 0.22 | R.P.B. INC. |
| BTR936US | GLOCK 26 | PISTOL 9MM | | GLOCK |
| 219-99448 | MKII | PISTOL .22 | | RUGER (NO SILENCER) |
| X1 | X1 | SILENCER .22 | | AAC |
| X11 | X11 | SILENCER .22 | | AAC |
| 97-3337 | LDE-9 | AOW | 9MM | GEMTECH |

Brittingham - 000108

| 065516 | PPK/S | SEMI AUTO PISTOL | 0.38 | WALTHER |
|---|---|---|---|---|
| 061073 | MICRO UZI | SMG | 9MM | IMI |
| MIU04098 | MINI UZI | SMG | 9MM | IMI |
| 7220720 | UZI | SMG | 9MM | SPRINGFIELD ARMORY |
| 3195S | MPK | SMG | 9MM | WALTHER |
| 54544 | M61J | MACHINEGUN | 7.65 | ZASTAVA YUGOSLAVIA |
| UAF8797 | 2213 | PISTOL | 0.22 | SMITH AND WESSON |
| F38195 | PM125 | SMG | 9MM | BERETTA |
| N63-99757 | MP5-SD | | | HK |
| BS42590 | MK-4 | RIFLE | 9MM | STERLING ARMAMENT |
| 275652 | 45 | MACHINEGUN | 9MM | NORTH FULTON ARMS |
| KM800247 | SR-1S | RIFLE | 5.56 | KNIGHTS ARMAMENT CORP |
| BE 523 | PKM | MACHINE GUN | 7.62X54R | In Range |