Exhibit 55

## FIRST AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This First Amended and Restated Employment Agreement (this "Agreement") by and between KEVIN BRITTINGHAM (the "Executive") and ADVANCED ARMAMENT CORP., LLC, FORMERLY KNOWN AS AAC ACQUISITIONS, LLC, a Delaware limited liability company (the "Company") (together the "Parties") is effective as of January 9, 2011 (the "Effective Date").

WHEREAS, the Parties had previously entered into a Employment Agreement on October 2, 2009 (the "Original Agreement") which they now desire to amend and restate; and,

WHEREAS, this Agreement shall supersede all prior versions and hereinafter shall solely establish the terms of Executive's employment with the Company.

NOW, THEREFORE, the Company hereby agrees to employ the Executive and the Executive accepts such employment upon the terms and conditions set forth in this Agreement.

1.      **Duties.**

1.1     The Executive shall serve as the Founder of the Company, during the Employment Term (as defined below) and shall have such authority and perform those duties identified in the job description attached hereto as Exhibit A and such other duties not inconsistent with such position as may from time to time be prescribed by the Vice President, Global Military Products Division for Freedom Group, Inc. (the "FGI VP-GMPD"). It is however understood by Executive that such duties shall not include responsibilities as the Responsible Person under the Company FFL or the management of the Compliance program. The Executive shall report to the FGI VP-GMPD or such other person designated by the FGI VP-GMPD.

1.2     The Executive shall devote his full time and best efforts to the performance of his duties for the Company and shall not engage in any other business activities during the Employment Term without prior written consent of the Company, acting through its Board of Directors.

2.      **Location of Employment.** The Executive shall initially be based in the Norcross Georgia area to perform his full-time services to the Company. He shall be required to travel frequently to the Company's headquarters located in Madison, North Carolina, as well as to other locations, to support its business activities.

3.      **Term and Termination.**

3.1     Term: The term of the Executive's employment under this Agreement will commence on the Effective Date and continue through March 31, 2015 (the "Employment Term"), unless sooner terminated as set forth in Section 3.2 of this Agreement. Upon expiration of the Employment Term, the parties may by mutual agreement renew this Agreement. Such renewal must be in writing. Upon expiration of the Employment Term, should the Executive continue in the Company's employ without the parties having executed a written renewal or new employment agreement, (a) the Executive shall be an "employee at will" at the same level of compensation as set forth in Section 4, (b) the provisions of Section 3.2 shall not apply to any subsequent termination of employment, and (c) Sections 6.1, 6.2, 6.3, 6.4, 6.5, 7 and 12 below (and no other terms of this Agreement) shall continue to be applicable in accordance with their terms subsequent to the Employment Term.

2615648 v03

Confidential                                                                                  REM010000467

3.2   <u>Termination:</u>

(a)   The Executive's employment under this Agreement shall be terminated upon the earliest to occur of any of the following:

    (i)   the death of the Executive.

    (ii)   the Executive's inability to perform the essential functions of his duties with or without reasonable accommodation on account of disability or incapacity for a period of six (6) or more months, as reasonably determined by the Company's Board of Directors.

    (iii)   written notice to the Executive that the Company is terminating the Executive's employment hereunder without Cause (as defined below).

    (iv)   written notice to the Company of the termination of the Executive's employment by the Executive at any time for any reason other than for Good Reason (as defined below) (other than as provided in clause (ii) above) including, without limitation, resignation or retirement.

    (v)   the termination of the Executive's employment by the Company at any time for "Cause," such termination to take effect immediately upon written notice from the Company to the Executive.   For purposes of this Agreement, the term "Cause" shall mean: (A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of, or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft; (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties; (C) actions by the Executive involving embezzlement, thief, sexual harassment, discrimination, fraud or other acts of a criminal nature by the Executive in his dealings with the Company or its employees or representatives; (D) the Executive's continuedl failure to perform his substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30 day period); (E) the Executive's  material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30 day period; or (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company. Additonally, for the twelve (12) month period starting on the Effective Date and ending on January 9, 2012 (the "Probationary Period") Cause shall  be further defined to include (X) ANY

Confidential

violation by the Executive of the Company's compliance policies and (Y) Executive's failure to attend and complete all Company required and mandated compliance and policy training during the Probationary Period.  Upon such termination for Cause, the only obligation the Company will have under this Agreement will be to pay the Executive's unpaid base salary accrued through the date of termination.

(vi)    written notice to the Company of the termination of the Executive's employment by the Executive for Good Reason.  For purposes of this Agreement, the term "Good Reason" shall mean a termination of employment by Executive within thirty (30) days following written notice to the Company of the occurrence of any of the following events without Executive's consent, if such event or events are not cured within such thirty (30) day period: (A) the assignment of Executive to a position the duties of which constitute a material diminution of Executive's duties as Founder; *provided, however*, that any change in reporting lines or the organizational structure of the Company or its affiliates shall not constitute Good Reason; (B) a material decrease in the Executive's total compensation, including Base Salary, bonus opportunity and benefits (other than as the result of a change in benefits affecting all employees of the Company); (C) a material breach by the Company of any of its obligations hereunder or (D) the transfer of Executive's primary work location to a location that is more than thirty (30) miles from Executive's current primary work location.

(b)    Upon the termination of this Agreement pursuant to Section 3.2(a)(i), (ii), (iv) or (v), the Executive shall be entitled to receive the following:

(i)    The Executive's accrued but unpaid Base Salary to the date of termination and any employee benefits that the Executive is entitled to receive pursuant to the employee benefit plans of the Company (other than any severance plans) in accordance with the terms of such employee benefit plans; and

(ii)    Expenses reimbursable under Section 5.2 below incurred but not yet reimbursed to the Executive to the date of termination.

(c)    Upon the termination of this Agreement pursuant to Section 3.2 (a)(iii) or (vi), the Executive shall receive, upon execution without revocation of a valid release agreement in a form provided by the Company, the incremental severance payments (in addition to the payments upon termination specified in Section 3.2(b) above) equal to continued Base Salary, less any applicable payroll deductions, for twelve (12) months, payable at the Company's option either (A) in accordance with the Company's normal payroll procedures or (B) as a single lump sum amount equal to the aggregate remaining Base Salary payable pursuant to this Section 3.2(c) within thirty (30) days following the date of termination; *provided, however* that the Executive's severance payments

Confidential
REM010000469

shall be reduced by the amount of any disability insurance payments from coverage provided by the Company or its affiliates that are received by the Executive during such severance payment period; and

(d)     A breach by the Executive of any undertaking set forth in Sections 6 or 7 hereof shall result in an immediate termination of the rights of the Executive hereunder (but shall not relieve the Executive of his obligation to comply with Sections 6 or 7 hereof).

(e)     Upon the termination of the Executive's employment for any reason, by either party, the Executive shall immediately return to the Company any property of the Company in his possession, custody or control.

4.     **Compensation**.

4.1     Base Salary: A base salary (the "Base Salary") at a rate of $200,000.00 per annum, payable in accordance with the Company's regular payroll policies commencing upon the Effective Date.

4.2     Bonuses: With respect to each full fiscal year during the Term, the Executive shall be eligible to earn an annual bonus ("Bonus") with a target of up to seventy-five percent (75%) of the Base Salary, which shall be based on the achievement of individual and/or Company performance goals established by the Board of Directors of the Company within the first three (3) months of each fiscal year during the Employment Term.  Such Bonus shall be payable on or before March 31 of the following year.

4.3     Upward Adjustment to Base Salary and Bonus Percentage:  Executive's Base Salary and Target Bonus Percentage will be reviewed at the end of the Probationary Period.  Any upward adjustments thereto will be at the sole discretion of the Company Board of Directors.

5.     **Executive Benefit Plans; Fringe Benefits, Expense Reimbursement.**

5.1     The Executive shall be entitled to (a) participate in whatever health and dental insurance, short term and long term disability leave and Company savings plans that are maintained by the Company from time to time for its salaried exempt employees, and (b) three (3) weeks of paid time off per calendar year, such paid time off to be accrued and used in accordance with applicable Company policy.  The Company may at any time or from time to time amend, modify, suspend or terminate any employee benefit plan, program or arrangement for any reason without the Executive's consent if such amendment, modification, suspension or termination is consistent with the amendment, modification, suspension or termination for other executives of the Company.

5.2     The Executive shall be entitled to receive reimbursement for all appropriate business expenses incurred by him in connection with his duties under this Agreement in accordance with the policies of the Company as in effect from time to time.

6.     **Duty of Loyalty.**  In consideration of this Agreement and the severance benefits that may be available herein, the Executive agrees to the following:

6.1     Confidentiality:  The Executive agrees to maintain in strictest confidence all proprietary data and other confidential or non-public information (whether concerning the Company, its subsidiaries, its affiliates or any of its customers or proposed customers) obtained or developed by the Executive before or in the course of his employment with the Company or with AAC.  Such information and data shall include but not be limited to the Company's and its subsidiaries' and affiliates' trade secrets, patents, inventions, systems, computer programs and software, procedures, manuals, confidential reports and communications and lists of customers and clients, as well as information that the Company, its subsidiaries and affiliates may obtain from third parties in confidence or subject to non-disclosure or similar agreements.  All such information and data is and shall remain the exclusive property of the Company (or, in certain circumstances, its particular customer) and shall be used solely for the benefit of the Company.  Any such information and data in the Executive's possession after termination of his employment shall be promptly returned to the Company.  The Executive's obligations under this Section 6.1 shall survive any termination of her employment.

6.2     Non-Competition:     The Executive acknowledges that he is a key employee of the Company and his talents and services are of a special, unique, unusual and extraordinary character and are of particular and peculiar benefit and importance to the Company.  In order for the Company to protect its interests against the competitive use of any confidential information, knowledge or relationships concerning the Company to which the Executive will have access by virtue of the special nature of his relationship with the Company and its subsidiaries and his involvement in their affairs, and in consideration of the payments made to the Executive hereunder and the agreements of the parties herein, the Executive agrees that, for so long as this Agreement is in effect and for a period of two (2) years following the termination of the Executive's employment hereunder, the Executive will not own (by ownership of securities or otherwise), manage, operate, control, engage in as an equity participant or be employed by or act as a consultant to, or be connected in any manner with, the ownership, management, operation or control of any business a substantial portion of whose business directly or indirectly competes with that of the Company.   In recognition of the geographic extent of the Company's existing and anticipated operations and the nature of the Company and competitive circumstances, the restrictive covenant contained in this Section 6.2 shall apply throughout North America.

6.3     Solicitation:  The Executive agrees that, for so long as this Agreement is in effect and for a period of two (2) years following the termination of the Executive's employment hereunder, the Executive shall not solicit or induce any employee of the Company, its subsidiaries or affiliates to leave the employ of the Company, or to hire or attempt to hire any person who was an employee of the Company, its subsidiaries or affiliates within the twelve (12) month period preceding such action by or on behalf of the Executive or by or on behalf of any other person or entity acting in concert with the Executive, and the Executive further agrees, during such period, not to interfere with, disrupt or attempt to disrupt any past, present or prospective contractual or other relationship between the Company, its subsidiaries or affiliates and any of its clients, customers, suppliers or employees, current or prospective.

6.4     Non-Disparagement.  The Executive agrees that he shall not make any statement that would disparage the Company, its subsidiaries or affiliates, their directors, officers or employees or any product line of the Company or its affiliates.  The Company shall not authorize the making of any statement that would disparage the Executive.

6.5     Remedy for Breach:   The parties recognize that the services to be rendered under this Agreement by the Executive are special, unique, and of an extraordinary

REM010000471

character, and that in the event of a breach of this Section 6 by the Executive, then the Company shall be entitled to institute and prosecute proceedings in any court of competent jurisdiction in equity, to enforce or have specifically performed any terms, conditions, obligations and requirements of this Section 6, and/or to enjoin the Executive from continuing those actions which are in breach of this Agreement, or to take any or all of the foregoing actions.  Without limitation of the foregoing, in the event of a breach by the Executive of this Section 6, the Executive shall forfeit any and all rights to receive severance payments under this Agreement. Nothing herein contained shall be construed to prevent the pursuit of any other remedy, judicial or otherwise, in case of any breach of this Section 6.

7.  **Intellectual Property**.  The parties expect that the Executive will in the performance of his duties develop intellectual property related to the business of the Company. The Executive hereby assigns to the Company any and all right, title and interest in and to such intellectual property, including any and all ideas, inventions, discoveries, trademarks, trade names, copyrights, patents and all other confidential, proprietary, or valuable information and data of any kind, developed by the Executive in the course of performing his duties, or developed using Company property or resources (the "Intellectual Property").  The Executive shall cooperate with the Company in taking any steps deemed necessary by the Company to protect, preserve, defend or enforce the Intellectual Property, such as filing patent applications. The Executive will execute on request of the Company or its attorneys any and all documents necessary to record the assignment of Intellectual Property to the Company, or to protect, preserve, defend or enforce it.  The Executive will disclose any Intellectual Property to the Company promptly upon its development.  The Executive agrees that he will not knowingly use the intellectual property of any third party in the performance of his duties.

8.  **Section Headings**.  Section headings contained in this Agreement are for convenience only and shall in no manner be construed as a part of this Agreement.

9.  **Amendment**.  This Agreement may be amended or modified only in writing signed by both parties.

10.  **Counterparts**.  This Agreement may be executed in two or more counterparts each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

11.  **Waiver**.  The failure of either party hereto in any one or more incidences to insist upon the performance of any of the terms or conditions of this Agreement, or to exercise any rights or privileges conferred in this Agreement, or the waiver of any breach of any of the terms of this Agreement shall not be construed as waiving any such terms and the same shall continue to remain in full force and effect as if no such forbearance or waiver had occurred.

12.  **Applicable Law**.  This Agreement has been entered into in the State of New York.  This Agreement shall be construed according to and governed by the laws of the State of New York (excluding conflict of law principles), and the Executive expressly irrevocably consents to submit himself to the jurisdiction of the federal and state courts of the State of New York, which shall be the exclusive forums in which any disputes arising under this Agreement or otherwise in connection with the Executive's relationship with the Company shall be adjudicated.

13.  **Reformation and Severability**.  In the event any provision or portion of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, any

such provision or portion may be reformed by the court to the minimum extent necessary in order to make it valid or enforceable as so reformed, whereupon the parties agree that said provision or portion as so reformed shall be valid and enforceable by or upon them without further action by the parties. Any such holding shall not invalidate or render unenforceable any other term contained in this Agreement.

**14.    Entire Agreement.**    This Agreement is intended by the parties to integrate all prior discussions and writings, including memoranda and e-mail messages, term sheets, and similar expressions of intent into a single, complete statement of the understandings of the parties with respect to the matters covered by this Agreement and the documents referred to in it, other than the Acknowledgement executed by Executive on January 9, 2011 (the "Acknowledgement").    Accordingly, the parties agree that this Agreement and the Acknowledgement supersede all prior agreements and understandings between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter, subject to the terms and conditions set forth in the Non-Compete Agreement. The parties further agree and acknowledge that

> (a)    this Agreement has not been entered into under undue time pressure, and that both parties have had an adequate opportunity to review this Agreement with counsel,
> (b)    no oral assurances have been given by either party that this Agreement is an interim agreement or that a more comprehensive agreement is or will be forthcoming,
> (c)    there are no oral conditions or promises that supplement or modify this Agreement, and
> (d)    this Section 14 does not constitute "boilerplate", but rather is a critical substantive provision of this Agreement.

**15.    Assignment and Successors.**    The Executive's rights under this Agreement shall not be assignable by the Executive.    This Agreement may be assigned by Company and shall inure to the benefit of and be binding upon Company, its successors and assigns.

**16.    Notices.**    Any notice to be given under this Agreement must be in writing and either delivered in person or sent by first class certified or registered mail, return receipt requested, postage prepaid, if to the Company, in care of the Company board of directors, and if to the Executive, at his home address, or such addresses as either party shall have designated in writing to the other party hereto.

**17.    Representation.**    The Executive represents and warrants that there is no agreement between her and any other person or entity that could interfere with the performance of his duties and obligations hereunder.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

| Advanced Armament Corp., LLC: | EXECUTIVE: |
|---|---|
| By: _____ | _____ |
| Name: _____ | |

Confidential

| Title: _Flowhw_ | KEVIN BRITTINGHAM |
|---|---|

Confidential

# Acknowledgement:

I, KEVIN BRITTINGHAM, hereby acknowledge that I am prohibited from bringing any personal silencers, firearms or ammunition onto Company property, including but not limited to Company's parent companies, subsidiaries and affiliated companies' properties, without the advance written approval of the Chief Human Resources Officer, Freedom Group, Inc. Additionally, I acknowledge and agree that if permission is provided to me to bring any such personal silencers, firearms or ammunition onto Company property that I will comply with all applicable laws, rules and regulations related to the presence of the silencers, firearms and ammunition on Company property including but not limited to the registration of the firearms into the Company Bound Book and records.

I agree to abide by all Company policies and practices related to the presence of personal silencers, firearms on Company property.

I understand that if I fail to observe the above that the Company shall have grounds to immediately terminate my employment with Cause.

Acknowledged and Agreed:

_____

KEVIN BRITTINGHAM

Date: ~~January ____, 2011~~

March 3, 2011

REM010000475