# Exhibit 78

NOTES Regarding Hotline Call

1/24/2012

**Interview conducted in person**

The reason I'm here today, we received a call on the company HotLine indicating that you, Eric, and Kevin have been discussing starting another business to compete in the silencer or weapons business.

Lynsey, as you aware from your past exposure to HR. whenever we receive information from the Hotline number it is our normal protocol to investigate and determine if there is any merit or truth to the allegations.

We need to ask you a few questions to see if you have any information that would help us determine if there is any validity to this call:

1. Do you know if Eric Burt took an LVAW (Low visibility assault weapon) off the premises without the permission of the acting head of compliance? If so, when did this happen? If so, do you know why he did this?

    No, I didn't know about this until Corry asked me about it.

2. Did you instruct Eric to do this? Do you know if Kevin asked him to do it?

    Absolutely not
    I don't know, but don't think that is the case.

3. Did you recently purchase 3 AAC silencers? Where did you purchase them? When? Why did you purchase them?

    Yes
    Here
    Right before Shot Show
    I have never purchased any and I just got my trust from David Goldman

4. Had you ever bought any silencers before? If not, why buy one now?

    No.
    In establishing the trust, I don't have to be fingerprinted.

5. How many weapons do you personally own? What types? Are the silencers for them? Do they work with those weapons?

1

Three
(I missed asking the question about what types)
Yes
Yes, two of them do. I will have to get a weapon for one of them. I want to get a Smith & Wesson.

6. Did Kevin ask you to buy the silencers? Has Kevin asked you to buy any other weapons since he was terminated?

    No
    No

7. Has Kevin asked you to leave AAC and join him in a competing business? If she denies this, has he had any discussions with you on this subject?

    No
    No

8. Has Kevin talked to you at all since his termination about any plans he has for competing against the company? Has he taken any steps to do that to your knowledge?

    No, he has just talked to me about job interviews
    No

9. Have you asked any AAC employees to join you and/or Kevin in a competing business?

    No

10. Do you know if Kevin has done this?

    Not that I know of

11. Do you know if Kevin has had any discussion with Bulls Eye about starting a silencer or firearms company? Have you had any such discussions with Kevin? With Bulls Eye?

    I don't know
    No
    No

2

12. Have you communicated with Kevin since his termination? By phone? In person? By email? By text message?

    Yes
    Yes
    Yes
    No
    Yes

13. What have you communicated with Kevin about?

    What he's up to; his kids; his traveling; what he's going to do; his feelings

14. Any discussion with Kevin about his termination? About your situation.

    No, he just told me had was let go, but I know no specifics
    No

15. Any discussions with Kevin about AAC business

    No, he just asks how work is; if I'm busy or not – just broad questions.

16. Did you talk to Kevin while you were at the Shot Show? If so, about what?

    Yes, we talked about what's going on (personally). We hung out – we have a lot of mutual friends in the industry. We looked at the other booths together.

17. Will you let us examine your cell phone to review text messages between you and Kevin? If she agrees, get it immediately and tell her it will be reviewed by an expert and returned promptly. If she refuses ask her why.

    No, this is my personal phone.

18. Have you spoken to Kevin at all about the MSR sniper rifle he claims he does not have? Do you know where it is?

    No, I've told him I don't want to talk about anything he has going on with AAC.
    No, I saw it when it came in and heard rumors that it was put in the truck, but I have not seen it since it came in.

3

One last thing we need to go over with you today is the tape from the compliance discussion you had with Dana Rust. We have asked repeatedly for the tape, which is AAC property. Are you prepared to give that to me now? ---- Lynsey by not turning this tape over, you are not cooperating with the investigation and that is grounds for termination.

Lynsey stated that she saw no reason to turn the tape over. It is in her safe and she has not shared the contents with anybody. She stated that she would be willing to turn it over to her attorney and then discuss whether or not it would be turned over to FGI. We explained again that not turning it over is a terminable offense and asked her if she understood that. She asked if that was the part in her agreement about cooperating with investigations and I told her "yes". She indicated that she understood. We again, asked her if she was willing to turn over the tape to either John or me and she said "no". John told her that by not turning the tape over she had breached the agreement and we were left with no choice but to terminate her employment. She said she understood. We presented her with the termination letter and allowed her to read it. She showed us some merchandise and indicated to us what was to be done with it. I think escorted her to the door. She had her dogs on the premises. She drove her car around to the side and John opened that door so she could retrieve her dogs.

4

REM040000050