UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RANDOM VENTURES, INC. (f/k/a, ADVANCED    :
ARMAMENT CORP.), KEVIN BRITTINGHAM,    :
and LYNSEY THOMPSON,    :    ECF Case
   :
           Plaintiffs,    :    No. 12-CV-6792 (KBF)
   :
      - against -    :
   :
ADVANCED ARMAMENT CORP., LLC, and    :
REMINGTON ARMS COMPANY, LLC,    :
   :
           Defendants.    :
   x

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000


O'HARE PARNAGIAN LLP
82 Wall Street, Suite 300
New York, New York 10005-3686
(212) 425-1401

*Attorney for Plaintiffs Random Ventures, Inc.,*
*Kevin Brittingham, and Lynsey Thompson*

# TABLE OF CONTENTS

I.     AAC's Attempt at Obfuscation. ........................................................................... 1

II.    Cause is Irrelevant Because AAC Breached the Employment Agreements. ...................... 2

    A.   Employer's Breach Renders Termination for Cause Ineffective and Irrelevant ................ 2

    B.   AAC Breached The Brittingham EA. .......................................................................... 3

    C.   AAC Breached The Thompson EA. ............................................................................ 5

III.   The Gun Control Act and National Firearms Act: The Basics. ........................................ 6

IV.    Defendants Cannot Establish That Cause Existed To Terminate Brittingham. .................... 8

    A.   The 43 Firearms Do Not Prove Any Wrongdoing by Brittingham. ................................. 9

    B.   No Violation of Any Law or Regulation. ..................................................................... 12

    C.   It is Defendants Who Play the Blame Game to Cover Their Compliance Failures. ......... 16

V.     Defendants Cannot Establish That Cause Existed To Terminate Thompson. ..................... 19

    A.   The Court Should Strike the Racich Declaration Because AAC Never Disclosed Him As
         An Expert or Witness. ............................................................................................... 19

    B.   No Cause Existed to Terminate Thompson. .................................................................. 21

    C.   Thompson Performed Her Obligations Under Her Employment Agreement. ................. 22

VI.    AAC Cannot Enforce its Restrictive Covenants As A Matter of Law. ............................. 23

VII.   Conclusion .................................................................................................................. 25

**CERTIFICATE OF SERVICE** .............................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Abdallah v. Napolitano</u>, No. 09-CV-0861, 2012 U.S. Dist. LEXIS 161209 (W.D.N.Y. Nov. 7, 2012) .................................................................................................................... 21

<u>ARB Upstate Communications LLC v. R.J. Reuter</u>, LLC, 93 A.D.3d 929, 940 N.Y.S.2d 679 (NY App. Div. 3d Dept. 2012)................................................................................................... 2

<u>BDO Seidman v. Hirshberg</u>, 93 N.Y.S.2d 382, 392 (2d Dep't 1991) ......................................... 24

<u>Borne Chemical Co. v. Dictrow</u>, 445 N.Y.S.2d 406, 412 (2d Dep't 1981) ................................ 23

<u>CreditSights, Inc. v. Ciasullo</u>, No. 05 CV 9345, 2008 U.S. Dist. LEXIS 91481 (S.D.N.Y. Sept. 5, 2008) .................................................................................................................... 23

<u>Deluca v. Bank of Tokyo–Mitsubishi UFJ, Ltd.</u>, No. 06 Civ. 5474, 2008 WL 857492, at *12 (S.D.N.Y. Mar. 31, 2008) ................................................................................................ 20

<u>DVL, Inc. v. Gen. Elec. Co.</u>, 811 F. Supp. 2d 579, 588-592 (N.D.N.Y. 2010)............................ 20

<u>Good Energy, L.P. v. Kosachuk</u>, 853 N.Y.S.2d 75, 77 (1st Dep't 2008) .................................... 24

<u>Hanson v. Capital Dist. Sports, Inc.</u>, 218 A.D.2d 909, 911 (3d Dep't 1995) .................... 3, 4, 5, 6

<u>In re UFG Int'l, Inc. v. Nisselson</u>, 225 B.R. 51, 55 (S.D.N.Y. 1998) ........................................ 23

<u>Kalus v. Prime Care Physicians, P.C.</u>, 20 A.D.3d 452, 453-54 (2d Dep't 2005) ............... 3, 4, 5, 6

<u>Kleinman v. Blue Ridge Foods, LLC</u>, No. 9603/2010, 934 N.Y.S.2d 34, at *3-*4 (Sup. Ct. 2011) ..................................................................................................................... 3, 4, 5, 6

<u>Kobrand Corp. v. Retuerta S.A.</u>, 2012 WL 5851139 at *8-9 (S.D.N.Y. Nov. 19, 2012) .............. 5

<u>Manhattan Real Estate Equities Group, LLC v. Pine Equity NY, Inc.</u>, 2004 WL 3267264, No. 603259/03 at *3 (N.Y.Sup. Aug. 3, 2004) ..................................................................... 25

<u>Purchasing Assocs., Inc. v. Weitz</u>, 13 N.Y.2d 267, 271 (1963) ................................................. 24

<u>Scudder v. Jack Hall Plumbing & Heating, Inc.</u>, 302 A.D.2d 848, 850-51 (3d Dep't 2003)3, 4, 5, 6

<u>SIFCO Indus., Inc. v. Advanced Plating Tech, Inc.</u>, 867 F. Supp. 155 (S.D.N.Y. 1994); .......... 23

<u>Slomin's Inc. v. Gray</u>, 575 N.Y.S.2d 545, 547 (2d Dep't 1991) ................................................ 25

<u>Technomarine SA v. Jacob Time, Inc.</u>, 2012 WL 2497276, No. 12-Civ-0790(KBF) at *1, n.1 (S.D.N.Y. June 22, 2012)................................................................................................. 25

<u>U.S. v. Bilzerian</u>, 926 F.2d 1285, 1292 (2d Cir. 1991).............................................................. 10

<u>Yarde v. Good Samaritan Hosp.</u>, 360 F. Supp. 2d 552 (S.D.N.Y. 2005) ................................... 21

**Statutes**

18 U.S.C. § 922........................................................................................................... 7, 13

18 U.S.C. § 923......................................................................................................... 6, 11, 12

26 U.S.C. § 5845.............................................................................................................. 7

**Other Authorities**

27 C.F.R. § 478.102........................................................................................................... 7

27 C.F.R. § 478.123....................................................................................................... 7, 13

27 C.F.R. § 478.124.......................................................................................................... 14

27 C.F.R. § 478.125.......................................................................................................... 14

27 C.F.R. § 478.152...................................................................................................... 12, 13

27 C.F.R. § 478.41(a).......................................................................................................... 6

27 C.F.R. § 478.44.......................................................................................................... 11

27 C.F.R. § 478.50............................................................................................................. 7

27 C.F.R. § 479.105 ................................................................................................. 8, 15

27 C.F.R. § 479.131 .................................................................................................... 7

**Rules**

Fed. R. Civ. P. 26(a)(2) ............................................................................................. 20

Fed. R. Civ. P. 37 ...................................................................................................... 20

## I.   <u>AAC's Attempt at Obfuscation</u>.

Throughout their Memorandum of Law in Support of Motion for Summary Judgment (the "MSJ Brief"), Defendants attempt to poison the well and distract the Court from (1) the key issues relevant to this case, and (2) more importantly, their lack of Cause[1] evidence under Brittingham and Thompson's Employment Agreements ("Brittingham EA" and "Thompson EA"). Defendants devote the majority of their brief to mudslinging and wholesale character assassinations. The MSJ Brief is replete with incomplete, unproven, sensationalistic claims and salacious accusations about tequila, "women in g-strings," satanic and Nazi iconography, "children's bodies being discarded," and anti-Semitic comments, all in an effort to make the Court think, "There's a lot of 'bad stuff' here. They must have done something wrong."

Not only are Defendants' assaults offensive, but completely irrelevant. Defendants have <u>never</u> claimed that Brittingham or Thompson's termination had anything to do with alcohol, charge accounts, strippers, or anything of the sort. Defendants' accusations are also inaccurate and misleading. For example, Defendants' favorite tale – one they repeat as often as possible – claims Brittingham kept a loaded shotgun near his tequila. (MSJ Brief, 1, 8, 27). However, Defendants fail to disclose that AAC received the infamous tequila as a gift from the military and the bottle remained sealed in a common refrigerator (not in Brittingham's office) that AAC employees shared. (Brit. Dep., Ex. A, 180-181).[2] Further, the "loaded shotgun" was in a different room than the refrigerator and contained no ammunition in the firearm's chamber. (Brit. Dep., Ex. A, 178-180). Defendants also fail to demonstrate how Brittingham's alleged receipt of an antique silencer at AAC constituted a compliance violation. In fact, Defendants fail to cite <u>any</u>

---

[1] Unless otherwise indicated, all capitalized terms shall be defined as set forth in Plaintiffs' Memorandum of Law and 56.1 Statement. (ECF Nos. 88-92). Plaintiffs incorporate by reference their Memorandum of Law and 56.1 Statement, and all exhibits thereto, filed in support of their Motion for Summary Judgment. (<u>Id</u>.).

[2] References to Exhibit letters refer to exhibits attached to the Caiafa Declaration filed in support of this Response. References to "Def. Ex." refer to exhibits filed in support of Defendants' MSJ Brief. References to "Pl. Ex." refer to exhibits attached to the Wooten Declaration in support of Plaintiffs' Motion for Summary Judgment.

evidence of compliance violations that led to Brittingham's suspension, any "findings" concerning Brittingham's suspension, or any audits or "investigations" leading to Brittingham's termination because they are all "protected" by attorney-client privilege. Hence, the characterization of Brittingham as a "compliance nightmare" who committed "multiple serious compliance violations" is baseless and without evidentiary support; Defendants have elected not to disclose any information that allegedly would support such a conclusion. More significant is what Defendants do <u>not</u> say about Brittingham: he has been married for 10 years and has three young children; he has the reputation throughout the firearm industry as a creative and visionary entrepreneur who revolutionized silencers, including those used by United States special forces on key missions; he is a collector with extensive knowledge of firearms history; and, in 2011 (the year he was terminated), he underwent an ATF audit that did not reveal any compliance violations. (Brit. Dec. #2, Ex. V, ¶ 13-17; Brit. Dep., Ex. A, 30-31).

Plaintiffs urge the Court to disregard the "rhetoric" and focus on what this case is really about – Defendants cannot establish that AAC properly terminated Brittingham or Thompson for "Cause" in accordance with their Employment Agreements. Instead, they resort to shameless character assassinations in hopes that the Court will think Plaintiffs are unsympathetic or "bad" people who are not worthy of the relief they seek.

## II. <u>Cause is Irrelevant Because AAC Breached the Employment Agreements.</u>[3]

### A. **Employer's Breach Renders Termination for Cause Ineffective and Irrelevant.**

An employer breaches an employment agreement if: (1) the agreement requires the employer to follow a certain procedure when terminating the employee for conduct allegedly

---

[3] Brittingham recognizes he cannot prevail on both a claim for breach of contract and breach of good faith and fair dealing where both claims are based on the same facts. Brittingham pled a cause of action for breach of good faith and fair dealing as an alternative to his breach of contract claims. See <u>ARB Upstate Commc'ns LLC v. R.J. Reuter, LLC</u>, 93 A.D.3d 929, 934, 940 N.Y.S.2d 679 (3d Dept. 2012).

constituting "cause" (i.e., providing the employee with written notice of such conduct and an opportunity to cure), and (2) the employer purports to terminate the employee for "cause" but fails to strictly comply with its notice and cure obligations. Kalus v. Prime Care Physicians, P.C., 20 A.D.3d 452, 453-54 (2d Dep't 2005); Hanson v. Capital Dist. Sports, Inc., 218 A.D.2d 909, 911 (3d Dep't 1995); Kleinman v. Blue Ridge Foods, LLC, No. 9603/2010, 934 N.Y.S.2d 34, at *3-*4 (Sup. Ct. 2011); Scudder v. Jack Hall Plumbing & Heating, Inc., 302 A.D.2d 848, 850-51 (3d Dep't 2003). Once the employer commits this breach, it cannot enforce other provisions of the agreement against the employee; consequently, it is "irrelevant whether the [employer] did, in fact, have the requisite cause to terminate the plaintiff's employment." Kalus, 20 A.D.3d at 454 (granting summary judgment on grounds that employer breached agreement by purporting to terminate employee for cause without complying with notice and cure provision); Scudder, 302 A.D.2d at 850-51; Kleinman, 934 N.Y.S.2d 34, at *4. As the Hanson court explained,

> [I]t is immaterial whether there was 'cause' for plaintiff's discharge. If there was no cause, defendant had no right to discharge plaintiff. If there was cause, plaintiff could not be discharged absent compliance with the relevant provisions of the employment contract. In view of defendant's demonstrated noncompliance, in either case, the discharge would be ineffective and plaintiff would be entitled to the relief demanded in the complaint.

218 A.D.2d at 911 (emphasis added).

## B.   AAC Breached The Brittingham EA.

Defendants claim Brittingham violated AAC policy under § 3.2(a)(v)(E). (MSJ Brief, 25; Term. Ltr., Def. Ex. D, 30-32). Section 3.2(a)(v)(E) defines Cause as:

> (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period;

(Brit. EA, 2-3; MSJ Brief, 25)(emphasis added). AAC claims Brittingham violated AAC's

3

written policy prohibiting him from "bring[ing] weapons to AAC without Cofield's written consent." (MSJ Brief, 25). Notwithstanding that Brittingham did not actually engaged in such alleged conduct, it is undisputed that AAC did not provide Brittingham with written notice of the occurrence of such violation or thirty (30) days to cure any such violation. (MSJ Brief, 25; Brit. Dec. #2, Ex. V, ¶ 11). **Because AAC breached the Brittingham EA, Cause is irrelevant.** See Kalus, 20 A.D.3d at 454; Scudder, 302 A.D.2d at 850-51; Hanson, 218 A.D.2d at 911; Kleinman, 934 N.Y.S.2d 34, at *4. Consequently, AAC cannot attempt to justify Brittingham's termination by contending that Cause existed for any reason, including grounds communicated to Brittingham at termination, evidence acquired after termination, or any other alleged bases for cause. See Hanson, 218 A.D.2d at 911 (employer cannot "escape the dire consequences" of breach by claiming cause existed); Kleinman, 934 N.Y.S.2d 34, at *4 (because of breach, defense counsel's "attempted retroactive validation of plaintiff's discharge is without force and effect").

AAC's half-hearted attempt to "escape the dire consequences" claims that: (1) the AAC Employee Reference Manual and the Workplace Violence Policy (which Brittingham received in October 2009), and Brittingham's probationary documents (which Brittingham received in January 2011 and do not constitute a "policy") constituted written notice "expressly advis[ing] him not to bring weapons to AAC without Cofield's written consent," and (2) Brittingham's "possession or attempted unlawful transfer of weapons to AAC" more than 30 days after receiving such documents violated the written notice he received in those documents. (MSJ Brief, 25). Defendants' contention lacks merit. By AAC's own admission, all of Brittingham's firearms were allegedly off of AAC's premises in December 2010/January 2011. (Def. Ex. L, ECF No. 75-18 at 11-12, 19). Further, none of the documents cited by Defendants provide notice

4

to Brittingham of <u>the occurrence of a violation</u> of alleged policy. (Def. Ex. A, ECF No. 75-4 at 39-70; ECF No. 75-5 at 1-16, 40-42; ECF No. 75-6 at 1-11). <u>See</u> <u>Kobrand Corp. v. Retuerta S.A.</u>, 2012 WL 5851139 at *8-9 (S.D.N.Y. Nov. 19, 2012)(defendant failed to terminate contract because "none of the communications [defendant] cites would have put [plaintiff] on notice that a failure to cure a material default within 120 days would result in termination of the contract" as required by the notice and cure provisions); <u>Kalus</u>, 20 A.D.3d at 453 (notice must state clearly the information required in the cause provision and documents generally providing notice of deficiencies do not satisfy the notice requirement). AAC could not provide Brittingham 30 days to cure an alleged violation if it failed to notify him of such alleged violation in the first place, and no evidence exists to support such a claim. (Brit. Dec. #2, Ex. V, ¶ 11).

Thus, AAC's breach of the Brittingham EA is dispositive. AAC cannot claim, <u>after its breach</u>, that Cause existed. <u>Kalus</u>, 20 A.D.3d at 454; <u>Scudder</u>, 302 A.D.2d at 850-51; <u>Hanson</u>, 218 A.D.2d at 911; <u>Kleinman</u>, 934 N.Y.S.2d 34, at *4. Accordingly, Brittingham is entitled to summary judgment as a matter of law. The only remaining issue before the Court is the damages to which Brittingham is entitled as a result of AAC's breach.

### C.   AAC Breached The Thompson EA.

AAC claims Thompson violated AAC's written policy and failed to cooperate in an investigation under § 3.2(a)(v)(E) and (F) of the Thompson EA. (MSJ Brief, 15-19, 28-31). Section 3.2(a)(v)(E) and (F) define Cause as:

> (E) the Executive's material violation of any written policy of the Company within thirty (30) days <u>following written notice from the Company of the occurrence of such failure, if such failure is not cured within such thirty (30) day period</u>; or
>
> (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case <u>as reasonably determined by the Board of Directors of the Company</u>.

(Thompson EA at 2-3)(emphasis added). Pretermitting whether Thompson actually engaged in such alleged conduct, it is undisputed that Thompson did not receive <u>written notice from AAC of the occurrence of such failure</u> or <u>thirty (30) days to cure</u> and, therefore, AAC breached its notice and cure obligations under the Thompson EA. (Pl. Ex. 92, ¶ 4; Pl. MSJ Brief, 20-22, 29-30). It is also undisputed that the sole member of AAC's Board of Directors, Stephen Jackson, did not reasonably determine that Thompson failed to fully cooperate in any investigation (because it was a "Prep Conversation", not an investigation).[4] (MSJ Brief, 17-19; Pl. Ex. 5-6; Pl. MSJ Brief, 31). <u>See</u> <u>Scudder</u>, 302 A.D.2d at 850-51 (employer breached agreement by terminating plaintiff for cause without complying with provision requiring consent of the board of directors). **Because AAC breached the Thompson EA, Cause is irrelevant.** <u>Kalus</u>, 20 A.D.3d at 453-54; <u>Scudder</u>, 302 A.D.2d at 850-51; <u>Hanson</u>, 218 A.D.2d at 911; <u>Kleinman</u>, 934 N.Y.S.2d 34, at *3-*4. Accordingly, AAC cannot attempt to justify Thompson's Cause termination for any reason, including relying on after-acquired evidence concerning Thompson's alleged copying of files to a hard drive during her employment. (MSJ Brief, 18, 30). <u>See</u> <u>Kleinman</u>, 934 N.Y.S.2d 34 ("defense counsel's attempted retroactive validation of plaintiff's discharge is without force and effect, in that [defendant] failed to comply with the contractual notice provision which was a condition precedent to a valid discharge for cause"). Thus, Thompson is entitled to summary judgment as a matter of law, and the only remaining issue before the Court is damages.

### III.   <u>The Gun Control Act and National Firearms Act: The Basics.</u>

The Gun Control Act of 1968 ("GCA") mandates that an individual or company engaged in the business of importing, manufacturing, or dealing in firearms maintain a Federal Firearms License ("FFL"). 18 U.S.C. § 923; 27 C.F.R. § 478.41(a); <u>ATF Nat'l Firearms Act Handbook</u> 2

---

[4] Defendants' three-paged explanation of the events leading to Thompson's termination makes absolutely no mention of Jackson or the AAC Board of Directors. (MSJ Brief, 17-19).

(rev. 2009)("NFA Handbook").[5] An FFL entitles the licensee to transport, ship, and receive firearms, and to engage in the business specified on the FFL, at the location described on the FFL. 27 C.F.R. § 478.41(a). An FFL cannot cover more than one location. 27 C.F.R. § 478.50. However, licensees are permitted to store or keep registered firearms on premises other than the location on the licensee's FFL, if the licensee's registration records are annotated to show where the firearms are stored or kept. NFA Handbook 73; 27 C.F.R. § 479.131. In addition, the GCA requires an FFL holder to maintain an ATF-approved registry, referred to as a "Bound Book," of the holder's acquisition and disposition[6] of all firearms. A Bound Book indicates which firearms are in the holder's possession but does not reflect legal ownership of firearms. A licensed manufacturer must record any acquisition or disposition in its Bound Book within 7 days following the date of such transaction. 27 C.F.R. § 478.123(a)&(b). The GCA does not regulate transfers between FFL holders. See 18 U.S.C. § 922(s)&(t); 27 C.F.R. § 478.102 (regulating only transfers from FFLs to unlicensed persons).

The National Firearms Act ("NFA") only applies to certain categories of firearms and imposes additional restrictions on such firearms. 26 U.S.C. § 5845. Under the NFA, it is unlawful for an FFL holder, like Random-AAC, to transfer any machinegun manufactured after 1986 unless and until: (1) the transferee provides the ATF with specific information concerning the use of the machinegun (a "Law Enforcement Letter"), and (2) the ATF approves such transfer. As late as December 2011, AAC was still trying to secure the Law Enforcement Letters necessary to transfer the machineguns included in the Acquisition. (Pl. Ex. 11, 117). See also 27

---

[5] The NFA Handbook is available on the ATF's website: http://www.atf.gov/publications/firearms/nfa-handbook/index.html.
[6] An FFL holder may possess, or "acquire," a firearm by various means (i.e., manufacture, purchase, loan), and may likewise "dispose" of a firearm in a variety of ways (i.e., sale, loan, loss, or destruction).

C.F.R. § 479.105(c)&(d). As of the current date, AAC still has not obtained a Law Enforcement

Letter for the machineguns. (Pl. Ex. 11, 116-117; Ex. 2, 127-128).

**IV.**      **Defendants Cannot Establish That Cause Existed To Terminate Brittingham.**

Assuming, arguendo, that AAC could attempt to justify its Cause determination even

though it breached (despite New York law cited above to the contrary), AAC fails to produce

any evidence to establish Cause existed. While Defendants devote pages to assaults on

Brittingham's character, their Cause explanation is contained in a **single sentence**:

> All told, 43 firearms (not including the MP5 he removed the night before he was
> terminated) belonging to Brittingham were at AAC's premises in violation of
> federal law, Company Policy and the express terms of his probationary
> documents.

(MSJ Brief, 24). Importantly, Defendants do not contend that Brittingham's probationary

documents or the proposed unsigned Amended and Restated Employment Agreement for

Brittingham amended the Brittingham EA; therefore, they abandon such arguments. (MSJ Brief,

25 & n.14). Defendants contend that Cause existed under § 3.2(a)(v)(B) of the Brittingham EA:

> (B) material failure by the Executive[7] to comply with applicable laws or
> governmental regulations with respect to the Company's operations or the
> performance of his duties;

(Brit. EA, 2-3; MSJ Brief, 23-28)(emphasis added).

To justify Brittingham's termination under § 3.2(a)(v)(B), AAC must establish all four

elements of that Cause definition: (1) a material failure, (2) by Brittingham, (3) to comply with

applicable laws or governmental regulations, (4) with respect to the Company's operations or the

performance of his duties. In a weak attempt to satisfy these elements, Defendants offer 43

firearms that they claim were "discovered" at AAC sometime in the Fall of 2011 or "shortly

---

[7] Curiously, the underlined language is omitted from Defendants' MSJ Brief. (MSJ Brief, 24).

after" Brittingham's termination and allegedly belong to Brittingham (the "43 Firearms").[8] (Def. 56.1 Stmt., ¶ 59; MSJ Brief, 24). Defendants refuse to disclose any facts or findings from AAC's 2011 audits or the "investigations" and discussions leading to Brittingham's termination, shielding them all under the attorney-client privilege. Therefore, the Court cannot know who allegedly discovered each of the 43 Firearms; where on AAC's premises they were allegedly discovered; how long they had allegedly been in Lawrenceville; who allegedly had possession of them while in Lawrenceville, why they were allegedly there, or how or when anyone allegedly knew they belonged to Brittingham. What the Court does know is that no one asked Brittingham or AAC's R&D Manager any of these questions. (Cofield, Ex. D, 47-48). Defendants merely identify the 43 Firearms and now ask the Court to conclude that their mere alleged presence on AAC's premises, whether or not Brittingham brought them there, constitutes Cause under § 3.2(a)(v)(B). Defendants' contention is wrong; as demonstrated below, they cannot establish Cause based on that one alleged fact alone.

### A.     The 43 Firearms Do Not Prove Any Wrongdoing by Brittingham.

Of the 43 Firearms, Defendants claim that 29 firearms[9] appear on the "Knox list," a handwritten list prepared by former employee Knox Williams in the "Fall of 2011" (referred to as the "Handwritten List" in Plaintiff's MSJ Brief). (MSJ Brief, 14-15; Def. 56.1 Stmt., ¶ 59). Here is what we know about the Knox list from AAC's own employees:

(1) The Knox list contained firearms that Williams and other employees "pulled" from "anywhere they could find" on AAC's premises (i.e., the vault, research and development, sales and marketing) on one particular day in October 2011 (Williams Dep., Ex. C, 15, 24-26, 85-93, 163-64; Stevens Dep., Ex. E, 223).

(2) The same day, AAC employees loaded the firearms that appear on the Knox list into

---

[8] Defendants attempt to add a 44th firearm, but that firearm – an MP5 Brittingham allegedly removed from AAC the day before his termination – already appears on the list of 43 Firearms. (MSJ Brief, 24; Def. 56.1 Stmt., ¶ 59).

[9] Plaintiffs already addressed these 29 firearms in their motion for summary judgment filed with the court on April 30, 2013. (Pl. MSJ Brief, Ex. 97). For purposes of clarity, Plaintiffs address all 43 Firearms here.

Brittingham's truck. "Someone" asked Brittingham to take them off the premises, and he did. (Id.).

(3) They loaded up Brittingham's truck sometime after the photo shoot which occurred on Yom Kippur (October 7, 2011). (Williams Dep. Ex. C, 65, 101; Stevens Dep., Ex. E, 223-29; MSJ Brief, 13). This was the first time since Stevens' arrival in July 2011 that anyone had asked Brittingham to remove firearms from AAC premises. (Brit. Dec. #2, Ex. V, ¶ 8). Contrary to Defendants' repeated misrepresentation, the spreadsheet they cite does not establish that AAC required Brittingham to remove certain firearms from Lawrenceville. (MSJ Brief, 13). See Brit. Dep. Ex. 34 ("have Kevin isolate or take the machineguns to the Inc. location")(emphasis added). Plus, Stevens testified that he is not sure whether or when he told Brittingham or Thompson to isolate or take the machineguns as stated in the spreadsheet. (Stevens Dep., Ex. E, 217-220). More importantly, Defendants withheld this spreadsheet from discovery because they claimed it was protected by privilege (Nordin Dec. #2, Ex. S, ¶ 6 and Ex. B); they cannot now rely on it as support for their claims or defenses. See, e.g., U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991).

(4) According to AAC's 30(b)(6) representative, Melissa Cofield, AAC did not penalize Brittingham for the firearms AAC loaded onto his truck and had him remove from the premises. (Pl. Ex. 3, 157).

Thus, by AAC's own admission, the company did not terminate Brittingham for 29 of the 43 Firearms, including firearms used in the October 2011 photo shoot.

The remaining 14 firearms appear on a new list, entitled the "Storage List," which Defendants now claim includes firearms belonging to Brittingham that were found at AAC "shortly after" or "around his termination."[10] **Tellingly, neither AAC's 30(b)(6) representative, Melissa Cofield, nor Schauble make any mention of the Storage List as a basis for Brittingham's termination.** (Cofield Dep., Ex. D, 56-59; Schauble Dep., Ex. F, 98). Of these 14 firearms, 4 firearms do not belong to Brittingham (Nordin Dec. #2, Ex. S at Ex. A #36, #38-40); 8 firearms were brought to Lawrenceville by AAC employees during the Move because they were thought to be included in the Acquisition (Id. at #30-35, #42-43); and 1 firearm was regularly used for testing and demos by R&D employees (Id. at #37). Only 1 firearm – a rare

---

[10] Brittingham received the Storage List containing the 14 firearms in August 2012, eight months after his termination. (Brit. Dep., Ex. A, 28-29).

World War II collectors piece (Guide Lamp) – remains in dispute as allegedly belonging to Brittingham because Smith claims Brittingham brought it to him in Lawrenceville. (Id. at #41). However, Smith testified that he was a Responsible Person on the KB FFL (Smith. Dep., Ex. I, 76-77); therefore, even if Brittingham brought this firearm to Smith, no unlawful transfer occurred. See ATF Handbook, 29-30; 18 U.S.C. § 923(d)(1)(B); 27 C.F.R. § 478.44(a)(1)(iii).

Most importantly, **Defendants provide no evidence that Brittingham brought any of the 43 Firearms – other than the one disputed firearm which did not constitute an unlawful transfer – to AAC's premises** in Lawrenceville or asked anyone to do so. (MSJ Brief, 12-13, 23-24; Nordin Dec. #2, Ex. S; Pl. Ex. 97). In addition, the undisputed evidence indicates that AAC knew its employees were transporting firearms on the RV FFL and KB FFL (including the 43 Firearms) to Lawrenceville in the performance of their duties. (Pl. Ex. 88, ¶ 18; Ex. 90, ¶ 7-18). **In fact, contrary to Defendants' contention (MSJ Brief, 25-26), AAC shockingly even provided its employees with legal documentation representing that: (1) the employees were licensees under the RV FFL, (2) the employees were authorized under the GCA to transport firearms registered under the RV FFL, and (3) the employees lawfully possessed RV FFL firearms in Norcross and Lawrenceville**. (Lessard Dec. #2, Ex. T, ¶ 6-10 and Ex. A). Other actions also demonstrate that AAC used the RV FFL to conduct its business: (1) AAC authorized its own employees to execute documentation for the RV FFL (REM140015076 and REM140015074, Ex. K); and (2) AAC unlawfully sold silencers located in Lawrenceville to dealers directly off the RV FFL for the Norcross facility. (Pl. Ex. 49; Ex. 7, 144-145; Ex. 88; Ex. 90).

Thus, the alleged presence of 43 Firearms, without more, does not prove any wrongdoing by Brittingham and, therefore, could not constitute evidence of Cause.

**B.      No Violation of Any Law or Regulation.**

Defendants do not establish that Brittingham materially failed to comply with applicable laws or regulations with respect to the operation of AAC's business or the performance of his duties. In their MSJ Brief, Defendants, for the first time in 1 ½ years, finally identify the three laws and regulations upon which AAC purports to base its Cause termination: **(1)** 18 U.S.C. § 923(g)(1)(A); **(2)** 27 C.F.R. § 478.152; and **(3)** ATF Ruling 2010-1. (MSJ Brief, 24-26). Defendants do not claim that Brittingham directly violated these laws and regulations, but rather contend that his alleged misconduct "exposed" AAC to such violations. (MSJ Brief, 24). Nevertheless, Defendants fail to provide any evidence to support their contention.

**18 U.S.C. § 923(g)(1)(A).** This section of the GCA requires FFL holders to maintain accurate Bound Book records for the firearms at their place of business. Presumably, Defendants claim that the failure to enter any of the 43 Firearms in AAC's Bound Book violated this statutory requirement. First, there is no way to confirm whether or not any of the 43 Firearms were actually recorded in AAC's Bound Book; it is undisputed that AAC's Bound Book records were inaccurate and unreliable. (Williams Dep., Ex. C, 63-64; Pl. Ex. 17, 82-84; Love Dep., Ex. J, 42-44; Stevens Dep., Ex. E, 15-16; REM130012159, REM130013885, REM130013883, REM140006754, REM130013045-13048, REM130013006-13007, REM130012952-12953, Ex. O). Further, even if someone failed to record any of the 43 Firearms in AAC's Bound Book, Defendants do not offer any evidence that Brittingham was responsible for such failure, especially since it is undisputed that he did not unlawfully bring any of the 43 Firearms to Lawrenceville. (See Section IV.A supra). In fact, AAC employees responsible for bringing the majority of these 43 Firearms to Lawrenceville expressly testified that they did not enter the firearms in AAC's Bound Book and did not even know how to do so. (Pl. Ex. 88, ¶ 19, 23; Ex. 90, ¶ 15, 18). Moreover, Defendants provide absolutely no evidence that any of the 43 Firearms

12

had been on AAC's premises for at least seven days at the time they were "discovered." In fact, Williams testified that he did not know when the firearms on the Knox list had been brought to Lawrenceville, and Stevens testified they "had been there a couple of days." (Williams Dep., Ex. C, 144-146; Stevens Dep., Ex. E, 227). Absent evidence the firearms had been in Lawrenceville for at least seven days, AAC had no obligation to record them in its Bound Book under the GCA. 27 C.F.R. § 478.123(a).

**27 C.F.R. § 478.152.** This regulation provides that firearms involved in the violation of § 922 (transfer of firearms in interstate or foreign commerce) and § 924 (fines and penalties for violations of § 922 and other inapplicable statutes) of the GCA or any other federal criminal law are subject to seizure and forfeiture. Defendants do not allege, nor is there any evidence to prove, that Brittingham violated any laws concerning the transportation of firearms in <u>interstate or foreign commerce</u> (which term is defined under the GCA as "commerce between any place in a State and any place outside of that State" and "does not include commerce between places within the same State but through any place outside of that State"); rather, they allege the 43 Firearms were transported from Norcross, Georgia to Lawrenceville, Georgia. (MSJ Brief, 23). Thus, 27 C.F.R. § 478.152 is not applicable to the facts of this case.

**ATF Ruling 2010-1.** As an initial matter, ATF Rulings are not "laws or governmental regulations" and, therefore, cannot form the basis of Cause under § 3.2(a)(v)(B). <u>See</u> <u>NFA Handbook</u> 3 (rev. 2009) ("Rulings do not have the force and effect of law ...."). Notwithstanding that it is not a law or regulation, this Ruling also does not apply to this case. The Ruling addresses the temporary assignment of a firearm by an FFL to its unlicensed employees, agents, contractors, volunteers, or other non-employees; it does not apply to transfers between FFL licensees. (ATF Rul. 2010-1, ECF No. 83-1 at 19-22, 3). Specifically, the Ruling permits AAC

employees, including Brittingham, to temporarily possess, use, and transport AAC's firearms off of AAC's premises for bona fide business purposes. (Id.). The Ruling says nothing about transferring firearms from one FFL holder to another FFL holder. (Id.). Here, Defendants allege that Brittingham unlawfully transferred firearms to AAC (through AAC employees), which is a licensed person under the GCA because AAC holds an FFL. Therefore, because both Brittingham and AAC hold FFLs, neither ATF Ruling 2010-1 nor the requirements of NICS backgrounds checks and ATF Form 4473 to which the Ruling refers apply. (Id.; 27 C.F.R. § 478.124; 27 C.F.R. § 478.125). To the extent AAC claims that Ruling 2010-1 applies because Brittingham unlawfully transferred firearms not to AAC, but to AAC's unlicensed employees, such claim is inconsistent with the legal documentation the company provided to its employees; this documentation expressly represents that AAC employees were licensees under the RV FFL and, therefore, authorized to lawfully transport firearms under the FFL. (Lessard Dec. #2, Ex. T ¶ 6-10 and Ex. A).

Defendants' only remaining allegation is that AAC "could have" lost its FFL as a result of Brittingham's alleged misconduct and "could have" received "potential" penalties under the NFA, based upon the opinion of Harry L. McCabe, III. (MSJ Brief, 25-26; McCabe Dec., ECF No. 77; 26 U.S.C. § 5861, 5871; 27 C.F.R. § 479.181, .182). McCabe's opinion is of no consequence and is contradicted by Plaintiffs' expert John Dugan. (Dugan Report, Ex. R). First, McCabe bases his analysis in large part on an examination of AAC's Bound Book (referred to as "A&D records") which, according to repeated deposition testimony and record evidence, was inaccurate and unreliable, i.e., transactions did not show up, dates were incorrect, and entries had the wrong FFL number. (McCabe Dec., 10; Williams Dep., Ex. C, 63-64; Pl. Ex. 17, 82-84; Love Dep., Ex. J, 42-44; Stevens Dep., Ex. E, 15-16; REM130012159, REM130013885,

REM130013883, REM140006754, REM130013045-13048, REM130013006-13007, REM130012952-12953, Ex. O). Accordingly, McCabe's assumption that any firearms that do not appear in AAC's incomplete Bound Book must belong to Brittingham is erroneous. (McCabe Dec., 13-14). McCabe also bases his analysis on the unsworn statements of four current and former AAC employees (Weisnicht, Stevens, Love, and Williams) who make unsupported claims that "Kevin's guns" were commonly "scattered" throughout AAC's premises. (Id. at 10). In their sworn depositions, none of these employees testified that they saw Brittingham unlawfully bring any "personal" firearm on to AAC's premises nor has AAC provided any evidence that Brittingham did so with respect to any of the 43 Firearms. (See Section IV.A supra; Stevens Dep., Ex. E, 190-191; Williams Dep., Ex. C, 29, 108; Love Dep., Ex. J, 138). Moreover, McCabe completely fails to consider that the machine guns found at AAC belonged to AAC and should have been transferred to AAC's FFL had the company obtained the Law Enforcement Letters necessary to effect such transfers. (McCabe Dec., 12, 14; 27 C.F.R. § 479.105(c)-(d)). Thus, McCabe's opinion misses the key point: **any "potential" penalties or "possible revocation" that AAC "could have" faced under 26 U.S.C. § 5861 "if ATF had conducted a compliance inspection" on the one day that Williams prepared the Knox list – which ATF inspection never actually occurred – was the result of AAC's own actions or failure to act**. Accordingly, it was **AAC's own employees** who "exposed" AAC to "potential" violations.

Notably, Defendants fail to explain why AAC treated Brittingham's alleged violations differently than other compliance issues that also could have "exposed" AAC to violations but were not tied to an $8 million dollar payout. For example, Defendants customarily disclosed other employees' serious compliance violations to the ATF in an effort to avoid penalties or loss of its FFL, i.e., misplacing 1,800 firearms and an AAC employee's unlawful export of technical

data to China in violation of the International Traffic in Arms Regulations ("ITAR"). (REM 90001332-1344, REM 30001130, Ex. L). Notably, the employee responsible for the ITAR violation, Robert Silvers, had the same definition of Cause in his employment agreement as Brittingham but no $8 million payout tied to his termination (Silvers EA, Ex. Q); AAC chose not to discipline or terminate Silvers for his admitted violation. (Mustian Dep., Ex. G, 122-127).

Thus, Defendants fail to satisfy their burden. They offer nothing but the claim that 43 Firearms were merely "discovered" at AAC's premises – where it was customary for hundreds, if not thousands, of firearms to be present – without any evidence that Brittingham unlawfully brought any one of the 43 Firearms to Lawrenceville. This single, unsupported claim is insufficient to establish a material failure by Brittingham to comply with applicable laws and regulations with respect to AAC's operations or the performance of his duties. (Brit. EA, § 3.2(a)(v)(B)). Accordingly, Defendants' claim of Cause under § 3.2(a)(v)(B) fails, and Brittingham is entitled to judgment as a matter of law.

### C.   It is Defendants Who Play the Blame Game to Cover Their Compliance Failures.

Not only do Defendants fail to establish that Brittingham materially failed to comply with applicable laws or governmental regulations under § 3.2(a)(v)(B), but the undisputed evidence shows that it was AAC which actively and knowingly engaged in the unlawful sale and transfer of firearms in violation of the GCA and NFA. (See Section IV.B supra). Thus, Defendants' repeated claim that Brittingham blames others for his violations and used AAC employees as "surrogates to do what he was barred from doing personally" is patently false. (MSJ Brief, 26). To the contrary, AAC used its own employees to do precisely what they accuse Brittingham of doing. AAC cannot have it both ways. AAC authorized its employees to conduct business using the RV FFL and knew employees used firearms under the RV FFL and KB FFL to fulfill

commercial and military contracts and projects. (Lessard Dec. #2, Ex. T, ¶ 6-10 and Ex. A; REM140015076 and REM140015074, Ex. K; Pl. Ex. 49; Ex. 7, 144-145; Ex. 88; Ex. 90). <u>AAC cannot now blame Brittingham for its own unlawful actions</u>, without any evidentiary support, simply because it saved the company more than $8 million at a time when FGI was hemorrhaging money.

Similarly, Defendants' after-the-fact attempt to weave a tale of robust compliance policies and practices at AAC is disingenuous at best. In fact, the true picture highlights the complete failure of anyone to take responsibility for compliance at AAC in 2011. In his deposition, Mustian – Director of Corporate Compliance for Freedom Group – disclaimed all responsibility for leading compliance activities at AAC and, along with other employees, could not identify who ultimately oversaw compliance at AAC after Brittingham's suspension. <u>See</u> Mustian Dep., Ex. G, 13-16, 40-42, 54, 58-59 ("It was not led by me ever … I wouldn't know the answer to that … [u]ltimately responsible, to me it's everybody who is holding themselves out in running that company" … [ATF] would look to the responsible persons that were on file at the time of whatever period of compliance they were looking at"). <u>See</u> <u>also</u> Weisnicht Dep., Ex. H, 28 ("At that time I would say they more or less had no one in charge of compliance"); Smith Dep., Ex. I, 57-58 (no knowledge of who in charge of compliance in 2011). No one knows what compliance responsibilities Roth actually had because Defendants claim all of his actions are privileged and no one saw him at AAC in 2011. (Smith Dep., Ex. I, 54). Yet Mustian, Roth, Schauble and Stevens were all listed, at one time in 2011, as "Responsible Persons" on the Lawrenceville FFL. (Schauble Dep., Ex. F, 55-56). Importantly, it is undisputed that <u>neither Thompson nor Brittingham had any responsibility for compliance in 2011</u>. (Cofield Dep., Ex. D, 199; Schauble Dep., Ex. F, 96-97; Pl. Ex. 53; Ex. 54). And despite Brittingham and Thompson's

repeated requests for compliance assistance, AAC waited <u>20 months after the Acquisition</u> to hire Nardelli's "friend" Stevens as a "success mediator." (REM06-002719-2720, Ex. M; Schauble, Ex. F, 140). Still, Schauble, Blackwell and Thompson all believed Stevens to be ineffective in this role, and Schauble even threatened to terminate him. (Schauble, Ex. F, 141-145, 157-159; Blackwell, Ex. X, 147-151; 166-169).

Contrary to Defendants' contention, there is no evidence that any AAC employee attended a "three-hour long firearms regulatory training" in 2009 after the Acquisition (Smith Dep., Ex. I, 49-53; Brit. Dep., Ex. A, 150-151; Thompson Dep. Ex. B, 89-90; Love Dep. Ex. J, 36-37). In fact, the compliance rules were never explained to AAC employees in detail. (Smith Dep., Ex. I, 59-60). Nor is there evidence, other than <u>one e-mail to one employee</u> in 2009, when AAC remained in Norcross, that AAC made any effort to avoid commingling Brittingham and AAC's firearms after the Acquisition. (REM 30001145, Ex. N).

Most importantly, even after AAC moved to Lawrenceville in 2010, AAC did not institute any compliance policies or attempt to avoid commingling but instead provided documentation to their employees representing that they <u>could lawfully</u> transport firearms on the RV FFL back and forth from Norcross or elsewhere. (Pl. Ex. 88; Ex. 90; Ex. 13, 105-107; Ex. 12, 50-51, 58-60). Immediately <u>after</u> Brittingham's termination, AAC made "some pretty big changes" and actually instituted compliance policies. (Smith, Dep., Ex. I, 58-62). Specifically, immediately after Brittingham's termination, AAC clearly told employees "how to abide by the compliance regs;" implemented new policies for bringing firearms in and out of the building; limited access to the vault and stockroom; required employees to sign firearms in and out of the vault, including when used for R&D, required all firearms to be locked up at the end of each workday; and required visitors who brought firearms to AAC to lock them in a locker accessible

only to the owner of the firearm. (Id.; Stevens Dep., Ex. E, 192-93, 196-97). Interestingly, although Freedom Group recognized the need for compliance policies at AAC prior to the Acquisition and possessed all of its so-called compliance resources and capabilities (including Mustian, Roth, and the always-on-call ATF attorney Mark Barnes), neither Freedom Group nor Defendants implemented any of these policies at AAC before terminating Brittingham's employment. (Id.).

**V.**     **Defendants Cannot Establish That Cause Existed To Terminate Thompson.**

    **A.**     **The Court Should Strike the Racich Declaration Because AAC Never Disclosed Him As An Expert or Witness.**

Defendants now claim that Thompson's termination was justified under § 3.2(a)(v)(E) because on January 8, 2012, she "copied approximately 2,800 files from her work computer on to her personal hard drive." (MSJ Brief at 30). To support this claim, Defendants offer the Declaration of J. Christopher Racich which includes a forensic analysis of Thompson's hard drive and conclusions regarding Thompson's alleged conduct. (Racich Decl., ECF No. 78). Consistent with the surprise tactics Defendants have employed throughout this litigation, Defendants never disclosed Racich as a fact or expert witness and have never provided his report. Accordingly, the Court should strike his Declaration and not consider its content.

Under Federal Rule of Civil Procedure 26(a)(1), Defendants were required to disclose individuals likely to have discoverable information. Further, Rule 26(a)(2) required Defendants to: (1) disclose the identity of any witness they may use to present expert testimony, and (2) provide Plaintiffs with a written expert report.

The Racich Declaration purportedly constitutes expert testimony and it is apparent that Defendants retained him to provide expert testimony. Fed. R. Civ. P. 26(a)(2)(B). Racich details his qualifications and previous expert witness work. (Racich Decl., ECF No. 78 ¶ 2-6). Further,

Racich states that he created a forensic image of Thompson's hard drive, analyzed the hard drive, made technical determinations regarding the data on the hard drive, and reached conclusions about Thompson's alleged conduct based on these technical determinations (Racich Decl., ¶ 7-16). But on or before April 15, 2013, Defendants <u>never disclosed</u> Racich as an expert witness, provided his written report, or disclosed a summary of the facts and opinions to which Racich is expected to testify. Fed. R. Civ. P. 26(a)(2). Nor have Defendants identified Racich as a witness with knowledge of discoverable information under Rule 26(a)(1).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), <u>the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless</u>." Fed. R. Civ. P. 37(c)(1) (emphasis added). <u>See</u> <u>Deluca v. Bank of Tokyo–Mitsubishi UFJ, Ltd.</u>, No. 06 Civ. 5474, 2008 WL 857492, at *12 (S.D.N.Y. Mar. 31, 2008) (where witness' testimony is based on scientific, technical, or other specialized knowledge, Rule 26(a)(2)'s mandatory disclosure and Rule 37(c)(1)'s prohibition on the use of untimely expert testimony prevents unfair "sandbagging" of adverse parties with new evidence). Incredibly, Defendants provide absolutely no explanation for their failure to comply with their disclosure obligations under Rule 26. (ECF No. 63). Defendants' misconduct has caused Plaintiffs severe prejudice because Plaintiffs are unable to prepare a response analyzing, challenging, or rebutting Racich's methods or conclusions. Defendants' conduct is precisely the "sandbagging" Rules 26 and 37 are designed to prevent. Thus, the Court should strike the Racich Declaration from the record. <u>See</u> <u>DVL, Inc. v. Gen. Elec. Co.</u>, 811 F. Supp. 2d 579, 588-592 (N.D.N.Y. 2010) (striking declaration of witness offered at summary judgment because he was not disclosed as an expert and adverse party "did not have the opportunity to anticipate, challenge, or counter [the witness's] statements,

assessments, methods, or conclusions.").

### B.    No Cause Existed to Terminate Thompson.

In Plaintiff's MSJ Brief incorporated by reference, Plaintiffs address Defendants' failure to provide any evidence that Thompson materially violated written AAC policy or failed to fully cooperate in an investigation with respect to the Tape or Text Issue. (Pl. MSJ Brief, 28-31). Curiously, Jackson's declaration does not establish that he reasonably determined that Thompson failed to fully cooperate in any investigation. (Jackson Dec., ECF No. 82). Thus, Defendants cannot rely on the Tape or Text Issue to establish their Cause determination.[11]

In their MSJ Brief, Defendants allege that Thompson violated AAC's Computer Network Acceptable Use Policy, Employee Declaration of Ownership of Work and Non-Disclosure Agreement ("NDA"), and Confidentiality Statement by downloading AAC files to her personal computer during her employment. (MSJ Brief at 30). None of the documents cited by Defendants prohibited Thompson from downloading files to a personal device during her employment. Rather, the documents cited by Defendants collectively prohibited Thompson from accessing unauthorized information, enabling unauthorized access to information, disclosing information, or failing to maintain the confidentiality of information. See Computer Network Acceptable Use Policy; Employee Declaration of Ownership of Work and Non-Disclosure Agreement; Confidentiality Statement (Def. Ex. A, Brit. Dep. Ex. 10 at 21; Def. Ex. Q; Thompson EA, § 6.1). Defendants do not provide any evidence or even allege that Thompson accessed unauthorized information, enabled unauthorized access to information, disclosed any confidential information, or otherwise failed to maintain the confidentiality of any information.

---

[11] The cases cited by Defendants are completely inapposite. Abdallah v. Napolitano, No. 09-CV-0861, 2012 U.S. Dist. LEXIS 161209 (W.D.N.Y. Nov. 7, 2012) and Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552 (S.D.N.Y. 2005) address whether failure to cooperate in an investigation constitutes a legitimate, nondiscriminatory reason for termination. Abdallah and Yarde have absolutely no application to whether Cause existed under the Thompson EA.

21

Even though not admissible, the Racich Declaration only establishes that Thompson copied files to a hard drive, accessed the drive, and opened two PST files, nothing more. (Racich Decl., ECF No. 78). There is no evidence that Thompson violated any policy. (Id.).

Further, the "Confidentiality Statement" and NDA do not constitute "written policies" of AAC; the Confidentiality Statement is a provision of the Thompson EA and the NDA is a separate agreement. (Thompson EA, § 6.1; Def. Ex. Q). The definition of "Cause" does not include any failure to comply with any other provisions of the Thompson EA or any other agreement with the Company. (See Thompson EA, Sec. 3.2). Thus, even though Thompson did not violate the Confidentiality Statement or NDA, Thompson's alleged failure to comply with those documents could not constitute Cause under the Thompson EA.

### C. Thompson Performed Her Obligations Under Her Employment Agreement.

In another attempt to avoid their obligations under the Thompson EA, Defendants claim that Thompson's January 8, 2012 download constituted a violation of § 6.1 of the Thompson EA, rendering her unable to establish that she performed under the contract. (MSJ Brief at 30-31). In other words, Defendants contend that Thompson's alleged conduct left them free to breach the Thompson EA without consequence. Defendants, however, provide no evidence that Thompson failed to perform her obligations under the employment agreement. (MSJ Brief, 30). § 6.1 does not prohibit downloading AAC files to personal devices but only requires Thompson to "maintain in strictest confidence all proprietary data and other confidential or non-public information" and use it "solely for the benefit of the Company". Defendants cannot establish that she did not "maintain in strictest confidence," or that she even downloaded any "proprietary data" or "other confidential or non-public information." Defendants also cannot point to any evidence that Thompson failed to use such information solely for the benefit of the Company. In addition, Thompson returned the information. (Thompson Dep., Ex. B, 146-148; Thompson EA

§ 6.1). More importantly, any purported breach of § 6.1 would have occurred after Thompson's wrongful termination and cannot establish that she failed to perform under the Thompson EA. To the contrary, it is undisputed that Thompson consistently performed well as an AAC employee. (Evaluation, Ex. P).

Defendants' reliance on CreditSights, Inc. v. Ciasullo, No. 05 CV 9345, 2008 U.S. Dist. LEXIS 91481 (S.D.N.Y. Sept. 5, 2008) is misplaced. (MSJ brief, 31). The breach of contract claim in Ciasullo did not involve an employment agreement; rather, it involved a stock agreement. The court granted the defendant's motion to dismiss the breach of contract claim because of defects in Ciasullo's complaint. Ciasullo, 2008 U.S. Dist. LEXIS 91481, at *31-*32. The court noted, in dicta, that it would be futile for Ciasullo to amend his complaint because documents proved that Ciasullo pledged his stock to third parties without obtaining written consent from the defendants. Id. at *32-*35. Obtaining written consent was a requirement under the stock agreement. Id. Ciasullo's pledge occurred prior to the defendants' alleged breach. Id. at *32-*33. Ciasullo does not support Defendants' contention that an alleged breach occurring after Thompson's wrongful termination can show that she failed to perform under the contract. In fact, as demonstrated above, Thompson fully performed under the Thompson EA.

## VI.    AAC Cannot Enforce its Restrictive Covenants As A Matter of Law.

Because AAC purported to terminate Brittingham and Thompson for Cause when Cause did not exist, the restrictive covenants in the Brittingham EA and Thompson EA (the "EA RCs") are unenforceable as a matter of law. In re UFG Int'l, Inc. v. Nisselson, 225 B.R. 51, 55 (S.D.N.Y. 1998); SIFCO Indus., Inc. v. Advanced Plating Tech., Inc., 867 F. Supp. 155 (S.D.N.Y. 1994); Borne Chemical Co. v. Dictrow, 445 N.Y.S.2d 406, 412 (2d Dep't 1981).

Further, the EA RCs are overbroad as a matter of law. For example, the noncompetition covenant in the Employment Agreements attempts to prohibit competition throughout North

America, but AAC only sold its products to customers in the United States, and not in the 22 other countries that also make up North America. (EA § 6.2; Brit. Dec. #2, ¶ 12; Jackson 30(b)(6) II Depo. 7-9); see Good Energy, L.P. v. Kosachuk, 853 N.Y.S.2d 75, 77 (1st Dep't 2008) employer cannot enforce nationwide noncompete where it operates in only eight states). In addition, the non-solicitation covenant impermissibly purports to prohibit Brittingham and Thompson from interfering with, disrupting, or attempting to disrupt "any past, present or prospective contractual or other relationship between the Company, its subsidiaries or affiliates and any of its clients, customers, suppliers or employees, current or prospective," without regard to whether Brittingham or Thompson ever acquired a relationship with any such clients or customers. (EA §6.3); see Kosachuk, 853 N.Y.S.2d at 77 (denying summary judgment and refusing to enforce nonsolicitation covenant that included clients employee did not service)(citing BDO Seidman v. Hirshberg, 93 N.Y.S.2d 382, 392 (2d Dep't 1991)).

The restrictive covenants in the APA (the "APA RCs") are also overbroad, because they are not reasonably limited the actual business Defendants acquired. See Purchasing Assocs., Inc. v. Weitz, 13 N.Y.2d 267, 271 (1963) (restraint should not be "more extensive than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought."). Defendants acquired the assets of Random-AAC, which engaged in the design, manufacture, and sale of suppressors, or "silencers," for firearms. (APA, Pl. Ex. 21, 1). Nevertheless, under the APA RCs, Brittingham purportedly cannot "own any interest in, control, function in an executive or managerial capacity for or be employed by… any entity engaged in **any commercial activity materially similar to that carried out by the Business, Buyer, or any Affiliate thereof**." (APA, §6.4(a)(ii))(emphasis added). Based on the definition of "Affiliate," the APA RCs thus preclude Brittingham from not only engaging in the business of

Random-AAC (making and selling silencers), but also of engaging in any commercial activity engaged in by Remington, Freedom Group, or Cerberus, thus extending well beyond silencers and even firearms. (APA, § 6.4(a)(ii), § 12.1; Brit. Dep., Ex. A, 64-65).[12] For example, Brittingham cannot sell eye protection in Zimbabwe, even though he and AAC never designed, manufactured, or sold such products. (Jackson 30(b)(6) I Dep., Ex. Y, 122; Brit. Dep., Ex. A, 64-65).

The APA RCs are similarly impaired by the lack of any geographic limitation. (APA, § 6.4). At the time of the Acquisition, Random-AAC did not sell its product outside the United States. (Jackson 30(b)(6) II Dep., Ex. Y, 7-9). Yet Brittingham faces a noncompete that purportedly prevents him from selling safety glasses as far away as Zimbabwe. (Jackson 30(b)(6) I Dep., Ex. Y, 122; Brit. Dep., Ex. A, 64-65). Thus, the APA RCs extend well beyond any reasonable geographic limit. See Slomin's Inc. v. Gray, 575 N.Y.S.2d 545, 547 (2d Dep't 1991) (test of reasonableness applies to post-sale covenants); see also Manhattan Real Estate Equities Group, LLC v. Pine Equity NY, Inc., 2004 WL 3267264, No. 603259/03 at *3 (N.Y.Sup. Aug. 3, 2004) (post-sale covenants must be "reasonable as to time and geographical scope").

## VII.   Conclusion

For all of these reasons, Plaintiffs respectfully request that the Court deny Defendants' summary judgment motion. In addition, Plaintiffs respectfully request that the Court grant Plaintiffs' summary judgment motion and dismiss Defendants' counterclaims.

---

[12] The Court may also take judicial notice of the expansive scope of products advertised by the Freedom Group companies by visiting the Freedom Group website at http://www.freedom-group.com/ and any of the Freedom Group's individual company websites. See, e.g., Technomarine SA v. Jacob Time, Inc., 2012 WL 2497276, No. 12-Civ-0790(KBF) at *1, n.1 (S.D.N.Y. June 22, 2012)("The Court may take judicial notice of the fact that a publicly accessible website contains certain information.")

Respectfully submitted this 30th day of May, 2013.

MORRIS, MANNING & MARTIN, LLP

_____/s/ R. Jason D'Cruz_____

R. Jason D'Cruz (GA Bar No. 004740)
(Admitted pro hac vice September 14, 2012)
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000
(404) 365-9532 (f)
rjd@mmmlaw.com

O'HARE PARNAGIAN LLP
Robert A. O'Hare Jr.
Michael Zarocostas
Andrew C. Levitt
82 Wall Street, Suite 300
New York, NY 10005-3686
(212) 425-1401
(212) 425-1421 (f)
rohare@ohareparnagian.com
mzarocostas@ohareparnagian.com
alevitt@ohareparnagian.com

*Attorneys for Plaintiffs*

26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RANDOM VENTURES, INC. (f/k/a, ADVANCED    :
ARMAMENT CORP.), KEVIN BRITTINGHAM,    :
and LYNSEY THOMPSON,    :    ECF Case
     :
                           Plaintiffs,    :    No. 12-CV-6792 (KBF)
     :
            - against -    :    **CERTIFICATE OF SERVICE**
     :
ADVANCED  ARMAMENT  CORP., LLC,  and    :
REMINGTON ARMS COMPANY, LLC,    :
     :
     :
                    Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       I hereby certify that I have  served  a  copy  of  the  foregoing  "Plaintiffs'  Response to

Defendants' Motion for Summary Judgment" upon Defendants Advanced Armament Corp., LLC

and Remington Arms Company, LLC via electronic filing through the CM-ECF system to the

following:

| | |
|---|---|
| Michael J. DiMattia | Dana L. Rust |
| Philip A. Goldstein | Edward M. Eakin, III |
| McGuire Woods LLP | McGuire Woods LLP |
| 1345 Avenue of the Americas, 7th Floor | 901 East Cary Street |
| New York, NY 10105 | Richmond, Virginia 23219 |

This 30th day of May, 2013

                                  By:   */s/ R. Jason D'Cruz*
                                       R. Jason D'Cruz (GA Bar No. 004740)
                                       Admitted pro hac vice September 14, 2012
                                       rjd@mmmlaw.com
                                       Morris, Manning & Martin, LLP
                                       1600 Atlanta Financial Center
                                       3343 Peachtree Road, N.E.
                                       Atlanta, GA 30226
                                       Telephone: (404) 233-7000
                                       Facsimile: (404) 365-9532
                                       *Attorney for Plaintiffs*

27