UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
RANDOM VENTURES, INC., KEVIN          :
BRITTINGHAM, & LYNSEY THOMPSON,:
                                      :
            Plaintiffs,               :
                                      :
            -v-                       :
                                      :
ADVANCED ARMAMENT CORP., LLC &  :
REMINGTON ARMS COMPANY, LLC,          :
                                      :
            Defendants.               :
----------------------------------------------------------- X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____      │
│ DATE FILED: January 13, 2014     │
└─────────────────────────────────┘
```

12 Civ. 6792 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

In some lawsuits, full development of the factual record reveals that neither side cloaked themselves in glory – that neither side did what it could or should have done to avert the mess that became the litigation. This is such a case. It is now this Court's task to take the factual record presented at trial and to grapple with the mess that characterized the parties' relationships; in short, to decide who wins and who loses. While the facts presented show less than stellar behavior on both sides, plaintiffs are entitled to the relief they seek.

In 1994, Kevin Brittingham started Advanced Armament Corp. (referred to herein as "Old-AAC"), a company that designed and manufactured silencers. A few years later, a friend of Brittingham's, Lynsey Thompson, joined the business; she soon took charge of the company's operations and finances, allowing Brittingham to focus on research and development ("R&D") and marketing. Old-AAC grew into a profitable business and a leader in the growing silencers industry.

In October 2009, a large firearms manufacturer, Remington Arms Company, LLC (formerly known as Remington Arms Company, Inc (referred to herein as "Remington"))[1] formed a new entity called Advanced Armament Corp., LLC ("AAC") and through AAC, acquired Old-AAC for approximately $10 million upfront and another $8 million to be paid upon certain conditions being met (in particular, that Brittingham was still employed by AAC in 2015).  Brittingham and Thompson were retained as part of the agreement; each entered into an Employment Agreement ("EA"), which contained a Cause provision that outlined the circumstances under which each could be terminated by (the "new") AAC.

As could have (and should have, based on the factual record as developed herein) been predicted, things did not go smoothly for Brittingham, and to a lesser extent, Thompson, following the acquisition.

In December 2010, Brittingham and Thompson were suspended in conjunction with the investigation of an antique silencer that Brittingham had received at AAC's premises.

In January 2011, Brittingham and Thompson were reinstated and put on a one-year probationary period.  On December 21, 2011, Brittingham was terminated by AAC; Thompson was terminated soon thereafter, in January of 2012.

On September 7, 2012, Old-AAC (sometimes referred to as Random Ventures), Brittingham, and Thompson filed this action against AAC and Remington (together, "defendants"), claiming, <u>inter alia</u>, that AAC and Remington

---

[1] Remington is a subsidiary of Freedom Group International ("FGI").  Cerberus Capital Management, L.P. ("Cerberus") owns a controlling interest in FGI.

breached their contracts as well as the implied covenant of good faith and fair

dealing.  On October 3, 2012, defendants answered and asserted a counterclaim

against Brittingham and Random Ventures for conversion and breach of contract.

(See ECF No. 13.)

On June 17-21 and June 24-25, 2013, this Court held a bench trial in the

action.  This Opinion & Order constitutes this Court's findings of fact and

conclusions of law.

<u>FINDINGS OF FACT</u>

I.    <u>Old-AAC</u>

Kevin Brittingham discovered silencers as a teenager, and he knew he had

found what he wanted to do with his life.[2]  (Tr. 72-73.)  At trial, he was sincere and

credible regarding his passion for the business he developed and the company he

started in 1994, Advanced Armament Corporation (again, "Old-AAC").  (Compl. ¶

15.)  Brittingham's skill in designing and marketing silencers is undisputed:  he

developed intellectual property (a series of patents) and a client base (a significant

portion of which was the United States military) that resulted in Old-AAC becoming

the industry leader for silencers.  (Tr. 73-77.)

Prior to its acquisition by Remington, Old-AAC had a youthful, untraditional

company culture.  (Tr. 74.)  Brittingham was determined to make Old-AAC a "cool"

place to work – a place where people were not embarrassed to wear the company t-

---

[2] As an illustration of his passion for silencers, one of Brittingham's children has the middle name of Maxim, a reference to the individual who invented the silencer, Hiram Percy Maxim.  (Tr. 71.)

shirts.  (Tr. 75.)  As an example of the Old-AAC culture, Brittingham created a

marketing campaign whereby people who tattooed Old-AAC's logo on their body

would receive a free silencer; the campaign proved so successful it cost Old-AAC

approximately $250,000.  (Tr. 89-90.)  Clearly, the Old-AAC was no typical

corporation.  Its employees were a small, dedicated, tight-knit group of people who

worked well in an unconventional environment.

     Brittingham was present for every moment of the trial and testified over the

course of multiple days.  The Court had ample opportunity to assess his demeanor.

He was sincere in his love for Old-AAC and its business, protective of the culture

that he had built and viewed as an important component of its success, and

saddened, angry, and frustrated with the events that followed the acquisition.

     After listening to Brittingham's testimony for just a few minutes, it was

obvious that Brittingham would not fit in well in most corporate boardrooms, nor

would he want to.  It was also clear that Brittingham would be right at home at gun

shows and gatherings of firearm enthusiasts.  Having seen and assessed

Brittingham, he is a non-conformist and not everyone's cup of tea; and that is fine

with him.  However, no sophisticated businessperson assessing Brittingham as a

potential employee for a large corporate entity could reasonably believe that he

would fit well in a corporate culture; nor could any sophisticated businessperson

believe Brittingham could or would be willing (let alone deem it necessary) to

change the way his highly successful company operated following the acquisition.

A key employee of Old-AAC, and one whom Brittingham credits with having been a critical part of its success, was Lynsey Thompson. Thompson started working for Old-AAC part-time while she was in college, and began working full-time upon her graduation. (Tr. 72-73.) Thompson handled the administrative and back-office side of the business; according to Brittingham, she "ran" the business while he focused on what he loved to do – designing, manufacturing, and marketing silencers. (Tr. 79.)

At trial, Thompson participated by live video-feed. (Tr. 9.) She was pregnant and under a doctor's order not to travel. Thompson testified and the Court found that she was largely credible – except as to topics not material to the outcome of this matter. Thompson and Brittingham had a close and complicated relationship during the period of events here at issue.

In connection with Old-AAC's R&D efforts, Old-AAC used a wide variety of firearms: machine guns of different types, rifles with short barrels and long barrels, semi-automatic and full automatic weapons, different types of revolvers; these firearms were critical tools of the trade – necessary to the design and development of silencers that complied with particular specifications. (Tr. 83-84, 95-97.)[3] As a result, these critical tools were on the desks and work benches of the employees who used them each day in connection with Old-AAC's business. (Tr. 94-97, 884.) This

---

[3] Brittingham explained: "You have to have a wide variety [of guns for R&D] because you have everything from .22 to .50 caliber for the military[,] and everything in between." (Tr. 97.)

was the way that Old-AAC operated, and such fact would have been apparent to anyone who walked through its facilities or spoke with its employees.

Among Old-AAC's regular and significant customers were special operations of the U.S. military ("Special Ops").  (Tr. 76-77.)  The requirements for these customers were specific and Old-AAC's marketing efforts were, quaintly put, tailored – and effective.  Brittingham testified credibly that this customer group included individuals deployed away from home for periods of time, "the guys who killed bin Laden."  (Tr. 494.)  From time to time, he and they would ride dirt bikes, go aerial pig hunting, and socialize at strip clubs.  (Tr. 494-96.)

There was no suggestion at trial that Brittingham or Old-AAC was the target of any enforcement efforts by the U.S. government or that it was ever investigated for any violations of firearm laws, rules, or regulations.  While it is true that silencers are highly regulated firearms – referred to, like machine guns as "NFA" firearms (tr. 93) – there is no evidence that Old-AAC was ever found non-compliant with the applicable statutory regime.

Prior to the acquisition, Brittingham maintained two Federal Firearms Licenses ("FFLs") – the 40006 FFL[4] (sometimes referred to as "the sole-proprietorship FFL") and the 02617 FFL[5] (sometimes referred to as "the Old-AAC FFL").  Each had a corresponding "bound book," which is where certain records

---

[4] This FFL had the following registration number:  1-58-135-01-2C-40006.  (See PX 312.)
[5] This FFL had the following registration number:  1-58-001-07-4D-02617.  (See PX 342.)

pertaining to each FFL were kept.  (The maintenance of FFLs and bound books are required pursuant to the statutory regime).[6]  (Tr. 107-08, 110; see infra.)

II.     Remington's Initial Interest in Old-AAC

In 2009, Brittingham was not looking to sell Old-AAC.  (Tr. 80-81.)  If Remington had never approached him, he might have continued to grow his company and the years spent in this litigation would never have occurred.  But that was not to be.

Old-AAC was doing well:  it was edgy, profitable, innovative, and growing. (Tr. 73, 74, 88, 90.)  Brittingham knew an individual who had been in the Special Forces of the U.S. Army, Greg Baradat; after Baradat retired from the military, he went to work for Remington as a military salesperson.  (Tr. 78.)  Baradat called Brittingham and asked him if he would be interested in speaking with Remington. (Tr. 78.)[7]  Baradat introduced him to Jason Schauble, a young, decorated former U.S. Marine who worked for Remington.  (Tr. 78, 80.)  Schauble expressed interest in acquiring Old-AAC, but Brittingham testified credibly that both he and Thompson initially expressed skepticism.  (Tr. 81.)  Brittingham was concerned about the very issue that ended up coming to pass – his company being swallowed by a large, corporate animal with a dyspeptic digestive tract.  (Tr. 79.)

---

[6] In the asset purchase agreement ("APA") between Brittingham and AAC LLC, Brittingham provides a representation that the company was in compliance with all rules and regulations.  (PX 1, § 3.12.)  Defendants have not asserted a breach of this provision.
[7] At this point, Brittingham's impression was that Remington was "a bit of a joke in the military market."  (Tr. 78.)

For example, Brittingham expressed concern to Schauble that a sale to Remington would cause the company to lose the innovative, "edgy" culture that he believed was integral to its success. (Tr. 74, 78-81.) As part of his sales pitch, Schauble reassured Brittingham that the company would be able to retain its unique culture and autonomy, especially with respect to marketing, innovation, and R&D. (Tr. 82-83, 87-90.) Schauble also assured Brittingham that the company would be organized as a separate profit and loss (P&L) center under Remington Defense, and that Brittingham would report directly to Schauble, who reported directly to the then Chief Executive Officer ("CEO") of FGI, Ted Torbeck. (Tr. 83, 86, 1077, 1103.)

Schauble testified that prior to the acquisition, Remington committed to growing AAC's R&D capabilities by providing them with rapid prototyping capability. (Tr. 1074.) Schauble promised Brittingham that Remington would invest the capital necessary to grow production capacity. (Tr. 83, 1075.) Schauble also told Brittingham that Remington possessed the resources the company needed to grow its business, including, among other things, various systems, financing, compliance structures, and distribution capabilities for commercial sales. (Tr. 81-83, 1074-75.) Brittingham testified credibility that compliance in particular was an important aspect of what Remington brought to the table. (Tr. 81.) Schauble told Brittingham, "we're the biggest gun company in the world, we have those resources, we can handle that stuff for you, a 'DBA system' or an 'ERP system' to run the business, to tie that [compliance] together." (Tr. 81; see also tr. 90.)

8

Schauble worked on Brittingham – he came to Old-AAC's facility and convinced Brittingham that the acquisition was a good idea.  (Tr. 90, 95.)

III.   The Terms of the Deal

For the majority of time that Remington was negotiating the acquisition of Old-AAC, the structure was a stock purchase.  (Tr. 83-84.)  Under this plan, Remington would acquire the totality of what comprised the Old-AAC, including, importantly, all the tools of its trade:  the firearms used daily by the staff.  (Tr. 83-84.)  However, for reasons never adequately explained at trial, a few weeks prior to the closing the transaction structure changed to an asset purchase arrangement. (Tr. 84-85.)

As part of the changed deal structure, the financial consideration was staged: instead of a single purchase price, the acquisition was instead to have a multi-piece structure in which a little over $10 million would be paid up-front; an additional $8 million would be paid in 2015 (in two $4 million payments), tied to a condition precedent that Brittingham still be employed and have met certain targets as of 2015.  (Tr. 85, 114, 117, 202.)  The agreed-upon deal structure included a provision that Brittingham would sign an employment agreement and become an AAC employee; a significant portion of Remington's consideration would be paid only if he could maintain his position for a period of five years.

Given the circumstances, this scenario conjures up an image of a person asked to tread on logs atop a running river for five years; it was not a deal

structured with the personality and business realities properly balanced, all things considered.

Under the asset purchase structure, some, but not all, of Old-AAC's assets were to be acquired by AAC – Old-AAC's entire inventory of manufactured silencers were included in the acquisition, but only some of their firearms (most of which were used for R&D) were included. (Tr. 84, 119-20.) Brittingham and Schauble – who did not have any prior experience with silencer R&D – negotiated which firearms would transfer as part of the acquisition. (Tr. 119-20.)[8] In the end, Brittingham and Schauble agreed upon a list of "Purchased Assets," set forth on Schedule 1.1 of the Asset Purchase Agreement (again, "APA"), and a list of "Excluded Assets," included as Schedule 1.2. (Tr. 118-19.) The firearms included on the Purchased Assets list were listed on either the 02617 FFL or the 40006 FFL. (Tr. 118-19.)

Schauble testified he understood that the acquired firearms to be the minimum number needed to run the business. (Tr. 1076.) Important to the unfolding of future events, Schauble knew and expected that AAC would continue to use some of the firearms on the Excluded Asset list to run its business; Schauble did

---

[8] Brittingham explained credibly (and was corroborated by several witnesses and not contradicted by defendants) that firearms are actively used in silencer design because each silencer is designed for a specific type of gun with particular specifications.

not believe this to be problematic so long as Brittingham maintained proper

dominion and control over them.  (Tr. 1076- 77.)[9]

      Brittingham shared the understanding that certain non-acquired firearms

used by Old-AAC would be used by AAC post-acquisition for some undefined period

of time.  (Tr. 121.)  At the time of the acquisition, Brittingham was never provided

with a timeframe regarding when non-acquired firearms would no longer be needed

or should no longer be used.  Brittingham credibly testified that if AAC were limited

to only using those firearms that had been acquired as part of the acquisition, the

business would have come to a halt.  (Tr. 121.)  This plainly was not the parties'

intent.

      The APA was executed on October 2, 2009 by Brittingham and Stephen P.

Jackson, the Chief Financial Officer ("CFO") of FGI.  (PX 1; Nardelli Dep. at 41.)

Section 1.1, which concerned the Purchased Assets, states:

> Except for the Excluded Assets, at the Closing, Seller
> shall sell to Buyer, and Buyer shall purchase from Seller,
> all of Seller's right, title, and interest in and to Seller's
> assets used or useful in connection with the Business
> (collectively the "Purchased Assets") . . .
>
> (a) all inventories of raw materials, work-in-process,
> finished goods, products under research and development,
> demonstration equipment, office and other supplies,
> parts, packaging materials and other accessories related
> thereto which are held at, or are in transit from or to, the
> locations at which the Business is conducted . . . which
> are used or held for use by Seller . . . .

---

[9] Schauble testified:  "As long as [Brittingham] brings them on to site for a day and
exercises proper dominion and control over those firearms and then brings them off
site at the end of the day or locks them up properly, he is able to do that and bring
firearms on site."  (Tr. 1077.)

(PX 1.)  The consideration is set forth in Sections 1.7 and 1.8:  $10,160,000 as an

"Immediate Payment" (PX 1, § 1.7(c)(iii)) and $4 million if AAC achieved a

Cumulative Adjusted EBITDA (Earnings Before Interest, Tax, Depreciation, and

Amortization) of $20 million and Brittingham continued to be an employee of Buyer

or was not an employee for a reason other than for "Cause" until 2015.  (PX 1, §

1.8(a).)[10]  In addition, the Brittingham and the defendants agreed to a $4 million

"Goodwill Payment," also contingent on Brittingham's employment "on or prior to"

January 2, 2015.  (PX 4.)

> As Seller, Brittingham represented in Section 3 of the APA that:

> > The Purchased Assets constitute all of the assets, tangible
> > and intangible, of any nature whatsoever, necessary to
> > operate the Business in the manner presently operated by
> > Seller, including all tangible personal property reflected
> > on the balance sheet in the June 30 Financial Statements
> > . . . .

(PX 1, § 3.26(a).)

> The same day the APA was executed, Brittingham as Seller and Jackson on

behalf of AAC, agreed that:

> > At any time or from time to time after the date hereof, at
> > Buyer's request and without further consideration, Seller
> > shall execute and deliver to Buyer such other instruments
> > of sale, transfer, conveyance, assignment and
> > confirmation, provide such materials and information and
> > take such other actions as Buyer may reasonably deem
> > necessary or desirable in order more effectively to
> > transfer, convey and assign to Buyer, and to confirm

---

[10] The parties stipulate that AAC would have achieved a Cumulative Adjusted
EBITDA of $20 million by March of 2015.  (Joint Pre-Trial Order, Joint Stipulations
of Fact and Law ¶ 16, June 12, 2013, ECF No. 133.)

> Buyer's title to, all of the Purchased Assets . . . and to put
> Buyer in actual possession and operating control of the
> Purchased Assets . . . .

(PX 5.)  Jackson testified at trial that the deal structure with Old-AAC, which

contained a significant portion of consideration paid as an earn-out, was unique; no

other FGI acquisition was designed in such fashion.  (Tr. 1226.)

Jackson testified that when Old-AAC was acquired, it was anticipated that it

would be run as a separate but related company; it was to be its own P&L center.

(Tr. 1211-12.)  The preponderance of the evidence supports that structuring AAC as

a separate P&L center was indicative of the parties' expectations and intent that

AAC would continue to maintain independence from the larger corporate entity.

This, in turn, was consistent with Brittingham's reasonable expectation that the

manner in which he had operated the business pre-acquisition was acceptable and

could be continued post-acquisition.

IV.   The Structure of AAC

The company that formally acquired Old-AAC's assets was AAC Acquisitions,

LLC (again, "AAC") ("Buyer").  (PX 1.)  The structure of AAC is important insofar as

it impacts plaintiffs' employment agreements – both of which anticipate certain

decision-making by the AAC Management Board (referred to as the "AAC Board" or

the "Board").

Section 3.1 of AAC's Limited Liability Company Agreement ("AAC LLC

Agreement") states:

> Management by the Board Acting as Manager.  The
> Company hereby establishes a Management Board (the

"Management Board"), which shall have the overall responsibility for the management, operation and administration of the Company acting, only as a body, as the "manager" of the Company within the meaning of the [Delaware Limited Liability Company] Act. . . .   Except as expressly set forth herein, the management, control and operation of the Company <u>will be vested exclusively in the Management Board, and the Management Board will have full power and authority and absolute discretion to do all things deemed necessary or desirable by it to conduct the business of the Company</u>; provided, however, that the consent of the Member [Remington] will be required to approve the following:  (i) dissolution of the Company, (ii) merger or conversion of the Company, (iii) the sale, exchange, lease, other transfer of all or substantially all of the assets of the Company, (iv) the admission of a new member, (v) interim distributions, and (vi) amendment of the Certificate of Formation of the Company or this Agreement. . . .

(DX 6, § 3.1 (emphasis added).)  Thus, as structured, AAC's Board would handle its operations and administration; Remington's role would be limited to specified major corporate acts.

Section 3.2 of the AAC LLC Agreement states:

<u>Officers</u>.  The Management Board, by written resolution, may appoint a president, chief executive officer, one or more vice presidents, chief financial officer, treasurer, secretary or such other officers ("Officers") of the Company as they deem necessary or appropriate, and may assign or delegate to such Officers the titles, duties, responsibilities, and authorities reflected in such resolutions. . . .

(DX 6, § 3.2.)  Section 3.4 of the AAC LLC Agreement states:

<u>Action by the Member, Management Board, or Committee</u>.  Any action required to, or which may, be taken by the Member, Management Board, or Committee may be taken without a meeting by consent thereto in writing, setting forth the action so taken, and

14

unanimously signed by the Member, Management Board,
or the Committee.

(DX 6, § 3.4.)  There is no evidence in the record that the AAC LLC Agreement has

ever been amended.  (See Tr. 1243-44.)  For all time periods relevant to this

litigation, Jackson, Remington's CFO, held the sole position as member of the AAC

Board.  (Tr. 1207.)

There were a number of individuals at Remington who had significant

involvement with AAC, Brittingham, and Thompson.  Given the important roles

they played in the eventual suspension and termination of plaintiffs, it is important

to note at the outset that none of the following individuals held Board seats during

the time period at issue:  Melissa Cofield (Chief Human Resources Officer for

Remington), Scott Blackwell (FGI's Chief Sales and Marketing Officer), John Day

(who took over as AAC's temporary leader upon Brittingham's termination), or

Roger Mustian (FGI's Director of Compliance).

V.   The Structure of the Employment Relationships

On the day of the closing, both Brittingham and Thompson entered into

employment agreements (referred to respectively as the "Brittingham EA" and the

"Thompson EA") with Jackson acting on behalf of AAC.  (PX 6; PX 7.)  Pursuant to

the EAs, both Brittingham and Thompson became employed by AAC, which was

defined as the "Company" in the EAs.  (PX 6 at 1; PX 7 at 1.)

The Brittingham EA provided, inter alia, that he would be President of AAC

through March 31, 2015 and that he would receive a salary of $250,000 per year.

(PX 6, §§ 1.1, 3.1, 4.1; see also tr. 115.)  For each fiscal year, Brittingham was

15

eligible to earn an annual bonus with a target of up to 100% of his base salary based on the achievement of individual and/or AAC performance goals established by AAC's Board.  (PX 6, § 4.2.)  Thompson similarly was eligible to earn an annual bonus with a target of up to 100% of her base salary, also upon the achievement of goals established by AAC's Board.  (PX 7, § 4.2.)  There is no evidence that the AAC Board ever formally met or set performance targets tied to material portions of Brittingham's and Thompson's compensation.[11]

Pursuant to Section 3.2 of Brittingham's EA, AAC could terminate his employment for "Cause."  (PX 6, § 3.2.)  Cause was defined as:

> (A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of, or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft;
>
> (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties;
>
> (C) actions by the Executive involving embezzlement, theft, sexual harassment, discrimination, fraud or other acts of a criminal nature by the Executive in his dealings with the Company or its employees or representatives;
>
> (D) the Executive's continued failure to perform his substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period;

---

[11] This prevented plaintiffs from ever receiving the benefit of their bargain with respect to their compensation.

16

> (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period; or
>
> (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company.

(PX 6, § 3.2(a)(v).)  Thompson's EA contained essentially the same definition of "Cause."  (PX 7, § 3.2(a)(v).)

As set forth in Section 3.2 of both EAs, the management structure of AAC LLC is important to the definition of "Cause" because under the EAs, "the Company" referred to, inter alia, in (B), (E), and (F), and the "Board" of the Company ("in each case as reasonably determined by the Board of Directors of the Company"), both refer to AAC.  This means that to the extent a reasonable determination was required, the AAC Board bore the burden of making it.[12]  For the time period in question, that responsibility fell on Jackson, the only AAC Board member – the responsibility did not fall on general Remington executives, some of whom clearly did not understand (and did not like) AAC and its unique culture.[13]

---

[12] The AAC LLC Agreement provides for a separate AAC Board that is exclusively responsible for the management, control, and operation of AAC.  (DX 6, § 3.1.)  Based on this structure, decisions regarding Caused-based terminations reside with the AAC Board.

[13] The evidence proves beyond a preponderance of the evidence that the AAC Board failed to make a reasonableness determination with respect to Brittingham and Thompson's terminations.  Jackson rubber-stamped the decision to terminate Thompson, and did not take any part whatsoever in the termination of Brittingham.

Both EAs provide that they can "be amended or modified only in writing signed by both parties."  (PX 6, § 9; PX 7, § 9.)[14]  Importantly, the EAs also include a non-waiver provision:

> The failure of either party hereto in any one or more incidences to insist upon the performance of any of the terms or conditions of this Agreement, or to exercise any rights or privileges conferred in this Agreement, or the waiver of any breach of this Agreement shall not be construed as waiving any such terms and the same shall continue to remain in full force and effect as if no such forbearance or waiver had occurred.

(PX 6, § 11; PX 7, § 11.)  The EAs also contain an integration clause stating that the EA constitutes "a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter" and that the integration clause is a "critical substantive provision of this Agreement."  (PX 6, § 14; PX 7, § 14.)[15]  Both EAs had terms through March 31, 2015.  (PX 6, § 3.1; PX 7, § 3.1.)

VI.    <u>Federal Firearms Licenses</u>

AAC, as a manufacturer of firearms, operates in a highly regulated environment.[16]  Its operations are governed by a wide variety of rules and regulations promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  (Tr. 111.)  Silencers are – along with, <u>inter alia</u>, machine guns

---

Other Remington executives bore full responsibility for the termination decisions. (<u>See</u> <u>infra</u>.)

[14] As set forth below, no proposed amendment or modification was ever signed by both parties with respect to either Brittingham or Thompson's EA.

[15] As discussed below, in January 2011, Remington unilaterally declared the EAs terminated for Cause and proposed amended Employment Agreements ("amended EAs") to plaintiffs.

[16] While silencers are not themselves capable of expelling a projectile, they are nonetheless considered "firearms."  <u>See</u> 18 U.S.C. § 921(a)(3)(C).

– subject to even more stringent regulations under the National Firearms Act ("NFA").  (Tr. 95, 111.)  As a result, silencers and machine guns are sometimes referred to as "NFA firearms."  (See, e.g., tr. 131.)

Every FFL has one or more "Responsible Party" ("RP").  An RP is required to maintain a log – referred to as a "bound book" – of all firearms associated with a particular FFL.  (See tr. 103.)  Thus, if Old-AAC owned a firearm, it would need to be in Old-AAC's bound book.  FFLs allow the holder to maintain firearms for commercial use so long as they are logged in the appropriate bound book.  18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.125(e).[17]

In their post-trial submissions, defendants set forth a litany of bases giving rise to a for-Cause termination of Brittingham:  (1) bringing his personal firearms to AAC and failing to maintain dominion and control over them; (2) allowing others to bring his firearms to AAC and failing to maintain dominion and control over them; (3) failing to register his personal firearms in AAC's bound book.  (Defs.' Post-Trial Mem., Aug. 2, 2013, ECF No. 52.)  According to Remington, this conduct violated 26 U.S.C. § 5861 ("making it a felony for AAC to possess an NFA firearm that is not registered to it"), 18 U.S.C. § 923(g)(1)(A) ("which required AAC to keep accurate bound book entries regarding the firearms at its place of business"), and 27 C.F.R. § 478.13 ("which prohibited the presence of firearms on AAC's premises that are not registered to it").  (Id.)

_____

[17] The APA takes careful note of the various laws and regulations that govern AAC's conduct.  (See PX 1, § 6.9.)  Neither party has alleged a breach of this agreement.

Defendants' emphasis at trial was clearly on Brittingham's personal firearms at AAC's premises.[18]  As a result, the question of what constituted a "personal firearm" was heavily contested (and differing testimony on the issue provided). However, no evidence at trial suggested that anyone at Remington ever explained to Brittingham Remington's definition of "personal" firearms.  (Tr. 170.)

As a legal matter, there is no requirement that firearms maintained for purely personal use by logged into a bound book.  In other words, a rifle used solely for personal sporting at home would not need to be – and would not be expected to be – listed on an FFL's bound book.  As a factual matter, the Court finds Brittingham understood and conducted himself according to his definition:  the two FFLs as to which he maintained bound books were for commercial use (i.e., for Old-AAC), not his personal firearms.  (Tr. 110, 171.)

a.  Pre-Acquisition FFLs

Prior to the acquisition, Old-AAC maintained its operations in a facility owned by Brittingham in Norcross, Georgia under the 02617 FFL.  (Tr. 101-02; PX 342.)  All silencers manufactured by AAC were registered under the 02617 FFL; all firearms listed on that FFL were used in the course of Old-AAC's business.  (Tr. 101-02, 125.)  In the acquisition, some of the firearms listed on the 02617 FFL were Purchased Assets; others were Excluded Assets.  (Tr. 126.)  Similarly, the 40006

---

[18] Brittingham owned a collection of firearms used for hunting and target shooting that he kept in a safe in his house.  (Tr. 95, 110.)  Brittingham considered these to be his "personal" firearms because they were not for commercial use.  (Tr. 110, 171.) These personal firearms were not registered under either the 02617 or 40006 FFL, nor were they included on either the Purchased or Excluded Asset List.  (Tr. 110, 225.)

FFL, which was also used in the course of Old-AAC's business, had some Purchased Assets and some Excluded Assets on it. (PX 312; tr. 83-84, 94-97, 102-03, 110, 125, 261.)

As set forth above, both Schauble and Brittingham expected that Excluded Asset firearms on the 02617 and 40006 FFLs would continue to be utilized by AAC for some undefined period of time post-acquisition.

b. Post-Acquisition FFLs

Roger Mustian, FGI's Director of Compliance, was responsible for obtaining an FFL for AAC post-acquisition. (Tr. 1045.) In March 2010, six months after the acquisition, Mustian obtained FFL 1-58-135-07-3C-05775 ("05775 FFL" or the "Norcross-interim FFL"). (Tr. 1045; PX 341.) There is no evidence that Mustian made any real effort to ensure the Acquired Assets were transferred from the 02617 and 40006 FFLs to the 05775 FFL; there is similarly no evidence that Mustian instructed employees to use the 05775 FFL for newly manufactured silencers. In fact, even after March 2010, newly manufactured silencers were being listed on the 02617 and 40006 FFLs. (See, e.g., PX 72; tr. 818-19.)

The overwhelming evidence is that Mustian did essentially nothing to effect the transfer of the firearms included on the Acquired Assets, or the manufactured silencer inventory (old or new), onto the new FFL.

In July of 2010, the Norcross operation was moved to Lawrenceville, Georgia. (Tr. 998.) Mustian applied for and received FFL 1-58-135-07-3G-06236 (the "06236 FFL" or the "Lawrenceville FFL")). (PX 45.) When AAC moved facilities from

Norcross to Lawrenceville, a variety of firearms were transferred between locations; Brittingham played no role in the move (and indeed was out of town at the time). (Tr. 139-40.)  Brittingham never saw any paperwork regarding which firearms were moved from Norcross to Lawrenceville.  (Tr. 140.)

Both before and after the move to Lawrenceville, silencers continued to be sold off of the 02617 FFL – this continued well into 2011.  (Tr. 818-19; see also PX 345.)  After obtaining the 06236 FFL, Mustian again failed to implement a timely and rational transfer of Acquired Asset firearms or inventory onto the 06236 FFL. Rather, AAC continued to actively utilize all four FFLs in its core operations through 2011.

Mustian's knowledge of and responsibility for this state of affairs is clear.  On October 13, 2010, Kathy Wagoner,[19] an administrative employee of AAC, sent Mustian a list of serial numbers for firearms on the Old-AAC FFL and a list of serial numbers for firearms on the Norcross FFL.  (See PXs 51, 52.)  Mustian's response, if any, is not in the record.

Moreover, AAC's formal reporting clearly illustrated its use of the Old-AAC and Norcross FFLs.  For the calendar year 2010, AAC reported to ATF that it had produced 3,044 silencers on the 05775 FFL, 2,970 silencers on the 02617 FFL, and 5,838 silencers on the 06236 FFL.  (PX 72.)  There is no indication in the record that Brittingham knew AAC was submitting these forms, nor is there any indication

---

[19] Kathy Wagoner later married and became Kathy Love.  (Tr. 792-93.)

that anyone at AAC or Remington raised concerns about the continued use of the old FFLs.

Post-acquisition, AAC did not differentiate between firearms on the various FFLs in other ways as well.  For instance, on December 8, 2010, an AAC employee provided Ethan Lessard, AAC's Director of R&D, with paperwork that allowed him to travel with firearms, including those listed on the 02617 FFL.  (PX 59; tr. 899-900.)  While the letter was signed by Brittingham, Brittingham had been suspended the day before, which suggests that the paperwork had been authorized by someone other than Brittingham.  (Tr. 902 (Lessard testified that Corey Weisnicht, another AAC employee, gave him the document).)

VII.   Compliance at AAC

The preponderance of the evidence presented at trial demonstrates that there was no unified view as to what was lawful or unlawful in terms of AAC's use of firearms on various FFLs; similarly, there was no unified view as to what needed to be recorded on or transferred between bound books.  Those in charge (namely, Mustian, Roth, and Schauble) knew – or should have known – what was going on, and they did not attempt to alter AAC's compliance efforts post-acquisition.[20] Instead, as explained below, Remington executives were responsible for AAC's lack

---

[20] Old-AAC did not maintain any written compliance policies or have compliance training (tr. 402) – Remington either discovered or should have discovered this during its pre-acquisition due diligence.

23

of compliance personnel, and were complacent as confusion reigned AAC's
compliance efforts.[21]

A key aspect of compliance is recordkeeping, particularly tracking firearms in
the appropriate bound books. Prior to the acquisition, AAC's bound books were
maintained by a part-time employee, Allison Wolfe, who was hired by Old-AAC in
2006 and left AAC in 2012. (Tr. 345-46.) Wolfe was responsible for recording bound
book transactions based on ATF Form 3s.[22] (Tr. 346-47.) Wolfe considered her job a
data entry position (tr. 346-47); she recorded information provided by others for all
acquisitions and dispositions of firearms into Old-AAC's bound book. (Tr. 349.)[23]

a. Compliance Framework Post-Acquisition

Mustian was in charge of compliance for Remington (and then FGI) until his
departure in 2011;[24] he testified that he "was responsible for the oversight of
firearms compliance." (Tr. 986.)[25] Mustian's primary office was located in Madison,
North Carolina, not at AAC. (Tr. 999.) He went to AAC's facility approximately

---

[21] As stated, pre-acquisition, individuals at Remington promised to support AAC's
compliance efforts and provide AAC with enhanced compliance resources – post-
acquisition, they failed to follow through on this promise.
[22] The ATF Form 3 is entitled: Application for Tax-Exempt Transfer of Firearm and
Registration to Special Occupation Taxpayer (National Firearms Act).
[23] Wolfe explained the process as follows: "When a Form 3 was approved, it would
go to the shipping department. When it was shipped, I would get a copy of the form
and a date stamp, and I would enter it into the computer from the Form 3." (Tr.
347.) Old-AAC's bound book was maintained a computer system called Silent
Island (tr. 347); post-acquisition, AAC's bound book was maintained on a software
system called DBA. (Tr. 249.)
[24] Ronchi testified at his deposition that Mustian and Roth bore ultimate
responsibllity for compliance at FGI. (Ronchi Dep. at 59-60, 67.)
[25] Mustian began his employment at Remington in 2005 as a manager of internal
controls relating to Sarbanes-Oxley. (Tr. 985-86.) In 2008, he was promoted to
Director of Corporate Compliance for Remington and later for FGI. (Tr. 986.)

once every three months.  (Tr. 999.)  Mustian was responsible for compliance both during and after the integration process immediately following the acquisition.  (Tr. 986-87.)  Materials for an "AAC Integration Kick-Off meeting" list Mustian as the "Remington Lead" for "Compliance and Governance," with Thompson and Wagoner as the "AAC Counterparts."  (PX 18 at REM 30000006.)[26]

In performing his post-acquisition duties relating to compliance, Mustian assigned tasks to individuals on the ground, but said that he "would have been there available to assist them with any complex or other issues that might arise."[27] (Tr. 987.)  Based on the record, Mustian consistently failed to ensure appropriate steps were taken to achieve a level of compliance beyond that which existed at Old-AAC.[28]

Remington prepared an "AAC Integration Scorecard" dated October 12, 2009. (DX 155.)  The "Key [Integration] Task" of physically segregating "firearms on [Brittingham's] personal FFL" from those acquired by AAC was assigned to Thompson and another AAC employee, Corey Weisnicht.  (DX 155 at 3.)  The estimated start date was October 11, 2009 and the estimated completion date was

---

[26] Ronchi stated during his deposition, however, that he understood Brittingham to be "responsible for making sure that the logging of firearms were correct."  (Ronchi Dep. at 107-08.)

[27] Ronchi admitted in his deposition testimony that more should have been done concerning compliance at AAC.  (Ronchi Dep. at 184.)  He also stated, incredibly, that he was unaware that plaintiffs had been asking for a compliance specialist since the acquisition.  (Id. at 186, 235.)

[28] During closing arguments, counsel for defendants also stated that "on the ground" compliance responsibility resided with Thompson – and that if "it wasn't done, it was Ms. Thompson's fault."  (Tr. 1471-72.)  However, following the acquisition, Thompson reported to Schauble, who credibly testified at trial that as of December 2010, Thompson had no formal compliance responsibilities.  (Tr. 1472, 1106.)

October 26, 2009.  (DX 155 at 3; tr. 993.)  Notably, this articulation of the task would not have resulted in total segregation of Brittingham's firearms from those of AAC – Old-AAC firearms were included on two separate FFLs prior to the acquisition.

Mustian testified that while he was in charge of this aspect of integration, he did not know for certain whether the task was completed; he "assumed" it had been done, but Thompson never provided him with confirmation.  (Tr. 993.)  Thompson testified that she does not have formal expertise in the federal firearms laws, and that no one at FGI ever asked her to create or implement policies or procedures relating to the federal firearms laws.  (Tr. 635.)

Brittingham testified credibly that post-acquisition, Thompson never spoke with him about physically segregating certain firearms.  (See tr. 414.)

Thompson testified credibly that after the acquisition, she told both Schauble and Mustian that AAC needed a full-time compliance person.  (Tr. 637-38; see also Blackwell Dep. at 84-82, 95 (explaining at his deposition that from October 2, 2009 through December 21, 2011, he was aware "that it was a desire on behalf of AAC to hire a compliance person" and that such desire was legitimate because he "believed that AAC in its growth curve was going to generate more paperwork . . .").)  Cofield testified that she believed Thompson was the person at AAC responsible for overseeing compliance and that Mustian and Roth would have been her points of contact post-acquisition.  (Tr. 1252, 1258.)  Notably, however, Mustian was always discussed as "above" Thompson on corporate hierarchy with respect to compliance.

Mustian did not know which firearms were moved from Norcross to Lawrenceville – he was not involved in the move and clearly failed to keep track of which firearms were located where (let alone to whom they belonged).  (Tr. 1052.) Mustian testified that he had no involvement in ensuring the firearms on the various FFLs were not commingled during the move.  (Tr. 1053.)  When pushed, he said he did not know "how Lawrenceville [was] supposed to be set up with respect to commingling and segregation."  (Tr. 1054.)  Mustian further testified that while he was ultimately in charge of compliance at AAC, he did not know where R&D's work with firearms actually occurred.  (Tr. 1002-03.)

Documents close in time to the acquisition further suggest either a failed or false intent to ensure AAC compliance.  For instance, a power point slide indicated that among the "Compliance/Legal Major Integration Efforts" was to obtain an FFL for the new facility by early November 2009 (PX 15); Mustian did not obtain an FFL for the new AAC until March of 2010.  (Tr. 1045-46.)  Even once Mustian obtained the new FFL (05775), he testified that he did not know whether he instructed employees to begin recording newly-manufactured silencers on the 05775 FFL (as opposed to (improperly) continuing to record them on the Old-AAC FFL).  (Tr. 1046.)  Mustian conceded that irrespective of whether he instructed employees on this issue (which the Court finds as a matter of fact, he did not), when new silencers were manufactured, they were listed on the Old-AAC FFL (tr. 1055); according to

Brittingham, when the silencers were subsequently sold, that transaction too was listed on the Old-AAC FFL.[29]   (Tr. 128, 188.)

As part of "Compliance/Legal Major Integration Efforts," serial numbers were to be collected and bound book were to be established.  (PX 15; see also PX 17 at REM 30000028.)  Had this actually occurred, the existence of dozens of firearms being used for AAC operations and listed in the bound books, but not included on the Purchased Asset List, would have been revealed.

On November 11, 2009, Trevor Shaw, Director of Military & Government Programs for Remington, sent an email to a group of individuals including Schauble, Mustian, Brittingham, and Thompson about AAC.  (PX 27.)  With respect to compliance, he asked whether it would be done with a combination of efforts from various people; he also indicated that Mustian had suggested a compliance position would be a 75% full time job.  (Id.)

On March 30, 2010, Ethan Lessard notified Mustian in writing:  "We have a large number of non Remington owned (Kevin's personal guns) serialized materials in our vault room that are going to be there for the foreseeable future.  Should these be included in the DBA[?]"[30]  (DX 29 at REM030001146.)[31]

---

[29] Brittingham also testified that post-acquisition, the 02617 FFL was used not only for newly manufactured silencers, but also for acquisitions (e.g., when AAC acquired a gun, a loaner from the military, or a competitor's product).  (Tr. 128.)

[30] DBA is the software program to which AAC transferred its bound book entries post-acquisition.

[31] In response to this email, Mustian wrote that "Kevin's personal guns will not be part of our bound book and should never be touched by you. . . .  [A]s anyone who touches them (NFA's) without Kevin in the room would be taking possession of a firearm unlawfully because you guys are not employees of that FFL."  (DX 29 at

As of May 10, 2010, a compliance person had yet to be hired.  (See PX 36.) Mustian emailed Thompson:  "I'll be [at AAC] next week (hopefully) and we can discuss the plan for hiring a compliance specialist."  (Id.)  Thompson responded that she had received resumes from two interested applicants.  (Id.)

On July 28, 2010, Mustian wrote Wolfe regarding transfer of "non-core silencers and firearms from the Old Co – Norcross FFL to the New Co – Lawrenceville FFL," explaining that "these include research & development, sales sample, etc that have been acquired since the purchase and that were part of the purchase list."  (DX 33.)  Mustian instructed that "core silencers that we have in inventory as new and are available for sale should be dispositioned from their existing [FFL] bound book."  (Id.)  Mustian further noted:  "The[re] will be remaining items that Kevin will need to authorize from Old Co – Norcross to Kevin's personal.  Since there are FULL AUTO firearms involved there it will have to be done as part of the Old Co – Norcross [FFL] out of business procedure."  (Id.)

---

REM030001146.)  Lessard then responded expressing confusion about Mustian's instructions; Mustin then wrote:  "Kevin has a personal FFL at your location that holds his firearms.  [Old-AAC] also has an FFL which is the one the company is currently operating under per the purchase agreement.  [AAC] also has an FFL there and is the one we will begin using immediately after cutover to DBA. . . .  In summary, you may not come into possession without Kevin being present of the firearms that Kevin owns personally. . . ."  (Id. at REM 3001145.)  This explanation undermines defendants' position that "personal firearms" include those on the Old-AAC FFL – taking into account the way in which AAC R&D functioned, it would have been impossible to have followed Mustian's instructions if Brittingham's "personal firearms" included Old-AAC firearms.  Mustian's explanation suggests that prior to this litigation, he in fact used a definition of "personal firearms" analogous to Brittingham's.  As a separate but equally important point, there is no evidence in the record that Mustian ever followed up on his instructions to Lessard.

At trial, Wolfe testified credibly that her job was limited to inputting information relating to manufactured firearms and that she did not understand Mustian to be giving her particular directions to do anything.[32]  (Tr. 378.)

On July 15, 2010, Thompson emailed Shaw and Schauble (among others) that she needed to talk to Mustian about the as yet unfilled compliance position.  (PX 44.)  She stated that the position technically reports to him, and that "[h]e was working with HR in Madison to start recruiting."  (Id.)

As of August 10, 2010, AAC was still selling silencers off of the Old-AAC FFL, using a stamp for Brittingham's signature.  (See, e.g., PX 50; tr. 145, 221-22.)  As Brittingham credibly explained:  AAC "never transferred the inventory once they received their Norcross FFL, and they never transferred the inventory even after getting the Lawrenceville FFL. . . .  They did the paperwork as if they were still in Norcross [using the Old-AAC FFL] and running that FFL and shipped them accordingly."  (Tr. 145.)

On October 13, 2010, Wagoner provided Mustian with a lengthy list of serial numbers still on the 02617 and 05775 FFLs.  (PX 51; PX 52.)  Wolfe testified that post-acquisition, she was still entering certain of AAC's acquisitions and dispositions into the 02617 bound book.  (Tr. 351.)  In fact, she testified credibly that she recalls continuing to make entries into the 02617 bound book relating to sales of silencers up until the time she left AAC in 2012.  (Tr. 354.)

---

[32] Wolfe explained:  "I did not do transfers.  So the e-mail is addressed to me, but I didn't physically do the Form [3s] to make the transfers.  I just logged the paperwork.  So Kathy [cc'ed on the email] would have been the one who physically handled doing the transfers."  (Tr. 378.)

While the DBA system implemented after the move to Lawrenceville was supposed to (if working correctly) automatically generate bound book entries, Wolfe stated that she encountered a number of problems with it.  (Tr. 353-57 (explaining, among other things, that she was concerned about "continuous problems with the accuracy").)  On July 29, 2010, Wolfe requested assistance from the consulting company that FGI had put in charge of the DBA database; she stated that the 06236 FFL should be the "new default FFL" and that DBA should be set up to reflect that; she also stated that she was having issues with DBA not saving information she had entered.  (PX 48.)  There is no evidence that the 06236 FFL became the default FFL for all purposes, and Wolfe testified that her concerns regarding accuracy were not resolved during her employment at AAC.  (Tr. 357.)[33]

Kathy Love was responsible for transferring items from one FFL to another (tr. 359); she was supposed to work with Mustian to make the necessary transfers.  (Tr. 367.)  However, the details of which FFL was to be used, and for what purpose, was never defined by Mustian.  There is no evidence that Mustian ever followed through on any directive to ensure the separation of firearms into the various FFLs based on legal ownership.  This conduct, however, is consistent with Mustian's trial testimony (discussed below) that he – as Director of Compliance of one of the largest gun manufacturers in the United States – did not view AAC's practices as out of sync with the applicable regulatory framework.

---

[33] In December 2011, Wolfe was still communicating with others at AAC regarding certain of her concerns.  (PX 267; tr. 357.)

b.  <u>Compliance in Practice at AAC</u>

Mustian testified credibly at trial that he believed AAC employees could lawfully work with firearms on the Brittingham's FFLs (i.e., the 40006 and 02617 FFLs) so long as Brittingham maintained dominion and control over such firearms. (Tr. 1051-52.)  Mustian further testified that the APA's prohibition on "commingling" would have been appropriately accomplished by establishing dominion and control.  (Tr. 990-91.)

According to Mustian, dominion and control merely required Brittingham to be present at AAC's premises.  (Tr. 991.)  Mustian explained that if the firearms and silencers on Brittingham's FFLs were "in the same envelope" or facility as Brittingham, sufficient dominion and control would exist; he further stated that Brittingham exercised sufficient dominion and control simply by being in charge of the facility.  (Tr. 1003, 1041; <u>see also</u> DX 29 at REM030001146.)

Moreover, Mustian agreed that there was no legal difference between Brittingham's ability to exercise dominion and control over firearms located in Lawrenceville on the Purchased versus Excluded Asset lists.  (Tr. 1043.)  Indeed, Mustian stated that firearms on the Excluded Asset List could be in Lawrenceville under the off-site storage facility provision of the ATF regulations, Section 478.50, which Mustian agreed states:  "No license is required to cover a separate warehouse used by the licensee solely for the storage of firearms or ammunition if the records required by this part are maintained at the licensed premises served by such warehouse."  (Tr. 1043-44.)  In other words, Lawrenceville could be a valid "storage"

32

facility for Excluded Asset firearms provided that the 02617 and 40006 bound books were on those premises (which they were).  (Tr. 1015.)[34]

According to Mustian, the firearms on Brittingham's FFLs could also lawfully be commingled with the 05775 and 06236 FFLs so long as Brittingham had "dominion and control" over them – which, again, could be accomplished simply by his being on AAC's premises.  (Tr. 996-97.)  For instance, a firearm on the 02617 FFL could lawfully be in the Lawrenceville facilities so long as Brittingham was physically present within the "envelope" of the building.  (Tr. 1038, 1040, 1058-59 (explaining that firearms on all of the various FFLs "could be located in Lawrenceville and all mixed up together in the same room on the same table so long as [Brittingham] was exercising dominion and control").)  As a result, Mustian was not concerned about machine guns AAC had not formally transferred to the new AAC FFL – they were in the Lawrenceville facility lawfully under Brittingham's dominion and control.  (Tr. 1065.)[35]

---

[34] Mustian viewed the AAC facility in Lawrenceville as a warehouse with various open areas housing different functions.  (Tr. 1002.)

[35] There was a great deal of testimony at trial about the machine guns on the Acquired Asset List and the fact that even at the time of Brittingham's termination, they remained on the 40006 and/or 027617 FFLs.  The significance of this point relates to who bore responsibility for the fact that Acquired Assets remained on Brittingham's FFLs.  In light of the overwhelming evidence that numerous acquired assets (including, significantly, the silencer inventory) remained on the Old-AAC FFL long after the acquisition, the machine gun issue has no special legal significance to this case.  In any event, Mustian agreed that the machine guns AAC acquired from Brittingham could only be transferred once a "law enforcement letter" was obtained.  (Tr. 1018.)  Neither party ever clarified who bore responsibility for obtaining that letter.

Mustian also testified that it was perfectly lawful for AAC to transfer silencer inventory from the Norcross facility to Lawrenceville without first making a transfer between the Old-AAC FFL and AAC's FFL (with the appropriate NFA paperwork accomplished), based on the "off-site storage facility" provision of the Gun Control Act.  (Tr. 1014 (citing Section 478.50A).)

Lessard's view of the regulatory regime was consistent with Mustian's – he believed he was allowed to touch any of the guns in the gun vault.  (Tr. 978.)[36] Indeed, both Lessard and another AAC employee, Knox Williams, testified that AAC employees would take various guns in and out of the gun vault, without logging them, 40 or 50 times per day.  (Tr. 975, 245.)  Lessard also testified credibly that he had no way of determining which firearms in the vault were on which FFL; he believed that the only firearms off limits were those stored in a locked vault to which he did not have access.  (Tr. 979.)

As a related point, Lessard testified credibly that he would not have been able to do his job at AAC had he not had access to all of the firearms – including those on the Old-AAC FFL.  (Tr. 980.)[37]  Lessard stated – and this was not contradicted by Mustian – that during the summer of 2011, while AAC was working on a large bid to the U.S. Government, several individuals from Remington – including Mustian, Trevor Shaw, and Chad Parment – came to AAC to assist with

---

[36] Lessard testified credibly that he understood that he was allowed to use any firearms on any of the FFLs – including those on the 40006 and 02617 FFLs – so long as Brittingham was "around."  (Tr. 978.)

[37] Lessard drew the following analogy:  "It's like if you had to type of a bunch of stuff into a computer, but you don't have a monitor.  You can type everything you want in there, you just can't see if it's working."  (Tr. 980.)

finalizing its bid.  (Tr. 981.)  Being present on site, they would have seen the indiscriminate use of firearms because during this time, the R&D group was actively using firearms on the Old-AAC FFL.  (Tr. 980-83.)[38]

VIII.   <u>Impact of Changes in Leadership</u>

From the top down, the compliance process at AAC was destined to fail.  As a factual matter, Remington bears responsibility for this failure.

After the acquisition, Brittingham reported to Schauble.  (Tr. 1077.) Schauble was not on-site post-acquisition, nor was he particularly available during the transition.  (Tr. 98.)[39]

In the fall of 2010, Ted Torbeck, CEO of FGI, left the company.  (Tr. 1207, 1219.)  Soon thereafter, in early 2011, the chief operating officer of FGI, Joe Gross, also left the company.  (Tr. 1207.)  Following these departures, Jackson was the only remaining individual on the Board of AAC.  (Tr. 1207.)

When Torbeck left, FGI's owner, Cerberus Capital Management, decided to create a structure called "Office of the CEO."  (Tr. 1219.)  The Office of the CEO was comprised of Jackson (CFO), Scott Blackwell (Chief Sales Officer), Joe Gross (Chief Operating Officer), and Robert Nardelli (Chairman of the Office of the CEO).  (Tr.

---

[38] During that time, Lessard also spoke to Mustian about the length of time it was taking him to travel back and forth between the Norcross facility and the Lawrenceville facility with the machine guns which were on Brittingham's FFL and had not yet been transferred to an AAC FFL.  (Tr. 981-82.)  Lessard testified that while Remington officials said they were "working on it," no long-term solution was implemented during his employment.  (Tr. 983.)

[39] Schauble's newborn son, who had a serious health issue, was undergoing treatment in early 2010, making it difficult for Schauble to assist with the transition.  (Tr. 1078.)

1219.)  Nardelli was the senior member of the Office of the CEO.  (Nardelli Dep. at 35-36.)  This remained the structure (except for the departure of Gross) until January 2012.  (Tr. 1219.)[40]

According to Schauble, Nardelli's management and leadership style were quite different from Torbeck's.  (See DX 71.)  For instance, Torbeck had apparently not cared about the venues Brittingham chose to meet with certain members of the military.  (Id.)  Nardelli, on the other hand, was characterized by Schauble as moralistic.  (Id.)  Based on the facts presented at trial, it was virtually impossible that Brittingham would be able to survive as an employee under Nardelli.  It appears similarly likely that had Nardelli been the senior member of the Office of CEO when the AAC acquisition was being explored, it would either have not occurred or would have been restructured.

As of late November 2010, Brittingham had still not met Nardelli.  (See PX 56.)  Brittingham asked Schauble when he would be able to meet him, and Schauble responded, "I invited him to visit you.  He'll be in mtw [Madison] next week but he's booked fucking w people. . . ."  (Id.)  As it turned out, Nardelli never ended up meeting Brittingham, despite the fact that Nardelli lived a mere 30 minutes from Lawrenceville.  (Nardelli Dep. at 62-63, 89, 141 (explaining that while he visited AAC's facilities on one occasion, Brittingham was not there).)

---

[40] In January 2012, Nardelli became the CEO of FGI for a short time.  (Nardelli Dep. at 46.)

IX.    <u>Brittingham and Thompson Suspended</u>

In December 2010, Brittingham and Thompson were suspended from AAC by Roth.  The reason provided for the suspension was that Brittingham had a "personal" firearm on premises – an antique silencer that had been shipped to Brittingham at AAC.  (Tr. 421, 428-29, 1269-70, 1079.)  No more detailed explanation was provided at the time of the suspension.[41]

On December 9, 2010, Melissa Cofield, Chief Human Resources Officer for FGI, emailed Don Ronchi, Chief Human Resources Officer for Cerberus,[42] about Brittingham and Thompson's suspension.  (PX 60; Ronchi Dep. at 7-8.)  Her email suggests that the suspension decision had been unsupported.  Her email states:  "I think we owe them [i.e., Brittingham and Thompson] an explanation of why they were suspended. . . .  They are not the compliance people. . . .  He continued to ask, but what gave Fred [Roth] the right to ask him to leave."  (PX 60.)[43]

While Schauble described the suspension as relating to an ongoing "compliance investigation into handling of an antique silencer," Nardelli told Schauble (among others):  "The fact is as you know there are several more issues than just 'the silencer.'"  (PX 64; Nardelli Dep. at 222.)

---

[41] According to Cofield, Brittingham also had loaded "personal" firearms on the premises, but this was not the reason he was suspended.  (Tr. 1270-71.)  Brittingham testified that the loaded firearm near his desk was an Old-AAC firearm.  (Tr. 430.)

[42] Technically, Ronchi worked for Cerberus Operations and Advisory Company ("COAC").  (Ronchi Dep. at 7.)

[43] According to the deposition testimony of Ronchi, Roth was taken off of the investigation following the suspension.  (Ronchi Dep. at 114-15.)

Ronchi expressed to Nardelli that he believed that Schauble had demonstrated a "failure to lead" in connection with the recent events at AAC, and that Schauble "should be telling us what he's doing to ensure that nothing slips through the cracks" rather than complaining about "the issues that are not being addressed while Kevin and Lynsey are suspended." (Id.)

On December 13, 2010, Brittingham pressed Remington for an explanation why he was suspended: "Duration, reason, policy, why [Human Resources] wasn't present?" (PX 65.)

On December 16, 2010, Cofield provided Ronchi with a summary of the APA and the terms associated with the remaining consideration to be paid to Brittingham. (PX 67.) On December 22, 2010, Brittingham escalated his concern about not getting answers regarding the reason for and duration of his suspension to Lisa Gray at Cerberus. (PX 70.) Grey responded: "The investigation is continuing and you will be notified when it is complete. . . ." (Id.) The following day, Brittingham wrote: "What is the alleged violation that led to the suspension?" (Id.)

On January 1, 2011, Brittingham continued to press for a rationale. (PX 73.) Brittingham asked Cofield: "What is the violation I am suspended for?" She responded: "As you are aware this is now being handled by outside counsel . . . ," to which Brittingham replied: "He refuses to answer. He said it's up to [you] and Fred [Roth] to answer . . . ." (Id.) Brittingham testified credibly at trial that he never received a report of the findings of the external investigation. (Tr. 608.)

On January 5, 2011, Schauble wrote to Nardelli apologizing for how he had handled the "AAC situation as the appointed business leader of that sight;" he also promised to "make sure that the AAC business going forward is a model of compliance, cooperation, performance[,] and quality . . . ."  (PX 77.)

On January 6, 2011, Schauble ghostwrote an apology email from Brittingham to Nardelli that stated:  "I accept that I made some mistakes and should have handled things differently. . . .  There are many policies, practices, information requirements, and expectations that I have not paid enough attention to and for that I apologize."  (PX 78; tr. 433-34, 1082-83.)  The letter does not provide any additional detail.   The letter requests that Brittingham be allowed to be able to return to work so that he can be on site for an impending visit from a military customer.  (PX 78.)

On January 7, 2011, Cofield and Ronchi communicated about bringing Brittingham back from suspension.  (PX 81.)  Ronchi stated:  "Please be thinking about title for Kevin in the event the Board decides to give him a second chance. . . . We will need to rewrite his employment agreement accordingly . . . .  I don't think we need to have all this done by Monday.  In fact, I think we should proceed with the Army visit without Kevin.  Jason can handle it and simply say that Kevin is on leave.  This will send a strong signal – Kevin is not indispensible – we can carry on just fine without him."  (Id.)

Cofield responded:  "In my opinion, AAC should be treated like a plant site (making silencers) just like our other locations.  AAC should not be the exception

39

from working under the same guidelines as our other locations just because they make a different product.  I understand the sensitivity around the different cultures.  However, I'm concerned that because we tried to handle them differently, this contributed to what we are facing now."  (Id.)  On January 8, 2011, Cofield reported to George Kollitides of Cerberus and others at Cerberus and Remington:

> George,
>
> At your request, I am providing the attached document for your approval. . . .
>
> In addition to the term sheet, they [Brittingham and Thompson] will be given an HR Interview Form notifying them of the following:
> 1. 1 year probation in their personnel file
> 2. Mandatory [c]ompliance [t]raining
> 3. No personal [w]eapons or property will be allowed on the property for R&D or marketing purposes without proper requests being filed with HR and bound book entries. . . .
>
> Below are additional comments from Jason that will help provide explanation four our decision.
>
> 1. I reduced KB and LT in order to pay for new compliance, HR, and leadership positions to cover the responsibilities KB and LT can no longer have by board direction (compliance, HR, RP) or to cover the responsibilities I no longer trust them to execute at AAC (overall leadership).  If I am to be held responsible for any indiscretion and am going to be under the microscope on any compliance or policy infractions at AAC and cannot reasonably be on site at all times, I need the tools and personnel to do the job . . . .
>
> 3. . . . I do not think they should just be reinstated at this point "as it was".  They have to understand they have to change to accept our terms or I don't want them.

40

(PX 83.)  The attached "Outline of Terms Sheets for Reinstatement of Kevin Brittingham and Lynsey Thompson" ("Terms Sheet") recite without explanation: "The external investigation found that definite grounds for termination for [C]ause exist."  (Id. at REM080000841.)

The Court finds as a factual matter that defendants lacked Cause to terminate Brittingham and Thompson at the time of their suspension.

X.    Brittingham and Thompson Return to AAC

On January 9, 2011, Brittingham and Thompson were given an "offer" to return:  sign the new employment documents (with substantial changes to the terms of plaintiffs' employment) or face immediate termination.  Brittingham's counsel attempted to negotiate changes to Brittingham's Term Sheet, but all were rejected (though Brittingham's compensation was changed "based on a conversation with him").  (DX 58; tr. 1084.)

Brittingham's Term Sheet included the following "Findings:"

> 1. Findings. The external investigation found that definite grounds for termination for cause exist.  However, the Company is willing to allow you to remain employed at AAC.  Upon receipt of written consent, you will be immediately permitted to return to work upon the terms reflected herein.  These terms will be reflected in a revised employment agreement which you will be required to execute within seven (7) days of receipt.  Failure to execute the revised employment agreement will be viewed as a rejection of the terms of this agreement and will result in the company terminating you with cause based on the findings of the internal investigation.

(PX 84 (emphasis added).)  The Term Sheet then materially altered the terms of the employment by stating:

41

> 2. Probation. Upon return to work, you will be on a 12 month probationary period wherein ANY violation of the Company's compliance policies or a material violation of any other company policy will result in immediate termination for cause . . . [you] . . . will [also] be required to sign an acknowledgement that <u>you may not maintain personal firearms on the premises unless required approval is received from HR</u> and the weapons are properly registered in the Bound Book.

(<u>Id.</u> (emphasis added).)  Brittingham signed after the statement, "I hereby acknowledge that I understand and accept the terms stated above and will sign a revised employment agreement containing these terms."  (<u>Id.</u>)

On January 9, 2011, on FGI letterhead, Cofield provided Brittingham and Thompson with an "Interview Record."  (DXs 60, 61.)  The document states:  "On December 8, 2010, inconsistencies were determined in a compliance investigation that led to you being suspended with pay until the investigation was completed."

(<u>Id.</u>)  Regarding reinstatement, the Interview Record states:

> Details around your probation, title[,] and responsibilities[,] and compensation are outlined in your 'Term Sheet for Reinstatement.'  In addition, the following will be required:
> 1. Mandatory Compliance Training
> 2. No personal firearms or property will be allowed on AAC property for R&D or marketing purposes without proper requests being filed with HR and bound book entries.

(<u>Id.</u>)

On March 1, 2011, Thompson executed her amended EA.  (PX 124.)  No copy of that agreement with an AAC counter-signature is in the record; Cofield nonetheless testified that she signed it.  (Tr. 1280.)

Brittingham consistently refused to execute his amended EA – which, based on the factual record and as explained in more detail below, was closer to an $8 million hold-up than a mutually agreed upon deal.[44]  While a copy of the amended EA was eventually faxed by Thompson to Cofield, Brittingham had never signed it; instead, it had the word "flounder" scribbled on the last page in the signature block. (PX 126.)  At trial, Brittingham denied having written the word "flounder," but the Court found this testimony lacking credibility.  (Tr. 460-61.)  The Court did find credible, however, his testimony that he intentionally did not sign his name to the amended EA and that, in his view, he never entered into the agreement.  (Tr. 462-64.)  As a sophisticated counter-party, Remington could not reasonably have been duped into believing Brittingham had adequately executed the proposed amended EA based on the scribbling on the last page.[45]  Moreover, Remington failed to

---

[44] On February 28, 2011, Brittingham emailed Cofield that he could not execute the amended EA because there were machine guns which were among the Purchased Assets that remained on his FFL and on-site; Brittingham expressed concern that having firearms on his FFL on site could be a violation of the terms of the amended EA.  (PX 130.)  Cofield responded (with Thompson and Schauble copied):  "I understand that Jason [Schauble] has spoken to you about your concern below and explained that this has nothing to do with your employment agreement."  (PX 130.)

[45] As discussed below, while defendants argue that Brittingham returned to work under the modified employment terms, not all acts or omissions constitute partial performance.  See, e.g., Gun Hill Road Serv. Station, Inc. v. ExxonMobil Oil Corp., No. 08 Civ. 7956, 2013 WL 395096, at *6 (S.D.N.Y. Feb. 1, 2013) (finding that plaintiffs' partial performance argument failed because, "[w]hile [defendant's] actions are consistent with an oral modification, they are just as easily explained as an attempt to improve a business relationship with a franchisee and help keep that franchisee selling gasoline for the parties' mutual benefit"); Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc., 401 B.R. 598, 619-20 (Bankr. S.D.N.Y. 2009) (holding that "refraining from accepting competing bids amounts to partial performance of a contract to sell bankruptcy receivables for money" did not constitute partial performance).

execute both amended EAs:  Jackson, the sole Board member of AAC at that time, testified that he was never asked to sign either document.  (Tr. 1227.)

To the extent that Brittingham and Thompson did agree to amended employment terms, however, the Court finds as a factual matter that they did so under false pretenses – as determined above, defendants did not have Cause to terminate either plaintiff at the time of their suspensions.

Despite all of this, both Brittingham and Thompson returned to work at AAC. All compliance responsibilities for the facility were explicitly removed from Brittingham.  (PX 126, § 1.1; tr. 610, 1087 (Brittingham was no longer an RP on site; Nardelli Dep. at 100-01).)  The on-site personnel did not change, however; Remington had still not hired a compliance professional.  Schauble testified that he was told by the "Compliance Committee" of AAC that if Brittingham was brought back from suspension, Schauble would be responsible for him and "how he goes, you go."  (Tr. 1093.)[46]

An organizational chart for AAC dated January 31, 2011 indicates there was an unfilled position for a human resources compliance specialist at AAC and that Mustian held the title of Director, Corporate Compliance.  (DX 68.)  Schauble is

---

[46] Ronchi testified at his deposition that following the suspensions, he expected Schauble to spend more time on site.  (Ronchi Dep. at 174-76.)  When asked whether Schauble in fact spent more time at AAC post-suspension, Ronchi said that he "recalled" that he did.  (Id. at 175,)  Ronchi further testified that he believed Schauble was qualified in compliance matters, and that if Schauble was on site and observed non-compliance, he was expected to address it.  (Id. at 175-76.)  Blackwell stated in his deposition, however, that he did not know who was responsible for compliance at AAC from January 9, 2011 through January 22, 2011.  (Blackwell Dep. at 82-83.)

shown as having overall responsibility for AAC.  (Id.)  Brittingham is described as "Founder, Sales and Marketing Manager;" under him is Robert Silvers as R&D Director. (Id.) Silvers worked off-site, at his home in Boston, Massachusetts.  (See DX 71, Tr. 824.)[47]

XI.   Post-Suspension Events

a.   Efforts to Hire a Compliance Expert

Following plaintiffs' suspensions, Barnes recommended that a compliance specialist be hired.  (Nardelli Dep. at 204.)

On January 14, 2011, Cofield informed the "HR Team" that the Office of the CEO had not approved a new compliance person at AAC – instead a new requisition should be submitted for a joint HR manager/compliance person.  (PX 93.)  Nardelli was copied on this email.  (Id.)

On January 25, 2011, Wagoner emailed Mustian stating:  "My examiner is asking if I have something approved from the ATF giving me permission to sign?" In response, Mustian emailed Wagoner with a message and attachment indicating that Wagoner is an "RP on every FGI firearms license."  (PX 97.)  However, Wagoner testified credibly – and no evidence was offered to the contrary – that she was never, in fact, an "RP."  (Tr. 793.)  Moreover, while Mustian may have been an

_____

[47] On March 3, 2011, Brittingham signed an Acknowledgment that he was "prohibited from bringing personal silencers, firearms or ammunition onto Company property . . . " without first getting approval from Cofield.  (PX 127.)  The Acknowledgement also stated:  "I understand that if I fail to observe the above that the Company shall have grounds to immediately terminate my employment with Cause."  (Id.)  The Acknowledgment does not on its face purport to amend Brittingham's EA.

RP for the FGI firearms licenses, he knew (or should have known) that AAC was still using Old-AAC's FFLs; those FFLs had silencer inventory (which Wagoner had written Mustian about more than a year earlier) as well as firearms that constituted "Purchased Assets."

On March 3, 2011, Mustian wrote to the Department of Justice that "we are hiring a Local Compliance Officer to be onsite at Advanced Armament Corp.  That position will report directly to me and will be extensively trained in these regulatory matters."  (PX 128.)  In fact, there is no evidence that any significant efforts were being made at that time to hire someone who had extensive training (and Mustian was in a position to know this at the time he wrote the letter).[48]

On March 5, 2011, Thompson sent Mustian a list of guns and silencers that were part of Remington's acquisition but had not yet been transferred.  (PX 132.) Thompson stated that they would start transferring the silencers; she did not mention whether the other items would be transferred.  (Id.)

Between March and May 2011, Wagoner filled out a series of NFA Form 3s to transfer firearms from Brittingham's 06236 FFL to the 40006 and 02617 FFLs.  (PX 145.)  This illustrates that almost two years post- acquisition, the FFLs were still not sorted out.

On May 26, 2011, Schauble wrote to Cofield regarding the still unfilled compliance position at AAC.  (PX 147.)  In response, Cofield wrote that "[i]t was put on hold," but that she would look into it.  (Id.)

---

[48] In March of 2011, Jerry Jackson was hired as a combined compliance/HR person. (Nardelli Dep. at 224.)  She stayed only a few weeks.  (Id.; tr. 148.)

In the summer of 2011, Remington hired John Stevens as a part-time consultant to assist with compliance at AAC.  (Tr. 1162.)  Stevens testified at trial that he was hired "to interact with the employees of the facility and to assure that compliance matters were being addressed."  (Tr. 1162; see also Ronchi Dep. at 205.) The Compliance Committee was not involved in hiring Stevens.  (Nardelli Dep. at 206.)[49]

Stevens was singularly unqualified for the job.  His background and experience related primarily to criminal investigations.  (Tr. 1157-58.)  He had never been involved in ATF compliance in the gun manufacturing industry.  (Tr. 1159.)  Indeed, Ronchi testified at his deposition that Stevens "didn't represent that he had extensive experience with [compliance prior to being hired]. . . .  [Stevens] represented that that was not a particular expertise of his . . . ."  (Ronchi Dep. at 209-10.)[50]  Stevens' training consisted of a four-day course with FGI's outside counsel, Mark Barnes.  (Tr. 1163.)[51]

The individuals who worked most closely with AAC did not view Stevens as an adequate answer to its compliance needs – and they were right.  For instance, on June 13, 2011, Schauble wrote to Cofield that he understood that Remington was considering hiring Stevens to fill the compliance role at AAC; Schauble expressed

---

[49] Ronchi never met Stevens prior to the time he was hired.  (Ronchi Dep. at 231.)
[50] Ronchi further testified at his deposition that he "certainly wasn't qualified to determine [Stevens'] exerptise with federal firearms regulation . . . ."  (Rochni Decl. at 221.)  He did state, however, that Stevens had personal relationships with staff members at the Atlanta ATF, which he believed would be beneficial.  (Id.)
[51] Stevens became an RP on the 06236 FFL; but, he did not learn until his deposition in this matter that he had also been made an RP on the 05775 FL.  (Tr. 1165, 1180.)

concern about Stevens.  (PX 148.)  On June 14, 2011, Blackwell emailed Cofield and stated:  "Is this really a compliance role or a babysitter?  I see his resume and he has nothing from a compliance [point of view]."  (PX 149.)

On June 15, 2011, after speaking with Stevens in a "round-table discussion" that included Nardelli, Roth, and Mustian (see PX 152), Blackwell again expressed his concerns in an email to Schauble:  "He's a consultant – and knows little about our compliance issues/challenges.  I got [the] impression we'll be training him while at AAC."  (PX 153.)  Schauble responded, "I need someone to take some of the hr and compliance ppwk load off [L]ynsey and [K]athy.  Instead, I get an overqualified consultant that won't do anything to relieve the workload."  (Id. ("Great guy.  Really interesting.  Totally not what we need to make [AAC] run more smoothly").)

Nonetheless, on August 18, 2011, Roth informed Blackwell and Schauble that Stevens "has completed his initial ATF training."  (PX 169.)  Stevens stated:  "Roger [Mustian] and I will continue to support and facilitate the practical aspects of the compliance program as he grows in the program."  (Id.)  Roth also stated that "we will implement an audit of the bound book . . . and mak[e] sure that the firearms and silencer lockers, 'check-out' rules and procedures, etc. are in order.  We will also reconcile the locker inventory."  (PX 169.)  Roth further reported that Schauble had listed three items concerning activities at AAC:  "(i) audit bound book, (ii) implement automated form filer, and (iii) vault inventory tracking."  (PX 169.)  Roth wrote:  "It appears that items (i) and (iii) have already been discussed with John [Stevens] and will be initiated next week, with Roger's support. . . .  Shortly, John

will be named as an Assistant Secretary for Compliance at AAC and then qualified as an RP." (Id.)[52]

On August 21, 2011, Schauble wrote to Blackwell that Stevens had told Thompson that he was not going to do "grunt work" on compliance; instead, he was a "success mediator." (PX 203.) Earlier that day, Brittingham had written to Schauble and Blackwell expressing concerns about compliance: "I really don't understand how we went from needing a compliance person for two years to receiving a 'success mediator.'" (Id. at REM06002720.) Brittingham wrote: "I feel these are bad decisions that continue to strangle AAC. The company is being destroyed. These decisions contradict the spirit and intent of the acquisition." (Id.)

On October 5, 2011, Schauble wrote to Blackwell that "based on Lynsey's two emails, [AAC] still needs a clerk to improve compliance and work on projects, and [S]tevens is not holding up his end and is not worth 2k/wk." (PX 180.)

Further illustrating Stevens' insufficiency as a compliance specialist is all of the following:

- Stevens did not understand the terms of the APA and did not have access to the Acquired or Excluded Asset lists; (tr. 1182)

- Stevens did not know that the 02617 FFL was used post-acquisition to operate AAC; (tr. 1182)

---

[52] Had Stevens been qualified and understood what needed to be accomplished at AAC, the issues that led to Brittingham and Thompson's terminations would not have occurred. If, for instance, it had become important to AAC that firearms on the 06236 and 40006 FFLs that had not been acquired as part of the APA should no longer be used, Stevens could have caused the project to segregate the firearms. This is not how the events unfolded.

- Stevens did not know whether or which firearms were moved from Norcross to Lawrenceville; (tr. 1183)

- No one at FGI had provided a definition to Stevens of "personal firearms," nor had Stevens been told that Brittingham was not to bring personal firearms to AAC.  (Tr. 1167, 1188, 1192-93 (indeed, Stevens did not know that Brittingham had previously been suspended).)[53]

Additionally, Stevens testified that he participated in an audit in the fall of 2011 with Mark Barnes and Kathy Love – during which he claims to have found about a half dozen firearms belonging to Brittingham.  (Tr. 1166.)  He claims he spoke to Brittingham about the issue and "not to do it again."  (Tr. 1167.)  This testimony lacked credibility.  In contrast, Brittingham testified credibly that Stevens did not tell him in September 2011 to remove certain firearms from AAC's premises.  (Tr. 178.)

Further undermining Stevens' testimony regarding an earlier warning is the absence of evidence as to how Stevens and Love (who testified she was not an expert in firearms) would have had the necessary information to determine which firearms were Brittingham's and which belonged to AAC.[54]  In addition, even according to defendants' version of events, it would have been unlikely that a mere half dozen

---

[53] Moreover, there is no evidence that Stevens ever sought to ensure all necessary steps had been taken to transfer the machine guns.  On September 6, 2011, Wolfe and Wagoner communicated about the transfer of the machine guns Remington had acquired off Brittingham's FFL:  "Come to think of it, you may have only done the silencers, I think Roger might have been the one who was suppose to have done the MG's b/c they needed law letters.  Not sure if this was ever done."  (PX 172.)
[54] A later project by AAC employee Knox Williams demonstrates how confused of an endeavor this would have been.  (See infra.)

firearms not listed in an AAC bound book would have been the sum of that revealed during any real audit – far more than half a dozen firearms were not listed in any bound book.  (See supra.)

    b.  Efforts to Terminate Brittingham

As described in more depth below, an incident occurred in October 2011 that defendants argue led to Brittingham's eventual for-Cause termination.  Specifically, in October 2011, Knox Williams compiled a list of firearms on AAC's premises but not owned by AAC; defendants argue this list evidenced the fact that Brittingham was keeping his personal firearms on AAC's premises in violation of his EA, providing Cause for termination.  What became clear at trial, however, was that the list was unreliable; it also became clear that while Schauble was not told about the existence of the list until late-November 2011, efforts to terminate Brittingham began as early as February of 2011.[55]

For example, still smarting from his unexplained suspension, on February 18, 2011, Brittingham asked Mustian certain questions regarding disposition of the antique silencer that purportedly justified his suspension.  (DX 73.)  The email sarcastically stated:  "Thanks for all of the help from you and Fred throughout this difficult process.  You guys are a real treat at FGI . . . it's amazing you both have not been promoted within the past couple of months."  (Id.)  Schauble forwarded the

---

[55] Defendants argue that so long as they had Cause to terminate plaintiffs, their motive for doing so was irrelevant.  (See Defendants' Proposed Findings of Fact and Conclusions of Law ("Defs.' Post-Trial Mem.") at 46, Aug. 2, 2013, ECF No. 170 (citing cases).)  Defendants' motive is relevant to whether they breached the covenant of good faith and fair dealing, however.

email to Cofield and stated, "I need to talk to you today. . . .  I want to take action on Kevin Brittingham for the way he is behaving.  I cannot tolerate it anymore . . . ." (Id.)

Two days later, Schauble wrote to Cofield again regarding Brittingham:  "We have to discuss timing and whether I have grounds, which I believe we do bc of the probationary period."  (DX 75; tr. 1119-21.)  Among the "grounds" that Schauble recited were (1) showing up late for compliance training (5 minutes); submitting a travel claim for $3,000 spent on entertainment at a strip club; (3) repeated attempts to "go around his chain of command;" (4) a lack of remorse for his "transgressions;" and (5) repeated complaints as well as threats that if Remington gets rid of him, AAC will be ruined.  (DX 75; tr. 1120-21.)  At trial, Schauble agreed that these enumerated reasons were not sufficient grounds to terminate Brittingham – but that he believed Brittingham's behavior "was inappropriate for his role."  (Tr. 1121.) Schauble testified, "I think you could say that I was not a big fan of Kevin Brittingham in 2011."  (Tr. 1137.)

On February 20, 2011, Schauble wrote an email to Cofield that stated:

> Bottom line:  he has not truly accepted responsibility for his actions and their consequences and continues to be a cancer. . . .  The price of his entrepreneurial spirit is too much for me to continue to bear and I want to call his bluff.

(DX 75.)  After suggesting termination, Schauble played out what might happen:

> . . . Kevin sues us (which he will – we defend – we make him spend what it takes to go after the money at the back end on principle and use the grounds for termination for

> cause in the investigation as the cornerstone of our
> defense for our actions).
>
> I just don't like him as a man bc I think he is completely
> selfish . . . .  I would rather have someone there like Chad.
> . . .  We pay [Brittingham] too much to not be doing the
> same amount of professional complex problem solving you
> and I do on a daily basis.

(DX 75 at REM 170018810.)

On November 4, 2011, Blackwell wrote to Jackson in an email with the subject line, "AAC leadership and 2012." (PX 199.)  The email chain starts with a communication from Blackwell to Cofield and Schauble about whether Brittingham and Thompson would be entitled to a reversion to their original salaries at the end of the probationary period.  (Id. at REM070003631.)  He stated that he needed to gather information for a call with Nardelli.  (Id.)  He states "I intend to set up a time for a call with [Nardelli] and review this with him knowing his position ref AAC."  (Id.)

On November 11, 2011, Schauble wrote Day with a subject line:  "Knox is quitting AAC." (PX212.)  "There goes the planner for SHOT, American Silencer Association, and Silencer Shoot.  Apparently he wrote a letter which I can't wait to see bc KB is going to tell me that it is FGI again just like Ethan but really its all about KBF.  The noose is closing."  (Id.)

On Monday, November 14, 2011, Schauble told Blackwell (at that point Schauble's boss and the president of FGI) that he was meeting with Stevens later that week and would be discussing compliance at AAC.  (PX 214; tr. 1131.)

53

Schauble testified credibly at trial that he did not meet with Stevens regarding compliance at AAC until November 29, 2011.  (Tr. 1106-08.)

On November 16, 2011, Schauble wrote to Blackwell:

> I think you and I should seriously consider a Plan B for this business. . . .  If we terminate [Brittingham] at our discretion before the end of his year, we might lose Lynsey and we might lose Robert, and we might get sued, but we will keep a lot of other people and I'll personally go down there and put people in place that will endure in the longer term and continue to grow this business.  Also, this move will get Bob on board and de-risk this business. . . . [T]he time is now to consider before we double down on our investment of a lot of our personal capital getting him his title and $$ back and enduring his inability to work within our system.

(PX 217 at REM 060002635.)

On Thursday, November 17, 2011, Schauble wrote to Blackwell:

> I have researched our Plan B options with APA, old employment agreements, new employment agreements, term sheets with probation statements, etc and can give you the bottom line tomorrow . . . .  I also thought through various replacement options . . . .
>
> I think we are at the juncture to discuss whether we want to make a leadership change for the long term at AAC if we believe that KB is not up to the task.  If we do, we have until Jan. 9 or else it becomes a ton harder bc probationary period ends. . . .

(PX 219.)

Schauble testified that based on Stevens' October audit, during which he had Brittingham remove firearms from the premises, Schauble determined that Brittingham was "not operating within the spirit and intent of our compliance policy or the word of that policy."  (Tr. 1107-08.)  According to Schauble's testimony,

54

it was at this point that he had a conversation with Blackwell in which he suggested that Brittingham should be terminated.  (Tr. 1108.)  Schauble testified that in his view, Brittingham was fired because he "repeatedly and . . . purposefully . . . undermined the chain of command and did not want to follow rules and regulations."  (Tr. 1112.)  Crediting this testimony, it is clear that a decision had been made prior to November 29, 2012 to terminate Brittingham.[56]

Despite all of this, there is no dispute – and the record fully supports – that in 2011, Brittingham had grown AAC by 100%, had greater than 55% profitability, had won a significant government contract, had developed protocols to compete for another significant government contract, had launched a new line of silencers (the 300 Blackout), and had diversified AAC's product line beyond the silencers industry. (PX 227.)

By December 7, 2011, Schauble was in high gear to terminate Brittingham and replace him with his own choice.  (PX 245.)  He suggested several individuals who would run the facility once Brittingham was terminated.  (Id.)  In the morning of December 8, 2011, Schauble provided Blackwell and Cofield with a summary of Remington's deal with Brittingham, and his view as to how termination would "make this 8 v 4" – or an $8 million savings versus $4 million savings.  (PX 247.)[57]

---

[56] Ronchi testified at his deposition that the Office of the CEO was notified of the issues in December 2011.  (Ronchi Dep. at 255, 258.)

[57] Schauble wrote:  "The modifier 'and' [in § 1.8(a) of the APA] is what I believe makes this 8 v 4 (and the deal summary slide from our confirmation brief in 1009), but this will be for the lawyers to sort out post event."  (PX 247.)

Later that same afternoon, Schauble asked Stevens for a statement relating to compliance issues with Brittingham.  (PX 246; Stevens Dep., Ex. 240.)

On December 12, 2011, Schauble drafted an email with an "AAC Plan" for "post KB."  (PX 249.)  Among the issues was reconciliation of AAC's owned firearms with its own bound book, as well as hiring a compliance specialist.  (Id.)  Blackwell and Schauble had a number of additional communications over the next week regarding who would be chosen to run AAC and how the entity would be handled after Brittingham was terminated.  (PXs 252, 253.)

On the morning of December 19, 2011, Blackwell informed Schauble that he had spoken with Nardelli and was adamant that "AAC will not be a separate P&L going forward. . . ."  (PX 263.)  Schauble testified at trial that he did not believe that going to a "matrix" type organization, in which AAC would be treated like a plant in the larger organization, was consistent with his view of how AAC should be operated.  (Tr. 1141.)

At 5:00 p.m. that day, Schauble sent his letter of resignation to Blackwell. (PX 259.)  Schauble explained:  "I just don't feel that we (fgi) have a fundamental philosophy that I can reconcile with on many levels."  (PX 259.)  He also stated that he objected to the manner in which the AAC business had been handled, the plan to "matrix" it, and the "lack of leadership overall."  (Id.)  He concluded by stating, "I'm sure you guys can figure out how to fire Kevin on your own, but I cannot in good conscience get rid of the leadership team at AAC without a plan I can support to replace them . . . ."  (PX 259.)

c. <u>The SHOT Show Photo Shoot</u>

Despite all of the aforementioned evidence that defendants sought to terminate Brittingham in the winter/spring of 2011, defendants argue that the incident provoking Brittingham's termination occurred in October 2011, when a photo shoot of various firearms was held at AAC.  (Tr. 1168.)[58]

In connection with this photo shoot, certain silencers and guns were brought to AAC and displayed.  (Tr. 295-302, 508-28.)  There is no evidence in the record that Brittingham sought or obtained permission from HR prior to the firearms being brought to AAC.  When walked through footage of the video made as part of the photo shoot, Brittingham testified that he was unsure whether certain guns were his, whether they were operable, or how they would have gotten to AAC.  (Tr. 507-28.)  This testimony lacked credibility.  It was evident that many of the guns used in the photo shoot were in fact Brittingham's; he or someone at his direction clearly had brought them to AAC.  However, Brittingham was present for the entire period of the photo shoot.  (Tr. 970.)[59]

_____

[58] Prior to the photo shoot, there also was a video shoot for Michael Bane to be aired on the Outdoor Channel, for which "multiple guns [ ] were brought in."  (<u>See</u> tr. 285.)  The footage was used as part of a video shown on a television show; this video featured AAC (not Brittingham personally); it may fairly be inferred that the video shoot was advantageous to AAC's overall image and business.

[59] As such, pursuant to the definition provided by Mustian of dominion and control, Brittingham exercised lawful dominion and control over the firearms and had not violated any rule or regulation.  As for whether Brittingham was in violation of the law following the photo shoot, insufficient evidence was offered at trial regarding how long these firearms remained at AAC (i.e., whether their presence exceeded an otherwise lawful period of time).

i. <u>Stevens' Visit to AAC and the Creation of the Knox Williams List</u>

Shortly after the photo shoot, Stevens visited the AAC site.  (Tr. 1168.)
According to Brittingham, who testified credibly on this issue, Stevens told him that
Barnes was coming to audit the premises and in his role as head of compliance,
Stevens wanted to ensure that firearms not in the AAC bound book were removed
from the premises.  (Tr. 530.)

According to Stevens, who acted evasively when he answered questions about
this important day in October 2011, once he saw the photo shoot firearms still on
the premises, he determined that he would immediately segregate all of the AAC
Purchased Asset firearms from the others – what he referred to as Brittingham's
firearms.  (Tr. 1168.)[60]  Stevens testified that he told Brittingham to remove "his"
weapons from the facility because of the upcoming audit.  (Tr. 1168-69.)  Stevens
stated that Brittingham then started identifying his weapons and laying them on
the floor of the manufacturing facility.  (Tr. 1169; <u>but see</u> tr. 251-52 (explaining that
while Brittingham "was around moving guns around," Williams, Stevens, Love, and
Hollister organized the firearms).)  As part of this work, Knox Williams compiled a
handwritten list that sought to identify each firearm and its rightful owner ("the
Knox Williams List").

---

[60] Stevens' testimony is particularly unconvincing in light of the value and rarity of
those firearms and based on the fact that they are not among those which were
later listed on the "Knox Williams List."  (<u>See</u> <u>infra</u>.)

Stevens stated that he told Brittingham to remove the firearms that were in the "Brittingham" pile from AAC. (Tr. 1169.)[61]  Brittingham testified credibly that there was confusion that day regarding which guns belonged to AAC and which had not been acquired by AAC; Knox Williams echoed this testimony. (Tr. 531, 265-66.) Brittingham testified that a lot of the guns were not his – they had been purchased by AAC but their information had not been transferred to the appropriate bound book. (Tr. 532.)  A few days after Brittingham was asked to remove firearms from AAC, he was asked to bring certain of them back. (Tr. 531.)

A number of the firearms on the Knox Williams List were, however, on the Excluded Asset List – which Brittingham concedes. (See, e.g., tr. 534-40.)  There were also unidentified firearms (i.e., firearms not listed on any FFL or on the Excluded Asset list) on the Knox Williams List. (Tr. 554-55.)

It total, the Knox Williams List included 69 firearms. (PX 179.)  After extensive testimony with respect to each and every firearm on the list, it is clear that at the time the list was created, there was great confusion regarding which firearms AAC itself owned and which it did not own; it also is clear that there was no necessary correlation between those firearms on the 40006 and 02617 FFLs and what Brittingham lawfully and exclusively owned.

Indeed, the testimony made apparent that there was confusion about numerous firearms that had been placed into the "Brittingham pile" – and that in the absence of finding a bound book entry, the firearms were placed by default into

---

[61] Brittingham does not recall another occasion when Stevens requested that he remove firearms (including machine guns) from AAC's premises. (Tr. 499.)

that pile.  (See, e.g., DX 109; tr. 254 (explaining that they put "the unknowns and what [they] thought were Brittingham's firearms into another pile") (emphasis added).)  Brittingham testified credibly that some of the firearms on the list had been acquired by AAC post-acquisition (and were therefore owned by AAC).  (Tr. 617.)  For instance, Brittingham did not own an FN45 but recalled that AAC had acquired one in the last year that he was at AAC (tr. 617); similarly, the CMMG AR nine millimeter was acquired by AAC after it moved to Lawrenceville for an R&D project specifically for Remington (tr. 618); the P22 brand pink was a common type of .22 – AAC had some that it used for R&D (Brittingham conceded that he owned one as well – but it was impossible to tell if the one on the list was one of AAC's or the one he had purchased) (tr. 619); the REPR had also been purchased by AAC for R&D purposes (tr. 619); the PPS/70PPSSD  was not a gun which Brittingham had ever owned, but he was aware that it was among a group of guns that Remington sent to AAC post-acquisition for the executive demonstration (tr. 620); Brittingham testified credibly that the 10/22 was the most common .22 in the world and that millions of them have been made – the "Phoenix" portion was a silencer added (the silencer then became a part of the firearm and was therefore a type of "integral firearm") (tr. 620); Brittingham also testified that the Handy Rifle prototype was not a gun he owned, but was made by one of the FGI companies and that an FGI company built them to support AAC's development of a "300 Blackout Cartridge" that would work with it (tr. 621); the Crink also does not belong to Brittingham's collection but had been used for the 300 Blackout Cartridge project (tr. 622); the Sig

522 was not a gun from his personal collection but was one owned by AAC (AAC used it for R&D) (tr. 622); the HK P9S was a common gun that Brittingham, and additionally, several employees owned (tr. 622); the Kimber .22 was not part of Brittingham's collection (tr. 622); the DPMS AR10 and several others listed below were part of the executive demonstration and had been sent to AAC post-acquisition for that purpose.  (Tr. 622-23.)

In short, the credible evidence demonstrates by more than a preponderance that the Knox Williams List was not a list of Brittingham's personal firearms – it was a List that included firearms that, as of October 18, 2011, were not appropriately listed in a bound book; it illustrated that when it came to knowing who owned which firearm, confusion reigned at AAC.[62]

At the time he created the list, Williams knew that the information he was relying on to separate the guns into the two piles was incomplete.  (Tr. 256-57.)  He understood that even though they considered the firearms which were not in AAC's bound books to be Brittingham's, in fact not all of them were.  (Tr. 257.)  He agreed that some of the firearms they had deemed to be Brittingham's turned out to belong to AAC.  (Tr. 257.)  He said that he was instructed to place any firearms about which he had questions in Brittingham's pile.  (Tr. 258.)

Williams testified that he could not tell from the list the location of where the guns were found – whether they came from the vault, the R&D area, or some other

---

[62] Notably missing from the list, and therefore not present at AAC on the Knox Williams List, were the various antique Winchester rifles, the De Lisle replica, and several maxim silencers, which had been part of the Bane shoot.

location within the building.  (Tr. 259-60.)  Williams acknowledged at trial that

employees regularly used the guns that were put into Brittingham's pile for R&D,

testing, demonstrations, and marketing, and that employees would transport the

guns from Norcross to Lawrenceville for those purposes.  (Tr. 261, 283.)  Williams

knew that the guns came in and out of AAC's Lawrenceville facility fairly regularly,

but was unable to say who brought them onto the premises.  (Tr. 261-62.)  He was

unable to state whether any of the guns on his list had been on AAC's premises for

more than seven (or 30) days.  (Tr. 262-63.)

After compiling his handwritten list, Williams transferred the information

into a spreadsheet.  (PX 200; tr. 263.)  Williams tried to determine which guns were

lawfully whose.  (Tr. 263.)  However, when he was preparing the spreadsheet,

Williams did not have access to the Purchased or Excluded Asset lists from the

APA.  (Tr. 264.)  He conceded that the creation of the spreadsheets and trying to

reconcile all of the information relating to the firearms was a complicated project

and confusing to him.  (Tr. 265-66; see also PX 200.)

Importantly, the vast majority the firearms on the Knox List Williams were

accounted for at trial – indeed, based on the evidence presented, all but one of the

items on the List served a legitimate business purpose for AAC business:[63]

- A number of the firearms on the Knox Williams List belonged to AAC (not

  Brittingham) – for example, the Marlin PPS/ 70 PPS SD, serial number

---

[63] The sole firearm that used for the photo shoot and no other purpose was a
silencer:  10/22/ Phoenix, serial number 252-95554/1022-074.  (PX 179 at
REM040000257.)

91523942/ S91523492; Handi Rifle Prototype, serial number CBA 293645/ ti 0001 (made by Remington, likely manufactured in 2010); Krink, serial number KO 460008 (which was built for a specific "300 Blackout Program"); and Sig 522, serial number XA 003888 (AAC used for testing; Brittingham did not own one);

- Remington executives attended a demonstration at AAC, for which many of the firearms on the List had been sent to AAC; (tr. 619-20)

- A number of other firearms on the List had been brought to a SHOT Show for demonstration purposes; AAC personnel had transported them back to the Lawrenceville facility and "dumped" them on the floor of the vault after a disagreement regarding who was responsible for cleaning up the demonstration (there is no evidence that Brittingham was at this demonstration or played any role in identifying guns to be brought to it, or that he was part of the cleanup following it); (tr. 910-11)

- Many of the firearms on the List were used by AAC in connection with work in 2011 on a series of bids for military contracts or other AAC R&D efforts (tr. 907-40) – Remington personnel were on site, assisting with completing the bids and would have seen firearms on the List being utilized in connection therewith.[64]

---

[64] Moreover, Lessard testified credibly that he transported most if not all of the firearms used for development work at AAC from the Old-AAC Norcross facility to AAC's facility in Lawrenceville.  (Tr. 890-91.)  He was not explicitly directed by Brittingham to bring certain of the firearms to AAC.  (Tr. 891 (explaining that Brittingham left the keys in his vehicles and permitted Lessard to take them as

The Court had an opportunity to see Williams testify live and he seemed quite intelligent; this, combined with the clear complexity of the situation, leads the Court to infer that the project of sorting out who owned what and what belonged where was in fact a difficult exercise.  Williams testified that the exercise was akin to a puzzle – and that the project was still incomplete at the time he resigned from AAC in mid-November 2011.[65]  (Tr. 267.)

ii.  Aftermath of the Knox Williams List

On November 9, 2011, Brittingham and Schauble were in communication regarding the ongoing compliance issues; Brittingham continued to express concern that Remington had promised compliance assistance but had not provided it, and that he would be fired for something that he could not control.  (DX 114.)  Also on November 9, 2011, Schauble promised Brittingham and Thompson that he would make sure that hiring a true compliance specialist at AAC would be a "priority fill" and that he intended to speak with Nardelli the following week about how Stevens was not up to the job.  (PX 204.)

Williams had a conversation with Stevens about the spreadsheets he made around November 18, 2011 (after he had resigned).  (Tr. 268.)  At that time, Williams believed that there were still many uncertainties regarding the guns on the spreadsheets.  (Tr. 268.)  Williams was quite clear in his testimony that AAC's

---

needed).)  Williams testified that he recalled several individuals bringing guns from Norcross to AAC, including Lessard, Mike Smith and Eric Burt (both Smith and Burt were supervised by Lessard).  (Tr. 283, 883.)

[65] As of November 3, 2011, the information on the "Knox Williams List" had still not been fully reconciled with the information contained in the bound books.  (Tr. 341.)

own bound book did not accurately reflect guns on the premises and that this issue was being worked on, but had not been resolved, when Williams resigned.  (Tr. 249.) Stevens testified that he did not ask anyone to continue working on the list following Williams' resignation.  (Tr. 1185.)  Instead, Stevens presented the list to Schauble as complete.  (Tr. 1172-73, 1183, 1185.)

Schauble and Stevens testified that they did not actually discuss the compliance issues raised by the Knox Williams List until November 29, 2011.  (Tr. 1106-07; see also PX 222.)  Schauble testified incredibly at trial that it was this conversation with Stevens that "changed everything" as far as his plans for Brittingham were concerned.  (Tr. 1106-07.)  According to Schauble, at the meeting he had with Stevens, Stevens presented him with "clear cut" information that Brittingham had violated the terms of his probation.  (Tr. 1107.)  This testimony lacked credibility and contradicted the evidence.

Rather, the preponderance of the credible evidence demonstrated that the Knox Williams List was an inaccurate and unreliable document, plainly insufficient upon which to base Brittingham's termination.  First, Stevens took no steps to determine if, how, and why any of the firearms on the list may have been actively in use for AAC R&D.  Indeed, on October 18, 2011, Stevens did not know what R&D projects Brittingham was working on at AAC.  (Tr. 1187-88 (during the entire time that Stevens worked at AAC, he never learned what R&D projects Brittingham was working on with one exception, "the piston issue").)  Second, Stevens provided no testimony as to an investigation into how the firearms got onto AAC's premises (for

instance, whether they had been there as of the date of the move from Norcross to Lawrenceville, as a result of advice from Mustian that commingling was fine so long as Brittingham was "in the envelope").  Third, there was no evidence of an investigation to determine how long the various firearms had been on the premise, and whether Brittingham was, in fact, the individual who (directly or indirectly) was responsible for them being at AAC.

Schauble understood that the list of firearms Stevens attributed to Brittingham contained a number of inaccuracies.  He reviewed the spreadsheet himself and on November 30, 2011, provided Stevens with a number of tasks to be done to correct the list.  (PX 230.)  Among the tasks were the following:

> 2) Figure out what AAC has purchased or manufactured since the acquisition that is on this list versus what is owned by Kevin Brittingham and designate those appropriately – I can tell you that the Remington 1911, Remington 51, Remington 7s and 700s, Bushmaster ACR, etc[.] were all brought by FGI post acquisition and MPWs were manufactured by AAC.

> 3) Locate the following silencers on the acquisition list that were not in the spreadsheet . . .

> . . .

> 5) Create a procedure for [F]orm 3s to accompany every firearm or silencer that requires one

> 6) Create a procedure for checking firearms in and out of the vault so we have full accountability

> 7) Recall all firearms back to AAC that are owned by AAC for scheduled January physical inventory and institute new check out procedures at that time[ ]

> 8) Remove all firearms from premises that are not owned
> by AAC and force Kevin to ask for written permission to
> bring personal firearms into the building[.]

(PX 230.)  Later that day, Schauble responded to Stevens:

> We need to close with this information as soon as possible
> and you can get any help you need from the AAC team as
> you have briefed Kevin and I and we (AAC) need to take
> measures to put ourselves in a position of better
> compliance as rapidly as possible.  As discussed, I will be
> working with my leadership to take appropriate actions
> based on what has already occurred but at this time we
> cannot delay taking actions that are necessary[.]

(PX 231.)

On December 1, 2011, Stevens delegated to Wolfe and Love authority to

execute instruments on three FFLs, including the Old-AAC FFL.  (PXs 233, 234.)

On December 2, 2011, Stevens wrote to Schauble regarding a number of steps that

he was then working on with AAC to take to bring the facility into basic compliance,

including:

> [P]iec[ing] together an SOP for "Visitor Weapon Storage
> at the AAC location. . . . ."  I told Lynsey we need separate
> locks for the indentified visitor holding areas in the
> CONEX and will produce clear signage identifying the
> space and procedures.  The procedure will also include
> strict adherence to mandated travel paperwork and time
> limits.
>
> I am at the plant now and just completed a conference call
> addressing the acquisition of machine guns and silencers.
> I have attached a spreadsheet of what we have identified.
> The items in yellow have been formed 3'ed and
> transferred to the new FFL. . . .
>
> . . .

> We have also been working on a[] plant wide SOP for receiving, manufacturing, storage[,] and shipping and handling. As you see, this is also where we have addressed the DBA and electronic [b]ound [b]ook issues with Brian's team.
>
> . . .
>
> I will be ready to immediately step in to assist as soon as the management action has taken place and <u>has changed commands if you will</u>. . . . I am willing to do what is needed and what you believe is best according to your plan. . . .

(PX 239 (emphasis added).)

On December 16, 2011, Schauble wrote to Blackwell regarding a number of outstanding items relating to AAC. (PX 264.) He reiterated the need for Blackwell to assist in hiring a compliance specialist for AAC. (<u>Id.</u> at REM060001106.)

On December 19, 2011, Wolfe and Love were still attempting to reconcile entries in the bound books and to ensure the proper firearms were included. (PX 267.) Wolfe reiterated her concern that the DBA software program was not recording entries properly. (<u>Id.</u>)[66]

On December 20, 2011, Stevens provided the ATF with several Form 3 applications for the transfer of silencers from the Norcross FFL to the Lawrenceville FFL – he represented that "AAC <u>recently</u> relocated its licensed premises from Norcross, GA to Lawrenceville, GA. . . . It has been in the process of moving operations from the Norcross site and transferring its NFA firearms to the new

---

[66] On January 3, 2012, Wolfe and Love continued to communicate about the transfer of firearms between FFLs. (PX 282.)

license . . . ." (PX 271 (emphasis added).)  The use of the word "recent" was misleading and clearly designed to obscure AAC's recordkeeping issues.

## X. Brittingham's Termination

On December 20, 2011, the night before Brittingham was to be fired, he went to AAC and removed some personal items (and possibly one machine gun).  (Tr. 193-94.)  A fair amount of time was spent during the trial on the uncontested fact that when Brittingham entered the facility, he purposefully turned a video security camera downwards so that it would not be able to record images of what he was removing; Brittingham does not deny taking certain items, but asserts he took only his personal property, fearing his impending termination.  (Tr. 193-94; 562-64.)  The Court finds this testimony is certainly demonstrative of the depths of mistrust between AAC and Brittingham.  There is insufficient evidence that Brittingham took any of the firearms defendants claim were converted, however.[67]

---

[67] There was also a fair amount of testimony at trial about the uncontested fact that Brittingham and Thompson exchanged a significant number of text messages that same evening.  Defendants attribute nefarious purposes to this exchange – and have asked this Court to draw an adverse inference regarding the content of those texts since the content was not produced.  The Court declines to draw an adverse inference in the sense that defendants seek.  A variety of circumstantial evidence at trial left no doubt that Brittingham and Thompson shared a very close relationship – the parameters of which were never explained.  That it went beyond the professional into the personal was apparent and acknowledged.  It is unsurprising that Brittingham and Thompson exchanged a large number of texts that night, and the Court accepts that the content of these texts would have involved arranging to go to AAC, opening the vault at AAC, and various matters regarding the removal of Brittingham's property from AAC.

In addition, the Court finds it likely that a number of such texts would have involved an exchange of thoughts regarding Brittingham's sense that he was shortly to be fired from the company he had built.  The Court declines to find that the texts somehow revealed that Brittingham was taking the very firearms that are part of

Brittingham was terminated the morning of December 21, 2011.[68]  (PX 275.)
That same day, Remington took a step in mere hours that it had declined to take for
the two years prior:  it hired a real compliance specialist.  By mid-day on December
21, 2011, Corey Weisnicht was promoted from within AAC to fill the position.  (See
PX 278.)  At trial, Weisnicht testified that he was only approached that morning
about taking the new position and that he immediately accepted.  (Tr. 1339.)  At the
time of his termination, AAC had grown from manufacturing approximately 100
silencers per week as of the date of its acquisition, to five or six times that amount.
(Tr. 92.)

    Brittingham testified that at no time after he returned from suspension on
January 9, 2011 until he was fired did he receive written notice from AAC that he
had violated its code of conduct.  (Tr. 599.)  He was also never provided notice that
he had violated the employee reference manual.  (Tr. 599.)

    On December 23, 2011, Nardelli wrote to the Board of FGI about FGI's
business during the course of 2011.  (PX 280.)  This letter evinces Nardelli's
strategy of altering structured aspects of the overall company; Brittingham's

the group defendants claim were converted.  With the hundreds of firearms at AAC
that were on Brittingham's FFLs, there is no evidence that any on the converted list
were of a nature that would have had a particular use or appeal to Brittingham.  It
is not, for instance, as if AAC was stripped of the bulk of its firearms the night of
December 20, 2011.  In fact, it is unclear whether those on the "converted" list were
in fact sent away with Brittingham in October, were left at a demo event when AAC
personnel fought over clean up, or something else.
[68] Blackwell's deposition testimony suggests that Cofield, Ronchi, and Nardelli
made the decision to terminate Brittingham, in conjunction with Schauble and
Stevens.  (Blackwell Dep. at 106, 118.)

position and the separate AAC P&L structure needed to be eliminated.[69]  Nardelli

noted that "our execution fell short of expectations. . . .  The journey begins in

operations, where from the very start of the year we failed to hit our plans.  In

Mayfield [another facility owned by FGI], for example, the average daily production

for the first two months of the year was less than 60% of plan."  (Id.)  He discussed

walking the facilities to try and determine how to address operational problems –

and outlined the changes he had made across FGI's business:  "Within days of our

first visits we began to make changes in the management team in operations.  We

eliminated the COO layer in order to gain greater visibility by having the plant

managers report directly to us. . . ."  (Id. at REM130018387.)  He discussed a host of

other production issues that had been addressed, including a spike in product

liability lawsuits relating to guns manufactured by one of FGI's companies and the

resolution of numerous OSHA violations at another.  (Id. at REM130018388-89.)

The letter notes that significant misses in sales and EBITDA expectations for 2011.

(Id. at REM1300018389.)  At the end of the letter, it states "we want to make the

entire Board aware of a decision taken in the last couple of days and reviewed with

the Compliance Committee.  On December 21st, Kevin Brittingham, founder and

former president of AAC, was separated from the company for [C]ause. . . ."  (Id. at

REM 130018390.)

    On January 5, 2012, Nardelli wrote to all employees at FGI that:

---

[69] To the extent that the evidence suggests Nardelli wanted Brittingham terminated
so that he could matrix AAC while Schauble wanted Brittingham terminated
because of their personality conflict, neither rises to the level of Cause as defined by
Brittingham's EA.

> Over the past year, the Leadership Team and I have taken an in-depth look at the acquisitions of recent years. We all agree that we can do a better job in fully integrating the new acquisitions and ensuring that they get all the support they need . . . .  To make sure we optimize the potential of all acquisitions in the future, I am appointing a senior executive, reporting directly to me, who will be responsible for the transition and integration of new businesses.
>
> I am pleased to announce that Steve Jackson has accepted the job of Chief Strategy and Acquisition Integration Officer, effectively immediately. . . .

(PX 283.)

## XI.   Post-Termination Interview with Thompson

Shortly after Brittingham was fired, counsel for Remington interviewed Thompson.  (Tr. 649.)  Thompson attended the interview and answered all questions posed to her.  (Tr. 649-50.)  She asked for, and was granted, permission to record the interview, with the caveat that she later provided a copy of the recording.  (Tr. 650-51.)  Counsel took notes of Thompson's responses to the questions.  (Tr. 650.)

On January 24, 2012, Thompson was terminated after she refused to turn over the original tape of the interview – defendants stated that she failed to cooperate with the investigation of Brittingham's termination.  (PX 297; tr. 634.)

John Day and Oralia Johnson (who worked for HR) were the two people present in the meeting where Thompson was terminated.  (Day Dep. at 72, 80.)  Day testified at his deposition that either Blackwell or Cofield instructed Day to terminate Thompson if she refused to give over the original interview tape.  (Id. at 73-74, 90.)  Jackson, the sole Board member of AAC, does not recall giving

authorization for the termination of Thompson – he was provided with a recommendation for her termination and he acquiesced.  (Tr. 1235.)  The (one person) Board never met regarding the termination.  (Tr. 1235-36.)  There are no Board resolutions adopting a determination that Thompson had failed to fully cooperate with a company investigation.  (Tr. 1237.)  Thompson was not given prior written notice of any violations of AAC policy, nor was she provided with an opportunity to change.  There is no evidence that any information on the recording was otherwise unavailable to AAC.

XII.    <u>Aftermath</u>

On January 28, 2012, Nardelli wrote an email to Blackwell and John Dwyer stating:  "Now that we have cleared the decks we have a huge responsibility to defendant and GROW AAC."  (PX 302.)  Ronchi suggested that "we look for the number one or number two guru in the industry, someone who would have been considered a competitor of Kevin, and somebody with a company mind-set."  (<u>Id.</u>)

At his deposition, Ronchi explained that by "company mind-set" he meant "someone who was committed to the corporation [FGI], that was, not interested in having an independent island in the company . . . ."  (Ronchi Dep. at 298.)  Ronchi conceded that he was unfamiliar with the discussions that had occurred with Brittingham relating to the acquisition.  (<u>See id.</u> at 300-01.)  According to Blackwell's deposition testimony, AAC became a semi-matrixed organization immediately upon the termination of Brittingham.  (Blackwell Dep. at 131.)

73

In early February, Nardelli and individuals from Cerberus visited the AAC facility; this is the only visit in the record of Nardelli visiting AAC.  (PX 298; <u>see also</u> Nardelli Dep. at 63.)

On February 15, 2012, Blackwell and AAC's temporary leader, Day (who took over for Schauble at Remington), communicated about the need to complete ongoing compliance projects at AAC.  (PX 309; Day Dep. at 7.).)  Soon thereafter, AAC became a fully matrixed organization.  (Day Dep. at 104; <u>see also</u> Blackwell Dep. at 130-31.)

<u>CONCLUSIONS OF LAW</u>

At its core, this is a breach of contract case.  The central claim to which everything else relates back (even Thompson's termination) is Brittingham's claim that defendants terminated him without Cause, in violation of his employment agreement with AAC.  (Count I.)  Plaintiffs also allege breach of Thompson's employment agreement (Count XII), breach of the APA (Counts II and III), breach of the Goodwill Agreement (Counts V and VI), and breach of the covenant of good faith and fair dealing with respect to both the APA and the Goodwill Agreement (Counts IV and VII).  Additionally, Brittingham asserts a claim on the guaranty (i.e., Remington's obligations under the APA and the Goodwill Agreement) (Counts VIII and IX)) and requests that a declaratory judgment be entered dissolving the restricting covenants otherwise imposed on both Brittingham and Thompson (Counts X, XI, XIII, XIV).

Defendants have counterclaimed for conversion of certain items and breach of the APA relating to such items.  (Counts I and II.)

I.  <u>Breach of Contract</u>

The Court must begin by determining which employment documents govern the parties' relationship.  For the reasons set forth below, the amended EAs are not legally binding, nor are the probationary documents (namely, the Term Sheets (PX 84, DX 63), Interview Records (DXs 61, 60; <u>see also</u> tr. 1275), and Acknowledgments (which are included as part of the amended EAs) ("probation documents")).  The Court finds that the original EAs govern the parties' employment relationships because the amended EAs were (1) never fully executed, (2) any agreement by plaintiffs to any of the terms of the amended EAs was based on their unilateral mistake (e.g., the belief that defendants had a sufficient basis for a "Cause" termination), (3) plaintiffs cannot have waived their rights under the original EAs because they did not do so knowingly, and (4) principles of equitable estoppel prevent enforcement of the amended EAs.

Defendants' basis for a Cause termination must therefore be assessed against the original EAs – and it is found lacking.  By declaring plaintiffs' employment at an end, defendants breached their contractual obligations under plaintiffs' original EAs.

a.  <u>Amended EAs</u>

While both the original and amended EAs defined Cause, <u>inter alia</u>, as:  (1) a material failure to comply with applicable laws or governmental regulations with

respect to the Company's operations or the performance of his/her duties; (2) a

material violation of any written policy of the Company within 30 days following

written notice from the Company of such violation; or (3) failure to fully cooperate

in any investigation or audit of the Company – the amended EAs are significant

because they contain an additional provision:

> Additionally, for the twelve (12) months period starting on
> the Effective Date and ending on January 9, 2012 (the
> "Probationary Period") Cause shall be further defined to
> include) (X) ANY violation by the Executive of the
> Company's compliance policies and (Y) Executive's failure
> to attend and complete all Company required and
> mandated compliance and policy training during the
> Probationary Period.  Upon such termination for Cause,
> the only obligation the Company will have under this
> Agreement will be to pay the Executive's unpaid base
> salary accrued through the date of termination.

(PX 125.)

### i. New Terms Based on Material Misrepresentation of Fact

The amended EAs were presented to plaintiffs in the form of an ultimatum:

sign or you may not return to work (i.e., you are fired).  At the time the documents

were presented to plaintiffs, defendants represented that Cause existed to

terminate plaintiffs.  As explained below, this was not actually the case –

defendants used false pretenses to improperly threaten Brittingham and Thompson

with termination in order to coerce them into agreeing to new employment terms.[70]

---

[70] While plaintiffs fail to clearly lay out this argument in their papers, their
presentation of the evidence at trial made clear that they believed such fact to be
both true and dispositive.  Indeed, throughout trial and in their post-trial
submissions as well, plaintiffs made the case that defendants failed to provide
adequate explanations for Brittingham's and Thompson's suspensions.

To the extent plaintiffs entered into the amended EAs, they did so based on material misrepresentations of fact by defendants (that "Cause" existed).

1. Material Misrepresentation of Fact

A court is required to construe a contract according to the parties' intent – typically derived from the four corners of the contract itself.  MHR Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009).  New York law is clear that a court should construe a contract according to its unambiguous terms.  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citing South Rd. Assocs., LLC v. IBM, 826 N.E.2d 806, 809, 793 N.Y.S.2d 835 (2005)).

The original Cause provision in both Brittingham and Thompson's EAs provide, inter alia, that they could be terminated for any of the following:

> . . .
>
> (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his [her] duties;
> . . .
>
> (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from the Company of the occurrence of such violation, if such violation is not cured within such thirty (30) day period; or
>
> (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company.

(PX 6, § 3.2(a)(v) (emphasis added).)  Based on the language of the Cause provision and the structural framework set out by the AAC LLC Agreement, there must be a

reasonable determination that Cause exists made by the Board of the Company, which during the time period at issue was one person: Jackson.[71]  (PX 6 § 3.2(v); PX 7 § 3.2(v).)

Requiring a Cause provision in plaintiffs' EAs was sensible given that Brittingham was due to receive $8 million upon still being employed by AAC in 2015.[72]  The language of the "Cause" provision reflects the bargain the parties struck in this regard and this Court cannot and must not rewrite that agreement to effectuate any other outcome.  Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (citations omitted).

---

[71] Defendants argue in their post-trial papers that plaintiffs have failed to raise and therefore waive any argument that the Board (i.e., Jackson) did not make the requisite reasonable determination. (Defs.' Post-Trial Mem. at 53-55.) Defendants further contend that "Remington employees had the authority to act on behalf of AAC in issuing Brittingham's probationary documents and termination letter under time-honored corporate and agency principles of law." (Id.) The Court rejects these arguments – the evidence presented at trial was wholly insufficient to support a finding that Jackson had any active role in the decision-making process. Rather, at best, he provided a rubber-stamp; at worst, he was not even told about the termination decisions until after the fact. Both Nardelli and Ronchi explicitly stated in their deposition testimony that the individuals who made the decision to terminate Brittingham were those on the Compliance Committee, which was created in December of 2010 and of which Jackson was not a member. (See Nardelli Dep. at 11, 161, 174, 232, 249, 247 (explaining that there were four people on the Compliance Committee: George Zahringer, General Joulwan, General Hagee, and George Kollitides); Ronchi Dep. at 13-14, 16, 18-19, 258 (stating that there were three people on the Compliance Committee: George Zahringer, General George Joulwan, and General Hagee). Ronchi stated at a later point in his deposition that Barnes and Stevens determined that Brittingham violated federal regulations and company policy. (Ronchi Dep. at 249, 288.)
    Accordingly, the Court finds that the Board's failure to determine whether Cause existed is a separate, sufficient ground for finding that defendants violated the terms of the EAs in firing both Brittingham and Thompson.
[72] As a key employee, which Thompson was, it was also rational for defendants to want Thompson's talents locked into an employment agreement and her to want reasonable certainty as to the terms upon which she could be fired.

i.   <u>Cause Based on Antique Silencer Incident</u>

Determining defendants' purported basis for a "Cause" termination in December 2010 when plaintiffs were suspended itself requires fact-finding.  No document was ever proffered or explanation ever given that provided a full rationale for defendants' assertion that Cause existed.[73]

The explanation provided by Schauble was that Brittingham and Thompson were suspended for being "evasive" in connection with discussions with Roth regarding the antique silencer.  (Tr. 1079.)  Even taking the facts regarding the antique silencer in the light most favorable to defendants,[74] this fact is itself contractually insufficient for termination.  While subsection (E) of the Cause provision requires full cooperation with investigations and audits, an unsupported assertion of "evasiveness" in connection with an investigation is not itself sufficient to reasonably determine that the provision has been breached.[75]

To the extent that defendants believed they had Cause to terminate Brittingham not for his evasiveness, but instead, for his possession of the antique silencer itself, this too would have been an insufficient basis for Cause.  In order to

---

[73] As discussed above, Brittingham testified credibly, and his testimony was corroborated by contemporaneous documents, that he was never provided an explanation for his suspension or the outcome of the investigation.

[74] The Court made a pre-trial ruling that limited the extent to which testimony would be entertained on the issue of the antique silencer.  Even taking the facts in the light most favorable to defendants, however, neither Brittingham's uncontroverted possession of the silencer nor plaintiffs' alleged evasiveness surrounding the investigation of the silencer provided Cause for defendants to terminate plaintiffs in December of 2010.

[75] Moreover, there is no evidence in the record that Jackson, or any other Remington executive, ever made a determination as to reasonableness, as required under the EAs.

have violated either subsection (B), for violating a law, rule, or regulation, or subsection (E), for violating a written AAC policy, a determination that the violation was material was necessary.  Based on this Court's factual findings, no such determination would have been warranted under the circumstances.

### a.  Materiality

The law is clear that contractual interpretations which give effect to all words are favored.  Two Guys from Harrison – N.Y., Inc. v. S.F.R. Realty Assoc., 63 N.Y.2d 396, 403 (1984).  The role of the Court is also to give a practical interpretation to meet the parties' reasonable expectations.  Howard v. Howard, 740 N.Y.S.2d 71, 71, 292 A.D.2d 345 (2d Dep't 2002) (citations omitted).  The Court should not be formalistic in a manner the parties would neither have intended nor expected.  In interpreting a contract under New York law, "'words and phrases . . . should be given their plain meaning" and the contract "should be construed so as to give full meaning and effect to all of its provisions.'"  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (quoting Shaw Grp., Inc. v. Triplefile Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003)).

If the Court finds that the contract is not ambiguous, it should assign the plain and ordinary meaning to each term.  International Multifoods Corp v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (citing Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998)).  In construing contractual text, "a court need not turn a blind eye to context."  In re Coudert Bros., 487 B.R. 375, 389 (Bankr. S.D.N.Y. 2013).

Rather, a court should give due regard "to 'the surrounding circumstances and the apparent purposes the parties sought to accomplish.'" Thompson v. Gijivoje, 896 F.2d 716, 721 (2d Cir. 1990) (quoting William C. Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519 (1927)).

The context in which the EAs were executed is important to this Court's interpretation of its terms, including particularly "materiality."  The following points are among those which are plainly relevant:  (1) AAC's business was about designing and manufacturing silencers; (2) neither silencers nor guns were foreign or scary objects; rather, they were core to AAC's business; (3) firearms (and silencers are a type of firearm) were all over AAC's facilities both pre- and post-acquisition; (4) running a business involving silencers requires extensive compliance paperwork and it was anticipated that post-acquisition, Remington would provide skilled assistance in that regard; (5) post-acquisition, years passed without anyone at Remington taking seriously the issue of who owned which firearms; (6) AAC could not have functioned without using firearms beyond those on the Purchased Asset List; anyone who interacted with AAC's R&D department knew such fact to be true; and (7) that the parties intended each word of the Cause provision to carry some meaning.

Taking these facts into consideration, a "material" violation of either the law or written policy required more than the presence of a single antique silencer at AAC – even one without proper paperwork in derogation of the law.  Indeed, the evidence at trial revealed that under Remington's ownership, the number of

silencers and other firearms that came in and out of the Lawrenceville facility without proper identification and bound book entries was significant. The presence of a single, improperly papered antique silencer in Brittingham's possession was simply not material in this overall context. This is further confirmed by the understanding expressed both by Schauble and Brittingham that post-acquisition AAC would continue to use the 02617 and 40006 FFLs, as well as firearms from the Excluded Asset List, in connection with AAC's business for some period of time.

Moreover, at the time the EA was signed, there is no doubt that at any given moment, paperwork as to "a" manufactured silencer might not be fully accurate: a silencer may have just come off a production line but may not have been entered into the bound book yet. As Wolfe testified, she only worked part-time; some delays in bound book entries (and therefore proper paperwork) were thus known to occur and expected. For this reason too, the existence of a single silencer missing its paperwork would be an unreasonably narrow interpretation of a "material violation." Given the way AAC ran, such an interpretation would not make sense and would make the term "material" as defining a violation as equivalent to "any" and therefore render it mere surplusage. New York law disfavors such a result. See Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 332-33 (S.D.N.Y. 2010) (citations omitted).

Materiality must also be assessed in the context of a business in which a two-year period elapsed post-acquisition when little was done to transfer numerous silencers from Brittingham's FFLs to an AAC FFL. On the day that Brittingham

and Thompson were suspended, there were dozens and dozens of silencers owned by AAC on Brittingham's FFLs that AAC had not transferred.  Paperwork as to all silencers – whether antique or new – was clearly not correct for a large number of silencers.  In this context, Brittingham's receipt of a single antique silencer at AAC without proper paperwork could not constitute a <u>material</u> violation of a law, rule, or company policy.[76]

In their EAs, plaintiffs' bargain included a Cause provision which did not make any and every single violation of a law grounds for termination.  They are contractually entitled to the benefit of that bargain.  Defendants could not reasonably have found a material violation of either governmental laws or corporate policy in December 2010.[77]

b.  <u>Notice and Opportunity to Cure</u>

Moreover, even were the violation to be found a violation of subsection (E) of plaintiffs' respective EAs, that provision requires written notice and 30 days to cure the issue.  As of December 2010, there is no evidence in the record that any notice or

---

[76] This is not the same as a determination as to whether, had ATF walked into AAC on December 9, 2010 and found the antique silencer, there would have been consequences and if so, what those consequences would have been.  Such a legal analysis at that time could have been relevant to whether a determination of "material" was reasonable or not.  But, there is no evidence in the record that AAC was ever found to have violated the law or applicable regulations, nor is there any evidence in the record that such an analysis by Remington ever occurred.

[77] Moreover, there was no determination made by Jackson that the existence of the antique silencer at AAC provided Cause to terminate plaintiffs.  As mentioned above, for this reason too, defendants could not have terminated plaintiffs at the time of their suspension without breaching the EAs.

opportunity to cure had been given to plaintiffs, such that subsection (E) could have been triggered as a for-Cause basis to terminate either Brittingham or Thompson.

      ii.   <u>Waiver</u>

Defendants argue that to the extent Brittingham and Thompson could have opposed the proposed changes to the terms of their employment, they waived their rights to do so by:  (1) agreeing to enter into the new agreements even though both parties did not sign the documents; and (2) acquiescing to the terms of the new agreements with their conduct.  (<u>See</u> Defs.' Post-Trial Mem. at 51-52.)  The Court finds otherwise with respect to both points.

"Waiver is the intentional relinquishment of a known right and should not be lightly presumed."  <u>Gilbert Frank Corp. v. Fed. Ins. Co.</u>, 70 N.Y.2d 966, 968 (1988) (citations omitted); <u>see also</u> <u>Beth Israel Medical Ctr. v. Horizon Blue Cross Blue Shield</u>, 448 F.3d 573, 585 (2d Cir. 2006) (citing cases); <u>Travellers Int'l AG v. Trans World Airlines, Inc.</u>, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989).  To constitute waiver, a party must both know of the right and intentionally relinquish it.  <u>Beth Israel Medical Ctr.</u>, 448 F.3d at 585; <u>Frontier Ins. Co. v. Koppell</u>, 648 N.Y.S.2d 812, 813, 225 A.D.2d 93 (3d Dep't 1996).  Whether a waiver has occurred is a question of fact; it ultimately is a question of intent.  <u>Beth Israel Medical Ctr.</u>, 448 F.3d at 585.  Such waiver may be found in action or in words.  <u>Hadden v. Consol. Ed. Co. of N.Y.</u>, 45 N.Y.2d 466, 469 (1978).  Relinquishment of a right induced by "deceit and device as to constitute fraud would be ineffective and not binding," however.  <u>Id.</u>

In this case, defendants first argue that plaintiffs waived their right to have all modifications of their EAs in writing and signed by both parties.  (PX 6, § 9; PX 7, § 9; Defs.' Post-Trial Mem. at 50-51.)  There is no evidence in the record that plaintiffs knowingly waived this right.  Rather, to the extent plaintiffs signed documents that relinquished their right to have all modifications of their EAs in writing and signed by both parties, they did so under false pretenses as a result of defendants' misrepresentations that they had no choice in the matter.

Second, defendants assert that plaintiffs waived the terms of their original EAs and accepted the terms of their amended EAs by partially performing pursuant to the amended EAs.  (See Defs.' Post-Trial Mem. at 51-52.)  By acting in accordance with certain terms of the amended employment terms – such as accepting new titles, diminished responsibilities, lowered pay, the "probation" period, and the agreement not to bring personal firearms onto the premises without prior permission – defendants argue plaintiffs in fact agreed to those terms.  (Id.)  Here again, the answer is "no."

The law of waiver requires intentional relinquishment of a known right. Beth Israel Medical Ctr., 448 F.3d at 585.  To the extent Brittingham and Thompson accepted altered employment terms, the evidence shows that they did so based on a misunderstanding of their rights.  They did not knowingly waive a right; they thought they no longer had the rights guaranteed by their original EAs.

As a separate point particular to Brittingham, the evidence is insufficient to warrant a finding that Brittingham waived (even unknowingly) his rights in the

first place.  For example, Brittingham explicitly stated that he could not agree to a new employment agreement until the "machine guns" that had been sold to the new AAC were transferred off his FFL.  (PX 130.)  The transfer of the machine guns did not occur at any time prior to his termination in 2011.

Moreover, Brittingham never signed the amended EA.  (See Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls.' Post-Trial Mem.") at 72-74, Aug. 2, 2013, ECF No. 171.)  While defendants argue that Brittingham submitted his amended EA "in a manner which was designed to deceive Cofield into believing that he had signed the document" (see Defs.' Post-Trial Mem. at 52), such contention is both unsupported by the record and wholly unpersuasive to the Court – Remington is a large business entity and particularly given the circumstances, its HR department could have and should have acted in a more sophisticated manner. The Court finds the Remington HR department was not duped.

That being said, plaintiffs' argument that Brittingham's failure to sign the amended EA itself renders the amended EA unenforceable is, while relevant, not dispositive to the issue.  Brittingham's scribbling of the word "flounder" in the signature block is conduct that carries some – but not enough – weight against a finding of waiver.  The act of placing an identifying mark ("flounder") must be viewed in the larger context of the circumstances and various attitudes of the parties, Brittingham's request for certain amendments to the new EA, as well as his dissatisfaction with the manner in which his suspension was handled and his expressed concern that if he signed he could in fact be subject to an immediate

86

termination.  Taken together, these facts support the mark of "flounder" as an act of defiance rather than acquiescence – and accordingly cannot support a waiver.

        iii.     Equitable Estoppel

Even were binding modifications of the original EAs or binding amended EAs found to be enforceable, defendants would nonetheless be equitably stopped from enforcing such provisions.

"Equitable estoppels 'is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp. 2d 507, 524 (S.D.N.Y. 2009) (quoting Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 725 (2d Cir. 2001)).  Under New York law, equitable estoppel requires a showing of:  (1) an act constituting a concealment of facts or false representation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; and (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment.  General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994).  "New York courts have 'consistently held that the doctrine of equitable estoppels cannot be invoked to create a right where one does not otherwise exist." Randolph Equities, LLC, 648 F. Supp. 2d at 524 (quoting Wilson v. Hevesi, No. 96 Civ. 1185, 1998 WL 351861, at *6 (S.D.N.Y. June 29, 1998)).

Here, defendants failed to provide plaintiffs with an explanation as to why they were suspended; similarly, defendants failed to explain to plaintiffs why they believed they had Cause to terminate plaintiffs at the time plaintiffs were suspended. Indeed, despite Brittingham's numerous requests for information, he received no explanation (and neither did Thompson). In failing to provide an explanation, defendants acted in bad faith and violated both the letter and the spirit of plaintiffs' original EAs.

On these facts, even were amended EAs otherwise enforceable, the doctrine of equitable estoppel would preclude enforcement of the amended employment terms contained therein. The evidence is clear far beyond a preponderance that: (1) defendants falsely represented their ability to terminate plaintiffs for Cause under the terms of the original EAs at the time of the suspensions: (2) defendants intended for plaintiffs rely on such representations; (3) defendants knew (or had constructive knowledge of the fact that) they did not actually have Cause to terminate plaintiffs at the time of their suspension; and (4) to the extent plaintiffs accepted the amended employment terms – which were to their detriment – they did so in reliance on defendants' representations. Accordingly, equitable estoppel provides another basis for the Court to find that the amended EAs are not enforceable as to either Brittingham or Thompson.

      iv.   <u>Mistake</u>

"A mistake is 'a belief that is not in accord with the facts.'" <u>Koam Produce, Inc. v. DiMare Homestead, Inc.</u>, 329 F.3d 123, 127 (2d Cir. 2003) (quoting

Restatement (Second) of Contracts § 151). "Under New York law, rescission of a contract on the basis of a unilateral mistake may be had if a party establishes that "(i) he entered into a contract based upon a mistake as to a material fact, and that (ii) the other contracting party either knew or should have known that such a mistake was being made." <u>VCC Special Opportunities Master Fund Ltd. v. Citibank, N.A.</u>, 594 F. Supp. 2d 334, 343 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). Here, the evidence demonstrates that defendants purposefully represented to plaintiffs that they had Cause to terminate them in December 2010/January 2011 when they knew or should have known this was not the case. Such representations were made in an effort to induce Brittingham and Thompson to enter into amended EAs, materially altering the terms of their employment to defendants' benefit.

b. <u>Probationary Documents</u>

Moreover, were the Court to construe the probationary documents separate and apart from the amended EAs, the evidence demonstrates by well more than a preponderance that these documents were not themselves binding contracts sufficient to eviscerate all of the contractual rights and duties under the original EAs, nor did they create separate binding contractual obligations.

It is undisputed that while plaintiffs signed the Term Sheets and Acknowledgments, defendants did not. As stated above, New York law provides that when parties' manifest intent is not to be bound by an agreement unless in writing signed by all parties, then no contract exists until that event occurs. <u>R.G.</u>

Grp., Inc. v. Horn & Hadart Co., 751 F.2d 69, 74 (2d Cir. 1984).  That may be so even if parties may have otherwise agreed to the terms of a proposed contract.  Id. Here, Section 9 of the EAs required a writing signed by all parties would similarly apply to this agreement to agree.

Even were they signed or clearly agreed upon by both parties, however, they nonetheless be insufficient to create an "agreement to agree" in this case.

In New York, under certain circumstances, an "agreement to agree" can create an enforceable contractual obligation.  See Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548-49 (2d Cir. 1998).  To determine whether the agreement to agree is binding, a court must examine:  (1) whether the parties reserved a right not to be bound in the absence of a writing; (2) whether there has been partial performance; (3) whether all terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract usually committed to writing.  Id. (citations omitted).

Here, the answer to these questions is mixed.  As to the first element, in neither the Term Sheets nor Acknowledgments do plaintiffs reserve the right not to be bound.  Of course, they believed they were in no position to make such reservations – they were essentially told to accept the terms or be fired; the documents were unilaterally imposed by defendants based on false pretenses (and changes to Brittingham's Term Sheet offered by his counsel were rejected).  As to the second element, plaintiffs did partially perform under the terms of the documents:  plaintiffs assumed the new titles and accepted the lesser compensation

and reduced job responsibilities; defendants paid plaintiffs on the terms described

in the Term Sheets.  Partial performance alone, however, does not require a finding

of an accepted contract.  Spencer Trask Software & Info. Servs. LLC v. RPost Int'l

Ltd., 383 F. Supp. 2d 428, 445 (S.D.N.Y. 2003) (citing Arcadian Phosphates, Inc. v.

Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989) ("affirming grant of summary

judgment dismissing breach of contract action even though there was 'considerable

partial performance,' where language of the memorandum showed that the parties

did not intend to be bound until the final contract was signed") and Adjustrite, 145

F.3d at 551)).  And again, plaintiffs had no choice.  As to the third element, all of the

terms of the amended EAs had not been agreed upon.  The original EAs were multi-

page documents providing for mutual rights and responsibilities; the Term Sheets

and Acknowledgments were less than a page and were only imposing obligations on

plaintiffs – indeed, they eased obligations on defendants.  As to the fourth element,

complex and substantial business matters are among the types of contracts

typically committed to writing.  R.G. Grp., Inc., 751 F.2d at 75.  Letter agreements

or term sheets contemplating more formal contracts are under certain

circumstances unenforceable agreements to agree.  See, e.g., Frankel v. Ford

Leasing Dev. Co., 776 N.Y.S.2d 905, 905, 7 A.D.3d 757 (2d Dep't 2004) (letter

agreement expressly contemplating a more complete and formal contract an

unenforceable agreement to agree); Joseph Martin Jr., Delicatessen, Inc. v.

Schumacher, 52 N.Y.2d 105, 109-10, 417 N.E.2d 541 (1981) (statement of intent to

execute formal agreement an unenforceable agreement to agree in the absence of a

material term).  In this case, since in this case the terms of the employment
agreement are worth millions of dollars and the parties' intent from the outset that
changed terms would be set forth in writing and signed by both parties, the
Acknowledgment and Term Sheets are unenforceable.

    c.  <u>The original EAs</u>

The question to which this Court now turns is whether defendants in fact
breached the original EAs.  The evidence at trial establishes well beyond a
preponderance that they did.

    i.  <u>Cause for Brittingham's Termination</u>

Defendants argue that Brittingham "violated the law and company policy
when he brought his personal firearms to AAC and allowed others to do the
same."[78]  (Defs.' Post-Trial Mem. at 41.)[79]

---

[78] An omnipresent issue in this litigation is the definition of "personal firearms."  At
trial, the only two consistent definitions of "personal firearms" were those provided
by Brittingham and AAC's expert, former ATF investigator, Harry McCabe.  Under
Brittingham and McCabe's definition, "personal firearms" did not include firearms
registered on the 40006 or 02617 FFLs unless they were specifically marked
"personal firearm not for sale."  (Tr. 170-71, 440-41, 1377-79).  Rather, "personal
firearms" were firearms Brittingham did not register on either the 02617 or the
40006 FFLs, but instead, were those Brittingham used for hunting and target
shooting, which were kept in a safe in his house.  (Tr. 95, 110.)  This definition is
consistent with the purpose of an FFL, i.e., to list firearms owned by a firearm
dealer or manufacturer and used for business purposes.  <u>See</u> 27 C.F.R. 478.41(a)
("Each person intending to engage in business as an importer or manufacturer of
firearms or ammunition, or a dealer in firearms shall, before commencing such
business, obtain the license required by this subpart for the business to be
operated.").

    The evidence establishes that none of the firearms on the Knox Williams List,
which defendants claim provided the basis of Brittingham's Cause termination, are
Brittingham's "personal firearms."  With respect to each firearm on the List that is
not on the 02617, 40006, or 06326 FFL, there is insufficient evidence to establish

1.  Subsection (B)

The first Cause provision potentially triggered is subsection (B), which concerns a material failure to comply with a law or regulation.  Defendants argue that Brittingham was in material violation of the regulatory framework because he: (1) failed to maintain dominion and control over his personal firearms; (2) allowed others to bring his personal firearms to AAC without maintaining dominion and control over them while they were in transit and while they were at AAC; and (3) failed to register his personal firearms in AAC's bound book.  (Id. at 42.)

In determining whether the following statutory and regulatory provisions were violated, the Court again is cognizant of the fact that a breach must be material in order to trigger the Cause provisions in the EAs.  A non-material violation is insufficient under the terms of the EAs to justify a Cause-based termination.  As discussed above, it is clear from the evidence presented at trial that not every technical violation of the applicable legal and statutory framework could constitute a material violation, such that the Cause provision would be triggered.  Given the manner in which AAC operated, reading the term "material"

_____

that the particular firearm belongs to Brittingham.  Rather, the non-FFL firearms on the List include:  (1) firearms that Brittingham does not own as part of his personal, non-FFL collection, and (2) firearms received, manufactured, or otherwise acquired by AAC post-acquisition for product demos, R&D, catalogs, or other business purposes.  (Tr.  617-24.)  The same holds true for the firearms AAC learned of after Brittingham's termination, including the Bane Firearms, the Photo Shoot Firearms, and firearms on the Storage List.  (Tr. 617-624.)  Each of these firearms falls within one of the two categories above.

[79] The Court notes that Nardelli testified at his deposition that there was only one reason for Brittingham's termination:  violation of his probationary period.  (Nardelli Dep. at 12-13.)  Of course, nothing in the original EA would allow for termination on this vague basis.

to equate with "any" violation would – as discussed above – in fact render the inclusion of the term meaningless.

<h3 style="text-align:center">a.  <u>26 U.S.C. § 5861</u></h3>

Under 26 U.S.C. § 5861, it is unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.  26 U.S.C. § 5861(d).  Defendants contend that the presence of firearms on the 02617 and 40006 FFLs in Lawrenceville "exposed" them to sanctions under this provision.  (Defs.' Post-Trial Mem. at 42.)

However, AAC itself utilized firearms on the 02617 and 40006 FFLS and according to its own arguments, such conduct was lawful.  Mustian, as Director of Compliance, testified that so long as Brittingham was "within the envelope" at AAC, it was lawful for AAC employees to use firearms on the 02617 and 20006 FFLs.  (Tr. 1014-15.)  Moreover, he stated that Brittingham could properly use AAC's Lawrenceville facility as a "storage facility" for firearms registered under these two FFLs pursuant to 27 C.F.R. § 478.50(a).[80]  (Tr. 1014-15.)  In fact, the parties anticipated that the 02617 and 40006 FFLs would continue to be used post-acquisition for an undefined period of time.  Thus, whether as a matter of law Brittingham's conduct resulted in such violation(s), according to Mustian's own

---

[80] Firearms on these FFLs could lawfully be located in Lawrenceville as long as the bound books for the FFLs were maintained there (which they were).  (Tr. 105-06, 350-52, 1044.)  <u>See</u> 27 C.F.R. 478.50(a) ("No license is required to cover a separate warehouse used by the licensee solely for storage of firearms or ammunition if the records required by this part are maintained at the licensed premises served by such warehouse.").

understanding as applied to the facts, Brittingham's conduct would not have been material.  (Tr. 1014-15.)

As such, to the extent that defendants now argue the existence of firearms on such FFLs at AAC improperly exposed them to legal liability, their argument is wholly unpersuasive.[81]

### b.  18 U.S.C. § 923(g)(1)(A)

Under 18 U.S.C. § 923(g)(1)(A), FFL holders must maintain accurate bound book records for the firearms at their place of business.  See 18 U.S.C. § 923(g)(1)(A).  Defendants contend that Brittingham violated this provision and exposed AAC to sanctions because firearms on the 02617 and 40006 FFLs were in Lawrenceville but not recorded in AAC's bound book.  As set forth extensively above, defendants were well aware of the inaccuracies in AAC's bound books:  Love and Wagoner corresponded about it (and complained about the problems they were having with DBA), Williams testified about it, and Schauble knew about it based on his own email acknowledging inaccuracies on the Knox Williams List.  Thompson repeatedly expressed the need for a compliance specialist.  Defendants' attempt to set aside those facts and argue that the failure to record certain items in the AAC bound book is sufficient to trigger the Cause provisions of the EAs must fail.

Moreover, as mentioned, it was expected and intended that AAC would continue to use the 02617 and 40006 FFLSs for a period of time; indeed, AAC

---

[81] The evidence showing that AAC was selling silencers off of the 02617 FFL into 2011, as well as testimony illustrating the extent to which AAC and Remington employees alike were confused as to who owned which firearms at any given time, underscore the Court's determination on this point.

continued to pay Wolfe's salary to maintain the bound books relating to those FFLs. Prior to AAC's acquisition by defendants, there were no known issues with its bound books. Any subsequent issues occurred in connection with AAC's ongoing utilization of those bound books. Under such circumstances, sorting out the bound books needed to be – and eventually was – a massive, multi-person undertaking. Based on these circumstances, it would be wholly unreasonable to find that any inaccuracies in the bounds books constituted material violations of 18 U.S.C. § 923(g)(1)(A).

Separately, the mere presence of firearms on AAC's premises on a single day that were not logged into AAC's bound book does not, by itself, establish a violation of 18 U.S.C. § 923(g)(1)(A). The accompanying regulation to Section 923(g)(1)(A) gives the licensee seven (7) days to make a record in the Bound Book following the acquisition. 27 C.F.R. § 478.123(a). There is insufficient evidence in the record to determine which firearms arrived at AAC when – and thus, whether this regulation was violated – let alone in any material way. (See tr. 259-63.)

### c.  27 C.F.R. 478.152

Defendants have also alleged a violation of 27 C.F.R. § 478.152. According to defendants, this regulation "prohibited the presence of firearms on AAC's premises that are not registered to it." (Defs.' Post-Trial Mem. at 42.) However, 27 C.F.R. § 478.152 relates to the transportation of firearms in "interstate or foreign commerce" in accordance with 18 U.S.C. § 922. (Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Pls.' Summ. J. Opp'n") at 12, May 30, 2013, ECF No. 105.)

There was no evidence at trial that any of the firearms on the Knox Williams List in fact moved in interstate commerce, undermining defendants' claim that the statute was materially violated.

Even if this were not the case, however, the record undermines defendants' contention that Cause to terminate existed because of "the presence of firearms on AAC's premises that [were] not registered to it."

First, AAC's operations relied on the use of non-AAC owned firearms; such fact was evident to numerous Remington executives (most notably, Mustian and Schuable); they enabled the use of such firearms throughout the post-acquisition period.[82]  Indeed, Mustian expressed his clear view that as long as Brittingham was "in the envelope," AAC could use Old-AAC firearms without violating the law (tr. 995-96, 1014-15, 1038, 1040, 1058-59).  And, on the day the Knox Williams List was created, Brittingham was indeed "in the envelope."  (Tr. 805.)

Second, there was significant confusion among AAC employees and executives alike in determining the owner of the various firearms on the premises. Such fact was evidenced by the challenges encountered in connection with the Knox Williams List, as well as the incomplete and inaccurate nature of the bound books – at least in part due to the flawed DBA system implemented post-acquisition and Remington's failure to hire a compliance specialist following the acquisition.  (Tr. 247-48, 814-16)).

---

[82] Mustian both acknowledged and endorsed the use of firearms on the Old-AAC FFL.  (See DX 29.)

97

Accordingly, to the extent there were firearms on the premises that were not registered to AAC, defendants were just as much (if not more) responsible for their presence than plaintiffs.  And, to the extent there may have been a small number of firearms on the premises to which defendants had not acquiesced, such fact hardly constitutes a material violation of 27 C.F.R. § 478.152 given the circumstances under which AAC operated.

d.  ATF Ruling 2010-1

Finally, defendants have pointed to ATF Ruling 2010-1.  ATF Rulings are not "laws or governmental regulations" and, therefore, cannot form the basis of Cause under § 3.2(a)(v)(B).  See ATF National Firearms Act Handbook § 1.4.2, ATF E-Publication 5320.8 (rev. Apr. 2009), available at http://www.atf.gov/files/ publications/ download/p/atf-p-5320-8/atf-p-5320-8.pdf (last visited Jan. 2, 2014) ("Rulings do not have the force and effect of law . . . .").

Moreover, ATF Ruling 2010-1 addresses the temporary assignment of a firearm by an FFL to its unlicensed employees, agents, contractors, volunteers, or other non-employees.  (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Summ. J. Mem."), Ex. 1 at 19-22, Apr. 30, 2013, ECF No. 83-1.)  Specifically, the Ruling permits AAC employees, such as Brittingham, to temporarily possess, use, and transport AAC's firearms off of AAC's premises for bona fide business purposes.  (Id.)  There is insufficient evidence to find that Brittingham himself actually "transferred" firearms to AAC's unlicensed employees in violation of Ruling 2010-1 to any greater extent than AAC itself did –

98

AAC continued to operate its business using the 02617 and 40006 FFLs for two years after the acquisition.  This fact undermines any argument that Brittingham violated the Ruling in any material way – to constitute a material violation, the conduct would need to have reached beyond AAC's customary (and accepted) business practices.  It also demonstrates Remington's knowledge of and acquiescence to a practice which it later stated gave rise to Cause for termination.

Accordingly, there is insufficient evidence to support a finding that plaintiffs were terminated based on a violation of ATF Ruling 2010-1.

### 2.  Subsection (E)

As a separate grounds for establishing Cause, defendants argue that Brittingham violated subsection (E) by improperly commingling his personal firearms with AAC firearms, constituting a material violation of a written company policy.  (See Defs.' Post-Trial Mem. at 48.)  While defendants argue that the applicable company policy can be found in the new employee orientation power point and the AAC Reference Manual – and that other documents including the APA, Integration Scorecard, and Mustian's emails to Lessard "were [ ] consistent with this policy and stressed the importance of Brittingham removing his personal firearms and segregating them from AAC firearms" (id.) – the way in which AAC operated contradicts defendants' reliance on company policy.  Indeed, employing defendants' use of the phrase "personal firearms," the evidence illustrates beyond a preponderance of the evidence that AAC firearms and Old-AAC firearms were

constantly commingled (separate and apart from any action or inaction by Brittingham); put simply, it was way AAC did business.

Moreover, Mustian himself stated that as long as Brittingham exercised sufficient dominion and control over non-AAC firearms, such commingling was not improper. (Tr. 996-97.) The evidence presented at trial proved beyond a preponderance that Brittingham exercised dominion and control the day the Knox Williams List was created (he was on the premises). And, defendants failed to identify any other specific time when Brittingham failed to act with sufficient dominion and control to such an extent that he materially violated company policy. Under these circumstances, to the extent that Brittingham did commingle Old-AAC and AAC firearms, his actions did not materially violate company policy.

Additionally, the lack of clarity regarding the relationship between "personal firearms" and Old-AAC firearms undermines defendants' argument that Brittingham materially violated company policy by intermingling Old-AAC and AAC firearms. There is no evidence in the record that anyone explained to Brittingham that according to official AAC policy "personal firearms" apparently included non-acquired Old-AAC firearms.[83] As such, even if it were the case that Brittingham intermingled Old-AAC and AAC firearms after receiving written notice (via the probationary documents) that he was not to bring personal firearms onto

---

[83] Based on AAC's reliance on non-acquired Old-AAC firearms, it seems unlikely that anyone would have a desire to make such a distinction – the evidence at trial demonstrated that doing so would have severely impeded AAC's ability to do business. For instance, Lessard testified that the vast majority of firearms on the Knox Williams List were used actively in R&D.

the premises, such facts fail to provide sufficient grounds for a Cause-based termination of Brittingham – following his probation, Brittingham received notice and an opportunity to cure any issues regarding his <u>personal</u> firearms; based on AAC's generally accepted activities, this did not include Old-AAC firearms.

### ii.  Cause for Thompson's Termination

Defendants argue that Thompson was fired pursuant to subsection (F) of her EA for failing to cooperate with AAC investigations; additionally, defendants argue that they had Cause to terminate Thompson for copying confidential AAC documents onto a personal hard drive, in violation of "numerous AAC policies." (Defs.' Post-Trial Mem. at 58.)[84]

### 1.  Failure to Cooperate with Internal Investigations

According to defendants, Thompson failed to fully cooperate with two separate investigations – one concerning Brittingham's termination and another concerning an anonymous hotline complaint that alleged Thompson, Brittingham, and another coworker were conspiring to start a competitor using AAC's intellectual property.  (<u>Id.</u> at 59.)  Plaintiffs argue that Thompson cooperated to the extent necessitated by her EA, and that in any event, the AAC Board never made a reasonableness determination as required by the applicable Cause provision.

---

[84] Notably, defendants do not base their termination of Thompson on a failure to fulfill any compliance responsibilities she may have had.  As a formal matter, Thompson only had compliance responsibilities through her return in January 2011; after her return from suspension, any compliance responsibilities were removed from her job description.

With respect to the investigation into Brittingham's termination, defendants argue that Thompson failed to turn over a copy of the recording she made of an interview conducted by Rust; later, she refused to turn over the original. (Id.) With respect to the hotline complaint, Thompson allegedly refused to give defendants certain text messages "which the Company requested to review in connection with its investigation . . . ." (Id.)

In response, plaintiffs first argue that the conversation (they dispute that it was an investigation) regarding Brittingham's termination was not about "the Company or its affiliates" as required to trigger the Cause provision; instead, they argue that the discussion was to "identify and/or obtain information concerning Brittingham." (Pls.' Post-Trial Mem. at 118-19 (emphasis in original).) Additionally, plaintiffs argue that the evidence shows Thompson did, in fact, fully cooperate with the investigation – she was under no obligation to turn over a copy of the recording she had made, and she was never told by Cofield that failing to provide a copy of the tape constituted a failure to cooperate. (Id. at 119.) Thompson was never provided written notice and an opportunity to cure as contractually required; and she never waived such right.

Concerning the investigation into the hotline call, the evidence demonstrates the basis of the call lacked merit. It is undisputed that Thompson answered questions posed to her regarding the call. In addition, investigation of the call fails to meet the plain language reading of the phrase "the Company or its affiliates;" instead, it concerned Brittingham, Thompson, and one other AAC employee. (Id. at

102

120.)  Finally, the Court declines to find the fact that Thompson declined to turn over her phone for Remington's perusal as a basis for a no-notice, "Cause" termination.  The evidence at trial provides more than a sufficient basis to support those texts as personal – even if between her and Brittingham.  She answered all questions posed to her on all topics.  (Id. at 120-21.)  Again, on none of these bases was she provided written notice and an opportunity to cure.

## 2. Copying Confidential Files

As a factual matter, all that defendants have proven with regard to the fact that Thompson copied confidential files from her work computer is that they were copied[85] – defendants have not shown any use.  According to defendants' own description of the company policy, Thompson was required "to protect Company data from unauthorized use, disclosure[,] or access."  There is nothing in the evidence that suggests Thompson failed to do so.  Thus, as a factual matter, defendants cannot base termination on a violation of that policy.

Moreover, there is again no evidence that Thompson was given notice and an opportunity to cure this issue, which is required by the applicable Cause provision.  (See Pls.' Post-Trial Mem. at 117.)  While defendants argue that Thompson engaged in this behavior during the probationary period and therefore notice and an opportunity to cure were not required, as the Court held above, the probation was

---

[85] Defendants argue that this conduct "violated multiple AAC policies which Thompson signed and agreed to abide by, including the Computer Network Acceptable Use Policy, Employee Declaration of Ownership of Work and Non-Disclosure Agreement and Confidentiality Statement."  (Defs.' Post-Trial Mem. at 61.)

based on false pretenses and the amended EA was unenforceable.  Accordingly, without notice and an opportunity to cure, Thompson's alleged copying of confidential information does not provide defendants with Cause for terminating Thompson.

II.    <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

Plaintiffs' Complaint contains allegations that AAC breached the APA and Goodwill Agreement in violation of the covenant of good faith and fair dealing. While this issue did not receive attention in plaintiffs' post-trial papers, the issue was implicitly raised at various points during the trial.  Indeed, in providing their narrative of the events that transpired between the parties, plaintiffs pushed the Court to making a finding that defendants acted in bad faith.

All contracts have an implied covenant of good faith and fair dealing.  <u>Kader v. Paper Software, Inc.</u>, 111 F.3d 337, 342 (2d Cir. 1997).  The covenant is an implied undertaking that neither party will do anything intentional or purposeful to prevent the other party from carrying out the agreement on his part.  <u>Id.</u>

A party's actions may "implicate the covenant of good faith when it acts so directly to impair the value of the contract for the other party that it may be assumed that they are inconsistent with the intent of the parties."  <u>Bank of China v. Chan</u>, 937 F.2d 780, 789 (2d Cir. 1991) (citing <u>M/A-COM Sec. Corp. v. Galesi</u>, 904 F.2d 134, 136 (2d Cir. 1990)).  The conduct asserted to violate the covenant of good faith must directly violate an obligation that falls within the parties' reasonable expectations – in effect, an implied promise that is necessary to effectuate the

contract's purposes.  Id. (citing Havel v. Kelsey-Hayes Co., 445 N.Y.S. 2d 333, 336,

83 A.D.2d 380 (4th Dep't 1981)).

If conduct alleged to breach the covenant of good faith and fair dealing is

different from that forming the basis for a claimed breach of the contract, the claims

are not duplicative.  See Cary Oil Co. v. MG Ref. & Mktg., Inc., 90 F. Supp. 2d 401,

419 (S.D.N.Y. 2000); Richmond Shop Smart, Inc. v. Kenbar Devel. Ctr., LLC, 820

N.Y.S.2d 124, 32 A.D.3d 423, 424 (2d Dep't 2006).  However, the exercise of

contractual rights cannot itself form the basis for a breach of the covenant of good

faith and fair dealing.  Schweizer v. Sikorsky Aircraft Corp., No. 10 Civ. 6547, 2011

WL 542355, at *5 (W.D.N.Y. Feb. 8, 2011) (citations omitted); see also Ferguson v.

Lion Holding, Inc., 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) (the implied covenant

does not extend to undermine a party's general right to act in its own interests).

In this case, plaintiffs' claim that defendant breached the covenant of good

faith and fair dealing is separate from their breach of contract claim.  By creating

conditions to try and force Brittingham to breach his EA, defendants engaged in bad

faith conduct.  By suspending Brittingham and Thompson and presenting them

with "take it or leave it" amended EAs, they engaged in bad faith conduct.

Moreover, because a covenant of good faith and fair dealing claim is also rooted in

the APA and the Goodwill Agreement, by intentionally attempting to cause

Brittingham to engage in terminable conduct, they breached those covenants of fair

dealing.  In short, given Remington's conduct, Brittingham and Thompson were

unable to receive the benefits of their contractual bargains.

Good faith performance of a contract emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (2d) of Contracts, § 205, comment a.  Bad faith "may be overt or may consist of inaction."  Id. at comment d.  "[W]illful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance," are among the types of acts which can constitute bad faith.  Id.

Here, defendants breached the covenant of good faith and fair dealing.  While defendants argue that they gave Brittingham and Thompson numerous chances and did not terminate Brittingham just simply because they did not like his behavior, the evidence suggests otherwise.  Based on this Court's factual findings, defendants purposefully and intentionally created a situation in which Brittingham was destined to fail.  Following the acquisition, defendants knowingly and intentionally declined to:  hire the necessary compliance personnel; actively participate in the post-acquisition transition; conduct a far earlier audit of the bound books; purchase the firearms necessary for AAC to conduct its business without relying on those listed on the Old-AAC FFLs; ensure the proper legal and physical transfer of firearms post-acquisition; maintain appropriate firearm protocol; provide sufficient support to AAC as an entity; etc.

In particular, Remington failed to fulfill one of the basic understandings of the acquisition:  that it would handle compliance.  While it purported to have compliance handled by Roth and Mustian, neither individual was on site with

sufficient regularity to have insured compliance practices were implemented; Remington did not hire a real compliance person until the day Brittingham was terminated; and Stevens was never intended to be a compliance person – at best, he was unqualified to ensure appropriate compliance; at worst, he was sent to AAC to find a basis to terminate Brittingham.

The Court finds Remington's failure to lead – or even adequately support for that matter – AAC's compliance efforts to be intentional:  Nardelli had no interest in maintaining AAC as a separate P&L or the deal his predecessor had struck (he did not like Brittingham or the way he ran his business).  Schauble found Brittingham increasingly difficult to work with and many months before the Knox Williams List was ever created, had already initiated discussions with Remington leadership about how to effectuate Brittingham's termination.

There is no doubt that a decision had been made to fire Brittingham before Stevens had ever reported to Schauble and Jackson the alleged compliance violations in October of 2011.  According to Schauble and Stevens, they did not meet about the AAC compliance situation until November 29, 2011; yet, the record is clear that Schauble had already decided to fire Brittingham in late October or early November, and had come up with his "Plan B" to manage the business after that termination.  The asserted compliance violations were not only lacking in materiality and reasonableness, but they were asserted in bad faith.[86]

---

[86] This is particularly clear in light of Williams' testimony that when he created his List and spreadsheet, he knew that it was incorrect, that it was a complicated puzzle to figure out who owned what, that they had sent certain guns away with

"[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has himself frustrated or prevented the occurrence of the condition." <u>MHR Capital Partners LP</u>, 12 N.Y. 3d at 646 (quoting <u>ADC Orange, Inc. v. Coyote Acres, Inc.</u>, 7 N.Y. 3d 484, 490 (2006)).

For all of these reasons, the Court finds that defendants breached the covenant of good faith and fair dealing.

DAMAGES

In a breach of contract action, the non-breaching party may recover general damages and consequential damages.  General damages are damages "which are the natural and probable consequence of the breach." <u>Kenford Co. v. County of Erie</u>, 73 N.Y.2d 312, 319, 537 N.E.2d 176 (1989); <u>Lava Trading Inc. v. Hartford Fire Ins. Co.</u>, No. 03 Civ. 7037, 2004 WL 943565, at *1 (S.D.N.Y. May 3, 2004) (citing <u>Kenford</u> as the leading New York case on contract damages).  Consequential damages are "unusual or extraordinary" damages which must "have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." <u>Kenford Co.</u>, 73 N.Y.2d at 319.  "In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have

---

Brittingham on October 18 that they later realized were owned by AAC.  In fact, it defies credulity and is unreasonable to have used the 02617 and 40006 FFLs as a basis to create a list of Brittingham "personal firearms" on AAC's premises when the evidence leaves no doubt that AAC had itself been actively utilizing these FFLs in its business since the acquisition.

warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." <u>Id.</u> (citations omitted).

As a direct and proximate result of AAC's breach of the Brittingham and Thompson's EAs, plaintiffs suffered general damages including lost salary, bonus compensation, benefits, unpaid, unused, and accrued vacation, and other perquisites they would have received under their EAs through the end of the term on March 31, 2015.  (Tr. 203.)

In addition, AAC's breaches caused the loss of the EBITDA Contingent Payment under the APA and the Goodwill Payment under the Goodwill Agreement.

AAC also separately agreed to indemnify Old-AAC and Brittingham from and against any and all "Losses" (which are defined to include all losses, claims, damages, liabilities, expenses (including reasonable attorneys' and accountants' fees), assessments and taxes) incurred by Brittingham in connection with or arising from any breach by AAC of, or failure by AAC to perform, any of its covenants or obligations contained in the APA and the Goodwill Agreement.  (PX 1, § 9.2; PX 4, § 8.)

Accordingly, as a direct and proximate result of AAC's violation of the covenant of good faith and fair dealing with respect to the APA and the Goodwill Agreement, Brittingham has suffered damages, including the EBITDA Contingent Payment, the Goodwill Payment, and attorneys' fees, costs, and expenses.

Finally, Brittingham is entitled to the declaration he seeks as to the Guaranty.  Under New York law, to enforce a written guaranty the creditor must

prove:  (1) the existence of an unconditional guaranty; (2) an underlying debt; and (3) the guarantor's failure to perform under the guaranty.  City of New York v. Clarose Cinema Corp., 681 N.Y.S.2d 251, 253, 256 A.D.2d 69 (1st Dept. 1998) (citations omitted).  Pursuant to the APA, Remington unconditionally and irrevocably guaranteed, as primary obligor, all of AAC's duties, liabilities, and obligations arising under or pursuant to the APA and the Goodwill Agreement.  (PX 1, § 6.7.)

## THE RESTRICTIVE COVENANTS

Finally, the Court turns to plaintiffs' request for a declaration of invalidity as to the restrictive covenants.  The Court grants plaintiffs the relief they seek in this regard, as well.[87]  The silencer industry is the only industry in which Brittingham and Thompson have ever worked.  (Tr. 71-72, 661.)  Enforcement of the APA Restrictive Covenants, the Brittingham Restrictive Covenants, and the Thompson Restrictive Covenants has and will to continue to cause Brittingham and Thompson irreparable and immediate injury, loss, and damage in their inability to do that which they know how to do:  for Brittingham, design and manufacture firearms, including silencers; for Thompson, to run the operations of a silencer design and manufacturing company.

The APA contains the following non-compete provision:

---

[87] The Court grants plaintiffs relief insofar as they seek to obtain employment in the silencer/firearms industry.  The Court does not find the confidentiality portions of the various non-compete agreements unenforceable, nor has such determination been requested.

For a period of five (5) years commencing on the Closing Date, Shareholder [Brittingham] and Seller [Old-AAC] shall not, directly or indirectly:

(i)    except as an employee of, or otherwise acting on behalf of, Buyer [AAC] or any Affiliate thereof, engage in any commercial activity materially similar to that carried out by the Business;

(ii)   own any interest in, control, function in an executive or managerial capacity for or be employed by, act as a consultant to or advise in any capacity, any entity engaged in any commercial activity materially similar to that carried out by the Business, Buyer or any Affiliate thereof;

(iii)  solicit, hire or engage as an employee, independent contractor or agent any Person who is then or who was in the twelve (12) month period preceding such solicitation, hiring or engagement, employed by, providing services to or associated with the Business, Buyer or any Affiliates; or cause or attempt to cause any officer, employee or consultant of the Business or Buyer or any Affiliate thereof to resign, sever or materially reduce a relationship with the Business or Buyer or any Affiliate thereof;

(iv)   cause or attempt to cause any client, customer, or supplier of the Business or Buyer or any Affiliate thereof to terminate or materially reduce its business with the Business or Buyer or any Affiliate thereof;

(v)    make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest in any Person in any way that will or may injure an interest of the Business, Buyer or any of its Affiliates in its relationship and dealings with existing or potential customers;

(vi)   disclose (unless compelled by judicial or administrative process) or use any Confidential

> Information relating to the Business, Buyer or any
> Affiliate thereof, or any of their respective clients,
> customers or suppliers (except, prior to the Closing
> Date, in the operation of the Business in the
> ordinary course).

(PX 1, §6.4.)  Brittingham and Thompson's termination letters contain

identical language concerning their post-termination obligations,

stating:

> You have additional obligations to the Company.  You
> may not disclose AAC's proprietary information and trade
> secrets.  You are prohibited from competing against the
> Company for two years.  You may not solicit AAC's
> employees to leave the Company, nor may you interfere
> with or disrupt AAC's relationships with its clients,
> customers or suppliers for two years.  In addition, you
> may not disparage AAC, its subsidiaries, affiliates,
> employees or any product line of the Company or its
> affiliates.

(PX 274; PX 297.)  As for the EAs themselves, both Brittingham's and Thompson's

non-competition clauses state:

> [T]he Executive agrees that, for so long as this Agreement
> is in effect and for a period of two (2) years following the
> termination of the Executive's employment hereunder,
> the Executive will not own (by ownership of securities or
> otherwise), manage, operate, control, engage in as an
> equity participant or be employed by or act as a
> consultant to, or be connected in any manner with, the
> ownership, management, operation or control of any
> business a substantial portion of whose business directly
> or indirectly competes with that of the Company.  In
> recognition of the geographic extent of the Company's
> existing and anticipated operations and the nature of the
> Company and competitive circumstances, the restrictive
> covenant . . . shall apply throughout North America.

(PX 6, § 6.2; PX 7, § 6.2.)

These clauses are overbroad as to scope and duration, and defendants have already received the benefit of more than two years of compliance with these covenants.

The APA Covenant in particular is also unenforceable because it is overbroad.[88]  Although restrictive covenants are afforded broader latitude in the sale of business context, they are not without limit and must be tailored to protect a legitimate business interest and "reasonable as to time and geographical scope." Manhattan Real Estate Equities Grp. LLC v. Pine Equity NY, Inc., No. 603259/03, 2004 WL 3267264, at *3 (N.Y. Sup. Ct. Aug. 3, 2004) (citation omitted); Slomin's Inc. v. Gray, 575 N.Y.S.2d 545, 547, 176 A.D.2d 934 (2d Dep't 1991) (test of reasonableness applies to post-sale covenants; purchaser cannot prevent seller from servicing customers who voluntarily terminated relationship with purchaser).  The restraint should not be "'more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought.'"  Kraft Agency, Inc. v. Delmonico, 494 N.Y.S.2d 77, 81, 110 A.D.2d 177 (4th Dep't 1985) (quoting Purchasing Assocs., Inc. v. Weitz, 13 N.Y.2d 267, 271, 196 N.E.2d 245 (1963), rearg. denied, 14 N.Y.2d 584 (1964)).

Defendants acquired the assets of Old-AAC, which engaged in the design, manufacture, and sale of silencers.  (Tr. 661.)  Nevertheless, under the APA Restrictive Covenants, neither Brittingham nor Old-AAC can "own any interest in,

---

[88] The restrictive covenants contained in the EAs are more narrowed – they only pertain to the business of AAC and are limited to North America.  (PX 6, § 6.2; PX 7, § 6.2.)

control, function in an executive or managerial capacity for or be employed by . . . any entity engaged in any commercial activity materially similar to that carried out by the Business, Buyer, or any Affiliate thereof."  (PX 1, § 6.4(a)(ii).)

Based on the broad definition of "Firearms" and "Affiliate," the APA Restrictive Covenants preclude Brittingham and Old-AAC from not only engaging in the business of making and selling silencers, but also of engaging in any commercial activity engaged in by Remington, FGI, or Cerberus, which extends well beyond silencers.  (Id. § 12.1; Jackson 30(b)(6) Dep. at 70-73.)  For example, Brittingham could not sell eye protection, despite the fact that he never designed, manufactured, or sold such products.  (Jackson 30(b)(6) Dep. at 122.)  Nor is Brittingham permitted to compete with the wide range of businesses in which Cerberus-owned funds are engaged, which would include Maxim magazine.  (Tr. 75, 208-09.)  As a result, the APA Restrictive Covenants are not reasonably tailored to protect the purchased business, and are, therefore, unenforceable.

The APA Restrictive Covenants are similarly impaired by the lack of any geographic limitation.  (PX 1, § 6.4.)  The failure to geographically limit the covenants ignores that at all times relevant to this dispute, Old-AAC only sold its commercial and military products inside the United States.  (Id.; tr. 201, 662.)  Nevertheless, Brittingham and Old-AAC face a non-compete that purportedly prevents them from selling safety glasses as far away as Zimbabwe.  (Jackson 30(b)(6) Dep. at 122.)  As a result, the APA Covenants extend well beyond any reasonable geographic limit, and therefore, are unenforceable.

114

In addition, the APA Restrictive Covenants, which run for five years, are unreasonable in duration.  See Maxon v. Franklin Traffic Serv., Inc., 689 N.Y.S.2d 559, 561, 261 A.D.2d 830 (4th Dep't 1999) (five-year covenant not to compete in franchise agreement unreasonable and unduly burdensome as to time).

With respect to the APA Restrictive Covenants as well as the non-compete clauses contained in the EAs, New York courts will not enforce otherwise enforceable covenants where the employer terminates the employee without cause. In re UFG Int'l, Inc., 225 B.R. 51, 55 (Bankr. S.D.N.Y. 1998); SIFCO Indus., Inc. v. Advanced Plating Tech, Inc., 867 F. Supp. 155, 159 n.4 (S.D.N.Y. 1994).  By terminating the employee without cause, the employer "destroys the mutuality of obligation on which the covenant rests." Post v. Merrill Lynch, Pierce, Fenner & Smith, 48 N.Y.2d 84, 89, 297 N.E.2d 358 (1979).  Because defendants improperly terminated Brittingham and Thompson, they cannot benefit from enforcement of the non-compete clauses contained in their EAs.  See DeCapua v. Dine-A-Mate, Inc., 744 N.Y.S.2d 417, 420, 292 A.D.2d 489 (2d Dep't 2002) (citations omitted) (restrictive covenants in licensing agreement not enforceable by party that breached the agreement by failing to make royalty payments); see also Elite Promotional Mktg., Inc. v. Stumacher, 779 N.Y.S.2d 528, 530-31, 8 A.D.3d 525 (2d Dep't 2004) (party's breach of services contract by failure to pay invoice rendered restrictive covenants unenforceable); Cornell v. T.V. Dev. Corp., 268 N.Y.S.2d 29, 34, 17 N.Y.2d 69 (1966) (otherwise valid covenant against competition is unenforceable "when the

115

party benefited was responsible for the breach of the contract containing the covenant") (citations omitted).

Further, "[a] restrictive covenant may not be enforced if it is unreasonably burdensome to the employee." Heartland Sec. Corp. v. Gerstenblatt, No. 99 Civ. 3694, 2000 WL 303274, at *9 (S.D.N.Y. March 22, 2000) (citing BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854 (1999)).  Brittingham devoted the last 20 years of his professional life to the design, manufacture, and sale of silencers at AAC; Thompson dedicated her entire professional career to running the operations side of the business.  (Tr. 71-72.)  The non-compete clauses contained in the Brittingham and Thompson EAs leave plaintiffs completely barred from their professions; therefore, they should not be enforced.

<u>COUNTERCLAIM AGAINST BRITTINGHAM</u>

Georgia law applies to defendants' counterclaim for conversion.  See Grund v. Delaware Charter Guarantee & Trust Co., 788 F. Supp. 2d 226, 243-44 (S.D.N.Y. 2011); Keehfus Ltd. P'ship v. Fromkin Energy, LLC, No. 06 Civ. 987, 2007 WL 2454217, at *3 (N.D.N.Y. Aug. 23, 2007) (explaining that for actions that sound in tort, the interest analysis governs).

To establish conversion where initial possession of the property was lawful, "the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." Washington v. Harrison, 299

Ga. App. 335, 338, 682 S.E.2d 679 (2009) (internal quotation marks and citation omitted).

AAC admits it has no evidence demonstrating that Brittingham has actual possession of any of the items forming the basis of its conversion claim, even though AAC had the opportunity to inspect Brittingham's personal property, including all of his firearms. (Stafford 30(b)(6) Dep. at 33, 39, 45.) The only evidence AAC has to support its conversion claim is that AAC determined the items are not at AAC's facility, which is insufficient. (Id. at 37-39.)

## CONCLUSION

For the reasons set forth above, judgment is hereby entered in favor of plaintiffs. Plaintiffs shall confer with defendants and submit a proposed form of judgment within **14 days**.

The Clerk of the Court is directed to terminate this action.


SO ORDERED.

Dated: New York, New York
        January 13, 2014

_____
KATHERINE B. FORREST
United States District Judge

117